IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| MEDIA MATTERS FOR AMERICA,<br>PO Box 44811,<br>Washington, DC 20026;<br><br>*and*,<br><br>ERIC HANANOKI,<br>[ADDRESS REDACTED],<br>Montgomery County, MD;<br><br>          Plaintiffs,<br><br>   v.<br><br>WARREN KENNETH PAXTON JR., in his official capacity as Attorney General of the State of Texas,<br>PO Box 12548,<br>Austin, TX 78711,<br><br>          Defendant. | CIV. NO. __-____<br><br>[CIVIL RIGHTS ACTION]<br><br><br>**COMPLAINT**<br><br>**(Rule 57 Speedy Hearing Request)** |

## INTRODUCTION

1.     This case is a test of our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open," particularly where it concerns criticism of "government and public officials." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). At the heart of this commitment is the First Amendment's promise that the people and the press may discuss public matters—and criticize powerful people—"without . . . fear of subsequent punishment" from government officials. *Roth v. United States*, 354 U.S. 476, 488 (1957) (quoting *Thornhill v. State of Alabama*, 310 U.S. 88, 101–02 (1940)).

2.      Plaintiffs Media Matters for America ("Media Matters") and Eric Hananoki investigate, research, and report on political extremism in American media. In doing so, they often publish criticism of powerful figures and politicians who engage in racist, hateful, or violent rhetoric in American public life. Their work is extensively cited and discussed by other media outlets—and even government agencies—thus contributing to an ongoing and critical national discussion about extremism in our politics and media.

3.      Over the past year, as part of their long running work and mission, Plaintiffs have frequently reported on a major national news story—the disturbing rise of violent and extremist rhetoric on the popular social media platform X (formerly known as Twitter) since it was purchased by Elon Musk, the world's richest man, shortly over a year ago. This trend, widely reported on by the media for over a year, has—in addition Musk's own statements appearing to endorse extremist rhetoric—coincided with an exodus of advertisers from the X platform.

4.      Hananoki, Media Matters's Senior Investigative Reporter, has covered political extremism on social media platforms like X for over a decade, and has published a series of articles over the past eight months on X's inability to protect its advertisers from appearing alongside extremist content. On November 16, 2023, Hananoki published an article—"*As Musk endorses antisemitic conspiracy theory, X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content*"—reporting on Musk's apparent endorsement of a statement that Jewish people have a "hatred against whites" and support "flooding the[] country" with "hordes of minorities." In his article, Hananoki noted that at the same time Musk endorsed this antisemitic conspiracy theory, X was permitting the placement of advertisements next to pro-Nazi content.

His article published several examples, such as this image of an advertisement for Oracle appearing next to an image of Adolf Hitler:



5.      Musk took personal offense at Hananoki's November 16 article, even though the surge of hate speech on X—including alongside advertisements—has been the subject of near constant media coverage for over a year. Shortly after the article was published, Musk tweeted to his 165 million followers that X would be filing a "thermonuclear" lawsuit against Media Matters and those who participated in preparing the November 16 article. Musk later made good on his threat, filing suit against Media Matters and Hananoki on November 20, 2023. *See X Corp. v. Media Matters for America, et al.*, No. 4:23-cv-1175 2023, WL 8091661, (N.D. Tex.).

6.      Certain politicians and media figures—many of them prior subjects of Plaintiffs' reporting on extremism—swiftly jumped to Musk's cause, including Texas Attorney General Kenneth Paxton. On November 20—the same day Musk sued Plaintiffs—Paxton announced he

was launching an investigation into Media Matters under Texas's deceptive trade practices act. *See* Ex. A, Attorney General Ken Paxton Opens Investigation into Media Matters for Potential Fraudulent Activity, Texas Attorney General's Office (Nov. 20, 2023). Paxton, whose office has been the subject of previous Media Matters articles and reports, offered no explanation as to how Media Matters—a Washington, D.C.-based non-profit—or Hananoki—a Maryland-based reporter—violated Texas's trade practices law, or even what possible jurisdiction he had over them. Indeed, his press release indicated his office had performed no meaningful analysis of these issues at all, simply stating that Paxton personally was "troubled" by the "allegations" made by Musk. *Id.* The release further disparaged Media Matters as "a radical anti-free speech organization" that "would like nothing more than to limit freedom by reducing participation in the public square." *Id.*

7.     Two days later, Paxton issued a civil investigative demand ("Demand") to Media Matters, commanding it to "produce [] documentary material[s] and permit inspection and copying." Tex. Bus. & Com. Code Ann. § 17.61(a); *see also* Ex. B, Civil Investigation Demand, Office of the Atty. General (Nov. 21, 2023) at 7. The Demand seeks a sweeping array of materials from Media Matters and Hananoki, including documents and communications about their research and reporting, their communications with possible sources at X and its advertisers, as well as sensitive materials related to Media Matters's operations. *See* Ex. B at 7. The Demand was formally served on counsel for Media Matters on December 1 and has a return date of December 12, 2023—tomorrow—at which point Attorney General Paxton is entitled to enforce the Demand in Texas state court, even though Plaintiffs have no relevant connection to Texas and have been afforded *zero* explanation as to how they may have violated Texas law. The Demand is an extraordinarily invasive intrusion into Plaintiffs' news gathering and reporting activities, and is

plainly intended to chill those activities, acting in effect as an ongoing demand for virtually any materials Plaintiffs have—or may prepare—related to their research and reporting on X or Musk.

8.      Paxton's retaliatory investigation and Demand are transparent attempts to punish Plaintiffs for their constitutionally protected speech and press activities, subjecting them to a baseless and arbitrary government investigation in a state to which they have no relevant connection, and demanding the right to rifle through their most sensitive journalistic and organizational documents and communication. And his retaliatory campaign has, for now, had its intended effect: Plaintiffs have not published any articles about how Musk's ownership has triggered a rise in political extremism on X since Paxton announced his investigation—despite a flood of tips identifying extremist content on the platform—for fear of further retaliation and harassment.

9.      "[T]he First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006). Likewise, under the Fourth Amendment, it is "contrary to the first principles of justice to allow a search through [Plaintiffs'] records, relevant or irrelevant, in the hope that something will turn up." *Fed. Trade Comm'n v. Am. Tobacco Co.*, 264 U.S. 298, 306 (1924) (Holmes, J.). Paxton's retaliatory investigation and Demand are "premised solely upon *legal* activity" and thus "the very type of 'fishing expeditions' that were the target of Justice Holmes's assault in *American Tobacco*." *Major League Baseball v. Crist*, 331 F.3d 1177, 1187 (11th Cir. 2003) (suppressing civil investigative demand violating Fourth Amendment).

10.     In view of Paxton's unlawful harassment and retaliation, Plaintiffs seek immediate declaratory and injunctive relief from this Court—in a jurisdiction where their constitutionally protected activities actually occur and where they will be uniquely injured by being compelled to

disclose information—to vindicate their fundamental right to gather the news and hold the powerful to account. To the same end, Plaintiffs also respectfully request that the Court order a "speedy hearing" of this "declaratory-judgment" action. *See* Fed. R. Civ. P. 57.

## JURISDICTION & VENUE

11.     This Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1331 because Plaintiffs' federal constitutional claims arise under the First, Fourth, and Fourteenth Amendments to the United States Constitution and 42 U.S.C. §§ 1983, 1988. It has authority to grant Plaintiffs declaratory, injunctive, and other relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and the Court's own legal and equitable powers. It also has supplemental jurisdiction over any state law claims derived from a common nuclear of operative fact. *See Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 349 (1988).

12.     This Court has personal jurisdiction over Defendant Paxton in his official capacity as Attorney General of Texas because this lawsuit arises from unlawful retaliatory action that he intentionally directed towards the District of Maryland for the purpose, and effect, of violating the constitutional rights of Plaintiffs, including Hananoki. The Demand issued by Attorney General Paxton focuses on an article written by Hananoki and published by Media Matters on November 16, 2023. All preparations, research, writing, and communications with editors related to the November 16 article were conducted by Hananoki in the District of Maryland, where he also resides. Thus, the information he is being compelled unlawfully to disclose is located in this District. Hananoki wishes to continue writing and publishing articles about how Musk's ownership of X has enabled political extremism on the platform but Defendant Paxton's actions demanding unbounded disclosure of Hananoki's newsgathering sources and means have chilled his speech. That constitutionally protected conduct, too, would be performed within this District. *See Calder v. Jones*, 465 U.S. 783, 788–90 (1984); *Bradley v. DentalPlans.com*, 617 F. Supp. 3d 326, 345 (D.

Md. 2022) (observing that "Maryland has a significant interest in providing a forum for its citizens to seek relief for in-state injuries").

13.    Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiffs' claims occurred in the District of Maryland, where nearly all of Hananoki's work occurred. This includes all preparation, research, writing, and communications with editors related to the November 16 article. These constitutionally protected acts are the target of Defendant Paxton's Demand and broader investigation, and the information sought by the Demand is in large part located in this district.

14.    Subject matter jurisdiction exists because Plaintiffs have demonstrated that they have suffered and will suffer injuries-in-fact; there is a sufficient causal connection between Plaintiffs' injuries and Attorney General Paxton's actions in pursuing his investigation and Demand, and a favorable decision from this Court granting Plaintiffs relief will redress those injuries. This dispute is ripe because Plaintiffs' legally protected First and Fourteenth Amendment rights are being violated already, and Plaintiffs will suffer further imminent invasions of those rights in the absence of relief from this Court. Plaintiffs have actual fear that the Demand will be enforced against them, which has already chilled their speech, and Texas law confirms there is a ripe dispute. Under Texas law, the target of such a demand has a right to file a "petition to extend the return date for, *or to modify or set aside the demand*, stating good cause," by filing an action before the date a response is due "in the district court in the county where the parties reside, or a district court of Travis County," Texas. Tex. Bus. & Com. Code § 17.61(g) (emphasis added). Because, as set forth in Count III below, it would violate Plaintiffs' constitutional rights to be subjected to the jurisdiction of any court in Texas, Plaintiffs cannot meaningfully obtain relief before Texas courts and accordingly seek relief before this Court.

**PARTIES**

15.     Plaintiff Media Matters for America ("Media Matters") is a not-for-profit research center and media watchdog dedicated to comprehensively monitoring, analyzing, and correcting conservative misinformation in the media. Media Matters routinely investigates political extremism on media platforms in the United States and publishes articles and commentary on public figures who endorse or espouse such rhetoric. It is incorporated under the laws of, and has its principal place of business in, the District of Columbia, but many of its reporters and employees live in and work from the surrounding Washington, D.C. metropolitan area, including Maryland.

16.     Plaintiff Eric Hananoki is a Senior Investigative Reporter at Media Matters. Hananoki resides in Montgomery County, Maryland. For over a decade, Hananoki's beat for Media Matters has included investigating, researching, and reporting on political extremism in U.S. media, including on social media platforms like X. In his role as Senior Investigative Reporter, Hananoki has written numerous articles about extremism, white nationalism, and anti-Semitic rhetoric espoused by politicians and public figures. Hananoki's reporting has included numerous articles about social media platform X and its owner, Elon Musk. Hananoki researched and wrote the November 16 article primarily from his residence in Maryland.

17.     Defendant Warren Kenneth Paxton, Jr. is the Attorney General of the State of Texas and is sued in his official capacity. The Texas Deceptive Trade Practices Act ("DPTA"), Tex. Bus. & Com. Code Ann. § 17.41, *et seq.*, grants Paxton various powers in his capacity as Attorney General through the consumer protection division of his office. This includes the power to issue a "civil investigative demand requiring" the recipient "to produce [] documentary material[s] and permit inspection and copying." Tex. Bus. & Com. Code Ann. § 17.61(a). Issuing such a demand does not require the Attorney General to show any cause or likelihood of having jurisdiction—he may do so if he "believes" the recipient to be in possession of relevant material concerning a

possible violation of the DPTA. Tex. Bus. & Com. Code Ann. § 17.61(a). Paxton "may use the documentary material or copies of it as [he] determines necessary" to enforce the DPTA, including before a court. Tex. Bus. & Com. Code Ann. § 17.61(f).

## FACTS

**A.    Media Matters and Hananoki have a long track record of reporting on political extremism, including on social media platforms like X.**

18.    Since its founding in 2004, Media Matters has been dedicated to monitoring and correcting misinformation from right-wing media, including by publishing its own investigatory research and reporting on its website. Media Matters provides its reporters and researchers, including Hananoki, a powerful platform from which to reach the public, often in the form of research and reporting on current events and criticism of powerful public figures and politicians.

19.    Media Matters has over 100 employees—including 64 reporters, writers, and researchers—most of whom work and reside within the Washington, D.C. metropolitan area where Media Matters's sole office is located.[1] Media Matters does not have an office, or any other physical presence, in Texas. Media Matters does not transact any business in Texas and thus has never registered in the state. *See* Tex. Bus. Org. Code § 9.0002(a). Media Matters is also not registered as a charity organization in Texas and does not have a registered agent in the state.

20.    Hananoki has worked at Media Matters since 2007 and is currently a Senior Investigative Reporter. Previously, Hananoki worked as a Researcher, Senior Researcher,

---

[1] Media Matters employees may request authorization to work remotely and, upon approval, may choose to do so from any location in the U.S. Hananoki is considered an employee with remote work authorization who may sometimes commute into the District of Columbia when he chooses to do so, but he performs most of his work at home in Montgomery County, Maryland. Of Media Matters employees authorized to work remotely, only one employee has provided a residential address in Texas. That employee has not been in Texas since the start of October 2023, did not work with Hananoki on the November 16 article nor any other of his articles related to X or otherwise, and works in an entirely different department.

Research Fellow, and Investigative Reporter at Media Matters. In his more than 16 years at the organization, Hananoki has researched and written countless reports and articles, often shedding light on public figures who espouse violent, extreme, or racist views. His articles and reports have been widely cited by a broad array of media outlets, including the Associated Press, CNN, Fox News, Los Angeles Times, MSNBC, New York Post, New York Times, Politico, USA Today, Wall Street Journal, and Washington Post.

21.     His long history of research and reporting has been relied upon by government officials, including under both Democratic and Republican leadership. Under President Trump, the Department of Justice cited Hananoki's research regarding a far-right commentator who promoted and sold a bogus COVID-19 cure.[2] Special Counsel Robert Mueller cited Hananoki's reporting on Roger Stone in his report on Russian interference in the 2016 presidential election,[3] as did a bipartisan U.S. Senate Select Committee on Intelligence report regarding the same.[4] Numerous political organizations, including the National Republican Congressional Committee,

---

[2] *United States v. My Dr. Suggests LLC*, No. 2:20-CV-00279-DBB (D. Utah Apr. 27, 2020), Plaintiffs' Ex Parte Mot. and Mem. of Law for a Temporary Restraining Order and Order to Show Cause Why a Preliminary Injunction Should Not Issue, Dkt. 2, at 13; *id.*, Decl. of Virginia Keys, Dkt. 2-1, ¶¶ 7, 28–29.

[3] Both reports cited a Media Matters article that included a video that Hananoki found and produced. *See* Report on the Investigation into Russian Interference in the 2016 Presidential Election, Volume I of II, Special Counsel Robert S. Mueller, III, March 2019, at 57 n.233, available at https://www.justice.gov/storage/report_volume1.pdf.

[4] Select Committee on Intelligence, Russian Active Measures Campaigns and Interference in the 2016 U.S. Election, Volume 5: Counterintelligence Threats and Vulnerabilities, at 246 n.1638, https://www.intelligence.senate.gov/sites/default/files/documents/report_volume5.pdf.

have at various times withdrawn support for political candidates after Hananoki reported on racist or extremist rhetoric from those candidates.[5]

22.     Attorney General Paxton himself has previously relied on Hananoki's work. In 2020, Hananoki uncovered "tweets filled with racist rhetoric, violent threats and coronavirus conspiracy theories" from an Assistant Attorney General in Paxton's office.[6] Paxton's office fired the employee in the wake of Hananoki's reporting.[7]

23.     As part of his work at Media Matters, Hananoki has been reporting on X—and before that, Twitter—for years. His coverage of X has increased over the past year due to a marked increase in extremist rhetoric on the platform since Musk took ownership, a disturbing trend widely reported on in the media, including by outlets other than Media Matters.

**B.      Elon Musk purchases X and cuts back its content-moderation infrastructure.**

24.     On October 27, 2022, Elon Musk completed his purchase of the social media platform then known as Twitter. Musk subsequently renamed the social media platform "X," though it continues to operate at its traditional twitter.com web address. Both before and after

---

[5] *See, e.g.,* "*House Republicans withdraw support of N.J. candidate after report says he shared racist screed,*" NJ.com (July 10, 2018), https://www.nj.com/politics/2018/07/house_republicans_withdraw_support_of_nj_candidate.html (noting that NRCC chair "Stivers reacted to a report by the liberal watchdog group Media Matters about [the candidate] linking to the article that ran on a white supremacist website.").

[6] "*A Texas assistant attorney general is a QAnon conspiracy theorist who tweets out violent threats and bigoted remarks,*" Media Matters for America (Sept. 3, 2020), https://www.mediamatters.org/twitter/texas-assistant-attorney-general-nick-moutos-qanon-conspiracy-theorist-who-tweets-out.

[7] Trinady Joslin, "*Assistant Texas attorney general loses job after report surfaces racist tweets,*" The Texas Tribune (Sept. 3, 2020), https://www.texastribune.org/2020/09/03/nick-moutos-texas-attorney-general; *see also* Taylor Goldenstein, "*Records: Texas assistant AG who lost job over tweets was fired, had been warned about social media,*" Houston Chronicle (Sept. 11, 2020), https://www.houstonchronicle.com/politics/texas/article/texas-assistant-ag-social-media-posts-fired-warned-15558487.php.

acquiring ownership of X, Musk frequently referred to the platform as a "digital town square" or "de facto town square" for public discussion.[8]

25.     Almost immediately after his takeover, Musk began laying off key executives and content moderators at X responsible for removing hate speech and other violent rhetoric.[9] Indeed, within his first few months of ownership, Musk laid off approximately 80 percent of the company's staff, including its former CEO, general counsel, policy chief, and head of trust and safety.[10] He downsized or eliminated critical areas of the company responsible for overseeing policy, trust and safety, communications, and ethical AI, among others.[11] These deep workforce cuts raised questions among U.S. lawmakers and regulators about the social media platform's ability to safely respond to security and privacy threats, misinformation, and hate speech—matters of significant public concern in view of Musk's claim that the platform should serve as a digital town square.[12] Lawmakers similarly expressed concern that, in the wake of Musk's ownership, the platform had

---

[8] Douglas Yeung, "*The 'Digital Town Square' Problem*," TheRANDBlog (Jan. 13, 2023), https://www.rand.org/pubs/commentary/2023/01/the-digital-town-square-problem.html.

[9] *See* Brian Fung & Clare Duffy, "*How a single year of Elon Musk turned Twitter into a husk of its former self*," CNN (Oct. 27, 2023), https://www.cnn.com/2023/10/27/tech/elon-musk-twitter-x-one-year-changes/index.html [hereinafter *A single year of Elon Musk turned Twitter into a husk*]; *see also* "*Musk fires outsourced content moderators who track abuse on Twitter*," MoneyWatch, CBS News (Nov. 14, 2022), https://www.cbsnews.com/news/elon-musk-twitter-layoffs-outsourced-content-moderators/.

[10] *A single year of Elon Musk turned Twitter into a husk*, *supra* note 9.

[11] *A single year of Elon Musk turned Twitter into a husk*, *supra* note 9; *see also* Rohan Goswami, "*X CEO Linda Yaccarino explains reason for getting rid of Twitter name*," CNBC (Aug. 10, 2023), https://www.cnbc.com/2023/08/10/x-corp-ceo-linda-yaccarino-says-she-has-autonomy-under-elon-musk.html.

[12] Brian Fung, "*First on CNN: US senators question Twitter's privacy compliance under Elon Musk*," CNN (June 5, 2023), https://www.cnn.com/2023/06/05/tech/twitter-compliance-musk-senators/index.html; *see also* Brian Fung, "*Elon Musk should be forced to testify on X's 'chaotic environment,' US regulator tells court*," CNN, https://www.cnn.com/2023/09/12/tech/elon-musk-testify-privacy-probe/index.html.

ceased to comply with two consent decrees it had entered into with the Federal Trade Commission concerning safeguards for personal data and privacy.[13]

26.     Musk also eliminated existing products and policies—many of which served to protect users from misinformation and violent content—under the auspices of promoting "free speech."[14] He reinstated suspended accounts of known white supremacists and conspiracy theorists while suspending the accounts of journalists who tracked his private air travel.[15]

27.     Unsurprisingly, after the elimination of 80 percent of X's staff and the dismantling of much of X's content moderation infrastructure, extremist and racist rhetoric surged on X in the wake of Musk's takeover. Less than a month into Musk's ownership, the Brookings Institute reported that the platform had seen a "surge in hateful language" in the wake of Musk's purchase, including "a nearly 500% increase in use of the N-word in the 12-hour window immediately following the shift of ownership to Musk."[16] Similarly, within the first week of his ownership, use of the word "Jew" increased fivefold, with tweets that were antisemitic receiving the most engagement.[17] Academic researchers in the School of Communication and Media at Montclair

---

[13] *See* "*Republicans defend Elon Musk in FTC's Twitter probe*," The Verge (July 14, 2023), https://www.theverge.com/2023/7/14/23794363/elon-musk-twitter-ftc-lina-khan-republicans; *see also* "*Musk may have violated FTC privacy order, new court filing shows*," The Washington Post (Sept. 12, 2023), https://www.washingtonpost.com/technology/2023/09/12/elon-musk-consent-order-ftc/.

[14] *A single year of Elon Musk turned Twitter into a husk*, *supra* note 9.

[15] *A single year of Elon Musk turned Twitter into a husk*, *supra* note 9.

[16] Rashawn Ray and Joy Anyanwu, "*Why is Elon Musk's Twitter takeover increasing hate speech?*," Brookings (Nov. 23, 2022), https://www.brookings.edu/articles/why-is-elon-musks-twitter-takeover-increasing-hate-speech/.

[17] *Id.*

State University published a report describing how "Hate Speech Spike[d] on Twitter After Elon Musk Acquire[d] the Platform."[18]

28.    Less than two months after Musk's takeover, the New York Times reported the following about the rising hate speech on the platform:

- "Before Elon Musk bought Twitter, slurs against Black Americans showed up on the social media service an average of 1,282 times a day. After the billionaire became Twitter's owner, they jumped to 3,876 times a day."

- "Slurs against gay men appeared on Twitter 2,506 times a day on average before Mr. Musk took over. Afterward, their use rose to 3,964 times a day."

- "[A]ntisemitic posts referring to Jews or Judaism soared more than 61 percent in the two weeks after Mr. Musk acquired the site."[19]

29.    A broad array of media outlets extensively reported on this disturbing trend in Musk's self-described "digital town square."

30.    On November 15, Musk appeared to publicly endorse the white supremacist theory that Jewish communities hate White people.[20] Musk's post "was the multibillionaire's most explicit public statement yet endorsing anti-Jewish views," and was extensively covered in the

---

[18] "*Hate Speech Spikes on Twitter After Elon Musk Acquires the Platform*," Montclair State University, (Nov. 1, 2022) https://www.montclair.edu/school-of-communication-and-media/wp-content/uploads/sites/20/2022/11/Montclair-State-SCM-Study-Increases-in-Twitter-Hate-Speech-After-Elon-Musks-Acquisition.pdf.

[19] Sheera Frenkel and Kate Conger, "*Hate Speech's Rise on Twitter Is Unprecedented, Researchers Find*," the New York Times (Dec. 2, 2022), https://www.nytimes.com/2022/12/02/technology/twitter-hate-speech.html.

[20] @elonmusk, X.com (Nov. 15, 2023, 4:52 PM ET), https://twitter.com/breakingbaht/status/1724892505647296620.

media.[21] Musk later claimed he was "sorry for that post," acknowledging that "[o]f the 30,000 it might be literally the worst and dumbest post I've ever done."[22]

31.     This spike in hateful rhetoric on X caught the attention of the platform's advertisers, many of whom promptly ceased advertising on the platform in the months after Musk took over. Since "the early days of Musk's takeover, many of Twitter's largest advertisers — including the likes of General Mills and the Volkswagen Group — paused their spending over concerns about X's layoffs, content moderation capabilities and general uncertainty about the platform's future."[23]

32.     The pullback of the company's largest advertisers led to precipitous drops in its revenue. In July 2023, Musk reported "a 50% decline in ad revenue and heavy debt load" while in September he reported that advertising revenue in the U.S. was "still down 60%."[24]

33.     More alarming still to X's advertisers was the fact that, after Musk's steep downsizing of company staff, the flood of hateful and violent rhetoric on the platform often began appearing alongside their advertising, creating a false association between their brands and vile

---

[21] Allison Morrow, "*With antisemitic tweet, Elon Musk reveals his 'actual truth,'*" CNN (Nov. 17, 2023), https://www.cnn.com/2023/11/17/business/elon-musk-reveals-his-actual-truth/index.html; *see also* Dana Hull, "*Elon Musk Replies to Antisemitic Post on X, Labeling It 'The Actual Truth,'*" Time (Nov. 16, 2023), https://time.com/6336123/elon-musk-antisemitic-post-x/.

[22] Max Zahn, "*Elon Musk apologizes for antisemitic tweet but crudely attacks advertisers*," ABC News (Nov. 30, 2023), https://abcnews.go.com/Business/elon-musk-apologizes-antisemitic-tweet-crudely-attacks-advertisers/story?id=105270907

[23] *A single year of Elon Musk turned Twitter into a husk*, *supra* note 9; *see also* Alberto Chiumento, et al., *Advertisers react to Twitter's new ownership*, Reuters (Nov. 18, 2022), https://www.reuters.com/technology/advertisers-react-twitters-new-ownership-2022-11-03/; Alan Ohnsman, *GM, Ford Say They Aren't Running Twitter Ads As They Assess Changes Under Elon Musk*, Forbes (Oct. 28, 2022), https://www.forbes.com/sites/alanohnsman/2022/10/28/gm-ford-say-they-arent-running-twitter-ads-as-they-assess-changes-under-elon-musk/?sh=1ade964b2a19.

[24] *A single year of Elon Musk turned Twitter into a husk*, *supra* note 9.

hate speech. X's inability to control the appearance of extremist and violent rhetoric alongside its

advertisers precipitated a broader exodus of advertisers from the platform.

34.     Indeed, the media writ large has, for over a year, consistently reported on X and

Musk's failure to protect advertisers from having their brands appear next to extremist, hateful,

and violent rhetoric. Some examples include:

1.   **Reuters**, "*Advertisers react to Twitter's new ownership*" (Nov. 18, 2022), https://www.reuters.com/technology/advertisers-react-twitters-new-ownership-2022-11-03/.

2.   **The Washington Post**, "*Amazon, Uber, Snap ads appear on Twitter pages of white nationalists restored by Musk*," Faiz Siddiqui (Dec. 6, 2022), https://www.washingtonpost.com/technology/2022/12/06/twitter-ads-elon-musk/.

3.   **ARS Technica**, "*Twitter running major brands' ads with extremist tweets— until they get flagged*," Ashley Belanger (Dec. 7, 2022), https://arstechnica.com/tech-policy/2022/12/amazon-among-brands-whose-ads-appeared-in-white-nationalist-twitter-feeds/.

4.   **The Verge**, "*Twitter advertisers aren't happy with ads appearing on pages of white nationalists*," Jon Porter (Dec. 7, 2022), https://www.theverge.com/2022/12/7/23497928/twitter-advertisers-brand-safety-unbanned-accounts-white-nationalists.

5.   **Center for Countering Digital Hate**, "*Toxic Twitter: How Twitter Generates Millions in Ad Revenue by Bringing Back Banned Accounts*," (Feb. 9, 2023), https://counterhate.com/wp-content/uploads/2023/02/Toxic-Twitter_FINAL.pdf.

6.   **The Washington Post**, "*Twitter stands to gain from restoring formerly banned accounts*," Taylor Lorenz (Feb. 9, 2023), https://www.washingtonpost.com/technology/2023/02/09/twitter-ads-revenue-suspended-account/.

7.   **The Kansas City Star**, "*Mizzou ad appears on racist X page as social media site faces concerned advertisers*," Jonathan Shorman (Mar. 15, 2023), https://www.kansascity.com/news/politics-government/article280309284.html.

8.   **Business Insider**, "*Disney, Microsoft, the NBA Had Twitter Ads Next to Neo-Nazi Propaganda*," Katherine Tangalakis-Lippert (June 18, 2023),

https://www.businessinsider.com/disney-microsoft-nba-twitter-ads-next-to-neo-nazi-propaganda-2023-6.

9. **The N.Y. Post**, "*Disney, Microsoft ads on Twitter show up next to neo-Nazi propaganda as advertisers return: report*," Shannon Thaler (June 19, 2023), https://nypost.com/2023/06/19/disney-microsoft-ads-on-twitter-show-up-next-to-neo-nazi-propaganda-report/.

35.    None of these articles cited or otherwise indicated that they relied on research or reporting performed by Media Matters or Hananoki.

C.    **Hananoki and Media Matters investigate and report on the surge of extremist rhetoric on X, including alongside advertisements.**

36.    As part of its long-running mission to document and report extremist political rhetoric in media, Media Matters began investigating, researching, and reporting on the rise in political extremism and bigotry on X after Musk's changes to the platform. Hananoki, as a Senior Investigative Reporter whose beat included political extremism, was often assigned this work.

37.    From February 10, 2023 to November 17, 2023, Media Matters published at least fourteen articles about the juxtaposition of advertisements alongside hateful content on the X platform. Most of these articles were researched and written by Hananoki.  They include:

1.    "**Under Elon Musk, Twitter is running corporate ads alongside tweets from Holocaust deniers**," Media Matters for America (Feb. 10, 2023), https://www.mediamatters.org/twitter/under-elon-musk-twitter-running-corporate-ads-alongside-tweets-holocaust-deniers.

2.    "**Linda Yaccarino just started as Twitter's new CEO, but Elon Musk already destroyed the platform for advertisers**," Media Matters for America (June 8, 2023),  https://www.mediamatters.org/twitter/linda-yaccarino-just-started-twitters-new-ceo-elon-musk-already-destroyed-platform.

3.    "**Dish, Samsung, Wall Street Journal, and others are advertising on the Twitter account of a leading white nationalist group**," Media Matters for America (June 22, 2023), https://www.mediamatters.org/twitter/dish-samsung-wall-street-journal-and-others-are-advertising-twitter-account-leading-white.

4.    "**Update: Twitter placed ads for USA Today, National Women's Soccer League, and other major brands on a terrorism-linked neo-Nazi account**," Media      Matters      for      America      (July      27,      2023),

17

https://www.mediamatters.org/twitter/twitter-placed-ads-usa-today-national-womens-soccer-league-and-other-major-brands-terrorism.

5. "**Advertisers beware: Elon Musk and Linda Yaccarino are trying to lure you back by rebranding Twitter, but it's still a toxic cesspool**," Media Matters for America (Aug. 8, 2023), https://www.mediamatters.org/twitter/advertisers-beware-elon-musk-and-linda-yaccarino-are-trying-lure-you-back-rebranding.

6. "**X Corp. CEO Yaccarino's interview on CNBC should alarm major advertising brands**," Media Matters for America (Aug. 11, 2023), https://www.mediamatters.org/twitter/x-corp-ceo-yaccarinos-interview-cnbc-should-alarm-major-advertising-brands.

7. "**Update: Under Linda Yaccarino, X is placing ads for major brands on a verified pro-Hitler account**," Media Matters for America (Aug. 16, 2023), https://www.mediamatters.org/twitter/update-under-linda-yaccarino-x-placing-ads-major-brands-verified-pro-hitler-account.

8. "**X is placing ads for brands like the NFL and MLB next to unhinged conspiracy theories about Jewish people and 9/11**," Media Matters for America (Sept. 11, 2023), https://www.mediamatters.org/twitter/x-placing-ads-brands-nfl-and-mlb-next-unhinged-conspiracy-theories-about-jewish-people-and.

9. "**X is placing major ads on a heavily followed antisemitic account that endorses killing politicians and LGBTQ advocates**," Media Matters for America (Sept. 12, 2023), https://www.mediamatters.org/twitter/x-placing-major-ads-heavily-followed-antisemitic-account-endorses-killing-politicians-and.

10. "**X is placing ads for the NFL on prominent white nationalist accounts**," Media Matters for America (Sept. 27, 2023), https://www.mediamatters.org/white-nationalism/x-placing-ads-nfl-prominent-white-nationalist-accounts.

11. "**X is placing ads for MLB, the NFL, and the Pittsburgh Steelers on antisemitic and Holocaust denial accounts**," Media Matters for America (Oct. 12, 2023), https://www.mediamatters.org/twitter/x-placing-ads-mlb-nfl-and-pittsburgh-steelers-antisemitic-and-holocaust-denial-accounts.

12. "**Pro-Hitler and Holocaust denier account: X has paid me $3,000 in ad revenue sharing**," Eric Hananoki, Media Matters for America (Nov. 13, 2023), https://www.mediamatters.org/twitter/pro-hitler-and-holocaust-denier-account-x-has-paid-me-3000-ad-revenue-sharing.

13. "**As Musk endorses antisemitic conspiracy theory, X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content**,"

Media Matters for America (Nov. 16, 2023), https://www.mediamatters.org/twitter/musk-endorses-antisemitic-conspiracy-theory-x-has-been-placing-ads-apple-bravo-ibm-oracle.

14. "**X is placing ads for Amazon, NBA Mexico, NBCUniversal, and others next to content with white nationalist hashtags**," Media Matters for America (Nov. 17, 2023), https://www.mediamatters.org/twitter/x-placing-ads-amazon-nba-mexico-nbcuniversal-and-others-next-content-white-nationalist.

38. Media Matters's research and reporting echoed what was being reported widely elsewhere—that the platform was continuing to permit the placement of advertisements alongside extremist content. Hananoki and Media Matters thus joined in ongoing national conversations about an important news story—the surge of hateful and violent rhetoric in America's supposed "digital town square."

39. Hananoki's research and reporting sometimes looked specifically at what advertisements X's increasingly right-wing user base might see on the platform. Following ordinary journalistic investigative practices, Hananoki used an existing X research account controlled by Media Matters to follow white supremacist content and gauge the advertising that X's computer algorithm would automatically generate in response. His research confirmed that the platform's system was continuing to permit advertisements next to violent and fringe content.

40. Hananoki published some of his findings, along with a handful of examples, in his November 16 article. That article also reported on Musk's endorsement of a widespread antisemitic conspiracy theory—that Jewish people are seeking to promote "hatred against whites" and are seeking to "flood[] the[] country" with "hordes of minorities"—which drew widespread condemnation and was extensively covered in the media.[25] Hananoki's article included screenshots

---

[25] *See, e.g.*, David Goldman, "*Elon Musk agrees with antisemitic X post that claims Jews 'push hatred' against White people*," CNN (Nov. 17, 2023), https://www.cnn.com/2023/11/15/media/elon-musk-antisemitism-white-people/index.html.

of six advertisements from major corporate entities appearing with at least nine posts from X users. For example, below are images of an advertisement for Oracle appearing with a quote from Adolf Hitler, as well as an advertisement for the Bravo television network next to a post praising Hitler's Nazi Party, which were included in his article:



41.     Hananoki did not say in his article that X, or anyone associated with X, was intentionally placing advertisements next to such violent or fringe content. He simply reported truthfully that the platform was permitting the placements of advertisements from some of the nation's biggest advertisers next to posts that touted Hitler or the Nazi party—which the platform's algorithm obviously did, as the examples he cited showed.

42.     Like many Media Matters employees, Hananoki typically works from home, and from Maryland conducted all work related to preparing, researching, drafting, communicating

about, editing, and publishing the November 16 article. Hananoki has never travelled outside of the Washington metropolitan area as part of his work for Media Matters.

43.     Hananoki researched, factchecked, and drafted the November 16 article in accordance with Media Matters's policies and standards, using similar methods to those he has used throughout his long career in journalism, and mirroring common journalistic practices.

**D.      Attorney General Paxton retaliates against Media Matters and Hananoki for their coverage of extremist rhetoric on X.**

44.     Despite the robust and ongoing reporting by Media Matters and other news outlets about X's extremist content, Musk apparently took personal offense only at Hananoki's November 16 article discussing Musk's endorsement of an antisemitic conspiracy theory.

45.     Just two days after the article was published, Musk promised to file "a thermonuclear lawsuit against Media Matters." *See* @elonmusk, X.com (Nov. 18, 2023, 2:01 AM ET), https://perma.cc/X4HN-PLJ4. The post received hundreds of thousands of likes and comments, and tens of thousands of reposts. *Id*.



46.     Musk attached a message to the post referencing Hananoki's November 16 article and accusing Media Matters of manipulating X's algorithm to artificially force the placement of ads next to extremist content. *See* @elonmusk, X.com (Nov. 18, 2023, 2:01 AM ET), https://perma.cc/X4HN-PLJ4. Musk made no mention of the year-long parade of reports and documentation illustrating this endemic problem with the architecture of the X platform.

47.     Various media and political figures—many of whom have been the subjects of Media Matters reporting over the years—leapt to Musk's defense and urged retaliation against Media Matters. For example, on November 19, former adviser to President Donald Trump Stephen Miller, discussing Media Matters's article, declared, "There are 2 dozen+ conservative state Attorneys General," seemingly urging states to investigate Plaintiffs for their article. *See* @StephenM, X.com (Nov. 19, 2023, 11:48 AM), https://perma.cc/9E6L-FJGY.

48.     Responding directly to Miller's call for retaliation, Missouri Attorney General Andrew Bailey announced that his "team [was] looking into" Plaintiffs' article. @AGAndrewBailey, X.com (Nov. 19, 2023, 4:46 PM ET), https://perma.cc/J463-656K.



49.     On November 20, 2023, Attorney General Paxton joined the fray, announcing via press release that he was launching an investigation into Media Matters. Ex. A. The press release asserted that the Attorney General would "vigorously enforce" the Texas Business Organizations Code and the Deceptive Trade Practices Act but failed to explain how Media Matters—a Washington, D.C.-based non-profit media watchdog—or Hananoki—a Maryland-based reporter—were believed to have violated those laws directed at consumer protection in the carrying on of a trade or business. *Id.* Instead, Attorney General Paxton's press release disparaged Media Matters as a "a radical anti-free speech organization," and as a "radical left-wing organization[] who would like nothing more than to limit freedom by reducing participation in the public square[.]" *Id.*

50.     Attorney General Paxton doubled down on his public attacks of Media Matters in subsequent interviews. In an interview with Charlie Kirk—a frequent subject of Media Matters's reporting[26]—on the Charlie Kirk Show, Attorney General Paxton discussed his investigation into Media Matters, asserting that his office could "do away with [Media Matters's] ability to do business in Texas[,]" and "go after" Media Matters for large amounts of money—to which Kirk replied, "I love it."[27]

51.     In a subsequent interview, activist Benny Johnson framed Paxton's investigation as "devastating" to Media Matters and "com[ing] in concert with Elon Musk dropping . . . [a] 'thermonuclear' lawsuit on Media Matters." *See* Ex. C, Nov. 28, 2023 "The Benny Show" Certified Tr. He asked Paxton if he "encourage[d] other Republican attorney generals to do this" and stated "we're so thankful that somebody is just standing up and doing something. Where are the rest of the Republican AGs? . . . Why are they so quiet on issues like this?" *See* Ex. C; *see also* @bennyjohnson, X.com (Nov. 29, 2023, 12:36 PM ET), [https://perma.cc/JA55-6A8G].

---

[26] *See* "Charlie Kirk," https://www.mediamatters.org/charlie-kirk.

[27] "*'We have the right as the state of Texas to go after those damages.' - AG Ken Paxton*," Rumble (Nov. 21, 2023), https://rumble.com/v3x3aim-we-have-the-right-as-the-state-of-texas-to-go-after-those-damages.-ag-ken-p.html.



52.     Paxton responded by encouraging other state Attorneys General to investigate Media Matters, saying: "You know, that's a good question . . . I would encourage them to look at this. They may have just become aware of it. I mean it's a relatively new issue so hopefully over the next couple of weeks, you'll see other attorney generals look at this." Ex. C. Paxton neither disputed nor qualified Johnson's framing. *Id*. Paxton later admitted in another interview that he only even became aware of this issue through Musk's litigation, rather than any independent investigation or work by his office.[28]

53.     On November 21, 2023, the day after Paxton announced his investigation, the Texas office of the Attorney General issued the Demand, which references and requests a broad swath of documents related to Hananoki's November 16 article. Ex. B at 7. The Demand was served on

---

[28] *See also* "*Texas A.G. Ken Paxton probes Media Matters for 'Fraudulent Activity,'*" Newsmax (Nov. 22, 2023), available at https://rumble.com/v3x4olk-texas-a.g.-ken-paxton-probes-media-matters-for-fraudulent-activity.html. *See id.* at 2:12 ("So we learned about this actually through the actual lawsuit that Elon Musk filed and then the reporting of it.").

counsel for Media Matters on December 1, 2023, with a return date of December 12, 2023. *Id.* at 1.

54.     Paxton's Demand, like his press release, provides no explanation as to how Media Matters or Hananoki could have violated Texas's Deceptive Trade Practices Act, nor any explanation for how Paxton could exercise the State's coercive power over them. *See generally* Ex. A; Ex. B.

55.     The overbroad Demand requests that Media Matters produce "all documents related to internal and external communications relating to the article titled '*As Musk endorses antisemitic conspiracy theory, X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content*' by Eric Hananoki." The Demand also requests documents sufficient to identify Media Matters's organizational structure; sources of income originating in Texas; operational expenditures in Texas; current and past X accounts, including those used to obtain the screenshots contained in the November 16 article; and direct and indirect sources of funding for operations involving X research and publications. Ex. B at 7.

56.     Paxton's Demand also requests that Media Matters produce—on an ongoing basis—all documents related to its internal and external communications, from as far back as January 1, 2022, regarding X CEO Linda Yaccarino and Musk's purchase of X; all internal and external communications regarding the November 16 article; external communications with employees and representatives of X, from November 1, 2023 to November 21, 2023; and external communications with ten corporate entities, from November 1, 2023 to November 21, 2023. *Id.* at 7. It is, in effect, an ongoing demand for virtually any materials Media Matters and Hananoki might generate as a result of future coverage of X and Musk.

**E.     Attorney General Paxton chilled Media Matters's and Hananoki's speech and reporting.**

57.     Paxton's investigation and Demand have chilled Media Matters's and Hananoki's speech and press activities. It has further resulted in a slew of threats against Media Matters and its staff. Hananoki has been harassed and has received hateful messages, requiring him to increase his home security and personal security. Media Matters has been forced to retain an outside security firm to protect its employees in response.

58.      Hananoki's research and writing have been severely impaired and disrupted by Paxton's baseless investigation. Draft articles he intended to publish about violent extremism on X were cut for fear of further retaliation from Paxton. In fact, since Paxton launched his investigation, Hananoki has not published any stories about the rise of extremist rhetoric in the wake of Musk's ownership  after consistently doing so for months. Several other Media Matters employees have reported feeling constrained in their work, fearful of being ensnared in Paxton's investigation or publishing articles that would ignite additional legal action.

59.     As a direct result of Paxton's intrusive Demand, many of Media Matters's reporters and researchers have pared back reporting and publishing, particularly on any topics that could be perceived as relating to the Paxton investigation. These reporters and researchers are also aware that Media Matters's editorial team has been required to hold back stories about X and Musk due to these concerns. This lack of new coverage on X and Musk is not for want of material; to the contrary, Media Matters has received an outpouring of tips from people who continue to see extremist and violent content placed next to advertisements on X. Media Matters has not yet acted on these tips due to the legal proceedings it is now embroiled in, not least of all because Paxton's Demand seeks to compel Plaintiffs to turn over any work performed in response to these tips.

60.     Media Matters's executive and editorial team have also been forced to become more involved in the organization's publishing decisions since Attorney General Paxton launched his investigation to protect the organization against further retaliation. This has significantly slowed down Media Matters's publication process, as the organization must carefully assess whether a new article or report could impact existing legal proceedings or spark new ones.

61.     Media Matters's associations with other groups have also been impaired by Attorney General Paxton's investigation. Groups that previously worked closely with Media Matters have reevaluated doing so, afraid that communications may be turned over to the Attorney General or spark investigations into their own publications.

62.     Attorney General Paxton's overbroad Demand—which on its face demands associational and journalistic materials protected from disclosure by the First Amendment—further harms Plaintiffs. Complying with the Demand would require Plaintiffs to turn over thousands of sensitive documents and communications including materials Hananoki prepared to write his November 16 article, in addition to sensitive operational information about Media Matters's employees, donors, funding, expenditures, and confidential sources. With this Demand looming over them, Plaintiffs have been chilled from publishing, and in some cases generating, new research and investigatory work product that could be subject to compelled disclosure.

63.     The onerous Demand is backed by the threat that, if Plaintiffs do not comply, Paxton is entitled to sue Plaintiffs in a Texas court to enforce the Demand. *See* Tex. Bus. & Com. Code Ann. § 17.62(b) (authorizing the Office of the Attorney General to "file . . . a petition for an order of the court for enforcement of" a Civil Investigative Demand under Section 17.61). Such a tribunal would be a foreign court to both Media Matters and Hananoki, who have no relevant

contacts with Texas and who understandably fear having their constitutional rights adjudicated in jurisdictions with which they have no connection.

64.     Media Matters is not registered as a foreign corporation in Texas and does not "transact business" in Texas. Tex. Bus. Org. Code § 9.0002(a). It does not have a registered agent in Texas. Media Matters performs no "business practices" in Texas, Bus. & Com. § 17.44(a), and conducts no "trade" or "commerce" in Texas, Bus. & Com. §§ 17.45(6), .46(a). And, as explained, Hananoki's work occurred exclusively in Maryland and involved no contact with Texas. That Plaintiffs may be dragged to court in an unknown, unfamiliar, and untouched venue in Texas at the option of Attorney General Paxton further chills their speech.

65.     The Deceptive Trade Practices Act arms Paxton with a host of other powers with which to retaliate against Plaintiffs, including restraining orders, civil penalties, and sanctions. *See, e.g.*, Tex. Bus. & Com. Code Ann. §§ 17.47(a)–(b) (authorizing OAG to "bring an action in the name of the state" for injunctive relief), (c)–(d) (authorizing OAG to seek damages and restitution), (e)–(f) (authorizing OAG to seek monetary civil penalties for violations of injunctions).

66.     Paxton's own past words resolve any possible doubt about the uniquely injurious effects of his Demand that will be felt by Plaintiffs Hananoki and Media Matters. In 2016, alongside several other state Attorneys General, Paxton filed an amicus brief excoriating Massachusetts for daring to use its own deceptive trade practices law to serve a similar civil investigative demand on Exxon Mobil—which, notably, is involved in trade practices—regarding claims it misled consumers about the impact of its energy products on climate change. Ex. D, Brief of Amici Curiae in *Exxon Mobile Corp., v., et al*., 4:16-CV-00469-K, ECF. No. 63-2 (Sept. 8, 2016). Paxton, at that time, wrote:

> "The[] [First Amendment] protections afforded by the Constitution . . . [are] threatened by the chill of subpoenas, like Massachusetts's CID, hanging in the air.

28

Thus, not only is Massachusetts attempting to silence Exxon through the issuance
and threat of compelling a response to the CID, this very action harms everyone[.]"

*Id.* at 6. He added that "[t]he authority attorneys general have to investigate fraud does not allow

them to encroach on the constitutional freedom of others to engage in an ongoing public . . .

debate." *Id.* at 3.

## CLAIMS FOR RELIEF

### COUNT I

**First Amendment Retaliation in Violation of Plaintiffs' Rights Under the First and
Fourteenth Amendments of the United States Constitution (42 U.S.C. § 1983)**

67.     Plaintiffs incorporate paragraphs one through 66 above as if set forth fully herein.

68.     Attorney General Paxton violated, and continues to violate, Plaintiffs' First

Amendment rights by launching an investigation and serving a burdensome Demand in retaliation

for Plaintiffs' speech and press activities. Paxton's use of the power of his office is discouraging,

and will continue to discourage Plaintiffs from continuing to engage in news coverage. The chill

imposed by his retaliatory scheme injures Plaintiffs' ability to investigate and publish news stories

and further chills their ability to participate in a robust public discussion around political

extremism on the X platform. Absent relief from this Court, that chill will continue so long as

Paxton's investigation and Demand are—in Paxton's own words—"hanging in the air." Ex. D at

6.

69.     "[T]he law is settled that . . . the First Amendment prohibits government officials

from subjecting an individual to retaliatory actions . . . for speaking out." *Hartman*, 547 U.S. at

256. "The First Amendment right of free speech includes not only the affirmative right to speak,

but also the right to be free from retaliation by a public official for the exercise of that right."

*Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000).

70.     The Fourth Circuit has long recognized First Amendment retaliation claims as "actionable" because "retaliatory actions may tend to chill individuals' exercise of constitutional rights." *ACLU v. Wicomico Cnty., Md.*, 999 F.2d 780, 785 (4th Cir. 1993) (citing *Perry v. Sindermann*, 408 U.S. 593, 597 (1972)). That cause of action for First Amendment retaliation arises under 42 U.S.C. § 1983, which "has long [been] interpreted . . . to permit suits against officials in their individual capacities" for constitutional violations. *Tanzin v. Tanvir*, 592 U.S. 43, 48 (2020). To prevail on a First Amendment retaliation claim, Plaintiffs must show: (1) they "engaged in protected First Amendment activity;" (2) Paxton took some action adversely affecting Plaintiffs' First Amendment rights; and "(3) there was a causal relationship between [Plaintiffs'] protected activity and [Paxton's] conduct." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005). "[F]or purposes of a First Amendment retaliation claim under § 1983, a plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would deter 'a person of ordinary firmness' from the exercise of First Amendment rights. *Id.* at 500 (4th Cir. 2005) (quoting *Washington v. Cnty. of Rockland*, 373 F.3d 310, 320 (2d Cir. 2004)). Plaintiffs satisfy each element.

71.     *First*, Plaintiffs' investigative, newsgathering, and reporting activities are "legally protected interest[s]" under the First Amendment. *Overbey v. Mayor of Baltimore*, 930 F.3d 215, 227 (4th Cir. 2019) (recognizing right of local news website operator to "gather news"). Media Matters provides journalistic research and investigative reporting on a variety of matters and figures of public importance. Hananoki is a senior investigative reporter who for over a decade has published journalism about political extremism online, including on platforms like X. The "First Amendment applies in full force" to this newsgathering and commentary, and further "protect[s] a news outlet's editorial perspective [and] the way its beat reporters cover a given" public issue.

*Washington Post v. McManus*, 944 F.3d 506, 518 (4th Cir. 2019) (quoting *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 255 (1974)). Indeed, "the constitutional protection of the press reaches its apogee" where, as here, Plaintiffs are members of the press who investigate and write about "a public figure" or "on a matter of public concern." *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092 (4th Cir. 1993) (citing *New York Times Co.*, 376 U.S. 254).

72.     *Second*, Paxton has taken action adverse to Plaintiffs' protected activity in response to news coverage. His investigation and intrusive Demand have already chilled Plaintiffs' speech and reporting activities and will continue to do so absent relief. Paxton's retaliatory conduct would "deter 'a person of ordinary firmness' from the exercise of First Amendment rights," *Constantine*, 411 F.3d at 500, particularly given the suite of tools Texas law provides Paxton to further punish, harass, and restrain Plaintiffs' constitutionally protected conduct. *See, e.g.*, Tex. Bus. & Com. Code Ann. §§ 17.47, .60, .62. This chill is exacerbated by the fear Plaintiffs will be forced to defend their constitutional rights in a jurisdiction with which they have no meaningful connection.

73.     *Third*, there is no serious dispute that Paxton's investigation and Demand are causally linked to Plaintiffs' coverage of X and Musk. Attorney General Paxton has publicly admitted as much. He announced his investigation into Plaintiffs on November 20, 2023, the same day that X filed a frivolous lawsuit against Plaintiffs for the very same coverage Paxton seeks to punish. Paxton issued his retaliatory Demand only a few days after announcing his investigation. Since then, Paxton has encouraged other state Attorneys General to take retaliatory action against Plaintiffs under their own state consumer laws—regardless of any connection Plaintiffs have with those states. The material sought by Attorney General Paxton's Demand further confirms the causal connection, as it singles out documents and communications related to the November 16 article, as well as X and its officers.

74.     Paxton's retaliatory campaign against Media Matters has injured Plaintiffs and will continue to do so absent relief from this Court. This harm will be redressed by an order declaring Paxton's conduct to be unlawful and enjoining him from further investigating Plaintiffs or enforcing his Demand. Such relief is appropriate under Section 1983. *Kenny v. Wilson*, 885 F.3d 280, 287–88 (4th Cir. 2018); *Cromer v. Brown*, 88 F.3d 1315, 1332 (4th Cir. 1996).

## COUNT II

### Violation of Plaintiffs' Rights Under the First, Fourth, and Fourteenth Amendments of the United States Constitution (42 U.S.C. § 1983)

75.     Plaintiffs incorporate paragraphs one through 74 above as if set forth fully herein.

76.     Attorney General Paxton's issuance of the overbroad and retaliatory Demand further violates Plaintiffs' First and Fourth Amendments by unreasonably requiring them to turn over sensitive and privileged materials.

77.     The Fourth Amendment limits the scope of administrative subpoenas. *See Okla. Press Publ'g Co. v. Walling*, 327 U.S. 186, 208–11 (1946). The First Amendment provides Plaintiffs a privilege against disclosure of materials that would chill their constitutional rights. *See Perry v. Schwarzenegger*, 591 F.3d 1147, 1160 (9th Cir. 2009). Where "the materials sought to be seized" by an administrative subpoena even "*may* be protected by the First Amendment," the requirements of the Fourth Amendment are applied with "scrupulous exactitude." *Zurcher v. Stanford Daily*, 436 U.S. 547, 564 (1978) (citing *Stanford v. Texas,* 379 U.S. 476, 485 (1965)) (emphasis added).

78.     Defendant Paxton has shown no such "scrupulous exactitude" in his Demand. Without any showing of cause or jurisdiction, Paxton has demanded that Plaintiffs produce a broad set of documents that implicate their core First Amendment rights. The Demand seeks, for example, swathes of documents related to Plaintiffs' donors, funding sources, expenditures, and

employees, all of which are protected from compelled disclosure under the First Amendment. *E.g.*, *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2382 (2021); *NAACP v. Alabama*, 357 U.S. 449, 462 (1958). It further requires that Plaintiffs surrender internal communications and files regarding news articles, as well as communications with employees at X and its advertisers, again with no showing of cause. Paxton may not "rummage at large in newspaper files or [] intrude into or to deter normal editorial and publication decisions" under the First Amendment. *Zurcher v. Stanford Daily*, 436 U.S. 547, 566 (1978); *see also Lacey v. Maricopa Cnty.*, 693 F.3d 896, 917 (9th Cir. 2012). Such "[b]road and sweeping state inquiries into these protected areas . . . discourage citizens from exercising rights protected by the Constitution." *Baird v. State Bar of Ariz.*, 401 U.S. 1, 6 (1971) (plurality opinion).

79.     It provides no meaningful relief to Plaintiffs that Paxton is only authorized to enforce his Demand through a petition to Texas's courts. *See* Tex. Bus. & Com. Code Ann. § 17.62(b). Texas courts plainly lack personal jurisdiction over Plaintiffs, who should not be forced to subject themselves to foreign tribunals to defend their constitutionally protected rights at home in Maryland.

80.     Plaintiff Media Matters is incorporated under the laws of, and has its principal place of business in, the District of Columbia. Plaintiff Eric Hananoki is domiciled in Maryland. Texas courts lack general jurisdiction over Plaintiffs. *See Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024–25 (2021).

81.     Plaintiffs have not purposefully availed themselves of the privilege of conducting activities in Texas, nor would any cause of action stemming from the Demand arise out of or relate to such purposeful contacts, if they existed. Texas courts lack specific jurisdiction to enforce the Demand against Plaintiffs. *See Johnson v. TheHuffingtonPost.com, Inc.*, 21 F.4th 314, 317–18 (5th

Cir. 2021), *reh'g en banc denied*, 32 F.4th 488 (5th Cir. 2022), *cert. denied*, 143 S. Ct. 485 (2022);

*Fidrych v. Marriott Int'l, Inc.*, 952 F.3d 124, 140 (4th Cir. 2020).

82.     Plaintiffs now have little time left to comply with Paxton's demand, at which point

they must either surrender constitutionally protected materials in violation of their First and Fourth

Amendment rights, or risk subjecting themselves to state-level proceedings in foreign courts that

plainly lack jurisdiction over them. That is no true choice at all.

83.     This ongoing violation of Plaintiffs' First and Fourth Amendment rights will be

remedied by prompt injunctive relief from this Court setting aside the Demand, as Texas law

allows.

**COUNT III**

**Violation of Plaintiffs' Due Process Rights Under the Fourteenth Amendment to the United States Constitution (42 U.S.C. § 1983)**

84.     Plaintiffs incorporate paragraphs one through 83 above as if set forth fully herein.

85.     The guarantee of due process in the Fourteenth Amendment "recognizes and

protects an individual liberty interest" from being subjected to legal process in a jurisdiction with

which a person has no contact, unless they willingly consent to such process. *Ins. Corp. of Ireland

v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982).

86.     For a state to exercise personal jurisdiction over a party in a manner consistent with

due process, the party must have "'minimum contacts' with the forum so that the exercise of

jurisdiction 'does not offend traditional notions of fair play and substantial justice.'" *Fidrych v.

Marriott Int'l, Inc.*, 952 F.3d 124, 131 (4th Cir. 2020) (quoting *Hawkins v. i-TV Digitalis

Tavkozlesi zrt.*, 935 F.3d 211, 228 (4th Cir. 2019)).

87.     Here, Defendant Paxton has purported to subject Plaintiffs to legal process under

Texas law—and has the power to force Plaintiffs into Texas court to defend against enforcement

34

of his Demand—despite Plaintiffs' having no minimum contacts with Texas and not being subject to either general or specific personal jurisdiction in that state. Plaintiffs do not avail themselves of Texas law and had no reason to ever foresee being subject to Texas's deceptive trade practices act. Media Matters's mere "operation of a website accessible in [Texas] is insufficient to satisfy the minimum-contacts requirement of the personal-jurisdiction inquiry" under the Due Process clause. *Fidrych*, 952 F.3d at 140.

88.    Plaintiffs are injured by the ongoing imposition of Texas law on them by Defendant Paxton despite his clear lack of jurisdiction to do so, and will be further injured if Paxton hauls Plaintiffs into Texas state court to defend their constitutional rights in a jurisdiction with which they have no relevant contacts.

**COUNT IV**

**Violation of Plaintiffs' Rights Under Maryland's and Washington, D.C.'s Reporters' Shield Laws**

89.    Plaintiffs incorporate paragraphs one through 88 above as if set forth fully herein.

90.    Attorney General Paxton's Demand violates Plaintiffs' rights under Maryland's and Washington, D.C.'s shield laws by seeking to compel disclosure of statutorily protected, confidential sources. Md. Cts. & Jud. Proc. Code Ann. § 9-112(b) (2014); D.C. Code § 16-4702 (2011).

91.    Maryland and Washington, D.C.'s shield laws provide an absolute privilege against the compelled disclosure of sources, regardless of whether those sources are confidential. Md. Cts. & Jud. Proc. Ann. § 9-112(d)(2) (2014); D.C. Code § 16-4703 (2011). To overcome this qualified privilege, both statutes provide that parties seeking news or information must establish by clear and convincing evidence that (1) the news or information is relevant to a significant legal issue before a party that has a power to issue a subpoena; (2) the news or information could not, with

due diligence, be obtained by any alternative means; and (3) there is an overriding public interest in the disclosure. Still, courts have quashed subpoenas that seek information from news media, even when all three prongs of the qualified privilege apply. *See, e.g.*, *Bice v. Bernstein*, No. 93-CA-22258, 1994 WL 555379, at *1–*2 (Md. Cir. Ct. Apr. 20, 1994); *Grunseth v. Marriott Corp.*, 868 F. Supp. 333, 336 (D.D.C. 1994).

92.     Attorney General Paxton's Demand is consequently infirm because its overbreadth will require that Plaintiffs turn over constitutionally protected sources. The Demand asks for any and all materials related to external *and internal* communications regarding Plaintiffs' November 16 article, as well as external communications between Plaintiffs and employees and representatives of X from November 1, 2023, to November 21, 2023. What is more, the Demand seeks numerous documents regarding Plaintiffs' organizational structure, as well as the specific X accounts used to obtain the screenshots contained in the November 16 article. In essence, the Demand functions as a boundless inquiry into Plaintiff's' organization and news gathering capacity—precisely the kind of pernicious subpoena that these shield laws were designed to combat.

93.     Attorney General Paxton's Demand not only seeks privileged material in violation of Plaintiff's First Amendment rights, but also chills Plaintiff's news gathering capacity. An setting aside the Demand is the only legal mechanism to ensure that plaintiff's rights—protected by the Constitution and promulgated by state statute—are secure.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully ask for the following relief:

94.     Declare Paxton's Demand constitute a First Amendment retaliatory action in violation of Plaintiffs' rights under the First and Fourteenth Amendments of the U.S. Constitution.

95.     Declare that Paxton's Demand violates Plaintiffs' rights under the First, Fourth, and Fourteenth Amendments of the U.S. Constitution.

96.     Declare that courts in the State of Texas cannot exercise personal jurisdiction over Plaintiffs in any imminent action to enforce the Demand.[29]

97.     Temporarily enjoin Paxton, his officers, agents, servants, and employees from initiating any action to enforce the Demand in violation of their constitutional rights.

98.     Permanently and preliminarily enjoin Paxton, his officers, agents, servants, and employees from initiating any action to enforce the Demand or further investigating Plaintiffs in violation of their constitutional rights, as well as to the extent enforcement would require the disclosure of information protected by the Maryland and D.C. shield laws.

99.      Award Plaintiffs their costs, expenses, and reasonable attorneys' fees, pursuant to 42 U.S.C. § 1988, and any other applicable law.

100.    Grant Plaintiffs any and all other relief as the Court deems just and proper.

Dated: December 11, 2023                    Respectfully submitted,
                                            */s/ Tina Meng Morrison*

                                            **ELIAS LAW GROUP LLP**
                                            Abha Khanna*
                                            1700 Seventh Ave. Suite 2100
                                            Seattle, WA 98101
                                            T: (206) 656-0177
                                            akhanna@elias.law

---

[29] It is neither unusual nor unprecedented for courts to determine whether other courts in other circuits have jurisdiction. *See, e.g.*, *Clark v. Busey*, 959 F.2d 808, 812 (9th Cir. 1992) ("Transfer is improper where the transferee court lacks jurisdiction and thus could not have originally heard the suit."); *Grondal v. United States*, 513 F. Supp. 3d 1262, 1275 (E.D. Wash. 2021); *In re Asbestos Prod. Liab. Litig. (No. VI)*, 965 F. Supp. 2d 612, 620 (E.D. Pa. 2013) ("Ohio's long-arm statute does not confer jurisdiction"). *See also* 28 U.S.C. § 1404(a) ("a district court may transfer any civil action to any other district or division where it might have been brought"); *id.* § 1631 ("the court shall, if it is in the interest of justice, transfer such action or appeal to any other such court . . . in which the action or appeal could have been brought at the time it was filed or noticed").

Tina Meng Morrison (D. Md. Bar No. 21832)
Aria C. Branch*
Christopher D. Dodge*
Jacob D. Shelly**
Elena A. Rodriguez Armenta*
Daniela Lorenzo*
Omeed Alerasool*
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
T: (202) 968-4652
tmengmorrison@elias.law
abranch@elias.law
cdodge@elias.law
jshelly@elias.law
erodriguezarmenta@elias.law
dlorenzo@elias.law
oalerasool@elias.law

**GIBSON, DUNN & CRUTCHER LLP**
Theodore J. Boutrous, Jr.*
Jay P. Srinivasan*
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: (213) 229-7000
Email: tboutrous@gibsondunn.com
Email: jsrinivasan@gibsondunn.com

Amer S. Ahmed*
Anne Champion*
200 Park Avenue
New York, New York 10166
Telephone: (212) 351-4000
Email: aahmed@gibsondunn.com
Email: achampion@gibsondunn.com

*Pro hac vice* application forthcoming
**Application for admission pending

*Counsel for Plaintiffs Media Matters for America and Eric Hananoki*