# Exhibit D

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| Exxon Mobil Corporation, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | No. 4:16-cv-00469-K |
| | ) | |
| Maura Tracy Healey, | ) | |
| Attorney General of Massachusetts, | ) | |
| in her official capacity, | ) | |
| | ) | |
| *Defendant.* | ) | |

**Brief of Texas, Louisiana, South Carolina, Alabama, Michigan, Arizona, Wisconsin, Nebraska, Oklahoma, Utah, and Nevada As *Amici Curiae* In Support of Plaintiff's Motion for Preliminary Injunction**

# TABLE OF CONTENTS

INTEREST OF *AMICI CURIAE* AND BACKGROUND ........................................................1

ARGUMENT ........................................................................................................................2

    I.    Attorneys General should act impartially. ...................................................2

        A.  Attorneys General should not employ legal power to tip the scales in a policy debate. .....................................................................3

            1.   Targeting critics. ..................................................................4

            2.   Abusing subpoena power. ...................................................5

        B.  Climate change is the subject of legitimate international debate. .......................................................................................................6

    II.   Politicized investigations undermine public confidence. .............................9

CONCLUSION .....................................................................................................................9

## INTEREST OF *AMICI CURIAE* AND BACKGROUND

Exxon Mobil Corporation (Exxon) is challenging the validity of a Civil Investigative Demand (CID), a state civil administrative subpoena, issued by the Attorney General of Massachusetts (Massachusetts). Massachusetts dispatched the CID to investigate supposed violations of consumer protection laws through Exxon's marketing and sale of fossil fuel-derived products and securities. Exxon is asking the Court to issue an injunction prohibiting Massachusetts from enforcing the CID.

*Amici* possess sovereign authority to investigate violations of law. As chief legal officers, they have long used their power—including the issuance of CIDs—to determine whether unlawful conduct occurred. However, this power does not include the right to engage in unrestrained, investigative excursions to promulgate a social ideology, or chill the expression of points of view, in international policy debates.

The concerns of *Amici* and others regarding Massachusetts's tactics are expressed in a recent open letter.[1] In it, the actions of Massachusetts and others are condemned, as "this effort by our colleagues to police the global warming debate through the power of the subpoena is a grave mistake." The signatories, representing a wide range of viewpoints on climate change, "agree on at least one thing—this is not a question for the courts. Using law enforcement authority to resolve a public policy debate undermines the trust invested in our offices and threatens free speech."[2] As most recognize, "vigorous debate exists in this country regarding the risks of climate change and the appropriate response to those risks. Both sides are well-funded and sophisticated public policy participants. Whatever our country's response,

---

[1] Open Letter from Attorneys General (Luther Strange, Alabama; Bill Schuette, Michigan; Ken Paxton, Texas; Craig Richards, Alaska; Doug Peterson, Nebraska; Sean Reyes, Utah; Mark Brnovich, Arizona; Adam Laxalt, Nevada; Brad Schimel, Wisconsin; Leslie Rutledge, Arkansas; Scott Pruitt, Oklahoma; Jeff Landry, Louisiana; Alan Wilson, South Carolina) dated June 15, 2016, *available online at* http://www.ago.state.al.us/news/852.pdf.

[2] *Id*. at p.1.

it will affect people, communities, and businesses that all have a right to participate in this debate." Thus, attorneys general should "stop policing viewpoints."[3]

*Amici* are concerned about the unconstitutional use of investigative powers. They have an interest in preserving their roles as evenhanded enforcers of the law and, thus, have direct and vital interests in the issues before the Court.

## ARGUMENT

Attorneys General have a constitutional duty to act dispassionately in the execution of their office. The Supreme Court has explained that attorneys representing the public do not represent an ordinary party in litigation, but "a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest , . . . is not that it should win a case but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935). This distinctive role of the prosecutor is also expressed the Model Code of Professional Responsibility. MODEL CODE OF PROF'L RESPONSIBILITY EC 7-13 (1982) ("The responsibility of a public prosecutor differs from that of the usual advocate; his duty is to seek justice, not merely to convict."). Massachusetts crossed both legal and ethical lines with its CID.

## I. Attorneys General should act impartially.

Massachusetts's investigation is the product of a cultural movement "committed to aggressively protecting and building upon the recent progress the United States has made in combatting climate change."[4] And the common interest agreement of the powers aligned on this axis of ideology underscores the partiality of their endeavor, as they seek to "limit climate change and ensur[e] the dissemination

---

[3] *Id*.

[4] Press Release, New York State Attorney General, *A.G. Schneiderman, Former Vice President Al Gore And A Coalition Of Attorneys General From Across The Country Announce Historic State-Based Effort To Combat Climate Change* (March 29, 2016) (*available online at* http://www.ag.ny.gov/press-release/ag-schneiderman-former-vice-president-al-gore-and-coalition-attorneys-general-across).

2

of accurate information about climate change." ECF No. 57 at 3.[5] And Defendant acknowledges that the issuance of the CID is part of an "aggressive approach."[6]

While *amici* have authority to conduct investigations regarding consumer protection, fraud, and deceptive trade practices, these investigations must be supported by a "reasonable belief" that there has been, or is about to be, unlawful false, misleading, or deceptive acts or practices in the conduct of any trade or commerce. *See*, *e.g.*, TEX. BUS. & COM. CODE §§ 17.46, 17.47, 17.60, 17.61. And while the government's power "to protect people against fraud" has "always been recognized in this country and is firmly established," *Donaldson v. Read Magazine, Inc.*, 333 U.S. 178, 190 (1948), "[s]imply labeling an action one for 'fraud,' of course, will not carry the day," *Illinois ex rel. Madigan v. Telemarketing Assocs.*, 538 U.S. 600, 617 (2003).

### A. Attorneys General should not employ legal power to tip the scales in a policy debate.

The authority attorneys general have to investigate fraud does not allow them to encroach on the constitutional freedom of others to engage in an ongoing public policy debate of international importance. Thus, government action that restricts or chills speech because of the message embodied within that speech contravenes the First Amendment. Indeed, "there is practically universal agreement that a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs." *Mills v. Alabama*, 384 U.S. 214, 218 (1966). The First Amendment generally prevents government from proscribing speech, *see*, *e.g.*, *Cantwell v. Connecticut*, 310 U.S. 296, 309–311 (1940), or even expressive conduct, *see*, *e.g.*, *Texas v. Johnson*, 491

---

[5] This ideology was on full display at the March 29, 2016 press conference of the so-called "AG's United for Clean Power," characterized as "the beginning of the end of our addiction to fossil fuel and the degradation of our planet." Attorney General Schneiderman, Press Conference, AGs United for Clean Power (March 29, 2016) (confirming subpoena to ExxonMobil) (*video available online at* http://www.ag.ny.gov/press-release/ag-schneiderman-former-vice-president-al-gore-and-coalition-at-torneys-general-across). Former Vice President Al Gore alleged that commercial interests (such as the Plaintiff) are "committing fraud in their communications . . . ." *Id.*

[6] *Id.*

3

U.S. 397, 406 (1989), for the mere disapproval of the ideas expressed. Here, the chilling effect of Massachusetts's CID should be of concern since the "loss of First Amendment freedoms for even minimal periods of time constitutes irreparable injury . . . ." *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. Unit B Nov. 1981) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

The heart of viewpoint discrimination is the government preferring one message to another. But "[t]he First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others." *Members of the City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984); *see also Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995); *Cornelius v. NAACP*, 473 U.S. 788, 806 (1985). Viewpoint discrimination occurs when "the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *McGuire v. Reilly*, 386 F.3d 45, 62 (1st Cir. 2004).

While Massachusetts claims an interest in consumer protection as the basis for its CID, the Supreme Court has been clear that proffering what may be on its face "reasonable grounds" for the action does "not save a regulation that is in reality a facade for viewpoint-based discrimination." *Cornelius*, 473 U.S. at 811.

### 1. Targeting critics.

The First Amendment is concerned with "the inherent risk that the Government seeks not to advance a legitimate regulatory goal, but to suppress unpopular ideas." *Hill v. Colorado*, 530 U.S. 703, 719 (2000). Thus, it stands as a bulwark against Government action designed to suppress ideas or information, or to manipulate the public debate through coercion rather than persuasion. *See Palmer ex rel. Palmer v. Waxahachie Indep. Sch. Dist.*, 579 F.3d 502, 510 (5th Cir. 2009).

Using CIDs to suppress policy debates is like imposing prior restraints on speech. Governmentally imposed prior restraints on speech are tantamount to censorship. *See Near v. Minnesota*, 283 U.S. 697, 713, (1931); *cf. Fernandes v.*

4

*Limmer*, 663 F.2d 619, 632 (5th Cir. Unit A Dec. 1981). Massachusetts labeling its so-called investigation (into an unsettled area of science and public policy) as related to "fraud" certainly "raise[s] the specter that the Government may effectively drive certain ideas or viewpoints from the marketplace." *Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116 (1991).

But if our society refuses to tolerate *both* the proponents and critics of ideas vying for acceptance, then the marketplace of ideas becomes a mere oligarchy of consumption. As Justice Holmes put it:

> But when men have realized that time has upset many fighting faiths, they may come to believe even more than they believe the very foundations of their own conduct that the ultimate good desired is better reached by free trade in ideas—that the best test of truth is the power of the thought to get itself accepted in the competition of the market, and that truth is the only ground upon which their wishes safely can be carried out.

*Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting).

### 2. Abusing subpoena power.

The Fourth Amendment limits the scope of administrative subpoenas. *See Okla. Press Publ'g Co. v. Walling*, 327 U.S. 186, 208–11 (1946). Where subpoenaed materials may be protected by the First Amendment, the requirements of the Fourth Amendment are applied with "scrupulous exactitude." *Stanford v. Texas,* 379 U.S. 476, 485 (1965). As such, so-called "fishing expeditions," like this one, are proscribed and "[i]t is contrary to the first principles of justice to allow a search through all the respondents' records, relevant or irrelevant, in the hope that something will turn up." *Fed. Trade Comm'n v. Am. Tobacco Co.*, 264 U.S. 298, 306 (1924).

Massachusetts's abuse of its subpoena power runs afoul of the First Amendment. *See, e.g., AFL-CIO v. FEC*, 333 F.3d 168, 175 (D.C. Cir. 2003) (citing *Buckley v. Valeo*, 424 U.S. 1, 64–68 (1976) (disclosure of campaign contributions); *NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449, 462–63 (1958) (disclosure of

5

membership lists)). A First Amendment privilege against disclosures exists where such "will result in (1) harassment, membership withdrawal, or discouragement of new members, or (2) other consequences which objectively suggest an impact on, or 'chilling' of, the members' associational rights." *Perry v. Schwarzenegger*, 591 F.3d 1147, 1160 (9th Cir. 2009) (quotation omitted).

For example, subpoenas seeking investigative notes as well as the names of contacts have been held to be an invalid chilling of the free exercise of political speech and association under the First Amendment. *See Lacey v. Maricopa Cnty.*, 693 F.3d 896, 917 (9th Cir. 2012) (finding "invalid" under First Amendment "subpoenas demanding that [a] paper . . . disclose its reporters' notes and reveal information about anyone who visited the New Times's [sic] website" because subpoenas would "chill speech"); *see also Pebble Ltd. P'ship v. EPA*, 310 F.R.D. 575, 582 (D. Alaska 2015) (subpoenas are invalid when they have "the tendency to chill the free exercise of political speech and association which is protected by the First Amendment").

These protections afforded by the Constitution protect us and our freedom to engage in open and candid discussions about significant issues. But the mere existence of those very discussions is threatened by the chill of subpoenas, like Massachusetts's CID, hanging in the air. Thus, not only is Massachusetts attempting to silence Exxon through the issuance and threat of compelling a response to the CID, this very action harms everyone, stifling consumers and those seeking information in order to evaluate various viewpoints in this public policy debate.

**B.     Climate change is the subject of legitimate international debate.**

Massachusetts presumes that the scientific debate regarding climate change is somehow settled, along with the related and equally important public policy debate on how to respond to what science has found. Yet, neither is true. The clearest and most undeniable fact about climate change is that, like so many other areas of science and public policy, the debate is unsettled, the research far from complete, and the

6

path forward unclear. *Amici* agree that "[s]cientists continue to disagree about the degree and extent of global warming and its connection to the actions of mankind,"[7] as do many others. Moreover, science does not teach the obvious public policy response to its data and findings, it merely provides a starting point.

Modern science helps us better understand our world. It constantly subjects to scrutiny various hypotheses against objective data. *See, e.g.*, *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593 (1993). However, because it is almost never possible for all relevant data to be marshaled, scientific proclamations are always subject to change because of new data, enhanced measurements, or other unforeseen factors. *Cf.* Karl Popper, The Logic of Scientific Discovery 44, 47 (1959). Thus, "[s]cientific controversies must be settled by the methods of science rather than by the methods of litigation." *Underwager v. Salter*, 22 F.3d 730, 736 (7th Cir. 1994)

Accordingly, the intersection of science, law, and public policy should be approached with caution and objectivity. Unfortunate results take root when government invests itself in only one side of a scientific debate since "bad ideas can persist in science for decades, and surrounded by myrmidons of furious defenders they can turn into intolerant dogmas."[8] Unfortunately,

---

[7] Scott Pruitt and Luther Strange, *The Climate-Change Gang*, National Review (May 17, 2016), *available online at* http://www.national review.com/article/435470/climate-change-attorneys-general-overstepping-their-authority.

[8] Matt Ridley, *The Climate Wars and the Damage to Science,* GWPF Essay 3 at p.3 (Global Warming Policy Foundation 2015), *available online at* http://www.thegwpf.com/content/uploads/2015/11/climate-wars.pdf. In addition to being former Science Editor of the Economist, "Matt Ridley is one of the world's foremost science writers. His books have sold over a million copies and been translated into 30 languages. His new book The Evolution of Everything was published in 2015. He is a member of the [Global Warming Policy Foundation]'s Academic Advisory Council. As a landowner, he receives a wayleave income from a coal-mining company." In the words of Ridley,

> I am not a full sceptic of climate change, let alone a 'denier'. I think carbon-dioxide induced warming during this century is likely, though I think it is unlikely to prove rapid and dangerous. So I don't agree with those who say the warming is all natural, or all driven by the sun, or only an artefact of bad measurement, but nor do I think anything excuses bad scientific practice in support of the carbon dioxide theory, and every time one of these scandals erupts and the scientific establishment asks us to ignore it, I wonder if the extreme sceptics are not

7

> [t]his is precisely what has happened with the climate debate and it is at risk of damaging the whole reputation of science. The 'bad idea' in this case is not that climate changes, nor that human beings influence climate change; but that the impending change is sufficiently dangerous to require urgent policy responses. In the 1970s, when global temperatures were cooling, some scientists could not resist the lure of press attention by arguing that a new ice age was imminent. Others called this nonsense and the World Meteorological Organization rightly refused to endorse the alarm. That's science working as it should. In the 1980s, as temperatures began to rise again, some of the same scientists dusted off the greenhouse effect and began to argue that runaway warming was now likely. At first, the science establishment reacted skeptically and a diversity of views was aired. It's hard to recall now just how much you were allowed to question the claims in those days.[9]

Even the premise that "97% of all climate scientists agree on climate change" is argued by Ridley to be pseudo-science. The self-serving conclusion that "97% of all climate scientists agree on climate change" is derived from a poll involving only seventy-nine scientists[10]—hardly a statistically-relevant sample. Moreover, of those seventy-nine scientists, 97% believe that climate change is man-made—not that it was dangerous.[11] "A more recent poll of 1854 members of the American Meteorological Society found the true number is 52 per cent."[12] Indeed,

> there has been a systematic and thorough campaign to rule out the middle ground as heretical: not just wrong, but mistaken, immoral and beyond the pale. That's what the word 'denier', with its deliberate connotations of Holocaust denial, is intended to do. For reasons I do not fully understand, journalists have been shamefully happy to go along with this fundamentally religious project. Politicians love this polarizing because it means they can attack a straw man.[13]

---

on to something. I feel genuinely betrayed by the profession that I have spent so much of my career championing.
*Id.* at p.10.
[9] *Id.* at p.4.
[10] *Id.* at p.7.
[11] *Id.*
[12] *Id.*
[13] *Id.* at p.6.

8

## II.  Politicized investigations undermine public confidence.

The transcript of the press conference of the "AG's United for Clean Power" demonstrates that Massachusetts commenced its investigation precisely for the reasons the First Amendment forbids.[14] "It is one thing to use the legal system to pursue public policy outcomes; but it is quite another to use prosecutorial weapons to intimidate critics, silence free speech, or chill the robust exchange of ideas."[15]

Allowing government law enforcement officials to violate constitutional rights is to "violate the sacred trust of the people . . . ." *United States v. Costa*, 356 F. Supp. 606, 609 (D.D.C. 1973). It undermines "the right of the people to be secure in their persons, houses, papers and effects, and would obliterate one of the most fundamental distinctions between our form of government, where officers are *under* the law, and the police-state where they *are* the law." *Johnson v. United States*, 333 U.S. 10, 17 (1948) (emphasis added).

Regrettably, history is embroiled with examples where the legitimate exercise of law enforcement is soiled with political ends rather than legal ones. Massachusetts seeks to repeats that unfortunate history. That the statements and workings of the "AG's United for Clean Power" are entirely one-sided, and target only certain participants in the climate change debate, speaks loudly enough.[16]

### Conclusion

*Amici* aver that the Court should grant Exxon's motion for preliminary relief.

---

[14] *See* n.5, *supra*.

[15] Press Release, Louisiana Department of Justice, Attorney General Jeff Landry Slams Al Gore's Coalition (Mar. 30, 2016) (*available online at* https://www.ag.state.la.us/Article/2207/5).

[16] "[T]his fraud investigation targets only 'fossil fuel companies' and only statements minimizing climate change risks. If it is possible to minimize the risks of climate change, then the same goes for exaggeration. If minimization is fraud, exaggeration is fraud." *See* n.1, *supra,* at p.2. It is also worth noting that "[e]leven of the 17 attorneys general who participated [in the "AG's United for Clean Power" press conference] are the same folks who took part in the 2010 sue-and-settle lawsuit that used federal courts to try to force the adoption of the federal energy regulations that became the EPA's 'Power Plan.'" Michael Batasch, *Kansas AG takes on Al Gore's Alarmism – Won't Join Anti-Exxon "Publicity Stunt,"* The Daily Caller (Apr. 4, 2016), *available online at* http://dailycaller.com/2016/04/04/kansas-ag-takes-on-al-gores-alarmism-wont-join-ant-exxon-publicity-stunt.

9

Respectfully submitted this the 8th day of September, 2016,

JEFF LANDRY
Attorney General of Louisiana

ALAN WILSON
Attorney General of South Carolina

LUTHER STRANGE
Attorney General of Alabama

BILL SCHUETTE
Attorney General of Michigan

MARK BRNOVICH
Attorney General of Arizona

BRAD SCHIMEL
Attorney General of Wisconsin

DOUG PETERSON
Attorney General of Nebraska

SCOTT PRUITT
Attorney General of Oklahoma

SEAN REYES
Attorney General of Utah

ADAM LAXALT
Attorney General of Nevada

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

BRANTLEY STARR
Deputy First Assistant Attorney General

PRERAK SHAH
Senior Counsel to the Attorney General

*/s/ Andrew D. Leonie*
ANDREW D. LEONIE
Associate Deputy Attorney General for the Office of Special Litigation
Andrew.Leonie@texasattorneygeneral.gov

AUSTIN R. NIMOCKS
Associate Deputy Attorney General for the Office of Special Litigation
Austin.Nimocks@texasattorneygeneral.gov

MICHAEL TOTH
Senior Counsel for the Office of Special Litigation

Office of Special Litigation
Texas Attorney General's Office
P.O. Box 12548, Mail Code 009
Austin, Texas 78711-2548
Tel: 512-936-1414
Fax: 512-936-0545

*ATTORNEYS FOR AMICI CURIAE*

10

**CERTIFICATE OF SERVICE**

I hereby certify that on the 8th day of September 2016, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which I understand to have caused service on all counsel of record.

> */s/ Andrew D. Leonie III*
> Andrew D. Leonie III
> SBOT No. 12216500