IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| MEDIA MATTERS FOR AMERICA, *et al.*,<br><br>　　　　　　　Plaintiffs,<br><br>　　v.<br><br>WARREN KENNETH PAXTON JR., in his official capacity as Attorney General of the State of Texas,<br><br>　　　　　　　Defendant. | CIV. NO. 23-cv-3363 |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF RENEWED
MOTION FOR TEMPORARY RESTRAINING ORDER**

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................... 1

BACKGROUND ...................................................................................................................... 3

    A.    Over the past year, in the wake of Musk's ownership, X consistently places advertisements on racist, antisemitic, and violent accounts. .................................. 3

    B.    Media Matters and Hananoki report on X's pattern of placing advertisements on extremist accounts ................................................................................................ 6

    C.    Texas Attorney General Kenneth Paxton retaliates against Media Matters and Hananoki for their reporting. ......................................................................... 8

    D.    Media Matters and Hananoki are chilled from further newsgathering and reporting on X and Musk. ................................................................................. 11

STANDARD OF REVIEW ................................................................................................... 13

ARGUMENT ......................................................................................................................... 13

  I.    **Media Matters and Hananoki are likely to prevail on the merits of their claims** ........................................................................................................................ 13

    A.    Plaintiffs are likely to establish Paxton retaliated against their constitutionally protected activities in violation of the First Amendment ...................................... 13

        1.    Media Matters's and Hananoki's newsgathering and reporting are protected First Amendment activities. ........................................................ 14

        2.    Paxton's retaliatory conduct has already chilled Plaintiffs' First Amendment rights and would chill any person of ordinary firmness ............ 16

        3.    Paxton's retaliatory actions are a direct causal response to Plaintiffs' constitutionally protected activities. ............................................................ 21

    B.    Plaintiffs are likely to establish that Paxton's Demand violates both the First and Fourth Amendments and the Maryland and D.C. shield laws. .............. 22

    C.    Plaintiffs are likely to establish that the legal process against them in Texas violates Due Process due to a lack of contact with that state ............................... 26

  II.    **Plaintiffs will suffer irreparable harm absent an order restraining Paxton's investigation and enforcement of his Demand.** ..................................................... 27

  III.    **The remaining equitable factors strongly favor granting preliminary relief** ...... 30

CONCLUSION ...................................................................................................................... 30

CERTIFICATE OF SERVICE .............................................................................................. 33

## INTRODUCTION

Media Matters for America ("Media Matters") and Eric Hananoki research and report on political extremism in the media. Their work is impactful, often at the center of a vigorous ongoing national conversation about political extremism in American public life. And it regularly shines a light on public figures and politicians who engage in hateful political rhetoric. These powerful people often bristle at this accountability, which is why Plaintiffs must now come to this Court: In response to Plaintiffs' journalism, Texas Attorney General Ken Paxton has misused the powers of his office to launch a retaliatory and unlawful investigation against Plaintiffs for their constitutionally protected research and reporting. This lawless investigation—which includes a demand that Paxton be permitted to rifle through Plaintiffs' most sensitive journalistic and organizational documents—is a frontal assault on our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open," particularly where it concerns criticism of "government and public officials." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). Plaintiffs seek immediate relief to protect their constitutionally protected speech and press rights, and their rights under the Maryland and District of Columbia reporters' shield laws, pending adjudication of their claims for declaratory relief. Plaintiffs have been—and will continue to be—irreparably harmed without immediate relief.

Hananoki, a Senior Investigative Reporter at Media Matters, has investigated the dramatic rise in hateful rhetoric on X since it was acquired about 15 months ago by Elon Musk. Musk has held X out as a "digital town square" for public debate, all while gutting its ability to regulate content that promotes violence, white nationalism, antisemitism, and a host of baseless conspiracy theories. Such content has proliferated under Musk's ownership, driving away advertisers who have seen their brands appear alongside vile hate speech. Plaintiffs and other media organizations have documented this trend in America's so-called digital town square for over a year.

On November 16, 2023, Hananoki published an article—"*As Musk endorses antisemitic conspiracy theory, X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content*"—reporting on Musk's support for a conspiracy theory that Jewish people have a "hatred against whites" and support "flooding the[] country" with "hordes of minorities." His article noted that at the same time Musk endorsed this antisemitic conspiracy theory, X was placing advertisements next to pro-Nazi content. Musk took offense at this coverage, and immediately threatened a "thermonuclear" lawsuit. Certain politicians and media figures rallied to Musk's cause, including Paxton, who on November 20—the same day Musk sued Plaintiffs—announced he was launching an investigation into Media Matters. Paxton offered no explanation as to how Media Matters—a D.C.-based non-profit—or Hananoki—a Maryland-based reporter—violated Texas law, or even what possible jurisdiction he had over them, as none of their work covering Musk occurred in or had anything to do with Texas. Instead, Paxton announced he was "troubled" by Musk's "allegations" and attacked Media Matters as a "radical anti-free speech organization" that "would like nothing more than to limit freedom by reducing participation in the public square."

Two days later, Paxton issued a civil investigative demand ("Demand") commanding Media Matters to turn over confidential materials, including documents and communications about their research and reporting, communications with possible sources at X and its advertisers, and sensitive materials related to Media Matters's operations. *See* Declaration of Christopher D. Dodge ("Dodge Decl."), Ex. A. The Demand was served on December 1 with a return date of December 12—two days ago—meaning that Paxton is entitled to enforce the demand in Texas state court at any time. The Demand is an extraordinary intrusion into Plaintiffs' newsgathering and reporting, plainly intended to chill those activities, acting in effect as an ongoing demand for virtually any materials Plaintiffs have—or may create—related to their research and reporting on X or Musk.

Paxton's retaliatory investigation and Demand are transparent attempts to punish and deter Plaintiffs speech and press activities. This retaliatory campaign has, for now, had its intended effect: Plaintiffs have been chilled from publishing additional criticism or coverage of X or Musk since Paxton announced his investigation—despite a flood of tips identifying extremist content on the platform—for fear of further retaliation and harassment. To remedy this ongoing irreparable harm, Plaintiffs move for a temporary restraining order enjoining Paxton from further investigating them or enforcing his Demand, as well as a preliminary injunction to ensure such relief is maintained until their constitutional and state law claims are resolved on the merits. This Court has jurisdiction to enjoin Attorney General Paxton because this lawsuit arises from unlawful retaliatory action that he intentionally directed towards Maryland. Compl. ¶ 12. Plaintiffs request a speedy hearing under Rule 57 on their claim for declaratory relief that the Demand and the investigation violate their rights under the U.S. constitution and Maryland law.

## BACKGROUND

### A.   Over the past year, in the wake of Musk's ownership, X consistently places advertisements on racist, antisemitic, and violent accounts.

Elon Musk completed his purchase of the social media platform now known as X on October 27, 2022. He purchased the platform, purportedly, because of his belief that "it is important to the future of civilization to have a common digital square."[1] After taking control, Musk promptly laid off approximately 80 percent of the platform's staff and hollowed out critical areas responsible for overseeing platform policy, trust and safety, communications, and ethical AI. Compl. ¶ 25. He likewise laid off many of the content moderators responsible for keeping the

---

[1] Douglas Yeung, *The 'Digital Town Square' Problem*, TheRANDBlog (Jan. 13, 2023), https://www.rand.org/pubs/commentary/2023/01/the-digital-town-square-problem.html.

platform free of harassment. *Id*. Musk's sweeping changes raised public alarm and sparked concern amongst lawmakers over the platform's ability to combat misinformation and hate speech.[2]

Under the auspices of promoting "free speech," Musk also suspended products and policies that protected users from misinformation and violent content. Compl. ¶ 26. He reinstated suspended accounts of known white supremacists and conspiracy theorists while suspending the accounts of journalists reporting on his air travel. *Id*. In the wake of Musk's deep changes to the social media platform, extremist, racist, antisemitic, and violent content surged on X. *Id*. ¶ 27. Within the 12 hours of Musk's takeover, there had been "a nearly 500% increase in the use of the N-word." *Id*. Within the first week, use of the word "Jew" increased fivefold with antisemitic content receiving the most engagement. *Id*. Within just two months, the New York Times reported the following about the rise in hate speech on the platform:

- "Before Elon Musk bought Twitter, slurs against Black Americans showed up on the social media service an average of 1,282 times a day. After the billionaire became Twitter's owner, they jumped to 3,876 times a day."
- "Slurs against gay men appeared on Twitter 2,506 times a day on average before Mr. Musk took over. Afterward, their use rose to 3,964 times a day."
- "[A]ntisemitic posts referring to Jews or Judaism soared more than 61 percent in the two weeks after Mr. Musk acquired the site."

Compl. ¶ 28. The platform likewise saw a renewed explosion of baseless conspiracy theories concerning, among other things, COVID-19 vaccines and Qanon. This spike in violent and extremist content on X, as well as Musk's drastic management changes, were widely reported on by a broad array of media outlets at the time. *Id*. (collecting sources).

---

[2] Brian Fung & Clare Duffy, *How a single year of Elon Musk turned Twitter into a husk of its former self*, CNN (Oct. 27, 2023), https://www.cnn.com/2023/10/27/tech/elon-musk-twitter-x-one-year-changes/index.html [hereinafter *A single year of Elon Musk turned Twitter into a husk*].

These developments, unsurprisingly, quickly pushed advertisers away. Since "the early days of Musk's takeover, many of Twitter's largest advertisers—including the likes of General Mills and the Volkswagen Group—paused their spending over concerns about X's layoffs, content moderation capabilities and general uncertainty about the platform's future."[3] This led to a precipitous drop in X's revenue. In July 2023, Musk reported "a 50% decline in ad revenue and heavy debt load" and in September reported that advertising revenue was "still down 60%."[4] Still more advertisers began to flee X when the increasing hateful and violent rhetoric started appearing alongside their advertising, creating a false association between their brands and vile hate speech.

X's inability to control the placement of extremist content alongside advertisements was widely reported in the media, beginning soon after Musk's takeover. Some examples include:

1. **Reuters**, "Advertisers react to Twitter's new ownership" (Nov. 18, 2022) ("Advertisers are grappling with Twitter's new ownership under Tesla boss Elon Musk, who once tweeted 'I hate advertising.'").

2. **The Washington Post**, "Amazon, Uber, Snap ads appear on Twitter pages of white nationalists restored by Musk," Faiz Siddiqui (Dec. 6, 2022) ("Ads from dozens of major brands were appearing on white nationalist and extremist accounts.").

3. **ARS Technica**, "Twitter running major brands' ads with extremist tweets—until they get flagged," Ashley Belanger (Dec. 7, 2022) ("[T]the US Department of Health and Human Services realized its promoted tweet about updated COVID vaccines was appearing on Twitter pages of white nationalist accounts.").

4. **The Verge**, "Twitter advertisers aren't happy with ads appearing on pages of white nationalists," Jon Porter (Dec. 7, 2022)

5. **Center for Countering Digital Hate**, "Toxic Twitter: How Twitter Generates Millions in Ad Revenue by Bringing Back Banned Accounts," (Feb. 2023) ("[J] just ten reinstated accounts renowned for publishing hateful content and dangerous conspiracies will generate up to $19 million a year in advertising revenue for Twitter.").

---

[3] *A single year of Elon Musk turned Twitter into a husk*, *supra* note 2; Alberto Chiumento, et al., *Advertisers react to Twitter's new ownership,* Reuters (Nov. 18, 2022), https://www.reuters.com /technology/advertisers-react-twitters-new-ownership-2022-11-03/; Alan Ohnsman, *GM, Ford Say They Aren't Running Twitter Ads As They Assess Changes Under Elon Musk*, Forbes (Oct. 28, 2022), https://www.forbes.com/sites/alanohnsman/2022/10/28/gm-ford-say-they-arent-running-twitter-ads-as-they-assess-changes-under-elon-musk.

[4] *A single year of Elon Musk turned Twitter into a husk*, *supra* note 2.

6. **The Washington Post**, "Twitter stands to gain from restoring formerly banned accounts," Taylor Lorenz (Feb. 9, 2023).

7. **The Kansas City Star**, "Mizzou ad appears on racist X page as social media site faces concerned advertisers," Jonathan Shorman (Mar. 15, 2023) ("CNN reported on Thursday that in the past 24 hours it had spotted ads on X, formerly called Twitter, for the University of Missouri and major brands, such as Amazon, Samsung, Cox Communications and others, on the profile page of VDARE, a racist outlet.").

8. **Business Insider**, "Disney, Microsoft, the NBA Had Twitter Ads Next to Neo-Nazi Propaganda," Katherine Tangalakis-Lippert (June 18, 2023) ("Ads for Disney, ESPN, the NBA, Adobe, and Microsoft appeared . . . next to vitriolic white supremacist content.").

9. **The N.Y. Post**, "Disney, Microsoft ads on Twitter show up next to neo-Nazi propaganda as advertisers return: report," Shannon Thaler (June 19, 2023) ("Neo-Nazi propaganda continues to find a home on Twitter and is adjacent to ads from major companies").

Compl. ¶ 34. This coverage occurred independently of Plaintiffs' own reporting efforts, reflecting the widespread interest and discussion around hate speech in America's "digital town square."

### B.  Media Matters and Hananoki report on X's pattern of placing advertisements on extremist accounts.

Since 2004, Media Matters has reported on misinformation and bias in the media. As part of its mission to educate the public on violent extremism and political rhetoric, Media Matters began researching and reporting on the rise in extremist and fringe content on X after Musk's changes to the platform. Hananoki, a Senior Investigative Reporter at Media Matters whose beat covers political extremism, has for over a decade researched and written countless reports and articles about extremist and violent rhetoric on social media platforms, often criticizing public figures and politicians in the process. Hananoki Decl. ¶¶ 2, 4, 6–9. His reporting has been widely cited and discussed in America's largest news outlets and relied upon by government officials, including a Department of Justice indictment, the Mueller Report on Russian interference in the 2016 election, and a bipartisan U.S. Senate Select Committee on Intelligence report. *Id.* ¶¶ 5–6. Even Attorney General Paxton has previously relied on Hananoki's reporting. In 2020, Hananoki

uncovered "tweets filled with racist rhetoric, violent threats" and conspiracy theories from an Assistant Attorney General in Texas, prompting Paxton's office to fire the employee. *Id.* ¶ 8.

Hananoki has reported on X—and before that, Twitter—for years. His coverage of X has increased over the past year given the marked increase in extremism on the platform since Musk's takeover. *Id.* ¶ 10. Hananoki's research and reporting often focused on what advertisements X's users of different political leanings might see on the platform. Since February 10, 2023, Media Matters has published at least 14 articles about X's placement of advertisements alongside hateful content, most of which were researched and written by Hananoki. Dimiero Decl. ¶ 8. They include:

1. "Under Elon Musk, Twitter is running corporate ads alongside tweets from Holocaust deniers," (Feb. 10, 2023).

2. "Linda Yaccarino just started as Twitter's new CEO, but Elon Musk already destroyed the platform for advertisers," (June 8, 2023).

3. "Dish, Samsung, Wall Street Journal, and others are advertising on the Twitter account of a leading white nationalist group," (June 22, 2023).

4. "Update: Twitter placed ads for USA Today, National Women's Soccer League, and other major brands on a terrorism-linked neo-Nazi account," (July 27, 2023).

5. "Advertisers beware: Elon Musk and Linda Yaccarino are trying to lure you back by rebranding Twitter, but it's still a toxic cesspool," (Aug. 8, 2023).

6. "X Corp. CEO Yaccarino's interview on CNBC should alarm major advertising brands," (Aug. 11, 2023).

7. "Update: Under Linda Yaccarino, X is placing ads for major brands on a verified pro-Hitler account (Aug. 16, 2023).

8. "X is placing ads for brands like the NFL and MLB next to unhinged conspiracy theories about Jewish people and 9/11," (Sept. 11, 2023).

9. "X is placing major ads on a heavily followed antisemitic account that endorses killing politicians and LGBTQ advocates," (Sept. 12, 2023).

10. "X is placing ads for the NFL on prominent white nationalist accounts," (Sept. 27, 2023).

11. "X is placing ads for MLB, the NFL, and the Pittsburgh Steelers on antisemitic and Holocaust denial accounts," (Oct. 12, 2023).

12. "Pro-Hitler and Holocaust denier account: X has paid me $3,000 in ad revenue sharing," (Nov. 13, 2023).

13. "As Musk endorses antisemitic conspiracy theory, X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content," (Nov. 16, 2023).

14. "X is placing ads for Amazon, NBA Mexico, NBCUniversal, and others next to content with white nationalist hashtags," (Nov. 17, 2023).

Hananoki's reporting was consistent with the findings of other news sources—in the wake of Musk's purchase, the X platform continued to juxtapose advertisements alongside extremist content, be it unintentional or not. Hananoki employed ordinary and unremarkable investigative journalistic practices to investigate this issue, using an existing X research account controlled by Media Matters to follow white supremacist accounts and gauge how X's automated advertising algorithm would respond. Compl. ¶¶ 39–40.

His November 16 article reported the results of his most recent investigatory work, providing the public examples of X's advertisement placement and reporting on Musk's endorsement of a widespread antisemitic conspiracy theory that Jewish people are seeking to promote "hatred against whites" and are seeking to "flood[] the[] country" with "hordes of minorities." Hananoki Decl. ¶ 14. In researching, fact checking, and drafting the November 16 article, Hananoki complied with Media Matters's policies and used ordinary journalistic practices. Dimiero Decl. ¶¶ 6–8. Hananoki researched and wrote the article from his home in Maryland, where he does most of his research and reporting. Hananoki Decl. ¶¶ 2, 21. He has never travelled outside of the Washington metropolitan area for his work, including to Texas. *Id.*

### C.   Texas Attorney General Kenneth Paxton retaliates against Media Matters and Hananoki for their reporting.

Despite a year's worth of reporting by Media Matters and other news outlets on X's inability to protect advertisers from extremist content, Musk seemed to take personal offense at Hananoki's November 16 article reporting on Musk's endorsements of an antisemitic conspiracy theory, for which he received widespread condemnation. Hananoki Decl. ¶ 14. Two days after the article was published, and directly referencing Hananoki's article, Musk posted on X that he would

file "a thermonuclear lawsuit against Media Matters." Hananoki Decl. ¶ 16. The post received hundreds of thousands of likes and comments, and tens of thousands of reposts.

Certain media and political figures—nearly all prior subjects of Media Matters's reporting on political extremism—quickly urged retaliation against Media Matters. As an example, on November 19, former adviser to President Trump, Stephen Miller declared "There are 2 dozen+ conservative state Attorneys General," implying states should investigate Plaintiffs for their journalism. Compl. ¶ 47. Missouri Attorney General Andrew Bailey took up Miller's call for retaliation and announced that his "team [was] looking into" Plaintiffs' article. *Id.* ¶ 48. Paxton acted the next day, announcing in November 20 a press release that he was launching an investigation into Media Matters. Dodge Decl., Ex. B. His press release used charged and partisan language to disparage Media Matters as "a radical anti-free speech . . . [and] left-wing organization[] who would like nothing more than to limit freedom by reducing participation in the public square[.]" Ex. B. It noticeably failed, however, to explain how Plaintiffs violated Texas law or were subject to its jurisdiction for Maryland-based reporting about a California-based company.

Paxton then provided an interview to activist Benny Johnson, who framed Paxton's investigation as "devastating" to Media Matters and "com[ing] in concert with Elon Musk dropping . . . [a] 'thermonuclear' lawsuit on Media Matters." Dodge Decl. Ex. C, Nov. 28, 2023 "The Benny Show" Certified Tr. 2:2–4. He pointedly asked Paxton if he "encourage[d] other Republican attorney generals to do this" and asked "Where are the rest of the Republican Ags? . . . Why are they so quiet on issues like this?" *Id.* at 2:7–11. Paxton responded by encouraging other state attorneys general to investigate Media Matters. *Id.* at 2:13–20. Paxton confirmed on CNBC that he launched his investigation because of "the information that []they provide" the public regarding X. Dodge Decl. Ex. D, Tr. at 3:5–6.

On November 21, 2023, the day after announcing his investigation, Paxton issued the Demand. Ex. A. Like the press release, it provided no explanation as to how Media Matters or Hananoki violated Texas law, nor any basis for exercising the State's coercive power over them. The Demand was served on December 1, 2023, with a return date of December 12. In accordance with the return date, Media Matters responded to the Demand on December 12 with a letter setting out a range of objections to the Demand, including but not limited to the arguments raised in this motion. *See* Dodge Decl., Ex. G at 3-6. Media Matters's letter response also provided notice of this lawsuit and Plaintiffs' efforts to obtain preliminary relief. *Id.*[5]

On its face, the Demand is unreasonable, overbroad, and seeks materials that are protected from disclosure under the First Amendment and the Maryland and District of Columbia shield laws. Ex. A at 7. The Demand requests that Media Matters produce on an ongoing basis all documents related to its internal and external communications, from as far back as January 1, 2022, regarding X CEO Linda Yaccarino and Musk's purchase of X, as well as all internal and external communications regarding the November 16 article. *Id*. In other words, it operates as an ongoing demand for virtually any materials related to Plaintiffs' coverage of X and Musk. It also demands all external communications with employees and representatives of X and ten other corporate entities from November 1, 2023 to November 21, 2023, *id*.; categories of documents related to Media Matters' internal operations, including documents related to its organizational structure, sources of income originating in Texas, operational expenditures in Texas, current and past X accounts including those used to obtain the screenshots contained in the November 16 article, and sources of funding for operations involving X research and publications, *id*.

---

[5] In addition to providing notice of this litigation to Paxton via their December 12 letter response, Plaintiffs also served Paxton on December 12. *See* ECF No. 9.

**D.     Media Matters and Hananoki are chilled from further newsgathering and reporting on X and Musk.**

Paxton's investigation, public attacks, and far-reaching Demand have chilled Media Matters and Hananoki's speech and press activities. Hananoki's research and writing have been severely impaired: draft articles he intended to publish about violent extremism on X have been held back by his editors for fear of further retaliation from Paxton. Hananoki Decl. ¶ 30. Since Paxton launched his investigation, Hananoki has not published any articles about Musk and how his ownership of X has enabled political extremism after consistently doing so for months. *Id.* ¶ 31; Dimiero Decl. ¶¶ 13–16. To compound this chill, Hananoki and Media Matters have been subjected to a wave of threats since Paxton's public retaliation campaign. Hananoki Decl. ¶ 28; Padera Decl. ¶ 21; Dimiero Decl. ¶ 19. This has caused Hananoki to fear for his safety and compelled him to increase security at his home. Hananoki Decl. ¶ 29. Media Matters itself has had to hire an outside security firm to ensure the safety of its employees in response. Padera Decl. ¶ 22.

Other researchers and writers at Media Matters have also been constrained in their journalistic work because they are fearful of becoming embroiled in Paxton's investigation or publishing articles that could incite additional retaliation. Dimiero Decl. ¶¶ 13–14, 18. As a direct result of Paxton's harassment, they have pared back reporting and publishing, particularly on any topics relating to the Paxton investigation. *Id*. Media Matters's editorial team's fear of retaliation has repeatedly caused them to not publish stories about X and Musk. *Id.* ¶¶ 15–16. This is not for want of material—Media Matters has received scores of unsolicited tips from readers and X users who continue to witness extremist and violent content placed next to advertisements on X. *Id.* ¶ 15. Media Matters has not pursued these tips due to Paxton's retaliation, in part because any work created by acting on these tips may have to be disclosed to Paxton. *Id.* ¶¶ 15–16, 18.

11

In a radical change of operation, Media Matters's executive and editorial team have also been forced to become closely involved in the organization's publishing decisions since Paxton launched his investigation. *Id*. ¶ 17. Now, Media Matters must carefully assess whether a new article impacts existing legal proceedings or could generate new ones. *Id*. This has significantly slowed down the publication process. *Id*. Meanwhile, Media Matters's associations with external groups have also been impacted by the investigation. Padera Decl. ¶ 20. Several groups that previously collaborated closely with Media Matters are reevaluating doing so following the commencement of Paxton's investigation, worried that any related communications may be turned over to Paxton or lead to investigations into their own work. *Id*.

Paxton's overbroad and unreasonable Demand further chills Plaintiffs' speech by threatening compelled disclosure of thousands of sensitive documents and communications, including materials Hananoki used to prepare his November 16 article relevant to the organization's editorial processes. Ex. A at 7; Dimiero Decl. ¶ 12. It would further require Media Matters to turn over operational information about its employees, donors, funding, and expenditures—closely guarded, non-public information essential to its strategic mission. Padera Decl. ¶ 17.

The Demand is no empty letter—it is backed by the now imminent possibility that Paxton will seek to haul Plaintiffs into a Texas court to compel disclosure of their documents. *See* Tex. Bus. & Com. Code Ann. § 17.62(b). Media Matters and Hananoki have no relevant contacts with Texas, and thus no reasonable expectation that they would ever be summoned to Texas to answer for their journalism and defend their speech and press rights or be subjected to intrusive demands from the State Attorney General. Media Matters is not registered as a foreign corporation in Texas, it has no registered agent in Texas, nor does it "transact business," perform any "business

practices," or conduct any "trade" or "commerce" in Texas. Tex. Bus. Org. Code § 9.0002(a); Bus. & Com. §§ 17.45(6), .46(a). Hananoki's work occurred exclusively in Maryland and involved no contact—direct or indirect—with Texas. Hananoki Decl. ¶¶ 21–24. The prospect that Plaintiffs may be dragged into court in Texas in retaliation for their work in Maryland and D.C. has further chilled them and discouraged further coverage of X and Musk. *Id.* ¶ 34; Dimiero Decl. ¶ 18.[6]

**STANDARD OF REVIEW**

To obtain a temporary restraining order or preliminary injunction, Plaintiffs must show: (1) likelihood of success on the merits; (2) likelihood of "suffer[ing] irreparable harm in the absence of preliminary relief;" (3) "the balance of equities tips in [their] favor;" and (4) "the injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "When a temporary restraining order is sought against the government . . . these last two factors merge." *Ass'n of Cmty. Cancer Ctrs. v. Azar*, 509 F. Supp. 3d 482, 501 (D. Md. 2020) (citing *Pursuing Am. Greatness v. Fed. Elec. Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016)). The requirements for a preliminary injunction are the same as for a temporary restraining order. *See Maages Auditorium v. Prince George's Cnty*, 4 F. Supp. 3d 752, 760 n.1 (D. Md. 2014).

**ARGUMENT**

**I.     Media Matters and Hananoki are likely to prevail on the merits of their claims.**

    **A.     Plaintiffs are likely to establish Paxton retaliated against their constitutionally protected activities in violation of the First Amendment.**

"[T]he law is settled that . . . the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out." *Hartman v. Moore*, 547 U.S.

---

[6] The Deceptive Trade Practices Act also arms Paxton with a host of other powers with which to retaliate against Plaintiffs, including restraining orders, civil penalties, and sanctions. *See, e.g.*, Tex. Bus. & Com. Code Ann. §§ 17.47(a)–(b) (authorizing OAG to "bring an action in the name of the state" for injunctive relief), (c)–(d) (authorizing OAG to seek damages and restitution), (e)–(f) (authorizing OAG to seek monetary civil penalties for violations of injunctions).

250, 256 (2006). "The First Amendment right to free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." *Suarez Corp. Indus. v. McGraw,* 202 F.3d 676, 685 (4th Cir. 2000). "Official reprisal for protected speech 'offends the Constitution [because] it threatens to inhibit exercise of the protected right.'" *Hartman*, 547 U.S. at 256 (quoting *Crawford–El v. Britton,* 523 U.S. 574, 588, n.10 (1998)). It is "obvious" that efforts "to punish political speech by members of the press . . . run afoul of the First Amendment." *El Dia, Inc. v. Rossello*, 165 F.3d 106, 109 (1st Cir. 1999).

The Fourth Circuit has long recognized First Amendment retaliation claims as "actionable" because "retaliatory actions may tend to chill individuals' exercise of constitutional rights." *ACLU of Md., Inc. v. Wicomico Cnty.*, 999 F.2d 780, 785 (4th Cir. 1993) (citing *Perry v. Sindermann,* 408 U.S. 593, 597 (1972)). To prevail, Plaintiffs must show: "(1) [they] engaged in protected First Amendment activity, (2) [Paxton] took some action that adversely affected [their] First Amendment rights, and (3) there was a causal relationship between [their] protected activity and [Paxton's] conduct." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005). "[F]or purposes of a First Amendment retaliation claim under § 1983, a plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter 'a person of ordinary firmness' from the exercise of First Amendment rights." *Id.* at 500. Plaintiffs are likely to prove each of these elements and prevail on the merits of their first claim. A declaratory judgment and injunctive relief are appropriate means of seeking vindication of such rights. *See* 28 U.S.C. §§ 2201 and 2202; *Kenny v. Wilson*, 885 F.3d 280, 287–88 (4th Cir. 2018).

### 1.  Media Matters's and Hananoki's newsgathering and reporting are protected First Amendment activities.

Media Matters is a non-profit media watchdog group that provides journalistic research and investigative reporting on political extremism. *See supra* 6. Hananoki is a senior investigative

reporter for Media Matters who covers political extremism, including extensive coverage of X's ongoing placement of advertisements on racist, antisemitic, and violent accounts on the X platform. *See supra* 6–7. Plaintiffs routinely investigate, publish, report, and comment on political extremism in American media, including on platforms like X.

Plaintiffs' journalistic pursuits—on topics of clear public concern and discussion—are at the core of our First Amendment freedoms. "The protection given speech and press" by the First Amendment "assure[s] [an] unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Roth v. United States*, 354 U.S. 476, 484 (1957). This protection serves not only the news media itself, but society at large: "A broadly defined freedom of the press assures the maintenance of our political system and an open society," *Time, Inc. v. Hill*, 385 U.S. 374, 389 (1967). A free press is foundational to our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co.*, 376 U.S. at 269–70. (explaining such "freedom of expression upon public questions is secured by the First Amendment").

Paxton is targeting Plaintiffs for retaliation because of their protected journalism and speech. As explained, since Musk purchased X in October 2022, the platform has permitted advertisements to appear next to accounts that promote racist, antisemitic, and violent content. *See supra* 3–6. This has been the subject of extensive public discussion and media coverage, and not only from Plaintiffs. *See supra* 5–6. X and Musk have invited this scrutiny by repeatedly framing X as "digital town square" for public debate. *See supra* 6.

Plaintiffs' reporting on this issue of important national concern is unequivocally protected by the First Amendment. They have a "legally protected interest" under the First Amendment to "gather news." *Overbey v. Mayor of Baltimore*, 930 F.3d 215, 227 (4th Cir. 2019). This protection

"unequivocally" extends to their "editorial judgment and . . . free expression of views on" matters of public concern, such as political extremism on X, "however controversial." *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 255 (1974) (quoting *Pittsburgh Press Co. v. Human Relations Comm'n*, 413 U.S. 376, 391 (1973)). Indeed, "the constitutional protection of the press reaches its apogee" where, as here, Plaintiffs are members of the press who write about "a public figure" or "on a matter of public concern." *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092 (4th Cir. 1993) (citing *New York Times Co.*, 376 U.S. at 254); *cf. Tannous v. Cabrini Univ.*, No. CV 23-1115, 2023 WL 8026634, at *3 (E.D. Pa. Nov. 20, 2023) (First Amendment protected allegedly "cherry-picked" reproduction of tweets and commentary suggesting Plaintiff held antisemitic views). Simply put, "the First Amendment applies in full force to *all* 'news, comment, and advertising'" and "protect[s] a news outlet's editorial perspective [and] the way its beat reporters cover a given" public issue. *Washington Post v. McManus*, 944 F.3d 506, 518 (4th Cir. 2019) (quoting *Tornillo*, 418 U.S. at 258). Plaintiffs are therefore likely to show they "engaged in protected First Amendment activity" by investigating and reporting on political extremism on X. *Constantine*, 411 F.3d at 499.

### 2. Paxton's retaliatory conduct has already chilled Plaintiffs' First Amendment rights and would chill any person of ordinary firmness.

Paxton, through his investigation and Demand, has already taken "action that adversely affected [Plaintiffs'] First Amendment rights." *Constantine*, 411 F.3d at 499. To determine whether retaliatory conduct violates the First Amendment, the Fourth Circuit employs an "objective standard" that looks to whether "the defendant's allegedly retaliatory conduct would likely deter 'a person of ordinary firmness' from the exercise of First Amendment rights." *Id.* at 500 (collecting cases). The "plaintiff[s'] actual response to the retaliatory conduct provides some evidence of the tendency of that conduct to chill First Amendment activity" but "it is not

dispositive." *Id.* The "cause of action targets conduct that tends to *chill* [First Amendment] activity, not just conduct that *freezes* it completely." *Id.* (emphases in original). Accordingly, Plaintiffs are *not* required to "prove that the allegedly retaliatory conduct caused [them] to cease First Amendment activity altogether." *Id.* It is sufficient to show—as Plaintiffs do—that Paxton's retaliatory acts would objectively chill the First Amendment activity of similarly situated plaintiffs of ordinary firmness. Indeed, it has already chilled Plaintiffs' protected speech and press activities.

The Court must "conduct this inquiry on a case-by-case basis, considering the actors involved and their relationship." *Snoeyenbos v. Curtis*, 60 F.4th 723, 731 (4th Cir. 2023). Here, as the result of their reporting about a California-based company, a non-profit news organization headquartered in Washington, D.C., and an investigative reporter living and working in Maryland have been made subject to an investigation in Texas seeking highly sensitive material regarding their funding, expenditures, organizational structure, communications with sources, and internal discussion of news stories. Ex. A at 7. The investigation was initiated by a State Attorney General without any showing that Plaintiffs violated that state's law or are even subject to its jurisdiction. *Id.* Indeed, Plaintiffs had *no* reasonable expectation of ever being subject to investigation by the Texas Attorney General, never mind under the state's Deceptive Trade Practices Act—Media Matters is a non-profit media organization, does not engage in trade or commerce with consumers, and neither it nor Hananoki have any relevant connection to the state. Despite no jurisdictional nexus, Paxton demands Plaintiffs turn over to him their most sensitive journalistic and organizational documents. Ex. A at 7. If Plaintiffs refuse, Paxton may seek to have them held in contempt or sue them in a foreign court under unspecified charges. *See* Tex. Bus. & Com. Code Ann. §§ 17.62, 17.47. This form of retaliation is no idle threat or mere inconvenience. It carries serious implications for Media Matters's ability to operate and report on matters of public concern.

To compound matters, Paxton has encouraged other attorneys general to launch their own retaliatory campaigns against Plaintiffs under their state laws, again regardless of any genuine basis to do so or whether Plaintiffs are even plausibly subject to the jurisdiction of such officials. *See supra* 9.

Paxton's explicit retaliation against Plaintiffs for news coverage and reporting would plainly "tend[] to chill the exercise of constitutional rights" by a person or organization of "ordinary firmness." *Constantine*, 411 F.3d at 500. The mere "*threat* of invoking legal sanctions and other means of coercion, persuasion, and intimidation" is sufficient to tend to chill protected speech. *Drive In Theatres, Inc. v. Huskey*, 435 F.2d 228, 230 (4th Cir. 1970) (emphasis added) (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963)); *see also Shoen v. Shoen*, 48 F.3d 412, 416 (9th Cir. 1995) (recognizing First Amendment harm from the "threat of administrative and judicial intrusion into the newsgathering and editorial process" (quoting *Shoen v. Shoen*, 5 F.3d 1289 (9th Cir. 1993))); *Coss v. Teters*, No. 2:23-CV-00180, 2023 WL 3470899, at *4 (S.D.W. Va. May 12, 2023) ("[T]hreats alone can constitute an adverse action if the threat is capable of deterring a person of ordinary firmness from engaging in protected conduct." (quoting *Hill v. Lappin*, 630 F.3d 468, 474 (6th Cir. 2010))).

Paxton's public threats to retaliate have already moved from threat to deed—he has formally announced his investigation and issued the Demand. Courts have, naturally, found that the actual commencement of a threatened investigation—even before any conclusion is reached or penalties imposed—constitutes actionable retaliation. Indeed, the Fourth Circuit found a plaintiff's speech chilled when a state board told him that "he and his website were under investigation" and that the board had "statutory authority" to modify what content he could put on his website— consistent with what Paxton has done here. *Cooksey v. Futrell*, 721 F.3d 226, 237 (4th Cir. 2013).

"A person of ordinary firmness would surely feel a chilling effect" under such circumstances. *Id.*; *see also Abbott v. Pastides*, 900 F.3d 160, 179 (4th Cir. 2018) (explaining "a threatened administrative inquiry" confers standing where "the administrative process itself imposes some significant burden, independent of any ultimate sanction");[7] *White v. Lee*, 227 F.3d 1214, 1228 (9th Cir. 2000) (concluding government officials "unquestionably chilled the plaintiffs' exercise of their First Amendment rights" through a retaliatory investigation even though the officials "did not ban or seize the plaintiffs' materials, and . . . ultimately decided not to pursue either criminal or civil sanctions against them"). The passage of the Demand's return date does nothing to ameliorate this harm. To the contrary, Plaintiffs remain under investigation and must now conduct their journalistic work under the ongoing specter of being hailed into Texas court at any moment to defend against Paxton's efforts to rummage through their files.

The predictable—and intended—chilling effect of Paxton's investigation and Demand is reinforced by the power Texas law gives him to further punish Plaintiffs for noncompliance— "here the penalties include public reprimands, sanctions, civil penalties," *South Carolina Freedom Caucus v. Jordan*, No. 3:23-CV-795-CMC, 2023 WL 4010391, at *8 (D.S.C. June 13, 2023), as well as restraining orders and the ability to haul Plaintiffs into courts in a jurisdiction with which they have no meaningful contacts, Tex. Bus. & Com. Code Ann. §§ 17.47, 17.62; *cf. Technology Patents, LLC v. Deutsche Telekom AG*, 573 F. Supp. 2d 903, 917 (D. Md. 2008) (recognizing the "chilling effect" of haling parties into jurisdiction with which they have limited contacts), *aff'd*

---

[7] *Abbott* involved "an unusual First Amendment claim" where school officials "approved" plaintiffs' public event even "knowing that it would include displays of a swastika and other controversial material," "did nothing to interfere with the event," and "imposed no sanction on the plaintiffs after the fact" despite briefly investigating complaints from other students. 900 F.3d at 168–69. Those facts bear no resemblance to the investigation here, where Plaintiffs remain subject to an ongoing, and not merely "threatened," "administrative inquiry" that "imposes [a] significant burden" on their First Amendment activities, "independent of any ultimate sanction." *Id.* at 179.

*sub nom. Technology Patents LLC v. T-Mobile (UK) Ltd.*, 700 F.3d 482 (Fed. Cir. 2012). These sanctions further establish an "asserted chill [that] would likely deter a person of ordinary firmness from the exercise of First Amendment rights." *S.C. Freedom Caucus*, 2023 WL 4010391, at *8.

Paxton himself recognizes that retaliatory efforts like these are likely to chill speech. In 2016, after Massachusetts issued a similar CID to Exxon Mobil regarding its climate change claims, Paxton and other state Attorneys General filed an amicus brief warning that "the authority attorneys general have to investigate fraud does not allow them to encroach on the constitutional freedom of others to engage in an" public debate. Dodge Decl. Ex. E, Brief of Amici Curiae in *Exxon Mobile Corp., v., et al.*, Case No. Case 16-CV-00469-K, ECF. No. 63-2 at 6. Paxton was concerned such abuse of state law "chills speech" and "contravenes the First Amendment." *Id.*

Finally, although it is not dispositive, Plaintiffs' speech has already been chilled. *See Constantine*, 411 F.3d at 500; *see also Cooksey*, 721 F.3d at 236 (finding plaintiff had "sufficiently shown that he has experienced a non-speculative and objectively reasonable chilling effect of his speech due to the actions of the State Board"); *Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333, 381 (D.D.C. 2020) (finding speech chilled where "journalists and editors ha[d] already refrained from engaging in certain speech and [were] likely to continue doing so" in response to investigation). Hananoki, after writing articles on X for the better part of a year, has been chilled from publishing new articles about the platform due to fear of further retaliation. Hananoki Decl. ¶¶ 30–31; *see also* Dimiero Decl. ¶ 13–18. His editors have instructed him that Media Matters cannot publish work he has already prepared describing extremism on X. At the same time, Media Matters has been flooded with tips about extremist content on X appearing alongside advertisements, but has not followed up on these tips due to chill imposed by Paxton's actions—including, in particular, the concern that it would have to turn over source information to

Paxton per the terms of the Demand. Dimiero Decl. ¶¶ 14–15. Hananoki—with over his sixteen-year career of reporting—has never been subject to this kind of retaliation from a government official, which has severely disrupted his writing and research. Hananoki Decl. ¶ 27, 33.

The chill has impacted Media Matters more broadly. Many other Media Matters reporters have shied away from covering topics that could be perceived as related to Paxton's investigation, for fear of being targeted in legal. Padera Decl. ¶ 18; Dimiero Decl. ¶¶ 14, 18. Media Matters's ability to release work to the public has been harmed—its publication process has been slowed due to a need for leadership to carefully scrutinize work in view of Paxton's investigative intrusion. Dimiero Decl. ¶ 17. Media Matters's editorial team has had to make the difficult decision to keep articles from being published due to threats of investigation and legal action. *Id.* ¶¶ 13–16. Likewise, Plaintiffs' ability to work with other organizations has been chilled. Padera Decl. ¶ 20. Groups that once routinely worked with Media Matters are reevaluating doing so, for fear that their documents and communications could be turned over to a retaliatory Attorney General. *Id.*

### 3. Paxton's retaliatory actions are a direct causal response to Plaintiffs' constitutionally protected activities.

Plaintiffs' commentary and reporting on X, particularly Hananoki's November 16 article discussing Musk's endorsement of an antisemitic conspiracy theory, is unambiguously what caught Paxton's attention. In his own words, Paxton initiated the Demand on Plaintiffs because of "the information they provide" the public regarding X. Ex. D, Tr. at 3:5–6. Paxton's choice to investigate Plaintiffs—without *any* showing that they violated Texas law or are subject to its jurisdiction—immediately followed Musk's public complaints about the November 16 article. *See* Ex. A; Ex. B. Paxton announced his investigation on November 20—the same day Musk filed his meritless civil suit against Media Matters. *See* Ex. B. Not long after launching his investigation, Paxton encouraged *other* state Attorneys General to take retaliatory actions against Plaintiffs.

The Demand also confirms that Paxton's retaliatory conduct is motivated by Plaintiffs' coverage of X and Musk. It demands Plaintiffs turn over "all documents related to internal and external communications" concerning Hananoki's November 16 article, as well Plaintiffs' internal and external communications "regarding Elon Musk's purchase of X" and "regarding Linda Yaccarino;" "communications with employees and representatives of X;" and "all current and past X accounts" controlled by Plaintiffs. *See* Ex. A at 7.

The materials sought by these demands reflect Paxton's desire to rifle through Plaintiffs' files concerning their news coverage and reporting . There is no serious dispute that—but-for Plaintiffs' constitutionally protected reporting on X—Paxton would not have launched his retaliatory investigation or served his Demand. Plaintiffs therefore will show "there was a causal relationship between [their] protected activity and [Paxton's] conduct." *Constantine*, 411 F.3d at 499; *see also Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019). Plaintiffs are therefore likely to prevail on their claim for unlawful retaliation.

**B.     Plaintiffs are likely to establish that Paxton's Demand violates both the First and Fourth Amendments and the Maryland and D.C. shield laws.**

1.     ***Constitutional Claims***. Plaintiffs are presently required to turn over a treasure trove of their most sensitive documents to Attorney General Paxton, who may now haul them into Texas court at any moment. *See supra* 10. Paxton's wide-ranging Demand touches upon nearly every part of Media Matters's operations, including its organizational and employee structure; its "sources of income;" its "operational expenditures;" its "internal communications" on articles and matters of public concern; its social media accounts on X; its communications with employees at X and X's advertisers (including potential sources); and "all direct and indirect sources of funding" for all "operations" relating to publications on X. Ex. A at 7. Plaintiffs are likely to show this intrusive Demand violates both the First and Fourth Amendments.

22

The Fourth Amendment limits the scope of administrative subpoenas. *Okla. Press Publ'g Co. v. Walling*, 327 U.S. 186, 208–11 (1946). Likewise, the First Amendment guards Plaintiffs from the compelled disclosure of materials that would chill their constitutional rights. *Perry v. Schwarzenegger*, 591 F.3d 1147, 1160 (9th Cir. 2009); *Pebble Ltd. P'ship v. EPA*, 310 F.R.D. 575, 582 (D. Alaska 2015) (subpoenas invalid when they have "the tendency to chill the free exercise of political speech and association which is protected by the First Amendment"). These twin constitutional guarantees often overlap; thus, where "the materials sought to be seized" by an administrative subpoena even simply "*may* be protected by the First Amendment," the requirements of the Fourth Amendment are applied with "scrupulous exactitude." *Zurcher v. Stanford Daily*, 436 U.S. 547, 564 (1978) (citing *Stanford v. Texas*, 379 U.S. 476, 485 (1965)) (emphasis added). "No less a standard could be faithful to First Amendment freedoms." *Stanford,* 379 U.S. at 485. That is especially true where, as here, no cause has been shown before demanding documents—such "unrestricted power of search and seizure [can] be an instrument for stifling liberty of expression." *Marcus v. Search Warrants,* 367 U.S. 717, 729 (1961).

Paxton's Demand, on its face, is vastly overbroad, unreasonable, and seeks to pry into matters protected by the First Amendment—it shows no trace of "scrupulous exactitude." *Stanford*, 379 U.S. at 485. It seeks information about Plaintiffs' donors, sources of funding, and expenditures in a manner designed to chill Plaintiffs' speech and press activities. The Supreme Court has "long understood as implicit in the right to engage in activities protected by the First Amendment a . . . right to associate with others." *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2382 (2021) (quoting *Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984)). Accordingly, the First Amendment "prohibit[s] . . . compelled disclosure" of documents about an organization's associational activities—including the compelled disclosures about members and

23

donors—absent compliance with "exacting scrutiny." *Id.* at 2382-83, 2386 (holding California violated First Amendment by requiring disclosure of "donors' names and the total contributions" to charitable organization); *see also NAACP v. Alabama*, 357 U.S. 449, 462 (1958) (membership lists); *Buckley v. Valeo*, 424 U.S. 1, 64 (1976) (campaign contributions); *Am. Fed'n of Lab. & Cong. of Indus. Organizations v. FEC*, 333 F.3d 168, 176 (D.C. Cir. 2003) (identities of employees and volunteers). Paxton, having provided no explanation as to how Plaintiffs may have violated Texas law, has not met the "exacting scrutiny" and "scrupulous exactitude" required to obtain these types of materials. "It is contrary to the first principles of justice to allow a search through all the respondents' r[e]cords, relevant or irrelevant, in the hope that something will turn up." *Fed. Trade Comm'n v. Am. Tobacco Co.*, 264 U.S. 298, 306 (1924) (Holmes, J.). This Court has the power to enjoin enforcement of such a constitutionally infirm subpoena. *See Local 1814, Int'l Longshoremen's Ass'n v. Waterfront Comm'n of N.Y. Harbor*, 667 F.2d 267, 274 (2d Cir. 1981).

The Demand is further infirm because it seeks journalistic materials that are afforded significant constitutional protection. Paxton may not "rummage at large in newspaper files or [] intrude into or [] deter normal editorial and publication decisions" through his search. *Zurcher*, 436 U.S. at 566. In *Zurcher*, the officers lacked "any occasion or opportunity," *id.*, for such rummaging because a judicially approved search warrant provided the necessary "exactitude" regarding the "First Amendment interests [that] would be endangered by the search," *id.* at 565. Paxton has met no similar bar here, yet nonetheless seeks categories of notes and files on draft articles and communications with potential sources—clearly protected materials. *See Lacey v. Maricopa Cnty.*, 693 F.3d 896, 917 (9th Cir. 2012) (quashing "broad, invalid subpoenas demanding that the paper reveal its sources [and] disclose its reporters' notes"). It is certainly not "carefully tailored to avoid unnecessary interference with protected activities." *Pebble Ltd. P'ship*,

24

310 F.R.D. at 582 (quashing subpoena). Fundamentally, Paxton's investigation is targeted at speech and press activities that are afforded broad constitutional protection. Such "investigations premised solely upon *legal* activity are the very type of 'fishing expeditions' that were the target of Justice Holmes's assault in *American Tobacco*." *Major League Baseball v. Crist*, 331 F.3d 1177, 1187 (11th Cir. 2003) (concluding that CID violated Fourth Amendment and "that an investigation predicated solely upon legal activity does not pass muster under *any* standard").

Plaintiffs are therefore likely to prevail on their second claim that the Demand itself is an unlawful fishing expedition in violation of the First and Fourth Amendments.

***Maryland & D.C. Shield Laws.*** The Demand also seeks information protected by Maryland's shield law. Md. Cts. & Jud. Proc. Code Ann. § 9-112(b)(3), (c)(2). The Maryland shield law provides absolute protection against compelled disclosure of sources and qualified protection against compelled disclosure of other information, including "any news or information procured . . . in the course of pursuing [] professional activit[ies]," including notes, to the extent such information is not publicly disclosed. *See id*. § 9-112(c). It protects media organizations and their employees acting within the scope of a contract in any news gathering or disseminating capacity. *See id*. § 9-112(d). The shield law is grounds to quash or limit a subpoena. *Equitable Trust Co. v. State Comm'n on Human Relations*, 411 A.2d 86, 99 (Md. 1979) ("It is well established that an enforcing court may limit through modification or partial enforcement subpoenas it finds to be unduly burdensome." (quoting *F.T.C. v. Texaco, Inc.*, 517 F.2d 137, 149–50 (D.C. Cir. 1975)); *Bice v. Bernstein*, 1994 WL 555379, at *1 (Md. Cir. Ct. Apr. 20, 1994) (quashing subpoena even where qualified disclosure test met). The Demand also seeks information protected by D.C.'s similar shield law. *See* D.C. Code § 16-4702.

25

Permitting attorneys general, like Paxton, to skirt another state's shield laws by misusing their own statutory authority to issue subpoenas violates basic principles of federalism and would make a mockery of state shield laws. Maryland and the District of Columbia each have a profound interest in protecting their residents from being summoned away from their home jurisdictions—by states that plainly personal jurisdiction over such residents—and made to divulge documents protected by Maryland and D.C. law. Texas may not "enact [] a policy for the entire Nation" by issuing CIDs that trample over another state's shield laws and deprive residents of the benefits of such laws. *See BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 571 (1996).

### C.     Plaintiffs are likely to establish that the legal process against them in Texas violates Due Process due to a lack of contact with that state.

The Due Process Clause of the Fourteenth Amendment "recognizes and protects an individual liberty interest" against being unwillingly subjected to legal process in a jurisdiction with which a person lacks meaningful contact. *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982). Simply put, due process guards against forcing parties like Plaintiffs to "submit[] to the coercive power of a State that may have little legitimate interest in the claims in question." *Bristol-Myers Squibb Co. v. Superior Ct. of California*, 582 U.S. 255, 263 (2017). Such arbitrary imposition of a "State's coercive power" is "subject to review for compatibility with the Fourteenth Amendment's Due Process Clause." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 918 (2011). Plaintiffs are likely to show that they are not within the personal jurisdiction of Texas, and thus not lawfully subject to Paxton's retaliatory investigation or any effort by him to enforce the Demand against Plaintiffs in Texas court.

Two flavors of personal jurisdiction exist: general and specific. *See Bristol-Myers Squibb*, 582 U.S. at 262. Plaintiffs are plainly not subject to general jurisdiction in Texas—neither is domiciled or "fairly regarded as at home" in Texas. *Goodyear*, 564 U.S. at 924; *see supra* 8.

Specific jurisdiction is lacking as well. It requires "an affiliation[n] between the forum and the underlying controversy, principally, [an] activity . . . that takes place in the forum State and is therefore subject to the State's regulation." *Goodyear*, 564 U.S. at 919 (first alteration in original). The controversy here arises out of Media Matters's and Hananoki's reporting and publishing on political extremism on X—work which occurred exclusively in Maryland and D.C. No element of this work occurred in Texas or required interaction with Texas. *See supra* 8. Paxton's actions alone are what connects this case to Texas, but he "cannot be the only link between" between his chosen forum and Plaintiffs—"[r]ather, it is [Media Matters and Hananoki's] conduct that must form the necessary connection with the forum State" for any jurisdictional basis to exist there. *Walden v. Fiore*, 571 U.S. 277, 285 (2014). No such connection exists here. Accordingly, Plaintiffs are likely to show that any imposition of Texas's coercive power by Paxton violates due process.

That Media Matters publishes Hananoki's work on a website available to anyone with an internet connection changes nothing. "Making a website that's visible in Texas, of course, does not suffice" for jurisdiction. *Johnson v. TheHuffingtonPost.com, Inc.*, 21 F.4th 314, 320 (5th Cir. 2021), *cert. denied*, 143 S. Ct. 485 (2022). "[T]he website does not target [Texas] residents . . . any more than it targets any other state" and "makes itself available to any one who seeks it out, regardless of where they live." *Fidrych v. Marriott Int'l, Inc.*, 952 F.3d 124, 141 (4th Cir. 2020). Accordingly, "the general availability of the website to [Texas] residents . . . does not create the substantial connection to [Texas] necessary to support the exercise of jurisdiction." *Id.* at 143.

## II.    Plaintiffs will suffer irreparable harm absent an order restraining Paxton's investigation and enforcement of his Demand.

Hananoki and Media Matters have been suffering irreparable harm since Paxton first served his retaliatory and far-ranging Demand. The issuance of this Demand by a state Attorney General has reasonably chilled Plaintiffs from publishing news coverage and criticism of Musk

and X. *See supra* 11–13. It is well established that "'loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Newsom ex rel. Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003) (internal quotations omitted). This harm will continue while Plaintiffs' journalistic efforts are subject to the intrusive and retaliatory demand for documents and communications from Paxton. *Id*. "[E]very moment's continuance" of Paxton's investigation into Plaintiffs' newsgathering and Demand for materials "amounts to a flagrant, indefensible, and continuing violation of the First Amendment." *New York Times Co. v. United States*, 403 U.S. 713, 714–15 (1971) (Black, J., concurring).

Plaintiffs' irreparable harm is exacerbated by the far-ranging scope and immense burdens of Paxton's retaliatory Demand. Among other overbroad requests, the Demand seeks "all documents" relating to "internal and external communications" regarding "Elon Musk's purchase of X" and "Linda Yaccarino" generally. Ex. A at 7. Because it requires continued production of documents until Plaintiffs' "final" production, Paxton's retaliatory Demand operates effectively as an ongoing demand for any new documents Media Matters and Hananoki create in relation to further reporting that Media Matters and Hananoki may wish to do on the impact of Musk's purchase of the X platform, for example, further chilling their ability to report and speak on such topics. The Demand even seeks "all of Media Matters for America's external communications with employees and representatives of X" between certain dates, effectively a demand for communications with sources at X. *Cf. N.J.-Philadelphia Presbytery of the Bible Presbyterian Church v. N.J. State Bd. of Higher Educ.*, 654 F.2d 868, 884 (3d Cir. 1981) (observing likelihood of irreparable harm in "first amendment contexts" where state action "prevent[s] a source from communicating with a reporter"). Paxton's prying into Plaintiffs' notes, research materials, and communications with any sources—in a jurisdiction where none of Plaintiffs' activities occur—

adds to the harm Plaintiffs are suffering. Dimiero Decl. ¶¶ 12–19; Hananoki Decl. ¶¶ 27–34. The passage of the return date only exacerbates this harm—Plaintiffs may now be dragged to Texas at a moment's notice.

The Demand poses an additional imminent and irreparable injury to their associational rights. *See Bonta*, 141 S. Ct. at 2382 (2021) (quoting *Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984)). At nothing more than the caprice of Paxton, Texas now demands documents from Plaintiffs concerning their donors, employees, operational expenditures, and internal communications. Ex. A at 7. Defendant Paxton has offered *zero* explanation of Texas's need for these materials, never mind an explanation sufficient to meet exacting scrutiny. *Bonta*, 141 S. Ct. at 2382–83. Indeed, to date Paxton has offered no explanation at all as to how Plaintiffs have violated Texas law or are properly subject to investigation in Texas. *See generally* Ex. A. Subjecting Plaintiffs to such an "unreasonable search[]" is "sufficient to demonstrate irreparable harm." *Am. Fed'n of Teachers.-W. Va., AFL-CIO v. Kanawha Cnty. Bd. of Educ.*, 592 F. Supp. 2d 883, 892 (S.D.W. Va. 2009) (violation of Fourth Amendment constituted irreparable harm).[8]

Plaintiffs' already strong showing of irreparable harm here is bolstered by the strength of their First Amendment claims. "[I]n the context of an alleged violation of First Amendment rights, a plaintiff's claimed irreparable harm is 'inseparably linked' to the likelihood of success on the merits of plaintiff's First Amendment claim." *WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave,* 553 F.3d 292, 298 (4th Cir. 2009). The flagrancy of Paxton's violation of core First Amendment rights reinforces the need for swift relief to remedy Plaintiffs' ongoing harms.

---

[8] The compelled disclosure of Plaintiffs' donors constitutes irreparable harm both to Plaintiffs and their donors, who lack the opportunity to protect their identities from disclosure. The irreparable harm to third parties further pushes this factor, as well as the balance of the equities, in Plaintiffs' favor. *See Jones v. D.C.*, 177 F. Supp. 3d 542, 546 n.3 (D.D.C. 2016).

**III.    The remaining equitable factors strongly favor granting preliminary relief.**

The remaining equitable factors favor Plaintiffs. Both "factors [are] established when there is a likely First Amendment violation." *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 191 (4th Cir. 2013). That is because "it is *always* in the public interest to protect First Amendment liberties." *Legend Night Club v. Miller*, 637 F.3d 291, 303 (4th Cir. 2011) (emphasis added) (quoting *Joelner v. Vill. of Wash. Park*, 378 F.3d 613, 620 (7th Cir. 2004)). That interest is heightened where, as here, the First Amendment protections serve both Plaintiffs and the public at large; "[a]n untrammeled press is a vital source of public information, and an informed public is the essence of working democracy." *Minneapolis Star and Tribune Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575, 585 (1983) (cleaned up). Granting temporary relief ensures that Plaintiffs may continue to participate in the "unfettered interchange of ideas for the bringing about of political and social changes desired by the people," *Roth*, 354 U.S. at 484, and further serves the public interest against intrusive government fishing expeditions, *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021) (en banc).

In contrast, granting preliminary relief does not harm Paxton. Because his investigation lacks any legitimate basis or connection to Texas, he suffers no harm in having his efforts temporarily enjoined. Paxton "cannot legitimately claim to be 'harmed' as a result of being restrained from illegal conduct." *Prysmian Cables & Sys. USA, LLC v. Szymanski*, 573 F. Supp. 3d 1021, 1044 (D.S.C. 2021) (collecting cases). "If anything, the system is improved by such an injunction." *Giovani Carandola, Ltd. v. Bason,* 303 F.3d 507, 521 (4th Cir. 2002).

## CONCLUSION

For the reasons set forth above, the Court should grant Plaintiffs' motion for a temporary restraining order and a preliminary injunction. A proposed order is attached.

Dated: December 14, 2023

Respectfully submitted,
*/s/ Tina Meng Morrison*

**ELIAS LAW GROUP LLP**
Abha Khanna*
1700 Seventh Ave. Suite 2100
Seattle, WA 98101
T: (206) 656-0177
akhanna@elias.law

Tina Meng Morrison (D. Md. Bar No. 21832)
Aria C. Branch*
Christopher D. Dodge*
Jacob D. Shelly**
Elena A. Rodriguez Armenta***
Daniela Lorenzo**
Omeed Alerasool*
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
T: (202) 968-4652
tmengmorrison@elias.law
abranch@elias.law
cdodge@elias.law
jshelly@elias.law
erodriguezarmenta@elias.law
dlorenzo@elias.law
oalerasool@elias.law

**GIBSON, DUNN & CRUTCHER LLP**
Theodore J. Boutrous, Jr.***
Jay P. Srinivasan***
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: (213) 229-7000
Email: tboutrous@gibsondunn.com
Email: jsrinivasan@gibsondunn.com

Amer S. Ahmed***
Anne Champion***
200 Park Avenue
New York, New York 10166
Telephone: (212) 351-4000
Email: aahmed@gibsondunn.com
Email: achampion@gibsondunn.com

*Admitted *pro hac vice*
**Application for admission pending
*** *Pro hac vice* application forthcoming

*Counsel for Plaintiffs Media Matters for America and Eric Hananoki*

## CERTIFICATE OF SERVICE

I hereby certify that this document will be served on the Defendant in accordance with Federal Rule of Civil Procedure 5(a).

*/s/ Tina Meng Morrison*
Tina Meng Morrison