IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| MEDIA MATTERS FOR AMERICA, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>WARREN KENNETH PAXTON JR., in his official capacity as Attorney General of the State of Texas,<br><br>Defendant. | CIV. NO. 23-3363 |

**DECLARATION OF CHRISTOPHER D. DODGE IN SUPPORT OF
PLAINTIFFS' RENEWED MOTION FOR TEMPORARY RESTRAINING ORDER**

I, Christopher D. Dodge, declare as follows:

1.      I am over the age of 18, am competent to testify, and have personal knowledge of the facts and information set forth in this declaration.

2.      I am a Counsel at Elias Law Group LLP in Washington, DC. I am a member of the bar in the State of New York, the Commonwealth of Massachusetts, and the District of Columbia. I am counsel for Media Matters for America and Eric Hananoki ("Plaintiffs") in this matter and have been admitted to this Court *pro hac vice*.

3.      I submit this declaration in support of Plaintiffs' Renewed Motion for Temporary Restraining Order in the above-captioned matter.

4.      A true and correct copy of the Civil Investigative Demand issued on November 21, 2023 by Texas Attorney General Warren Kenneth Paxton Jr. is attached as **Exhibit A**.

5.      A true and correct copy of the November 20, 2023 press release from Attorney

General Paxton's office describing the investigation is attached as **Exhibit B**.

6.      A true and correct copy of the certified transcript of Attorney General Paxton's November 28, 2023 interview with Benny Johnson is attached as **Exhibit C**.

7.      A true and correct copy of the certified transcript of Attorney General Paxton's November 21, 2023 interview with CNBC "Last Call" is attached as **Exhibit D**.

8.      A true and correct copy of Brief of Amici Curiae in *Exxon Mobile Corp., v., et al.*, Case No. Case 16-CV-00469-K, ECF. No. 63-2, is attached as **Exhibit E**.

9.      Attached as **Exhibit F** is a true and correct copy of a December 13, 2023 email that I personally sent to Mr. Levi Fuller and Mr. Will Taylor of the Texas Attorney General's Office, along with the attachments to that email. The attachments include (1) a letter response to Attorney General Paxton's Civil Investigative Demand; (2) a copy of the complaint in this matter; and (3) a copy of Plaintiffs' December 12, 2023 motion for a temporary restraining order. I previously received correspondence from Mr. Fuller at the email address to which I addressed these materials.

10.      I also mailed copies of the contents of my December 13, 2023 email to Mr. Fuller to the address he provided on the Civil Investigative Demand. Attached as **Exhibit G** is a true and correct copy of a December 13, 2023 United States Postal Service Express 1-Day shipping label reflecting this mailing.


Under 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

*/s/ Christopher D. Dodge*
Christopher D. Dodge

# Exhibit A



OFFICE OF THE ATTORNEY GENERAL
CONSUMER PROTECTION DIVISION

# CIVIL INVESTIGATIVE DEMAND

**To:**   **Media Matters for America**        *via FedEx 7741 8756 3037*
                                                   **Return Date: December 12, 2023**

**c/o**   **Angelo Carusone**
         **800 Maine Ave SW, Suite 500**
         **Washington, DC 20024**

Pursuant to this office's specific authority under § 17.61 of the Texas Deceptive Trade Practices – Consumer Protection Act, §§ 17.41-.63, Texas Business and Commerce Code ("DTPA"), Media Matters for America ("Media Matters") is hereby directed to produce the items listed in **"Exhibit A"** attached hereto.

You are to make available the documentary material described in **"Exhibit A"** to the undersigned Assistant Attorney General, or other authorized agent(s) identified by the Consumer Protection Division ("Division"), by the "Return Date" indicated above for inspection and copying. In lieu of producing the originals for inspection and copying at your principal place of business, you may deliver true copies of the requested documents to the Assistant Attorney General or Authorized Agent below at the Office of the Attorney General, 300 W 15th St, Austin, TX, 78701. **Contact one of the persons listed below upon receipt to discuss the logistics of producing the requested documents to the Division.**

The Division believes that Media Matters for America is in possession, custody, or control of documentary material relevant to the subject matter of an investigation of possible violations of §§ 17.46(a) and (b) of the DTPA, related to false, misleading, and/or deceptive practices in the State of Texas.

> **TAKE NOTICE THAT pursuant to section 17.62, Texas Business and Commerce Code, any person who attempts to avoid, evade, or prevent compliance, in whole or in part, with this directive by removing, concealing, withholding, destroying, mutilating, altering, or by any other means falsifying any documentary material may be guilty of a misdemeanor and on conviction is punishable by a fine of not more than $5,000.00 or by confinement in the county jail for not more than one year, or both.**

ISSUED THIS 21st day of November, 2023.

/s Levi Fuller                              **Authorized Agent**
Levi Fuller                                 Ryan Hanlan
Assistant Attorney General                  Investigator
(512) 936-1308                              (512) 936-3354

## Instructions

1. **Read These Instructions/Definitions.** Read these instructions and definitions carefully.

2. **Duty to Preserve Documents**. All documents and/or other data which relate to the subject matter or requests of this Civil Investigative Demand must be preserved. *Any ongoing, scheduled or other process of document or data destruction involving such documents or data must cease even if it is your normal or routine course of business for you to delete or destroy such documents or data and even if you believe such documents or data are protected from discovery by privilege or otherwise.* Failure to preserve such documents or data may result in legal action and may be regarded as spoliation of evidence under applicable law.

3. **Relevant Dates**. Unless otherwise noted, the requests in this Civil Investigative Demand require production of documents for each year from January 1, 2022 to the final date of your production of responsive documents, herein called "the relevant time period."

4. **Custody and Control.** In responding to this Civil Investigative Demand, you are required to produce not only all requested documents in your physical possession, but also all requested documents within your custody and control, including those within the possession of persons reasonably available to you or under your direction or control.

5. **Identification of Documents not in Custody or Control.** If any responsive document was, but no longer is, in your possession, custody or control, produce a description of each such document. The description shall include the following:

   a. The name of each author, sender, creator, and initiator of such document;

   b. the name of each recipient, addressee, or party for whom such document was intended;

   c. the date the document was created;

   d. the date(s) the document was in use;

   e. a detailed description of the content of the document;

   f. the reason it is no longer in your possession, custody or control; and

   g. the document's present whereabouts.

   If the document is no longer in existence, in addition to providing the information indicated above, state on whose instructions the document was destroyed or otherwise disposed of, and the date and manner of the destruction or disposal.

6. **Privileged Documents**. If any responsive document is withheld, in whole or in part, under any claim of privilege, provide a detailed privilege log that contains at least the following information for each document or partial document that you have withheld:

   a. the document's control numbers;

   b. all authors of the document;

   c. all addressees of the document;

   d. all recipients of the document or of any copies of the document, to the extent not included among the document's addressees;

e.  the date of the document;

f.  a description of the subject matter of the document sufficient to determine the applicability of the privilege;

g.  the nature or type of the privilege that is being asserted for the document (e.g., "attorney-client privilege");

h.  the specification(s) of the Demand to which the document is responsive;

i.  the document control number(s) of any attachments to the document, regardless of whether any privilege is being asserted for such attachment(s); and

j.  whether the document has been produced in redacted form, and if so, the range of the control numbers for the document.

7.  **Trade Secrets.** It is your responsibility to clearly designate which, if any, of the requested documents contain trade secrets, in accordance with Section 17.61(f) of the Texas Business and Commerce Code.

8.  **Consult Before Producing Documents.** Before processing or making copies of hard copy documents or electronically stored information in response to this Civil Investigative Demand, consult with the designated representative(s) of the Office of the Attorney General, ("OAG") identified above and reach agreement on the format and method of production.

    Likewise, before producing any *original* documents, consult with one of the designated representatives of the OAG identified above to obtain approval. If you produce original documents, the OAG cannot guarantee their return.

9.  **You May Produce Copies.** Subject to the consultation requirement noted above, you may submit photocopies (with color photocopies where necessary to interpret the document) in lieu of original hard-copy documents, provided that such copies are accompanied by an affidavit of an officer of Media Matters for America stating that the copies are true, correct, and complete copies of the original documents, and (if appropriate) were generated and maintained in the ordinary course of your business, and provided that where the original contains colored text or images, a color copy must be provided.

10. **Non-identical Copies to be Produced.** Identical copies of responsive documents need not be produced. However, any copy of a document that differs in any manner, including but not limited to the presence of handwritten notations, different senders or recipients, etc. must be produced.

11. **No Redaction**. All materials or documents produced in response to this Civil Investigative Demand shall be produced, except as deemed privileged, in complete unabridged, unedited and unredacted form, even if portions may contain information not explicitly requested, or might include interim or final editions of a document.

12. **Documents to be Bates Numbered.** Mark each page or electronic medium (e.g., disk, tape, or CD) with individual or corporate identification and eight-digit consecutive document control numbers (e.g., DOE-12345678; CORP-12345678). Hardcopy bound pamphlets or books may be marked with a single identification and control number. Documents as to which privilege is asserted are to also receive identification and control numbers.

    If your production will be more than one box or piece of electronic media, number each box or electronic media, as well as the total number of boxes/media (e.g., box 1 of 13) and mark each with the name(s) of the person(s) whose files are contained therein, the requests(s) to which they are responsive, and the document control numbers contained therein.

13. **Document Organization**. *Each document and other tangible thing produced shall be clearly designated as to which request, and each sub-part of a request, that it satisfies. The documents produced shall be identified and segregated to correspond with the number and subsection of the request.*

14. **Production of Electronic Documents.** Unless otherwise agreed to in writing by the designated OAG representative, electronically stored information shall be produced in electronic form. Before you prepare documents or information for production in electronic form in order to comply with this Civil Investigative Demand (for example, before you attempt to process electronically stored information or image hard copy documents), you must consult with the designated representative(s) of the OAG identified above and reach agreement regarding the format and method of production.

15. **Questions.** Questions concerning this Civil Investigative Demand should be directed to Assistant Attorney General Levi Fuller at (512) 936-1308.

# Definitions

1. **"You," "your," "the business," "Media Matters for America,"** or **"Media Matters"** means Media Matters for America, their past and present officers, employees, agents and representatives, parents and predecessors, divisions, subsidiaries, affiliates, partnerships and joint ventures, and includes all persons and entities acting or purporting to act under the guidance or on behalf of any of the above. The terms "subsidiary," "affiliate," and "joint venture" refer to any firm in which there is total or partial ownership (25 percent or more) or control between the company and any other person or entity.

2. **"X," "X Corp.," "Twitter,"** or **"Twitter, Inc."** means X, their past and present officers, employees, agents and representatives, parents and predecessors, divisions, subsidiaries, affiliates, partnerships and joint ventures, and includes all persons and entities acting or purporting to act under the guidance or on behalf of any of the above.

3. **"Document"** means the original and all non-identical copies (whether different from the original because of notes, underlining, attachments, or otherwise) of all computer files, and all written, printed, graphic or recorded material of every kind, regardless of authorship. It includes communications in words, symbols, pictures, photographs, sounds, films, and tapes, as well as electronically stored information, computer files, together with all codes and/or programming instructions and other materials necessary to understand and use such systems. The term "computer files" includes information stored in or accessible through computers or other information retrieval systems and includes but is not limited to drafts of documents, metadata, embedded, hidden and other bibliographic or historical data describing or relating to documents created, revised, or distributed on computer systems, as well as spreadsheets and their underlying cell formulae and other codes. Thus, you should produce documents that exist in machine-readable form, including documents stored in personal computers, portable computers, workstations, minicomputers, phones, pagers, personal data/digital assistants, archival voice storage systems, group and collaborative tools, electronic messaging devices, mainframes, servers, backup disks and tapes, archive disks and tapes, and other forms of offline storage, whether on or off your premises. This definition covers electronic mail messages ("e-mail"), text messages, voice mail, and all other documents in the possession of you and/or your directors, officers, managers, or employees, whether located at their home or office, whether on work or personal devices. Notice: Unless otherwise specified, the term "document" excludes bills of lading, invoices in non-electronic form, customs declarations, purchase orders, and other similar documents of a purely transactional nature.

4. **"Communication"** means any exchange or transmission of words or ideas to another person or an entity, including without limitation conversations, discussions, letters, memoranda, meetings, notes, speeches, or other transfer of information, whether written, oral, or by any other means, whether direct or indirect, formal or informal, and includes any document which abstracts, digests, transcribes or records any such communication. This definition extends to and encompasses electronic communications on internal chat platforms such as Slack, Microsoft Teams, Google Chat, and other similar messaging platforms.

5. **"Entity"** means legal or business entity of any kind and includes, without limitation, corporations, partnerships, joint ventures, associations, governmental bodies, and trusts.

6. **"Evidencing"** means having any tendency to make the existence of any fact related to the request more probable than it would be without the evidence.

7. **"Identify"** means

    a.  Regarding an individual, to identify that individual's:

        i.  name;

        ii.  current or last known telephone numbers at business and home; and

        iii.  current or last known business and home addresses.

    b.  Regarding a person other than an individual, to identify:

        i.  its full name;

        ii.  the nature of its organization;

        iii.  the address and telephone number of its principal offices and, if applicable, the state in which it is incorporated; and

        iv.  its principal line of business or activity.

    c.  Regarding any other tangible thing, to identify:

        i.  what it is, giving a reasonably detailed description thereof;

        ii.  when, where, and how it was made, if applicable;

        iii.  who made it, if applicable; and

        iv.  its current custodian or the person that had last known possession, custody, or control thereof.

8. **"Including"** means including, but not limited to.

9. **"Person"** includes you and means any entity or natural person.

10. **"Relate," "related,"** and **"relating"** mean being in any way legally, logically, or factually connected with the subject matter of the request at issue.

11. The words **"and"** and **"or"** shall be construed either conjunctively or disjunctively as required by the context to bring within the scope of the request, any document(s) that might be deemed outside its scope by another construction.

12. Unless the context otherwise clearly indicates, words used in the singular include the plural, the plural includes the singular, and the neuter gender includes the masculine and the feminine.

## EXHIBIT A: DOCUMENTS TO BE PRODUCED

1. Produce documents sufficient to identify Media Matters for America's employee organizational chart.

2. Produce documents sufficient to identify all of Media Matters for America's sources of income originating in the State of Texas.

3. Produce documents sufficient to identify all of Media Matters for America's operational expenditures in the State of Texas.

4. Produce all documents related to internal and external communications by Media Matters for America regarding Elon Musk's purchase of X during the relevant time period.

5. Produce all documents related to internal and external communications by Media Matters for America regarding Linda Yaccarino during the relevant time period.

6. Produce documents sufficient to identify all current and past X accounts under the ownership, control, or operating at the behest of Media Matters for America.

7. Produce all documents related to internal and external communications relating to the article titled "As Musk endorses antisemitic conspiracy theory, X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content" by Eric Hananoki.

8. Produce documents sufficient to identify all of Media Matters for America's owned, controlled, or authorized X accounts that were used to obtain, produce, or otherwise acquire the screenshot images contained in the article titled "As Musk endorses antisemitic conspiracy theory, X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content" by Eric Hananoki.

9. Produce documents sufficient to identify all X accounts, profiles, and members followed by the X accounts identified in response to Demand Number 8, above.

10. Produce all of Media Matters for America's external communications with employees and representatives of X from November 1, 2023 to November 21, 2023.

11. Produce all of Media Matters for America's external communications with Apple Inc., International Business Machine Corporation (IBM), Bravo television network, NBCUniversal, Oracle Corporation, and Comcast Corporation, Lions Gate Entertainment Corporation, Warner Bros Discovery Inc., Paramount Pictures Corporation, and Sony Group Corporation from November 1, 2023 to November 21, 2023.

12. Produce documents sufficient to identify all direct and indirect sources of funding for all Media Matters for America operations involving X research or publications.

# Exhibit B

**KEN PAXTON**
ATTORNEY GENERAL *of* TEXAS

*()*

**November 20, 2023 | Press Release**

# Attorney General Ken Paxton Opens Investigation into Media Matters for Potential Fraudulent Activity

The Office of the Attorney General ("OAG") is opening an investigation into Media Matters for potential fraudulent activity. Under the Texas Business Organizations Code and the Deceptive Trade Practices Act, the OAG will vigorously enforce against nonprofits who commit fraudulent acts in or affecting the state of Texas.

Attorney General Paxton was extremely troubled by the allegations that Media Matters, a radical anti-free speech organization, fraudulently manipulated data on X.com (formerly known as Twitter).

"We are examining the issue closely to ensure that the public has not been deceived by the schemes of radical left-wing organizations who would like nothing more than to limit freedom by reducing participation in the public square," said Attorney General Paxton.

Back to Top

# Exhibit C



# Transcript of Recorded Conversation

**Case:** MMFA Litigation

**Planet Depos**

**Phone:** 888-433-3767

**Fax:** 888-503-3767

**Email:** transcripts@planetdepos.com

www.planetdepos.com

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

1

2

3

4

5

6

7                     In re: MMFA Litigation

8

9                     RECORDED CONVERSATION

10

11

12

13

14

15

16

17

18

19

20   Job No.:   518338

21   Pages:   1 - 3

22   Transcribed by: Lauren Bishop

Transcript of Recorded Conversation

1              BENNY JOHNSON: So, this is obviously

2      horrifying. Devastating and comes in concert with

3      Elon Musk dropping and I quote, thermonuclear

4      lawsuit. On Media Matters, though it seems like

5      you're standing with the Missouri Attorney General,

6      do you encourage other republican attorney generals

7      to do this? We're -- we're so thankful that somebody

8      is just standing up and doing something. Where are

9      the rest of the republican AGs? There's got to be 20,

10     30 republican AGs in the country. Why are they so

11     quiet on issues like this?

12             KEN PAXTON: You know, that's a good

13     question. I -- I would -- I would encourage them to

14     look at this. They may have just become aware of it.

15     I mean it's a relatively new issue so hopefully over

16     the next couple weeks, you'll see other attorney

17     generals look at this and -- and I -- I would

18     encourage even democratic attorney generals. I know

19     they probably wont but they should because they

20     should care about free speech as much as we do.

21             (The recording was concluded.)

22

Transcript of Recorded Conversation

3

```
1               CERTIFICATE OF TRANSCRIBER
2          I, Lauren Bishop, do hereby certify that
3     the transcript was prepared from the digital audio
4     recording of the foregoing proceeding; that said
5     proceedings were reduced to typewriting under my
6     supervision; that said transcript is a true and
7     accurate record of the proceedings to the best of my
8     knowledge, skills, and ability; and that I am neither
9     counsel for, related to, nor employed by any of the
10    parties to the case and have no interest, financial
11    or otherwise, in its outcome.
12
13
14    _____
15    LAUREN BISHOP
16    Planet Depos,
17    December 8, 2023
18
19
20
21
22
```

Transcript of Recorded Conversation

**A**

ability
3:8
about
2:20
accurate
3:7
ags
2:9, 2: 0
any
3:9
attorney
2:5, 2:6, 2: 6,
2: 8
audio
3:3
aware
2: 4

**B**

because
2: 9
become
2: 4
benny
2:
best
3:7
bishop
 :22, 3:2, 3: 5

**C**

care
2:20
case
3: 0
certificate
3:
certify
3:2
comes
2:2
concert
2:2
concluded
2:2
conversation
 :9

counsel
3:9
country
2: 0
couple
2: 6

**D**

december
3: 7
democratic
2: 8
depos
3: 6
devastating
2:2
digital
3:3
doing
2:8
dropping
2:3

**E**

elon
2:3
employed
3:9
encourage
2:6, 2: 3, 2: 8
even
2: 8

**F**

financial
3: 0
foregoing
3:4
free
2:20

**G**

general
2:5
generals
2:6, 2: 7, 2: 8
good
2: 2

**H**

hereby
3:2
hopefully
2: 5
horrifying
2:2

**I**

interest
3: 0
issue
2: 5
issues
2:
it's
2: 5

**J**

job
 :20
johnson
2:

**K**

ken
2: 2
know
2: 2, 2: 8
knowledge
3:8

**L**

lauren
 :22, 3:2, 3: 5
lawsuit
2:4
litigation
 :7
look
2: 4, 2: 7

**M**

matters
2:4
mean
2: 5

media
2:4
missouri
2:5
mmfa
 :7
much
2:20
musk
2:3

**N**

neither
3:8
new
2: 5
next
2: 6

**O**

obviously
2:
other
2:6, 2: 6
otherwise
3:
outcome
3:
over
2: 5

**P**

pages
 :2
parties
3: 0
paxton
2: 2
planet
3: 6
prepared
3:3
probably
2: 9
proceeding
3:4
proceedings
3:5, 3:7

Transcript of Recorded Conversation

| **Q** | | |
|---|---|---|
| **question** | **supervision** | **5** |
| 2: 3 | 3:6 | **518338** |
| **quiet** | **T** | :20 |
| 2: | **thankful** | |
| **quote** | 2:7 | |
| 2:3 | **that's** | |
| **R** | 2: 2 | |
| **record** | **there's** | |
| 3:7 | 2:9 | |
| **recorded** | **thermonuclear** | |
| :9 | 2:3 | |
| **recording** | **transcribed** | |
| 2:2 , 3:4 | :22 | |
| **reduced** | **transcriber** | |
| 3:5 | 3: | |
| **related** | **transcript** | |
| 3:9 | 3:3, 3:6 | |
| **relatively** | **true** | |
| 2: 5 | 3:6 | |
| **republican** | **typewriting** | |
| 2:6, 2:9, 2: 0 | 3:5 | |
| **rest** | **U** | |
| 2:9 | **under** | |
| **S** | 3:5 | |
| **said** | **W** | |
| 3:4, 3:6 | **weeks** | |
| **see** | 2: 6 | |
| 2: 6 | **we're** | |
| **seems** | 2:7 | |
| 2:4 | **wont** | |
| **should** | 2: 9 | |
| 2: 9, 2:20 | **Y** | |
| **signature-p1kal** | **you'll** | |
| 3: 3 | 2: 6 | |
| **skills** | **you're** | |
| 3:8 | 2:5 | |
| **somebody** | **2** | |
| 2:7 | **20** | |
| **something** | 2:9 | |
| 2:8 | **2023** | |
| **speech** | 3: 7 | |
| 2:20 | **3** | |
| **standing** | **30** | |
| 2:5, 2:8 | 2: 0 | |

# Exhibit D



# Transcript of Recorded Conversation

**Case:** MMFA Litigation

**Planet Depos**

**Phone:** 888-433-3767

**Fax:** 888-503-3767

**Email:** transcripts@planetdepos.com

**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

1

2

3

4

5

6

7               In re: MMFA Litigation

8

9               RECORDED CONVERSATION

10

11

12

13

14

15

16

17

18

19

20   Job No.:   517865

21   Pages:  1 - 6

22   Transcribed by: Lauren Bishop

Transcript of Recorded Conversation

1        MALE SPEAKER 1: Let's speak with

2   Republican Attorney General of Texas, Ken Paxton.

3   Ken, Attorney General, thank you very much for

4   joining us. What specifically are you looking for in

5   this investigation?

6        KEN PAXTON: We have an obligation. I have

7   four different responsibilities into the Texas

8   Constitution. One of those is to look at any

9   fraudulent activity of a corporation and then we also

10  oversee charitable organizations. So in this case

11  with Media Matters being charitable organization,

12  nonprofit, we have the responsibility to make sure

13  that doing things that are inappropriate for

14  violating state law. We've started off with asking

15  them questions and we're going to ask them questions

16  and whether that leads to anything else will be

17  determined by their actual behavior and what

18  information they turn over.

19       MALE SPEAKER 1: There are already people

20  of course questioning the -- I won't say the

21  jurisdiction, but Texas' involvement given that X

22  formerly known as Twitter, is a California-based

Transcript of Recorded Conversation

1  corporation. What is the people and the state of

2  Texas' interest in this?

3          KEN PAXTON: Well, look, I mean X operates

4  in Texas. It operates all the world and Media

5  Matters, what they do to X, the information that they

6  -- they provide effects Texas. And so anything that

7  affects Texans, we have an obligation to look at and

8  that's -- that's what we're doing. So, yeah, it

9  doesn't matter whether they're incorporated, but

10 they're doing business and Texas becomes our

11 interest.

12         MALE SPEAKER 1: Well, what -- and it's

13 very complicated and of course, this is TV, so we

14 don't have a lot of time, but as I understand it

15 Attorney General Paxton, what X is alleging and --

16 and by the way Media Matters is denying -- want to

17 make that clear. Is that Media Matters created a lot

18 of fake accounts or a bunch of different accounts

19 followed a bunch of accounts that might be around or

20 involved in hateful content and sort of almost gained

21 the algorithm to force a specific result. They deny

22 it. Let's say they actually did that. Is that illegal

Transcript of Recorded Conversation

1    in any way?

2             KEN PAXTON: Yeah. I mean it can be.

3    Depends on exactly what they did. If it's viewed as

4    fraudulent activity under Texas law, then they can be

5    accountable to the state of Texas for that. I mean,

6    the reality is we're also -- we're in a lawsuit with

7    Twitter. We've been in a lawsuit with them for

8    several years involving kind of this similar

9    information that they might have created fake

10   accounts several years ago that were deceptively

11   providing information to advertisers and consumers

12   about how big their audience is. So we've looked at

13   actually both sides.

14             MALE SPEAKER 1: Yeah. Because there are

15   just regular users that probably have multiple

16   accounts for multiple different -- multiple different

17   reasons. Would this be more of a criminal situation

18   or a civil situation because I can -- I can go from A

19   to Z if -- if the allegations are accurate you're

20   damaging X's business by basically doing this and

21   then writing about it and then spooking advertisers

22   away.

Transcript of Recorded Conversation

5

1              KEN PAXTON: Yeah. So for us we don't have

2    any authority to investigate or do anything

3    criminally unless we're referred that by a local

4    district attorney in Texas. So district attorney in

5    Texas with to do the investigation, refer us to

6    either investigation or prosecution. Until then

7    everything that we're doing is completely civil

8    related to what -- exactly what you're talking about.

9              (The recording was concluded.)

10

11

12

13

14

15

16

17

18

19

20

21

22

Transcript of Recorded Conversation

6

```
1              CERTIFICATE OF TRANSCRIBER

2         I, Lauren Bishop, do hereby certify that

3    the transcript was prepared from the digital audio

4    recording of the foregoing proceeding; that said

5    proceedings were reduced to typewriting under my

6    supervision; that said transcript is a true and

7    accurate record of the proceedings to the best of my

8    knowledge, skills, and ability; and that I am neither

9    counsel for, related to, nor employed by any of the

10   parties to the case and have no interest, financial

11   or otherwise, in its outcome.

12       Lauren Bishop

13

14

15   _____

16   LAUREN BISHOP

17   Planet Depos,

18   December 6, 2023

19

20

21

22
```

Transcript of Recorded Conversation

**A**

ability
6:8
about
4: 2, 4:2 , 5:8
accountable
4:5
accounts
3: 8, 3: 9,
4: 0, 4: 6
accurate
4: 9, 6:7
activity
2:9, 4:4
actual
2: 7
actually
3:22, 4: 3
advertisers
4: , 4:2
affects
3:7
ago
4: 0
algorithm
3:2
all
3:4
allegations
4: 9
alleging
3: 5
almost
3:20
already
2: 9
also
2:9, 4:6
any
2:8, 4: , 5:2,
6:9
anything
2: 6, 3:6, 5:2
around
3: 9
asking
2: 4

**B**

attorney
2:2, 2:3, 3: 5,
5:4
audience
4: 2
audio
6:3
authority
5:2
away
4:22

**B**

basically
4:20
because
4: 4, 4: 8
becomes
3: 0
been
4:7
behavior
2: 7
being
2:
best
6:7
big
4: 2
bishop
:22, 6:2, 6: 6
both
4: 3
bunch
3: 8, 3: 9
business
3: 0, 4:20

**C**

california-based
2:22
case
2: 0, 6: 0
certificate
6:
certify
6:2
charitable
2: 0, 2:

civil
4: 8, 5:7
clear
3: 7
completely
5:7
complicated
3: 3
concluded
5:9
constitution
2:8
consumers
4:
content
3:20
conversation
:9
corporation
2:9, 3:
counsel
6:9
course
2:20, 3: 3
created
3: 7, 4:9
criminal
4: 7
criminally
5:3

**D**

damaging
4:20
december
6: 8
deceptively
4: 0
deny
3:2
denying
3: 6
depends
4:3
depos
6: 7
determined
2: 7

different
2:7, 3: 8, 4: 6
digital
6:3
district
5:4
doing
2: 3, 3:8,
3: 0, 4:20, 5:7

**E**

effects
3:6
either
5:6
else
2: 6
employed
6:9
everything
5:7
exactly
4:3, 5:8

**F**

fake
3: 8, 4:9
financial
6: 0
followed
3: 9
force
3:2
foregoing
6:4
formerly
2:22
four
2:7
fraudulent
2:9, 4:4

**G**

gained
3:20
general
2:2, 2:3, 3: 5
given
2:2

Transcript of Recorded Conversation

go
4: 8
going
2: 5

**H**

hateful
3:20
hereby
6:2

**I**

illegal
3:22
inappropriate
2: 3
incorporated
3:9
information
2: 8, 3:5, 4:9,
4:
interest
3:2, 3:  , 6: 0
investigate
5:2
investigation
2:5, 5:5, 5:6
involved
3:20
involvement
2:2
involving
4:8

**J**

job
 :20
joining
2:4
jurisdiction
2:2

**K**

ken
2:2, 2:3, 2:6,
3:3, 4:2, 5:
kind
4:8

knowledge
6:8
known
2:22

**L**

lauren
 :22, 6:2, 6: 6
law
2: 4, 4:4
lawsuit
4:6, 4:7
leads
2: 6
let's
2: , 3:22
litigation
 :7
local
5:3
look
2:8, 3:3, 3:7
looked
4: 2
looking
2:4
lot
3: 4, 3: 7

**M**

make
2: 2, 3: 7
male
2: , 2: 9,
3: 2, 4: 4
matter
3:9
matters
2:  , 3:5,
3: 6, 3: 7
mean
3:3, 4:2, 4:5
media
2:  , 3:4,
3: 6, 3: 7
might
3: 9, 4:9
mmfa
 :7

more
4: 7
much
2:3
multiple
4: 5, 4: 6

**N**

neither
6:8
nonprofit
2: 2

**O**

obligation
2:6, 3:7
one
2:8
operates
3:3, 3:4
organization
2:
organizations
2: 0
otherwise
6:
outcome
6:
over
2: 8
oversee
2: 0

**P**

pages
 :2
parties
6: 0
paxton
2:2, 2:6, 3:3,
3: 5, 4:2, 5:
people
2: 9, 3:
planet
6: 7
prepared
6:3
probably
4: 5

proceeding
6:4
proceedings
6:5, 6:7
prosecution
5:6
provide
3:6
providing
4:

**Q**

questioning
2:20
questions
2: 5

**R**

reality
4:6
reasons
4: 7
record
6:7
recorded
 :9
recording
5:9, 6:4
reduced
6:5
refer
5:5
referred
5:3
regular
4: 5
related
5:8, 6:9
republican
2:2
responsibilities
2:7
responsibility
2: 2
result
3:2

**S**

said
6:4, 6:6

Transcript of Recorded Conversation

| | | | |
|---|---|---|---|
| **say**<br>2:20, 3:22<br>**several**<br>4:8, 4: 0<br>**sides**<br>4: 3<br>**signature-p1kal**<br>6: 2<br>**similar**<br>4:8<br>**situation**<br>4: 7, 4: 8<br>**skills**<br>6:8<br>**sort**<br>3:20<br>**speak**<br>2:<br>**speaker**<br>2: , 2: 9,<br>3: 2, 4: 4<br>**specific**<br>3:2<br>**specifically**<br>2:4<br>**spooking**<br>4:2<br>**started**<br>2: 4<br>**state**<br>2: 4, 3: , 4:5<br>**supervision**<br>6:6<br>**sure**<br>2: 2<br>**T**<br>**talking**<br>5:8<br>**texans**<br>3:7<br>**texas**<br>2:2, 2:7, 3:4,<br>3:6, 3: 0, 4:4,<br>4:5, 5:4, 5:5<br>**texas'**<br>2:2 , 3:2<br>**thank**<br>2:3 | **things**<br>2: 3<br>**time**<br>3: 4<br>**transcribed**<br> :22<br>**transcriber**<br>6:<br>**transcript**<br>6:3, 6:6<br>**true**<br>6:6<br>**turn**<br>2: 8<br>**tv**<br>3: 3<br>**twitter**<br>2:22, 4:7<br>**typewriting**<br>6:5<br>**U**<br>**under**<br>4:4, 6:5<br>**understand**<br>3: 4<br>**unless**<br>5:3<br>**until**<br>5:6<br>**users**<br>4: 5<br>**V**<br>**viewed**<br>4:3<br>**violating**<br>2: 4<br>**W**<br>**want**<br>3: 6<br>**way**<br>3: 6, 4:<br>**we're**<br>2: 5, 3:8, 5:3,<br>5:7<br>**we've**<br>2: 4, 4:7, 4: 2 | **we're**<br>4:6<br>**whether**<br>2: 6, 3:9<br>**world**<br>3:4<br>**writing**<br>4:2<br>**X**<br>**x's**<br>4:20<br>**Y**<br>**yeah**<br>3:8, 4:2, 4: 4,<br>5:<br>**years**<br>4:8, 4: 0<br>**1**<br>**1**<br>2: , 2: 9,<br>3: 2, 4: 4<br>**2**<br>**2023**<br>6: 8<br>**5**<br>**517865**<br> :20 | |

# Exhibit E

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| EXXON MOBIL CORPORATION, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | No. 4:16-cv-00469-K |
| | ) | |
| MAURA TRACY HEALEY, | ) | |
| Attorney General of Massachusetts, | ) | |
| in her official capacity, | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**BRIEF OF TEXAS, LOUISIANA, SOUTH CAROLINA, ALABAMA, MICHIGAN, ARIZONA, WISCONSIN, NEBRASKA, OKLAHOMA, UTAH, AND NEVADA AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

---

# TABLE OF CONTENTS

INTEREST OF *AMICI CURIAE* AND BACKGROUND ..........................................................1

ARGUMENT ..........................................................................................................................2

    I.    Attorneys General should act impartially. ....................................................2

        A.    Attorneys General should not employ legal power to tip the scales in a policy debate. ..........................................................3

            1.    Targeting critics. .......................................................................4

            2.    Abusing subpoena power.............................................................5

        B.    Climate change is the subject of legitimate international debate..........................................................................6

    II.    Politicized investigations undermine public confidence............................9

CONCLUSION ........................................................................................................................9

## INTEREST OF *AMICI CURIAE* AND BACKGROUND

Exxon Mobil Corporation (Exxon) is challenging the validity of a Civil Investigative Demand (CID), a state civil administrative subpoena, issued by the Attorney General of Massachusetts (Massachusetts). Massachusetts dispatched the CID to investigate supposed violations of consumer protection laws through Exxon's marketing and sale of fossil fuel-derived products and securities. Exxon is asking the Court to issue an injunction prohibiting Massachusetts from enforcing the CID.

*Amici* possess sovereign authority to investigate violations of law. As chief legal officers, they have long used their power—including the issuance of CIDs—to determine whether unlawful conduct occurred. However, this power does not include the right to engage in unrestrained, investigative excursions to promulgate a social ideology, or chill the expression of points of view, in international policy debates.

The concerns of *Amici* and others regarding Massachusetts's tactics are expressed in a recent open letter.[1] In it, the actions of Massachusetts and others are condemned, as "this effort by our colleagues to police the global warming debate through the power of the subpoena is a grave mistake." The signatories, representing a wide range of viewpoints on climate change, "agree on at least one thing—this is not a question for the courts. Using law enforcement authority to resolve a public policy debate undermines the trust invested in our offices and threatens free speech."[2] As most recognize, "vigorous debate exists in this country regarding the risks of climate change and the appropriate response to those risks. Both sides are well-funded and sophisticated public policy participants. Whatever our country's response,

---

[1] Open Letter from Attorneys General (Luther Strange, Alabama; Bill Schuette, Michigan; Ken Paxton, Texas; Craig Richards, Alaska; Doug Peterson, Nebraska; Sean Reyes, Utah; Mark Brnovich, Arizona; Adam Laxalt, Nevada; Brad Schimel, Wisconsin; Leslie Rutledge, Arkansas; Scott Pruitt, Oklahoma; Jeff Landry, Louisiana; Alan Wilson, South Carolina) dated June 15, 2016, *available online at* http://www.ago.state.al.us/news/852.pdf.

[2] *Id*. at p.1.

it will affect people, communities, and businesses that all have a right to participate in this debate." Thus, attorneys general should "stop policing viewpoints."[3]

*Amici* are concerned about the unconstitutional use of investigative powers. They have an interest in preserving their roles as evenhanded enforcers of the law and, thus, have direct and vital interests in the issues before the Court.

ARGUMENT

Attorneys General have a constitutional duty to act dispassionately in the execution of their office. The Supreme Court has explained that attorneys representing the public do not represent an ordinary party in litigation, but "a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest , . . . is not that it should win a case but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935). This distinctive role of the prosecutor is also expressed the Model Code of Professional Responsibility. MODEL CODE OF PROF'L RESPONSIBILITY EC 7-13 (1982) ("The responsibility of a public prosecutor differs from that of the usual advocate; his duty is to seek justice, not merely to convict."). Massachusetts crossed both legal and ethical lines with its CID.

## I.  Attorneys General should act impartially.

Massachusetts's investigation is the product of a cultural movement "committed to aggressively protecting and building upon the recent progress the United States has made in combatting climate change."[4] And the common interest agreement of the powers aligned on this axis of ideology underscores the partiality of their endeavor, as they seek to "limit climate change and ensur[e] the dissemination

---

[3] *Id.*
[4] Press Release, New York State Attorney General, *A.G. Schneiderman, Former Vice President Al Gore And A Coalition Of Attorneys General From Across The Country Announce Historic State-Based Effort To Combat Climate Change* (March 29, 2016) (*available online at* http://www.ag.ny.gov/press-release/ag-schneiderman-former-vice-president-al-gore-and-coalition-attorneys-general-across).

of accurate information about climate change." ECF No. 57 at 3.[5] And Defendant acknowledges that the issuance of the CID is part of an "aggressive approach."[6]

While *amici* have authority to conduct investigations regarding consumer protection, fraud, and deceptive trade practices, these investigations must be supported by a "reasonable belief" that there has been, or is about to be, unlawful false, misleading, or deceptive acts or practices in the conduct of any trade or commerce. *See*, *e.g.*, TEX. BUS. & COM. CODE §§ 17.46, 17.47, 17.60, 17.61. And while the government's power "to protect people against fraud" has "always been recognized in this country and is firmly established," *Donaldson v. Read Magazine, Inc.*, 333 U.S. 178, 190 (1948), "[s]imply labeling an action one for 'fraud,' of course, will not carry the day," *Illinois ex rel. Madigan v. Telemarketing Assocs.*, 538 U.S. 600, 617 (2003).

## A. Attorneys General should not employ legal power to tip the scales in a policy debate.

The authority attorneys general have to investigate fraud does not allow them to encroach on the constitutional freedom of others to engage in an ongoing public policy debate of international importance. Thus, government action that restricts or chills speech because of the message embodied within that speech contravenes the First Amendment. Indeed, "there is practically universal agreement that a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs." *Mills v. Alabama*, 384 U.S. 214, 218 (1966). The First Amendment generally prevents government from proscribing speech, *see*, *e.g.*, *Cantwell v. Connecticut*, 310 U.S. 296, 309–311 (1940), or even expressive conduct, *see*, *e.g.*, *Texas v. Johnson*, 491

---

[5] This ideology was on full display at the March 29, 2016 press conference of the so-called "AG's United for Clean Power," characterized as "the beginning of the end of our addiction to fossil fuel and the degradation of our planet." Attorney General Schneiderman, Press Conference, AGs United for Clean Power (March 29, 2016) (confirming subpoena to ExxonMobil) (*video available online at* http://www.ag.ny.gov/press-release/ag-schneiderman-former-vice-president-al-gore-and-coalition-attorneys-general-across). Former Vice President Al Gore alleged that commercial interests (such as the Plaintiff) are "committing fraud in their communications . . . ." *Id.*

[6] *Id.*

U.S. 397, 406 (1989), for the mere disapproval of the ideas expressed. Here, the chilling effect of Massachusetts's CID should be of concern since the "loss of First Amendment freedoms for even minimal periods of time constitutes irreparable injury . . . ." *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. Unit B Nov. 1981) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

The heart of viewpoint discrimination is the government preferring one message to another. But "[t]he First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others." *Members of the City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984); *see also Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995); *Cornelius v. NAACP*, 473 U.S. 788, 806 (1985). Viewpoint discrimination occurs when "the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *McGuire v. Reilly*, 386 F.3d 45, 62 (1st Cir. 2004).

While Massachusetts claims an interest in consumer protection as the basis for its CID, the Supreme Court has been clear that proffering what may be on its face "reasonable grounds" for the action does "not save a regulation that is in reality a facade for viewpoint-based discrimination." *Cornelius*, 473 U.S. at 811.

### 1.   Targeting critics.

The First Amendment is concerned with "the inherent risk that the Government seeks not to advance a legitimate regulatory goal, but to suppress unpopular ideas." *Hill v. Colorado*, 530 U.S. 703, 719 (2000). Thus, it stands as a bulwark against Government action designed to suppress ideas or information, or to manipulate the public debate through coercion rather than persuasion. *See Palmer ex rel. Palmer v. Waxahachie Indep. Sch. Dist.*, 579 F.3d 502, 510 (5th Cir. 2009).

Using CIDs to suppress policy debates is like imposing prior restraints on speech. Governmentally imposed prior restraints on speech are tantamount to censorship. *See Near v. Minnesota*, 283 U.S. 697, 713, (1931); *cf. Fernandes v.*

*Limmer*, 663 F.2d 619, 632 (5th Cir. Unit A Dec. 1981). Massachusetts labeling its so-called investigation (into an unsettled area of science and public policy) as related to "fraud" certainly "raise[s] the specter that the Government may effectively drive certain ideas or viewpoints from the marketplace." *Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116 (1991).

But if our society refuses to tolerate *both* the proponents and critics of ideas vying for acceptance, then the marketplace of ideas becomes a mere oligarchy of consumption. As Justice Holmes put it:

> But when men have realized that time has upset many fighting faiths, they may come to believe even more than they believe the very foundations of their own conduct that the ultimate good desired is better reached by free trade in ideas—that the best test of truth is the power of the thought to get itself accepted in the competition of the market, and that truth is the only ground upon which their wishes safely can be carried out.

*Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting).

## 2. Abusing subpoena power.

The Fourth Amendment limits the scope of administrative subpoenas. *See Okla. Press Publ'g Co. v. Walling*, 327 U.S. 186, 208–11 (1946). Where subpoenaed materials may be protected by the First Amendment, the requirements of the Fourth Amendment are applied with "scrupulous exactitude." *Stanford v. Texas,* 379 U.S. 476, 485 (1965). As such, so-called "fishing expeditions," like this one, are proscribed and "[i]t is contrary to the first principles of justice to allow a search through all the respondents' records, relevant or irrelevant, in the hope that something will turn up." *Fed. Trade Comm'n v. Am. Tobacco Co.*, 264 U.S. 298, 306 (1924).

Massachusetts's abuse of its subpoena power runs afoul of the First Amendment. *See, e.g., AFL-CIO v. FEC*, 333 F.3d 168, 175 (D.C. Cir. 2003) (citing *Buckley v. Valeo*, 424 U.S. 1, 64–68 (1976) (disclosure of campaign contributions); *NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449, 462–63 (1958) (disclosure of

membership lists)). A First Amendment privilege against disclosures exists where such "will result in (1) harassment, membership withdrawal, or discouragement of new members, or (2) other consequences which objectively suggest an impact on, or 'chilling' of, the members' associational rights." *Perry v. Schwarzenegger*, 591 F.3d 1147, 1160 (9th Cir. 2009) (quotation omitted).

   For example, subpoenas seeking investigative notes as well as the names of contacts have been held to be an invalid chilling of the free exercise of political speech and association under the First Amendment. *See Lacey v. Maricopa Cnty.*, 693 F.3d 896, 917 (9th Cir. 2012) (finding "invalid" under First Amendment "subpoenas demanding that [a] paper . . . disclose its reporters' notes and reveal information about anyone who visited the New Times's [sic] website" because subpoenas would "chill speech"); *see also Pebble Ltd. P'ship v. EPA*, 310 F.R.D. 575, 582 (D. Alaska 2015) (subpoenas are invalid when they have "the tendency to chill the free exercise of political speech and association which is protected by the First Amendment").

These protections afforded by the Constitution protect us and our freedom to engage in open and candid discussions about significant issues. But the mere existence of those very discussions is threatened by the chill of subpoenas, like Massachusetts's CID, hanging in the air. Thus, not only is Massachusetts attempting to silence Exxon through the issuance and threat of compelling a response to the CID, this very action harms everyone, stifling consumers and those seeking information in order to evaluate various viewpoints in this public policy debate.

### B.   Climate change is the subject of legitimate international debate.

Massachusetts presumes that the scientific debate regarding climate change is somehow settled, along with the related and equally important public policy debate on how to respond to what science has found. Yet, neither is true. The clearest and most undeniable fact about climate change is that, like so many other areas of science and public policy, the debate is unsettled, the research far from complete, and the

path forward unclear. *Amici* agree that "[s]cientists continue to disagree about the degree and extent of global warming and its connection to the actions of mankind,"[7] as do many others. Moreover, science does not teach the obvious public policy response to its data and findings, it merely provides a starting point.

Modern science helps us better understand our world. It constantly subjects to scrutiny various hypotheses against objective data. *See, e.g.*, *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593 (1993). However, because it is almost never possible for all relevant data to be marshaled, scientific proclamations are always subject to change because of new data, enhanced measurements, or other unforeseen factors. *Cf.* Karl Popper, The Logic of Scientific Discovery 44, 47 (1959). Thus, "[s]cientific controversies must be settled by the methods of science rather than by the methods of litigation." *Underwager v. Salter*, 22 F.3d 730, 736 (7th Cir. 1994)

Accordingly, the intersection of science, law, and public policy should be approached with caution and objectivity. Unfortunate results take root when government invests itself in only one side of a scientific debate since "bad ideas can persist in science for decades, and surrounded by myrmidons of furious defenders they can turn into intolerant dogmas."[8] Unfortunately,

---

[7] Scott Pruitt and Luther Strange, *The Climate-Change Gang*, National Review (May 17, 2016), *available online at* http://www.national review.com/article/435470/climate-change-attorneys-general-overstepping-their-authority.

[8] Matt Ridley, *The Climate Wars and the Damage to Science,* GWPF Essay 3 at p.3 (Global Warming Policy Foundation 2015), *available online at* http://www.thegwpf.com/content/uploads/2015/11/climate-wars.pdf. In addition to being former Science Editor of the Economist, "Matt Ridley is one of the world's foremost science writers. His books have sold over a million copies and been translated into 30 languages. His new book The Evolution of Everything was published in 2015. He is a member of the [Global Warming Policy Foundation]'s Academic Advisory Council. As a landowner, he receives a wayleave income from a coal-mining company." In the words of Ridley,

I am not a full sceptic of climate change, let alone a 'denier'. I think carbon-dioxide induced warming during this century is likely, though I think it is unlikely to prove rapid and dangerous. So I don't agree with those who say the warming is all natural, or all driven by the sun, or only an artefact of bad measurement, but nor do I think anything excuses bad scientific practice in support of the carbon dioxide theory, and every time one of these scandals erupts and the scientific establishment asks us to ignore it, I wonder if the extreme sceptics are not

[t]his is precisely what has happened with the climate debate and it is at risk of damaging the whole reputation of science. The 'bad idea' in this case is not that climate changes, nor that human beings influence climate change; but that the impending change is sufficiently dangerous to require urgent policy responses. In the 1970s, when global temperatures were cooling, some scientists could not resist the lure of press attention by arguing that a new ice age was imminent. Others called this nonsense and the World Meteorological Organization rightly refused to endorse the alarm. That's science working as it should. In the 1980s, as temperatures began to rise again, some of the same scientists dusted off the greenhouse effect and began to argue that runaway warming was now likely. At first, the science establishment reacted skeptically and a diversity of views was aired. It's hard to recall now just how much you were allowed to question the claims in those days.[9]

Even the premise that "97% of all climate scientists agree on climate change" is argued by Ridley to be pseudo-science. The self-serving conclusion that "97% of all climate scientists agree on climate change" is derived from a poll involving only seventy-nine scientists[10]—hardly a statistically-relevant sample. Moreover, of those seventy-nine scientists, 97% believe that climate change is man-made—not that it was dangerous.[11] "A more recent poll of 1854 members of the American Meteorological Society found the true number is 52 per cent."[12] Indeed,

there has been a systematic and thorough campaign to rule out the middle ground as heretical: not just wrong, but mistaken, immoral and beyond the pale. That's what the word 'denier', with its deliberate connotations of Holocaust denial, is intended to do. For reasons I do not fully understand, journalists have been shamefully happy to go along with this fundamentally religious project. Politicians love this polarizing because it means they can attack a straw man.[13]

---

on to something. I feel genuinely betrayed by the profession that I have spent so much of my career championing.
*Id.* at p.10.
    [9] *Id.* at p.4.
    [10] *Id.* at p.7.
    [11] *Id.*
    [12] *Id.*
    [13] *Id.* at p.6.

## II.   Politicized investigations undermine public confidence.

The transcript of the press conference of the "AG's United for Clean Power" demonstrates that Massachusetts commenced its investigation precisely for the reasons the First Amendment forbids.[14] "It is one thing to use the legal system to pursue public policy outcomes; but it is quite another to use prosecutorial weapons to intimidate critics, silence free speech, or chill the robust exchange of ideas."[15]

Allowing government law enforcement officials to violate constitutional rights is to "violate the sacred trust of the people . . . ." *United States v. Costa*, 356 F. Supp. 606, 609 (D.D.C. 1973). It undermines "the right of the people to be secure in their persons, houses, papers and effects, and would obliterate one of the most fundamental distinctions between our form of government, where officers are *under* the law, and the police-state where they *are* the law." *Johnson v. United States*, 333 U.S. 10, 17 (1948) (emphasis added).

Regrettably, history is embroiled with examples where the legitimate exercise of law enforcement is soiled with political ends rather than legal ones. Massachusetts seeks to repeats that unfortunate history. That the statements and workings of the "AG's United for Clean Power" are entirely one-sided, and target only certain participants in the climate change debate, speaks loudly enough.[16]

### CONCLUSION

*Amici* aver that the Court should grant Exxon's motion for preliminary relief.

---

[14] *See* n.5, *supra*.

[15] Press Release, Louisiana Department of Justice, Attorney General Jeff Landry Slams Al Gore's Coalition (Mar. 30, 2016) (*available online at* https://www.ag.state.la.us/Article/2207/5).

[16] "[T]his fraud investigation targets only 'fossil fuel companies' and only statements minimizing climate change risks. If it is possible to minimize the risks of climate change, then the same goes for exaggeration. If minimization is fraud, exaggeration is fraud." *See* n.1, *supra*, at p.2. It is also worth noting that "[e]leven of the 17 attorneys general who participated [in the "AG's United for Clean Power" press conference] are the same folks who took part in the 2010 sue-and-settle lawsuit that used federal courts to try to force the adoption of the federal energy regulations that became the EPA's 'Power Plan.'" Michael Batasch, *Kansas AG takes on Al Gore's Alarmism – Won't Join Anti-Exxon "Publicity Stunt,"* The Daily Caller (Apr. 4, 2016), *available online at* http://dailycaller.com/2016/04/04/kansas-ag-takes-on-al-gores-alarmism-wont-join-ant-exxon-publicity-stunt.

Respectfully submitted this the 8th day of September, 2016,

JEFF LANDRY
Attorney General of Louisiana

ALAN WILSON
Attorney General of South Carolina

LUTHER STRANGE
Attorney General of Alabama

BILL SCHUETTE
Attorney General of Michigan

MARK BRNOVICH
Attorney General of Arizona

BRAD SCHIMEL
Attorney General of Wisconsin

DOUG PETERSON
Attorney General of Nebraska

SCOTT PRUITT
Attorney General of Oklahoma

SEAN REYES
Attorney General of Utah

ADAM LAXALT
Attorney General of Nevada

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

BRANTLEY STARR
Deputy First Assistant Attorney General

PRERAK SHAH
Senior Counsel to the Attorney General

*/s/ Andrew D. Leonie*
ANDREW D. LEONIE
Associate Deputy Attorney General for the
Office of Special Litigation
Andrew.Leonie@texasattorneygeneral.gov

AUSTIN R. NIMOCKS
Associate Deputy Attorney General for the
Office of Special Litigation
Austin.Nimocks@texasattorneygeneral.gov

MICHAEL TOTH
Senior Counsel for the Office of Special
Litigation

Office of Special Litigation
Texas Attorney General's Office
P.O. Box 12548, Mail Code 009
Austin, Texas 78711-2548
Tel: 512-936-1414
Fax: 512-936-0545

*ATTORNEYS FOR AMICI CURIAE*

10

**CERTIFICATE OF SERVICE**

I hereby certify that on the 8th day of September 2016, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which I understand to have caused service on all counsel of record.

/s/ *Andrew D. Leonie III*
Andrew D. Leonie III
SBOT No. 12216500

# Exhibit F

| | |
|---|---|
| **From:** | Chris Dodge |
| **To:** | Levi Fuller; Will Taylor |
| **Cc:** | Aria Branch; Abha Khanna |
| **Subject:** | Media Matters CID |
| **Date:** | Tuesday, December 12, 2023 3:52:00 PM |
| **Attachments:** | 2023.12.12 - MMFA Letter to Texas AG re CID.pdf |
| | Exhibit A - Complaint.pdf |
| | Exhibit B - Motion for TRO and PI.pdf |

Mr. Fuller and Mr. Taylor,

Please see the attached correspondence in response to your office's civil investigative demand to our client, Media Matters for America.

Best regards,

Chris

**Christopher D. Dodge**
**Counsel**
Elias Law Group LLP
250 Massachusetts Ave NW
Washington, DC 20001
202-987-4928
cdodge@elias.law



ELIAS
LAW
GROUP

250 Massachusetts Ave NW, Suite 400  |  Washington, DC 20001

December 12, 2023

**VIA ELECTRONIC MAIL AND FEDEX**

Levi T. Fuller
Assistant Attorney General
Special Litigation and Non-Profit Enforcement
Consumer Protection Division
Office of the Attorney General of Texas
PO Box 12548
Austin, TX 78711-2548
Levi.Fuller@oag.texas.gov

> Re:   **Office of the Attorney General of Texas Civil Investigative Demand: Media Matters for America**

Dear Mr. Fuller:

We write as counsel to Media Matters for America ("Media Matters") in response to the Civil Investigative Demand ("CID") served on Media Matters on December 1, 2023. For the reasons explained below and in the lawsuit filed by Media Matters against Attorney General Paxton yesterday,[1] Media Matters objects to the CID in its entirety.

Your Office's initiation of this investigation and issuance of the CID constitutes flagrant retaliation against Media Matters for engaging in constitutionally protected speech and press activities. *See* Exhibit A (Complaint). The CID itself—served without any explanation as to how Media Matters may have violated or is even subject to Texas law on deceptive trade practices—infringes upon Media Matters's free speech and press rights under the First and Fourth Amendments, its due process rights under the Fourteenth Amendment, and its rights under the Maryland and District of Columbia reporters' shield laws. The CID has chilled and will continue to chill Media Matters from publishing additional news reports on X Corp. ("X") and Mr. Musk out of fear of further retaliation and harassment. Plaintiffs are seeking immediate relief in the form

---

[1] *See Media Matters for America, et al. v. Paxton*, Case No. 8:23-cv-3363-PX (D. Md.). As-filed copies of the operative complaint and a copy of Plaintiffs' motion for temporary restraining order, are appended to this letter as Exhibits A and B.

Office of the Attorney General of Texas
December 12, 2023
Page 2

of a temporary restraining order and/or preliminary injunction to protect them from the ongoing, imminent, and irreparable injury posed by the CID.

Background. In November 2023, Mr. Eric Hananoki, senior investigative reporter at Media Matters, published three pieces of investigatory reporting on Media Matters's website showing the placement of advertisements for major corporations next to extremist content on the social media platform formerly known as Twitter, now called X and owned by X.[2] Mr. Hananoki's reporting was consistent with a year's worth of additional reporting from an array of different media outlets showing pervasive white nationalist, antisemitic, and other extremist content available on X. *See* Ex. A at 11-21. On November 20, following the publication of these articles, X filed a lawsuit in the Northern District of Texas against Media Matters and Mr. Hananoki. *See X Corp. v. Media Matters for America, et al.*, Case No. 4:23-cv-01175 (N.D. Tex.). On the same day, the Texas Attorney General issued a press release announcing that he was opening an investigation into Media Matters "for potential fraudulent activity."[3] Rather than set out any basis for investigating Media Matters—or explaining how the Texas Office of the Attorney General could even plausibly have jurisdiction over Media Matters—the press release used charged and partisan language, characterizing Media Matters as a "a radical anti-free speech organization" and a "radical left-wing organization[] who would like nothing more than to limit freedom by reducing participation in the public square[.]"

Media Matters received a copy of the CID via Federal Express on November 22 and was served via counsel on December 1, 2023. The CID provided a return date of December 12, 2023, less than two weeks later, and demands production of 12 overbroad categories of documents ("Demands") that overwhelmingly have nothing to do with trade practices or consumer protection. This Office's investigation, Mr. Paxton's related public statements and threats, and the issuance and substance of the CID have chilled Media Matters' protected speech and press activities. *See* Ex. A at 21-29.

Objections to CID. *First*, this Office is plainly without jurisdiction to investigate Media Matters, which is a non-profit media watchdog group with a principal place of business in Washington, D.C., where it is registered to do business. Media Matters is not registered as a foreign corporation in Texas because it does not "transact business" in Texas. Tex. Bus. Org. Code § 9.0002(a). Nor does it have a registered agent in Texas. Media Matters does not perform any "business practices" in Texas, Bus. & Com. § 17.44(a), and does not conduct any "trade" or "commerce" in Texas, *id.* §§ 17.45(6), .46(a). Mr. Hananoki's research, drafting, preparation, and review of the news articles referenced in the CID were done at his home in Maryland, where he performs nearly all of his work for Media Matters. Mr. Hananoki has never traveled to Texas to

---

[2] Articles specifically published on MediaMatters.Org on Monday, November 13, Thursday, November 16, and Friday, November 17 (the "November Articles").

[3] Press Release, Ken Paxton, Attorney General of Texas, Attorney General Ken Paxton Opens Investigation into Media Matters for Potential Fraudulent Activity (Nov. 20, 20223),
https://www.oag.state.tx.us/news/releases/attorney-general-ken-paxton-opens-investigation-media-matters-potential-fraudulent-activity.

Office of the Attorney General of Texas
December 12, 2023
Page 3

perform his duties for Media Matters, nor did his preparation of the referenced articles involve communication with any residents, consumers, or businesses located in Texas.

*Second*, the CID demands associational and journalistic materials protected from disclosure by the First Amendment. Demands 1, 2, 4, 5, and 6-12 expressly seek documents which are protected wholesale from disclosure by the First Amendment privilege guaranteed to Media Matters by the U.S. Constitution. Demand 12 in particular, seeks documents sufficient to identify Media Matters's sources of funding, in violation of Media Matters's and its donors' associational rights protected by the First Amendment. As detailed in the attached complaint and motion, Attorney General Paxton has singled out Media Matters in retaliation for its constitutionally protected speech, resulting in an infringement of its rights and work as part of the press. *See* Ex. A at 21-32. This Office's investigation and the CID constitute a First Amendment retaliatory action in violation of Plaintiffs' rights under the First and Fourteenth Amendments of the U.S. Constitution and U.S. Code Section 1983.

*Finally*, the CID seeks expansive, privileged, and objectionable categories of documents and communications, many of which dramatically exceed the scope of the purported underlying issues. Each demand is overly broad and unduly burdensome. Demands 4-5, 7, 10-11 seek the production of large amounts of documents, many of which are protected from disclosure by the attorney-client privilege. Demands 1-5 constitute far-reaching fishing expeditions into Media Matters' possible jurisdictional contacts within Texas, and as stated above, Media Matters does not conduct business activity in Texas. Demands 1-6 are wholly irrelevant to any allegedly "fraudulent activity" engaged in by Media Matters. Additionally, with few exceptions, the CID imposes an unreasonable, burdensome temporal obligation on Media Matters by seeking an ongoing production of documents from January 1, 2022 until an undefined "final date of your production of responsive documents[.]"[4] Demands 2-3, and 12, which seek financial information from Media Matters, are both vague and overbroad.

Because the production of any materials demanded by the CID would require Media Matters to comply with an unconstitutional retaliation and unreasonable request for documents, many of which are privileged, Media Matters objects to the CID in its entirety.

The objections delineated above are illustrative and are not meant to be exhaustive. Media Matters's objections to the CID are based on the information it currently has available. It reserves the right to alter, supplement, or otherwise modify these objections based on the discovery of new or additional circumstances. Nothing in this letter constitutes waiver of any additional objections Media Matters may raise in the future to the CID or to any other investigations or claims brought by this Office or any other Texas official.

---

[4] CID at 2; Demands 2-8, 12.

Office of the Attorney General of Texas
December 12, 2023
Page 4

Regards,

Abha Khanna
Aria C. Branch
Christopher D. Dodge
Jacob D. Shelly
Elena A. Rodriguez Armenta
Daniela Lorenzo
Omeed Alerasool
**Elias Law Group LLP**

Theodore J. Boutrous, Jr.
Jay P. Srinivasan
Amer S. Ahmed
Anne Champion
**Gibson, Dunn & Crutcher LLP**

*Counsel to Media Matters*

# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| MEDIA MATTERS FOR AMERICA,<br>PO Box 44811,<br>Washington, DC 20026;<br><br>*and*,<br><br>ERIC HANANOKI,<br>[ADDRESS REDACTED],<br>Montgomery County, MD;<br><br>               Plaintiffs,<br><br>  v.<br><br>WARREN KENNETH PAXTON JR., in his official capacity as Attorney General of the State of Texas,<br>PO Box 12548,<br>Austin, TX 78711,<br><br>            Defendant. | CIV. NO. __-____<br><br>[CIVIL RIGHTS ACTION]<br><br><br>**COMPLAINT**<br><br>**(Rule 57 Speedy Hearing Request)** |

**INTRODUCTION**

1.      This case is a test of our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open," particularly where it concerns criticism of "government and public officials." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). At the heart of this commitment is the First Amendment's promise that the people and the press may discuss public matters—and criticize powerful people—"without . . . fear of subsequent punishment" from government officials. *Roth v. United States*, 354 U.S. 476, 488 (1957) (quoting *Thornhill v. State of Alabama*, 310 U.S. 88, 101–02 (1940)).

2.      Plaintiffs Media Matters for America ("Media Matters") and Eric Hananoki investigate, research, and report on political extremism in American media. In doing so, they often publish criticism of powerful figures and politicians who engage in racist, hateful, or violent rhetoric in American public life. Their work is extensively cited and discussed by other media outlets—and even government agencies—thus contributing to an ongoing and critical national discussion about extremism in our politics and media.

3.      Over the past year, as part of their long running work and mission, Plaintiffs have frequently reported on a major national news story—the disturbing rise of violent and extremist rhetoric on the popular social media platform X (formerly known as Twitter) since it was purchased by Elon Musk, the world's richest man, shortly over a year ago. This trend, widely reported on by the media for over a year, has—in addition Musk's own statements appearing to endorse extremist rhetoric—coincided with an exodus of advertisers from the X platform.

4.      Hananoki, Media Matters's Senior Investigative Reporter, has covered political extremism on social media platforms like X for over a decade, and has published a series of articles over the past eight months on X's inability to protect its advertisers from appearing alongside extremist content. On November 16, 2023, Hananoki published an article—"*As Musk endorses antisemitic conspiracy theory, X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content*"—reporting on Musk's apparent endorsement of a statement that Jewish people have a "hatred against whites" and support "flooding the[] country" with "hordes of minorities." In his article, Hananoki noted that at the same time Musk endorsed this antisemitic conspiracy theory, X was permitting the placement of advertisements next to pro-Nazi content.

His article published several examples, such as this image of an advertisement for Oracle appearing next to an image of Adolf Hitler:



5.      Musk took personal offense at Hananoki's November 16 article, even though the surge of hate speech on X—including alongside advertisements—has been the subject of near constant media coverage for over a year. Shortly after the article was published, Musk tweeted to his 165 million followers that X would be filing a "thermonuclear" lawsuit against Media Matters and those who participated in preparing the November 16 article. Musk later made good on his threat, filing suit against Media Matters and Hananoki on November 20, 2023. *See X Corp. v. Media Matters for America, et al.*, No. 4:23-cv-1175 2023, WL 8091661, (N.D. Tex.).

6.      Certain politicians and media figures—many of them prior subjects of Plaintiffs' reporting on extremism—swiftly jumped to Musk's cause, including Texas Attorney General Kenneth Paxton. On November 20—the same day Musk sued Plaintiffs—Paxton announced he

was launching an investigation into Media Matters under Texas's deceptive trade practices act. *See* Ex. A, Attorney General Ken Paxton Opens Investigation into Media Matters for Potential Fraudulent Activity, Texas Attorney General's Office (Nov. 20, 2023). Paxton, whose office has been the subject of previous Media Matters articles and reports, offered no explanation as to how Media Matters—a Washington, D.C.-based non-profit—or Hananoki—a Maryland-based reporter—violated Texas's trade practices law, or even what possible jurisdiction he had over them. Indeed, his press release indicated his office had performed no meaningful analysis of these issues at all, simply stating that Paxton personally was "troubled" by the "allegations" made by Musk. *Id.* The release further disparaged Media Matters as "a radical anti-free speech organization" that "would like nothing more than to limit freedom by reducing participation in the public square." *Id.*

7.    Two days later, Paxton issued a civil investigative demand ("Demand") to Media Matters, commanding it to "produce [] documentary material[s] and permit inspection and copying." Tex. Bus. & Com. Code Ann. § 17.61(a); *see also* Ex. B, Civil Investigation Demand, Office of the Atty. General (Nov. 21, 2023) at 7. The Demand seeks a sweeping array of materials from Media Matters and Hananoki, including documents and communications about their research and reporting, their communications with possible sources at X and its advertisers, as well as sensitive materials related to Media Matters's operations. *See* Ex. B at 7. The Demand was formally served on counsel for Media Matters on December 1 and has a return date of December 12, 2023—tomorrow—at which point Attorney General Paxton is entitled to enforce the Demand in Texas state court, even though Plaintiffs have no relevant connection to Texas and have been afforded *zero* explanation as to how they may have violated Texas law. The Demand is an extraordinarily invasive intrusion into Plaintiffs' news gathering and reporting activities, and is

4

plainly intended to chill those activities, acting in effect as an ongoing demand for virtually any materials Plaintiffs have—or may prepare—related to their research and reporting on X or Musk.

8.      Paxton's retaliatory investigation and Demand are transparent attempts to punish Plaintiffs for their constitutionally protected speech and press activities, subjecting them to a baseless and arbitrary government investigation in a state to which they have no relevant connection, and demanding the right to rifle through their most sensitive journalistic and organizational documents and communication. And his retaliatory campaign has, for now, had its intended effect: Plaintiffs have not published any articles about how Musk's ownership has triggered a rise in political extremism on X since Paxton announced his investigation—despite a flood of tips identifying extremist content on the platform—for fear of further retaliation and harassment.

9.      "[T]he First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006). Likewise, under the Fourth Amendment, it is "contrary to the first principles of justice to allow a search through [Plaintiffs'] records, relevant or irrelevant, in the hope that something will turn up." *Fed. Trade Comm'n v. Am. Tobacco Co.*, 264 U.S. 298, 306 (1924) (Holmes, J.). Paxton's retaliatory investigation and Demand are "premised solely upon *legal* activity" and thus "the very type of 'fishing expeditions' that were the target of Justice Holmes's assault in *American Tobacco*." *Major League Baseball v. Crist*, 331 F.3d 1177, 1187 (11th Cir. 2003) (suppressing civil investigative demand violating Fourth Amendment).

10.      In view of Paxton's unlawful harassment and retaliation, Plaintiffs seek immediate declaratory and injunctive relief from this Court—in a jurisdiction where their constitutionally protected activities actually occur and where they will be uniquely injured by being compelled to

5

disclose information—to vindicate their fundamental right to gather the news and hold the powerful to account. To the same end, Plaintiffs also respectfully request that the Court order a "speedy hearing" of this "declaratory-judgment" action. *See* Fed. R. Civ. P. 57.

## JURISDICTION & VENUE

11.     This Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1331 because Plaintiffs' federal constitutional claims arise under the First, Fourth, and Fourteenth Amendments to the United States Constitution and 42 U.S.C. §§ 1983, 1988. It has authority to grant Plaintiffs declaratory, injunctive, and other relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and the Court's own legal and equitable powers. It also has supplemental jurisdiction over any state law claims derived from a common nuclear of operative fact. *See Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 349 (1988).

12.     This Court has personal jurisdiction over Defendant Paxton in his official capacity as Attorney General of Texas because this lawsuit arises from unlawful retaliatory action that he intentionally directed towards the District of Maryland for the purpose, and effect, of violating the constitutional rights of Plaintiffs, including Hananoki. The Demand issued by Attorney General Paxton focuses on an article written by Hananoki and published by Media Matters on November 16, 2023. All preparations, research, writing, and communications with editors related to the November 16 article were conducted by Hananoki in the District of Maryland, where he also resides. Thus, the information he is being compelled unlawfully to disclose is located in this District. Hananoki wishes to continue writing and publishing articles about how Musk's ownership of X has enabled political extremism on the platform but Defendant Paxton's actions demanding unbounded disclosure of Hananoki's newsgathering sources and means have chilled his speech. That constitutionally protected conduct, too, would be performed within this District. *See Calder v. Jones*, 465 U.S. 783, 788–90 (1984); *Bradley v. DentalPlans.com*, 617 F. Supp. 3d 326, 345 (D.

Md. 2022) (observing that "Maryland has a significant interest in providing a forum for its citizens to seek relief for in-state injuries").

13.    Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiffs' claims occurred in the District of Maryland, where nearly all of Hananoki's work occurred. This includes all preparation, research, writing, and communications with editors related to the November 16 article. These constitutionally protected acts are the target of Defendant Paxton's Demand and broader investigation, and the information sought by the Demand is in large part located in this district.

14.    Subject matter jurisdiction exists because Plaintiffs have demonstrated that they have suffered and will suffer injuries-in-fact; there is a sufficient causal connection between Plaintiffs' injuries and Attorney General Paxton's actions in pursuing his investigation and Demand, and a favorable decision from this Court granting Plaintiffs relief will redress those injuries. This dispute is ripe because Plaintiffs' legally protected First and Fourteenth Amendment rights are being violated already, and Plaintiffs will suffer further imminent invasions of those rights in the absence of relief from this Court. Plaintiffs have actual fear that the Demand will be enforced against them, which has already chilled their speech, and Texas law confirms there is a ripe dispute. Under Texas law, the target of such a demand has a right to file a "petition to extend the return date for, *or to modify or set aside the demand*, stating good cause," by filing an action before the date a response is due "in the district court in the county where the parties reside, or a district court of Travis County," Texas. Tex. Bus. & Com. Code § 17.61(g) (emphasis added). Because, as set forth in Count III below, it would violate Plaintiffs' constitutional rights to be subjected to the jurisdiction of any court in Texas, Plaintiffs cannot meaningfully obtain relief before Texas courts and accordingly seek relief before this Court.

## PARTIES

15.     Plaintiff Media Matters for America ("Media Matters") is a not-for-profit research center and media watchdog dedicated to comprehensively monitoring, analyzing, and correcting conservative misinformation in the media. Media Matters routinely investigates political extremism on media platforms in the United States and publishes articles and commentary on public figures who endorse or espouse such rhetoric. It is incorporated under the laws of, and has its principal place of business in, the District of Columbia, but many of its reporters and employees live in and work from the surrounding Washington, D.C. metropolitan area, including Maryland.

16.     Plaintiff Eric Hananoki is a Senior Investigative Reporter at Media Matters. Hananoki resides in Montgomery County, Maryland. For over a decade, Hananoki's beat for Media Matters has included investigating, researching, and reporting on political extremism in U.S. media, including on social media platforms like X. In his role as Senior Investigative Reporter, Hananoki has written numerous articles about extremism, white nationalism, and anti-Semitic rhetoric espoused by politicians and public figures. Hananoki's reporting has included numerous articles about social media platform X and its owner, Elon Musk. Hananoki researched and wrote the November 16 article primarily from his residence in Maryland.

17.     Defendant Warren Kenneth Paxton, Jr. is the Attorney General of the State of Texas and is sued in his official capacity. The Texas Deceptive Trade Practices Act ("DPTA"), Tex. Bus. & Com. Code Ann. § 17.41, *et seq.*, grants Paxton various powers in his capacity as Attorney General through the consumer protection division of his office. This includes the power to issue a "civil investigative demand requiring" the recipient "to produce [] documentary material[s] and permit inspection and copying." Tex. Bus. & Com. Code Ann. § 17.61(a). Issuing such a demand does not require the Attorney General to show any cause or likelihood of having jurisdiction—he may do so if he "believes" the recipient to be in possession of relevant material concerning a

possible violation of the DPTA. Tex. Bus. & Com. Code Ann. § 17.61(a). Paxton "may use the documentary material or copies of it as [he] determines necessary" to enforce the DPTA, including before a court. Tex. Bus. & Com. Code Ann. § 17.61(f).

## FACTS

**A.      Media Matters and Hananoki have a long track record of reporting on political extremism, including on social media platforms like X.**

18.      Since its founding in 2004, Media Matters has been dedicated to monitoring and correcting misinformation from right-wing media, including by publishing its own investigatory research and reporting on its website. Media Matters provides its reporters and researchers, including Hananoki, a powerful platform from which to reach the public, often in the form of research and reporting on current events and criticism of powerful public figures and politicians.

19.      Media Matters has over 100 employees—including 64 reporters, writers, and researchers—most of whom work and reside within the Washington, D.C. metropolitan area where Media Matters's sole office is located.[1] Media Matters does not have an office, or any other physical presence, in Texas. Media Matters does not transact any business in Texas and thus has never registered in the state. *See* Tex. Bus. Org. Code § 9.0002(a). Media Matters is also not registered as a charity organization in Texas and does not have a registered agent in the state.

20.      Hananoki has worked at Media Matters since 2007 and is currently a Senior Investigative Reporter. Previously, Hananoki worked as a Researcher, Senior Researcher,

---

[1] Media Matters employees may request authorization to work remotely and, upon approval, may choose to do so from any location in the U.S. Hananoki is considered an employee with remote work authorization who may sometimes commute into the District of Columbia when he chooses to do so, but he performs most of his work at home in Montgomery County, Maryland. Of Media Matters employees authorized to work remotely, only one employee has provided a residential address in Texas. That employee has not been in Texas since the start of October 2023, did not work with Hananoki on the November 16 article nor any other of his articles related to X or otherwise, and works in an entirely different department.

Research Fellow, and Investigative Reporter at Media Matters. In his more than 16 years at the organization, Hananoki has researched and written countless reports and articles, often shedding light on public figures who espouse violent, extreme, or racist views. His articles and reports have been widely cited by a broad array of media outlets, including the Associated Press, CNN, Fox News, Los Angeles Times, MSNBC, New York Post, New York Times, Politico, USA Today, Wall Street Journal, and Washington Post.

21.     His long history of research and reporting has been relied upon by government officials, including under both Democratic and Republican leadership. Under President Trump, the Department of Justice cited Hananoki's research regarding a far-right commentator who promoted and sold a bogus COVID-19 cure.[2] Special Counsel Robert Mueller cited Hananoki's reporting on Roger Stone in his report on Russian interference in the 2016 presidential election,[3] as did a bipartisan U.S. Senate Select Committee on Intelligence report regarding the same.[4] Numerous political organizations, including the National Republican Congressional Committee,

---

[2] *United States v. My Dr. Suggests LLC*, No. 2:20-CV-00279-DBB (D. Utah Apr. 27, 2020), Plaintiffs' Ex Parte Mot. and Mem. of Law for a Temporary Restraining Order and Order to Show Cause Why a Preliminary Injunction Should Not Issue, Dkt. 2, at 13; *id.*, Decl. of Virginia Keys, Dkt. 2-1, ¶¶ 7, 28–29.

[3] Both reports cited a Media Matters article that included a video that Hananoki found and produced. *See* Report on the Investigation into Russian Interference in the 2016 Presidential Election, Volume I of II, Special Counsel Robert S. Mueller, III, March 2019, at 57 n.233, available at https://www.justice.gov/storage/report_volume1.pdf.

[4] Select Committee on Intelligence, Russian Active Measures Campaigns and Interference in the 2016 U.S. Election, Volume 5: Counterintelligence Threats and Vulnerabilities, at 246 n.1638, https://www.intelligence.senate.gov/sites/default/files/documents/report_volume5.pdf.

have at various times withdrawn support for political candidates after Hananoki reported on racist or extremist rhetoric from those candidates.[5]

22.     Attorney General Paxton himself has previously relied on Hananoki's work. In 2020, Hananoki uncovered "tweets filled with racist rhetoric, violent threats and coronavirus conspiracy theories" from an Assistant Attorney General in Paxton's office.[6] Paxton's office fired the employee in the wake of Hananoki's reporting.[7]

23.     As part of his work at Media Matters, Hananoki has been reporting on X—and before that, Twitter—for years. His coverage of X has increased over the past year due to a marked increase in extremist rhetoric on the platform since Musk took ownership, a disturbing trend widely reported on in the media, including by outlets other than Media Matters.

**B.     Elon Musk purchases X and cuts back its content-moderation infrastructure.**

24.     On October 27, 2022, Elon Musk completed his purchase of the social media platform then known as Twitter. Musk subsequently renamed the social media platform "X," though it continues to operate at its traditional twitter.com web address. Both before and after

---

[5] *See, e.g.*, "*House Republicans withdraw support of N.J. candidate after report says he shared racist screed*," NJ.com (July 10, 2018), https://www.nj.com/politics/2018/07/house_republicans_withdraw_support_of_nj_candidate.html (noting that NRCC chair "Stivers reacted to a report by the liberal watchdog group Media Matters about [the candidate] linking to the article that ran on a white supremacist website.").

[6] "*A Texas assistant attorney general is a QAnon conspiracy theorist who tweets out violent threats and bigoted remarks*," Media Matters for America (Sept. 3, 2020), https://www.mediamatters.org/twitter/texas-assistant-attorney-general-nick-moutos-qanon-conspiracy-theorist-who-tweets-out.

[7] Trinady Joslin, "*Assistant Texas attorney general loses job after report surfaces racist tweets*," The Texas Tribune (Sept. 3, 2020), https://www.texastribune.org/2020/09/03/nick-moutos-texas-attorney-general; *see also* Taylor Goldenstein, "*Records: Texas assistant AG who lost job over tweets was fired, had been warned about social media*," Houston Chronicle (Sept. 11, 2020), https://www.houstonchronicle.com/politics/texas/article/texas-assistant-ag-social-media-posts-fired-warned-15558487.php.

acquiring ownership of X, Musk frequently referred to the platform as a "digital town square" or "de facto town square" for public discussion.[8]

25.     Almost immediately after his takeover, Musk began laying off key executives and content moderators at X responsible for removing hate speech and other violent rhetoric.[9] Indeed, within his first few months of ownership, Musk laid off approximately 80 percent of the company's staff, including its former CEO, general counsel, policy chief, and head of trust and safety.[10] He downsized or eliminated critical areas of the company responsible for overseeing policy, trust and safety, communications, and ethical AI, among others.[11] These deep workforce cuts raised questions among U.S. lawmakers and regulators about the social media platform's ability to safely respond to security and privacy threats, misinformation, and hate speech—matters of significant public concern in view of Musk's claim that the platform should serve as a digital town square.[12] Lawmakers similarly expressed concern that, in the wake of Musk's ownership, the platform had

---

[8] Douglas Yeung, "*The 'Digital Town Square' Problem*," TheRANDBlog (Jan. 13, 2023), https://www.rand.org/pubs/commentary/2023/01/the-digital-town-square-problem.html.

[9] *See* Brian Fung & Clare Duffy, "*How a single year of Elon Musk turned Twitter into a husk of its former self*," CNN (Oct. 27, 2023), https://www.cnn.com/2023/10/27/tech/elon-musk-twitter-x-one-year-changes/index.html [hereinafter *A single year of Elon Musk turned Twitter into a husk*]; *see also* "*Musk fires outsourced content moderators who track abuse on Twitter*," MoneyWatch, CBS News (Nov. 14, 2022), https://www.cbsnews.com/news/elon-musk-twitter-layoffs-outsourced-content-moderators/.

[10] *A single year of Elon Musk turned Twitter into a husk*, *supra* note 9.

[11] *A single year of Elon Musk turned Twitter into a husk*, *supra* note 9; *see also* Rohan Goswami, "*X CEO Linda Yaccarino explains reason for getting rid of Twitter name*," CNBC (Aug. 10, 2023), https://www.cnbc.com/2023/08/10/x-corp-ceo-linda-yaccarino-says-she-has-autonomy-under-elon-musk.html.

[12] Brian Fung, "*First on CNN: US senators question Twitter's privacy compliance under Elon Musk*," CNN (June 5, 2023), https://www.cnn.com/2023/06/05/tech/twitter-compliance-musk-senators/index.html; *see also* Brian Fung, "*Elon Musk should be forced to testify on X's 'chaotic environment,' US regulator tells court*," CNN, https://www.cnn.com/2023/09/12/tech/elon-musk-testify-privacy-probe/index.html.

ceased to comply with two consent decrees it had entered into with the Federal Trade Commission concerning safeguards for personal data and privacy.[13]

26.     Musk also eliminated existing products and policies—many of which served to protect users from misinformation and violent content—under the auspices of promoting "free speech."[14] He reinstated suspended accounts of known white supremacists and conspiracy theorists while suspending the accounts of journalists who tracked his private air travel.[15]

27.     Unsurprisingly, after the elimination of 80 percent of X's staff and the dismantling of much of X's content moderation infrastructure, extremist and racist rhetoric surged on X in the wake of Musk's takeover. Less than a month into Musk's ownership, the Brookings Institute reported that the platform had seen a "surge in hateful language" in the wake of Musk's purchase, including "a nearly 500% increase in use of the N-word in the 12-hour window immediately following the shift of ownership to Musk."[16] Similarly, within the first week of his ownership, use of the word "Jew" increased fivefold, with tweets that were antisemitic receiving the most engagement.[17] Academic researchers in the School of Communication and Media at Montclair

---

[13] *See* "*Republicans defend Elon Musk in FTC's Twitter probe*," The Verge (July 14, 2023), https://www.theverge.com/2023/7/14/23794363/elon-musk-twitter-ftc-lina-khan-republicans; *see also* "*Musk may have violated FTC privacy order, new court filing shows*," The Washington Post (Sept. 12, 2023), https://www.washingtonpost.com/technology/2023/09/12/elon-musk-consent-order-ftc/.

[14] *A single year of Elon Musk turned Twitter into a husk*, *supra* note 9.

[15] *A single year of Elon Musk turned Twitter into a husk*, *supra* note 9.

[16] Rashawn Ray and Joy Anyanwu, "*Why is Elon Musk's Twitter takeover increasing hate speech?*," Brookings (Nov. 23, 2022), https://www.brookings.edu/articles/why-is-elon-musks-twitter-takeover-increasing-hate-speech/.

[17] *Id.*

State University published a report describing how "Hate Speech Spike[d] on Twitter After Elon Musk Acquire[d] the Platform."[18]

28.     Less than two months after Musk's takeover, the New York Times reported the following about the rising hate speech on the platform:

- "Before Elon Musk bought Twitter, slurs against Black Americans showed up on the social media service an average of 1,282 times a day. After the billionaire became Twitter's owner, they jumped to 3,876 times a day."

- "Slurs against gay men appeared on Twitter 2,506 times a day on average before Mr. Musk took over. Afterward, their use rose to 3,964 times a day."

- "[A]ntisemitic posts referring to Jews or Judaism soared more than 61 percent in the two weeks after Mr. Musk acquired the site."[19]

29.     A broad array of media outlets extensively reported on this disturbing trend in Musk's self-described "digital town square."

30.     On November 15, Musk appeared to publicly endorse the white supremacist theory that Jewish communities hate White people.[20] Musk's post "was the multibillionaire's most explicit public statement yet endorsing anti-Jewish views," and was extensively covered in the

---

[18] "*Hate Speech Spikes on Twitter After Elon Musk Acquires the Platform*," Montclair State University, (Nov. 1, 2022) https://www.montclair.edu/school-of-communication-and-media/wp-content/uploads/sites/20/2022/11/Montclair-State-SCM-Study-Increases-in-Twitter-Hate-Speech-After-Elon-Musks-Acquisition.pdf.

[19] Sheera Frenkel and Kate Conger, "*Hate Speech's Rise on Twitter Is Unprecedented, Researchers Find*," the New York Times (Dec. 2, 2022), https://www.nytimes.com/2022/12/02/technology/twitter-hate-speech.html.

[20] @elonmusk, X.com (Nov. 15, 2023, 4:52 PM ET), https://twitter.com/breakingbaht/status/1724892505647296620.

media.[21] Musk later claimed he was "sorry for that post," acknowledging that "[o]f the 30,000 it

might be literally the worst and dumbest post I've ever done."[22]

31.     This spike in hateful rhetoric on X caught the attention of the platform's advertisers,

many of whom promptly ceased advertising on the platform in the months after Musk took over.

Since "the early days of Musk's takeover, many of Twitter's largest advertisers — including the

likes of General Mills and the Volkswagen Group — paused their spending over concerns about

X's layoffs, content moderation capabilities and general uncertainty about the platform's future."[23]

32.     The pullback of the company's largest advertisers led to precipitous drops in its

revenue. In July 2023, Musk reported "a 50% decline in ad revenue and heavy debt load" while in

September he reported that advertising revenue in the U.S. was "still down 60%."[24]

33.     More alarming still to X's advertisers was the fact that, after Musk's steep

downsizing of company staff, the flood of hateful and violent rhetoric on the platform often began

appearing alongside their advertising, creating a false association between their brands and vile

---

[21] Allison Morrow, "*With antisemitic tweet, Elon Musk reveals his 'actual truth,'*" CNN (Nov. 17, 2023), https://www.cnn.com/2023/11/17/business/elon-musk-reveals-his-actual-truth/index.html; *see also* Dana Hull, "*Elon Musk Replies to Antisemitic Post on X, Labeling It 'The Actual Truth,'*" Time (Nov. 16, 2023), https://time.com/6336123/elon-musk-antisemitic-post-x/.

[22] Max Zahn, "*Elon Musk apologizes for antisemitic tweet but crudely attacks advertisers,*" ABC News (Nov. 30, 2023), https://abcnews.go.com/Business/elon-musk-apologizes-antisemitic-tweet-crudely-attacks-advertisers/story?id=105270907

[23] *A single year of Elon Musk turned Twitter into a husk*, *supra* note 9; *see also* Alberto Chiumento, et al., *Advertisers react to Twitter's new ownership*, Reuters (Nov. 18, 2022), https://www.reuters.com/technology/advertisers-react-twitters-new-ownership-2022-11-03/; Alan Ohnsman, *GM, Ford Say They Aren't Running Twitter Ads As They Assess Changes Under Elon Musk*, Forbes (Oct. 28, 2022), https://www.forbes.com/sites/alanohnsman/2022/10/28/gm-ford-say-they-arent-running-twitter-ads-as-they-assess-changes-under-elon-musk/?sh=1ade964b2a19.

[24] *A single year of Elon Musk turned Twitter into a husk*, *supra* note 9.

hate speech. X's inability to control the appearance of extremist and violent rhetoric alongside its advertisers precipitated a broader exodus of advertisers from the platform.

34. Indeed, the media writ large has, for over a year, consistently reported on X and Musk's failure to protect advertisers from having their brands appear next to extremist, hateful, and violent rhetoric. Some examples include:

1. **Reuters**, "*Advertisers react to Twitter's new ownership*" (Nov. 18, 2022), https://www.reuters.com/technology/advertisers-react-twitters-new-ownership-2022-11-03/.

2. **The Washington Post**, "*Amazon, Uber, Snap ads appear on Twitter pages of white nationalists restored by Musk*," Faiz Siddiqui (Dec. 6, 2022), https://www.washingtonpost.com/technology/2022/12/06/twitter-ads-elon-musk/.

3. **ARS Technica**, "*Twitter running major brands' ads with extremist tweets— until they get flagged*," Ashley Belanger (Dec. 7, 2022), https://arstechnica.com/tech-policy/2022/12/amazon-among-brands-whose-ads-appeared-in-white-nationalist-twitter-feeds/.

4. **The Verge**, "*Twitter advertisers aren't happy with ads appearing on pages of white nationalists*," Jon Porter (Dec. 7, 2022), https://www.theverge.com/2022/12/7/23497928/twitter-advertisers-brand-safety-unbanned-accounts-white-nationalists.

5. **Center for Countering Digital Hate**, "*Toxic Twitter: How Twitter Generates Millions in Ad Revenue by Bringing Back Banned Accounts*," (Feb. 9, 2023), https://counterhate.com/wp-content/uploads/2023/02/Toxic-Twitter_FINAL.pdf.

6. **The Washington Post**, "*Twitter stands to gain from restoring formerly banned accounts*," Taylor Lorenz (Feb. 9, 2023), https://www.washingtonpost.com/technology/2023/02/09/twitter-ads-revenue-suspended-account/.

7. **The Kansas City Star**, "*Mizzou ad appears on racist X page as social media site faces concerned advertisers*," Jonathan Shorman (Mar. 15, 2023), https://www.kansascity.com/news/politics-government/article280309284.html.

8. **Business Insider**, "*Disney, Microsoft, the NBA Had Twitter Ads Next to Neo-Nazi Propaganda*," Katherine Tangalakis-Lippert (June 18, 2023),

> https://www.businessinsider.com/disney-microsoft-nba-twitter-ads-next-to-neo-nazi-propaganda-2023-6.

9. **The N.Y. Post**, "*Disney, Microsoft ads on Twitter show up next to neo-Nazi propaganda as advertisers return: report*," Shannon Thaler (June 19, 2023), https://nypost.com/2023/06/19/disney-microsoft-ads-on-twitter-show-up-next-to-neo-nazi-propaganda-report/.

35.    None of these articles cited or otherwise indicated that they relied on research or reporting performed by Media Matters or Hananoki.

**C.     Hananoki and Media Matters investigate and report on the surge of extremist rhetoric on X, including alongside advertisements.**

36.    As part of its long-running mission to document and report extremist political rhetoric in media, Media Matters began investigating, researching, and reporting on the rise in political extremism and bigotry on X after Musk's changes to the platform. Hananoki, as a Senior Investigative Reporter whose beat included political extremism, was often assigned this work.

37.    From February 10, 2023 to November 17, 2023, Media Matters published at least fourteen articles about the juxtaposition of advertisements alongside hateful content on the X platform. Most of these articles were researched and written by Hananoki.  They include:

1. "**Under Elon Musk, Twitter is running corporate ads alongside tweets from Holocaust deniers**," Media Matters for America (Feb. 10, 2023), https://www.mediamatters.org/twitter/under-elon-musk-twitter-running-corporate-ads-alongside-tweets-holocaust-deniers.

2. "**Linda Yaccarino just started as Twitter's new CEO, but Elon Musk already destroyed the platform for advertisers**," Media Matters for America (June 8, 2023), https://www.mediamatters.org/twitter/linda-yaccarino-just-started-twitters-new-ceo-elon-musk-already-destroyed-platform.

3. "**Dish, Samsung, Wall Street Journal, and others are advertising on the Twitter account of a leading white nationalist group**," Media Matters for America (June 22, 2023), https://www.mediamatters.org/twitter/dish-samsung-wall-street-journal-and-others-are-advertising-twitter-account-leading-white.

4. "**Update: Twitter placed ads for USA Today, National Women's Soccer League, and other major brands on a terrorism-linked neo-Nazi account**," Media Matters for America (July 27, 2023),

https://www.mediamatters.org/twitter/twitter-placed-ads-usa-today-national-womens-soccer-league-and-other-major-brands-terrorism.

5. "**Advertisers beware: Elon Musk and Linda Yaccarino are trying to lure you back by rebranding Twitter, but it's still a toxic cesspool,**" Media Matters for America (Aug. 8, 2023), https://www.mediamatters.org/twitter/advertisers-beware-elon-musk-and-linda-yaccarino-are-trying-lure-you-back-rebranding.

6. "**X Corp. CEO Yaccarino's interview on CNBC should alarm major advertising brands,**" Media Matters for America (Aug. 11, 2023), https://www.mediamatters.org/twitter/x-corp-ceo-yaccarinos-interview-cnbc-should-alarm-major-advertising-brands.

7. "**Update: Under Linda Yaccarino, X is placing ads for major brands on a verified pro-Hitler account,**" Media Matters for America (Aug. 16, 2023), https://www.mediamatters.org/twitter/update-under-linda-yaccarino-x-placing-ads-major-brands-verified-pro-hitler-account.

8. "**X is placing ads for brands like the NFL and MLB next to unhinged conspiracy theories about Jewish people and 9/11,**" Media Matters for America (Sept. 11, 2023), https://www.mediamatters.org/twitter/x-placing-ads-brands-nfl-and-mlb-next-unhinged-conspiracy-theories-about-jewish-people-and.

9. "**X is placing major ads on a heavily followed antisemitic account that endorses killing politicians and LGBTQ advocates,**" Media Matters for America (Sept. 12, 2023), https://www.mediamatters.org/twitter/x-placing-major-ads-heavily-followed-antisemitic-account-endorses-killing-politicians-and.

10. "**X is placing ads for the NFL on prominent white nationalist accounts,**" Media Matters for America (Sept. 27, 2023), https://www.mediamatters.org/white-nationalism/x-placing-ads-nfl-prominent-white-nationalist-accounts.

11. "**X is placing ads for MLB, the NFL, and the Pittsburgh Steelers on antisemitic and Holocaust denial accounts,**" Media Matters for America (Oct. 12, 2023), https://www.mediamatters.org/twitter/x-placing-ads-mlb-nfl-and-pittsburgh-steelers-antisemitic-and-holocaust-denial-accounts.

12. "**Pro-Hitler and Holocaust denier account: X has paid me $3,000 in ad revenue sharing,**" Eric Hananoki, Media Matters for America (Nov. 13, 2023), https://www.mediamatters.org/twitter/pro-hitler-and-holocaust-denier-account-x-has-paid-me-3000-ad-revenue-sharing.

13. "**As Musk endorses antisemitic conspiracy theory, X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content,**"

18

Media Matters for America (Nov. 16, 2023), https://www.mediamatters.org/twitter/musk-endorses-antisemitic-conspiracy-theory-x-has-been-placing-ads-apple-bravo-ibm-oracle.

14. "**X is placing ads for Amazon, NBA Mexico, NBCUniversal, and others next to content with white nationalist hashtags**," Media Matters for America (Nov. 17, 2023), https://www.mediamatters.org/twitter/x-placing-ads-amazon-nba-mexico-nbcuniversal-and-others-next-content-white-nationalist.

38.     Media Matters's research and reporting echoed what was being reported widely elsewhere—that the platform was continuing to permit the placement of advertisements alongside extremist content. Hananoki and Media Matters thus joined in ongoing national conversations about an important news story—the surge of hateful and violent rhetoric in America's supposed "digital town square."

39.     Hananoki's research and reporting sometimes looked specifically at what advertisements X's increasingly right-wing user base might see on the platform. Following ordinary journalistic investigative practices, Hananoki used an existing X research account controlled by Media Matters to follow white supremacist content and gauge the advertising that X's computer algorithm would automatically generate in response. His research confirmed that the platform's system was continuing to permit advertisements next to violent and fringe content.

40.     Hananoki published some of his findings, along with a handful of examples, in his November 16 article. That article also reported on Musk's endorsement of a widespread antisemitic conspiracy theory—that Jewish people are seeking to promote "hatred against whites" and are seeking to "flood[] the[] country" with "hordes of minorities"—which drew widespread condemnation and was extensively covered in the media.[25] Hananoki's article included screenshots

---

[25] *See, e.g.*, David Goldman, "*Elon Musk agrees with antisemitic X post that claims Jews 'push hatred' against White people*," CNN (Nov. 17, 2023), https://www.cnn.com/2023/11/15/media/elon-musk-antisemitism-white-people/index.html.

of six advertisements from major corporate entities appearing with at least nine posts from X users. For example, below are images of an advertisement for Oracle appearing with a quote from Adolf Hitler, as well as an advertisement for the Bravo television network next to a post praising Hitler's Nazi Party, which were included in his article:



41.     Hananoki did not say in his article that X, or anyone associated with X, was intentionally placing advertisements next to such violent or fringe content. He simply reported truthfully that the platform was permitting the placements of advertisements from some of the nation's biggest advertisers next to posts that touted Hitler or the Nazi party—which the platform's algorithm obviously did, as the examples he cited showed.

42.     Like many Media Matters employees, Hananoki typically works from home, and from Maryland conducted all work related to preparing, researching, drafting, communicating

about, editing, and publishing the November 16 article. Hananoki has never travelled outside of the Washington metropolitan area as part of his work for Media Matters.

43.     Hananoki researched, factchecked, and drafted the November 16 article in accordance with Media Matters's policies and standards, using similar methods to those he has used throughout his long career in journalism, and mirroring common journalistic practices.

### D.     Attorney General Paxton retaliates against Media Matters and Hananoki for their coverage of extremist rhetoric on X.

44.     Despite the robust and ongoing reporting by Media Matters and other news outlets about X's extremist content, Musk apparently took personal offense only at Hananoki's November 16 article discussing Musk's endorsement of an antisemitic conspiracy theory.

45.     Just two days after the article was published, Musk promised to file "a thermonuclear lawsuit against Media Matters." *See* @elonmusk, X.com (Nov. 18, 2023, 2:01 AM ET), https://perma.cc/X4HN-PLJ4. The post received hundreds of thousands of likes and comments, and tens of thousands of reposts. *Id.*



46.     Musk attached a message to the post referencing Hananoki's November 16 article and accusing Media Matters of manipulating X's algorithm to artificially force the placement of ads next to extremist content. *See* @elonmusk, X.com (Nov. 18, 2023, 2:01 AM ET), https://perma.cc/X4HN-PLJ4. Musk made no mention of the year-long parade of reports and documentation illustrating this endemic problem with the architecture of the X platform.

47.     Various media and political figures—many of whom have been the subjects of Media Matters reporting over the years—leapt to Musk's defense and urged retaliation against Media Matters. For example, on November 19, former adviser to President Donald Trump Stephen Miller, discussing Media Matters's article, declared, "There are 2 dozen+ conservative state Attorneys General," seemingly urging states to investigate Plaintiffs for their article. *See* @StephenM, X.com (Nov. 19, 2023, 11:48 AM), https://perma.cc/9E6L-FJGY.

48.     Responding directly to Miller's call for retaliation, Missouri Attorney General Andrew Bailey announced that his "team [was] looking into" Plaintiffs' article. @AGAndrewBailey, X.com (Nov. 19, 2023, 4:46 PM ET), https://perma.cc/J463-656K.



49.     On November 20, 2023, Attorney General Paxton joined the fray, announcing via press release that he was launching an investigation into Media Matters. Ex. A. The press release asserted that the Attorney General would "vigorously enforce" the Texas Business Organizations Code and the Deceptive Trade Practices Act but failed to explain how Media Matters—a Washington, D.C.-based non-profit media watchdog—or Hananoki—a Maryland-based reporter—were believed to have violated those laws directed at consumer protection in the carrying on of a trade or business. *Id.* Instead, Attorney General Paxton's press release disparaged Media Matters as a "a radical anti-free speech organization," and as a "radical left-wing organization[]" who would like nothing more than to limit freedom by reducing participation in the public square[.]" *Id.*

22

50.     Attorney General Paxton doubled down on his public attacks of Media Matters in subsequent interviews. In an interview with Charlie Kirk—a frequent subject of Media Matters's reporting[26]—on the Charlie Kirk Show, Attorney General Paxton discussed his investigation into Media Matters, asserting that his office could "do away with [Media Matters's] ability to do business in Texas[,]" and "go after" Media Matters for large amounts of money—to which Kirk replied, "I love it."[27]

51.     In a subsequent interview, activist Benny Johnson framed Paxton's investigation as "devastating" to Media Matters and "com[ing] in concert with Elon Musk dropping . . . [a] 'thermonuclear' lawsuit on Media Matters." *See* Ex. C, Nov. 28, 2023 "The Benny Show" Certified Tr. He asked Paxton if he "encourage[d] other Republican attorney generals to do this" and stated "we're so thankful that somebody is just standing up and doing something. Where are the rest of the Republican AGs? . . . Why are they so quiet on issues like this?" *See* Ex. C; *see also* @bennyjohnson, X.com (Nov. 29, 2023, 12:36 PM ET), [https://perma.cc/JA55-6A8G].

---

[26] *See* "Charlie Kirk," https://www.mediamatters.org/charlie-kirk.

[27] " *'We have the right as the state of Texas to go after those damages.' - AG Ken Paxton*," Rumble (Nov. 21, 2023), https://rumble.com/v3x3aim-we-have-the-right-as-the-state-of-texas-to-go-after-those-damages.-ag-ken-p.html.



52.     Paxton responded by encouraging other state Attorneys General to investigate
Media Matters, saying: "You know, that's a good question . . . I would encourage them to look at
this. They may have just become aware of it. I mean it's a relatively new issue so hopefully over
the next couple of weeks, you'll see other attorney generals look at this." Ex. C. Paxton neither
disputed nor qualified Johnson's framing. *Id*. Paxton later admitted in another interview that he
only even became aware of this issue through Musk's litigation, rather than any independent
investigation or work by his office.[28]

53.     On November 21, 2023, the day after Paxton announced his investigation, the Texas
office of the Attorney General issued the Demand, which references and requests a broad swath of
documents related to Hananoki's November 16 article. Ex. B at 7. The Demand was served on

---

[28] *See also* "*Texas A.G. Ken Paxton probes Media Matters for 'Fraudulent Activity,'*" Newsmax
(Nov. 22, 2023), available at https://rumble.com/v3x4olk-texas-a.g.-ken-paxton-probes-media-
matters-for-fraudulent-activity.html. *See id.* at 2:12 ("So we learned about this actually through
the actual lawsuit that Elon Musk filed and then the reporting of it.").

counsel for Media Matters on December 1, 2023, with a return date of December 12, 2023. *Id.* at 1.

54. Paxton's Demand, like his press release, provides no explanation as to how Media Matters or Hananoki could have violated Texas's Deceptive Trade Practices Act, nor any explanation for how Paxton could exercise the State's coercive power over them. *See generally* Ex. A; Ex. B.

55. The overbroad Demand requests that Media Matters produce "all documents related to internal and external communications relating to the article titled '*As Musk endorses antisemitic conspiracy theory, X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content*' by Eric Hananoki." The Demand also requests documents sufficient to identify Media Matters's organizational structure; sources of income originating in Texas; operational expenditures in Texas; current and past X accounts, including those used to obtain the screenshots contained in the November 16 article; and direct and indirect sources of funding for operations involving X research and publications. Ex. B at 7.

56. Paxton's Demand also requests that Media Matters produce—on an ongoing basis—all documents related to its internal and external communications, from as far back as January 1, 2022, regarding X CEO Linda Yaccarino and Musk's purchase of X; all internal and external communications regarding the November 16 article; external communications with employees and representatives of X, from November 1, 2023 to November 21, 2023; and external communications with ten corporate entities, from November 1, 2023 to November 21, 2023. *Id.* at 7. It is, in effect, an ongoing demand for virtually any materials Media Matters and Hananoki might generate as a result of future coverage of X and Musk.

25

**E.** **Attorney General Paxton chilled Media Matters's and Hananoki's speech and reporting.**

57.     Paxton's investigation and Demand have chilled Media Matters's and Hananoki's speech and press activities. It has further resulted in a slew of threats against Media Matters and its staff. Hananoki has been harassed and has received hateful messages, requiring him to increase his home security and personal security. Media Matters has been forced to retain an outside security firm to protect its employees in response.

58.      Hananoki's research and writing have been severely impaired and disrupted by Paxton's baseless investigation. Draft articles he intended to publish about violent extremism on X were cut for fear of further retaliation from Paxton. In fact, since Paxton launched his investigation, Hananoki has not published any stories about the rise of extremist rhetoric in the wake of Musk's ownership  after consistently doing so for months. Several other Media Matters employees have reported feeling constrained in their work, fearful of being ensnared in Paxton's investigation or publishing articles that would ignite additional legal action.

59.     As a direct result of Paxton's intrusive Demand, many of Media Matters's reporters and researchers have pared back reporting and publishing, particularly on any topics that could be perceived as relating to the Paxton investigation. These reporters and researchers are also aware that Media Matters's editorial team has been required to hold back stories about X and Musk due to these concerns. This lack of new coverage on X and Musk is not for want of material; to the contrary, Media Matters has received an outpouring of tips from people who continue to see extremist and violent content placed next to advertisements on X. Media Matters has not yet acted on these tips due to the legal proceedings it is now embroiled in, not least of all because Paxton's Demand seeks to compel Plaintiffs to turn over any work performed in response to these tips.

26

60.     Media Matters's executive and editorial team have also been forced to become more involved in the organization's publishing decisions since Attorney General Paxton launched his investigation to protect the organization against further retaliation. This has significantly slowed down Media Matters's publication process, as the organization must carefully assess whether a new article or report could impact existing legal proceedings or spark new ones.

61.     Media Matters's associations with other groups have also been impaired by Attorney General Paxton's investigation. Groups that previously worked closely with Media Matters have reevaluated doing so, afraid that communications may be turned over to the Attorney General or spark investigations into their own publications.

62.     Attorney General Paxton's overbroad Demand—which on its face demands associational and journalistic materials protected from disclosure by the First Amendment—further harms Plaintiffs. Complying with the Demand would require Plaintiffs to turn over thousands of sensitive documents and communications including materials Hananoki prepared to write his November 16 article, in addition to sensitive operational information about Media Matters's employees, donors, funding, expenditures, and confidential sources. With this Demand looming over them, Plaintiffs have been chilled from publishing, and in some cases generating, new research and investigatory work product that could be subject to compelled disclosure.

63.     The onerous Demand is backed by the threat that, if Plaintiffs do not comply, Paxton is entitled to sue Plaintiffs in a Texas court to enforce the Demand. *See* Tex. Bus. & Com. Code Ann. § 17.62(b) (authorizing the Office of the Attorney General to "file . . . a petition for an order of the court for enforcement of" a Civil Investigative Demand under Section 17.61). Such a tribunal would be a foreign court to both Media Matters and Hananoki, who have no relevant

contacts with Texas and who understandably fear having their constitutional rights adjudicated in jurisdictions with which they have no connection.

64.    Media Matters is not registered as a foreign corporation in Texas and does not "transact business" in Texas. Tex. Bus. Org. Code § 9.0002(a). It does not have a registered agent in Texas. Media Matters performs no "business practices" in Texas, Bus. & Com. § 17.44(a), and conducts no "trade" or "commerce" in Texas, Bus. & Com. §§ 17.45(6), .46(a). And, as explained, Hananoki's work occurred exclusively in Maryland and involved no contact with Texas. That Plaintiffs may be dragged to court in an unknown, unfamiliar, and untouched venue in Texas at the option of Attorney General Paxton further chills their speech.

65.    The Deceptive Trade Practices Act arms Paxton with a host of other powers with which to retaliate against Plaintiffs, including restraining orders, civil penalties, and sanctions. *See, e.g.*, Tex. Bus. & Com. Code Ann. §§ 17.47(a)–(b) (authorizing OAG to "bring an action in the name of the state" for injunctive relief), (c)–(d) (authorizing OAG to seek damages and restitution), (e)–(f) (authorizing OAG to seek monetary civil penalties for violations of injunctions).

66.    Paxton's own past words resolve any possible doubt about the uniquely injurious effects of his Demand that will be felt by Plaintiffs Hananoki and Media Matters. In 2016, alongside several other state Attorneys General, Paxton filed an amicus brief excoriating Massachusetts for daring to use its own deceptive trade practices law to serve a similar civil investigative demand on Exxon Mobil—which, notably, is involved in trade practices—regarding claims it misled consumers about the impact of its energy products on climate change. Ex. D, Brief of Amici Curiae in *Exxon Mobile Corp., v., et al*., 4:16-CV-00469-K, ECF. No. 63-2 (Sept. 8, 2016). Paxton, at that time, wrote:

> "The[] [First Amendment] protections afforded by the Constitution . . . [are] threatened by the chill of subpoenas, like Massachusetts's CID, hanging in the air.

Thus, not only is Massachusetts attempting to silence Exxon through the issuance
and threat of compelling a response to the CID, this very action harms everyone[.]"

*Id.* at 6. He added that "[t]he authority attorneys general have to investigate fraud does not allow

them to encroach on the constitutional freedom of others to engage in an ongoing public . . .

debate." *Id.* at 3.

## CLAIMS FOR RELIEF

## COUNT I

### First Amendment Retaliation in Violation of Plaintiffs' Rights Under the First and Fourteenth Amendments of the United States Constitution (42 U.S.C. § 1983)

67.     Plaintiffs incorporate paragraphs one through 66 above as if set forth fully herein.

68.     Attorney General Paxton violated, and continues to violate, Plaintiffs' First

Amendment rights by launching an investigation and serving a burdensome Demand in retaliation

for Plaintiffs' speech and press activities. Paxton's use of the power of his office is discouraging,

and will continue to discourage Plaintiffs from continuing to engage in news coverage. The chill

imposed by his retaliatory scheme injures Plaintiffs' ability to investigate and publish news stories

and further chills their ability to participate in a robust public discussion around political

extremism on the X platform. Absent relief from this Court, that chill will continue so long as

Paxton's investigation and Demand are—in Paxton's own words—"hanging in the air." Ex. D at

6.

69.     "[T]he law is settled that . . . the First Amendment prohibits government officials

from subjecting an individual to retaliatory actions . . . for speaking out." *Hartman*, 547 U.S. at

256. "The First Amendment right of free speech includes not only the affirmative right to speak,

but also the right to be free from retaliation by a public official for the exercise of that right."

*Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000).

70.    The Fourth Circuit has long recognized First Amendment retaliation claims as "actionable" because "retaliatory actions may tend to chill individuals' exercise of constitutional rights." *ACLU v. Wicomico Cnty., Md.*, 999 F.2d 780, 785 (4th Cir. 1993) (citing *Perry v. Sindermann*, 408 U.S. 593, 597 (1972)). That cause of action for First Amendment retaliation arises under 42 U.S.C. § 1983, which "has long [been] interpreted . . . to permit suits against officials in their individual capacities" for constitutional violations. *Tanzin v. Tanvir*, 592 U.S. 43, 48 (2020). To prevail on a First Amendment retaliation claim, Plaintiffs must show: (1) they "engaged in protected First Amendment activity;" (2) Paxton took some action adversely affecting Plaintiffs' First Amendment rights; and "(3) there was a causal relationship between [Plaintiffs'] protected activity and [Paxton's] conduct." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005). "[F]or purposes of a First Amendment retaliation claim under § 1983, a plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would deter 'a person of ordinary firmness' from the exercise of First Amendment rights. *Id.* at 500 (4th Cir. 2005) (quoting *Washington v. Cnty. of Rockland*, 373 F.3d 310, 320 (2d Cir. 2004)). Plaintiffs satisfy each element.

71.    *First*, Plaintiffs' investigative, newsgathering, and reporting activities are "legally protected interest[s]" under the First Amendment. *Overbey v. Mayor of Baltimore*, 930 F.3d 215, 227 (4th Cir. 2019) (recognizing right of local news website operator to "gather news"). Media Matters provides journalistic research and investigative reporting on a variety of matters and figures of public importance. Hananoki is a senior investigative reporter who for over a decade has published journalism about political extremism online, including on platforms like X. The "First Amendment applies in full force" to this newsgathering and commentary, and further "protect[s] a news outlet's editorial perspective [and] the way its beat reporters cover a given" public issue.

30

*Washington Post v. McManus*, 944 F.3d 506, 518 (4th Cir. 2019) (quoting *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 255 (1974)). Indeed, "the constitutional protection of the press reaches its apogee" where, as here, Plaintiffs are members of the press who investigate and write about "a public figure" or "on a matter of public concern." *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092 (4th Cir. 1993) (citing *New York Times Co.*, 376 U.S. 254).

72.     *Second*, Paxton has taken action adverse to Plaintiffs' protected activity in response to news coverage. His investigation and intrusive Demand have already chilled Plaintiffs' speech and reporting activities and will continue to do so absent relief. Paxton's retaliatory conduct would "deter 'a person of ordinary firmness' from the exercise of First Amendment rights," *Constantine*, 411 F.3d at 500, particularly given the suite of tools Texas law provides Paxton to further punish, harass, and restrain Plaintiffs' constitutionally protected conduct. *See, e.g.*, Tex. Bus. & Com. Code Ann. §§ 17.47, .60, .62. This chill is exacerbated by the fear Plaintiffs will be forced to defend their constitutional rights in a jurisdiction with which they have no meaningful connection.

73.     *Third*, there is no serious dispute that Paxton's investigation and Demand are causally linked to Plaintiffs' coverage of X and Musk. Attorney General Paxton has publicly admitted as much. He announced his investigation into Plaintiffs on November 20, 2023, the same day that X filed a frivolous lawsuit against Plaintiffs for the very same coverage Paxton seeks to punish. Paxton issued his retaliatory Demand only a few days after announcing his investigation. Since then, Paxton has encouraged other state Attorneys General to take retaliatory action against Plaintiffs under their own state consumer laws—regardless of any connection Plaintiffs have with those states. The material sought by Attorney General Paxton's Demand further confirms the causal connection, as it singles out documents and communications related to the November 16 article, as well as X and its officers.

31

74. Paxton's retaliatory campaign against Media Matters has injured Plaintiffs and will continue to do so absent relief from this Court. This harm will be redressed by an order declaring Paxton's conduct to be unlawful and enjoining him from further investigating Plaintiffs or enforcing his Demand. Such relief is appropriate under Section 1983. *Kenny v. Wilson*, 885 F.3d 280, 287–88 (4th Cir. 2018); *Cromer v. Brown*, 88 F.3d 1315, 1332 (4th Cir. 1996).

## COUNT II

### Violation of Plaintiffs' Rights Under the First, Fourth, and Fourteenth Amendments of the United States Constitution (42 U.S.C. § 1983)

75. Plaintiffs incorporate paragraphs one through 74 above as if set forth fully herein.

76. Attorney General Paxton's issuance of the overbroad and retaliatory Demand further violates Plaintiffs' First and Fourth Amendments by unreasonably requiring them to turn over sensitive and privileged materials.

77. The Fourth Amendment limits the scope of administrative subpoenas. *See Okla. Press Publ'g Co. v. Walling*, 327 U.S. 186, 208–11 (1946). The First Amendment provides Plaintiffs a privilege against disclosure of materials that would chill their constitutional rights. *See Perry v. Schwarzenegger*, 591 F.3d 1147, 1160 (9th Cir. 2009). Where "the materials sought to be seized" by an administrative subpoena even "*may* be protected by the First Amendment," the requirements of the Fourth Amendment are applied with "scrupulous exactitude." *Zurcher v. Stanford Daily*, 436 U.S. 547, 564 (1978) (citing *Stanford v. Texas,* 379 U.S. 476, 485 (1965)) (emphasis added).

78. Defendant Paxton has shown no such "scrupulous exactitude" in his Demand. Without any showing of cause or jurisdiction, Paxton has demanded that Plaintiffs produce a broad set of documents that implicate their core First Amendment rights. The Demand seeks, for example, swathes of documents related to Plaintiffs' donors, funding sources, expenditures, and

32

employees, all of which are protected from compelled disclosure under the First Amendment. *E.g.*, *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2382 (2021); *NAACP v. Alabama*, 357 U.S. 449, 462 (1958). It further requires that Plaintiffs surrender internal communications and files regarding news articles, as well as communications with employees at X and its advertisers, again with no showing of cause. Paxton may not "rummage at large in newspaper files or [] intrude into or to deter normal editorial and publication decisions" under the First Amendment. *Zurcher v. Stanford Daily*, 436 U.S. 547, 566 (1978); *see also Lacey v. Maricopa Cnty.*, 693 F.3d 896, 917 (9th Cir. 2012). Such "[b]road and sweeping state inquiries into these protected areas . . . discourage citizens from exercising rights protected by the Constitution." *Baird v. State Bar of Ariz.*, 401 U.S. 1, 6 (1971) (plurality opinion).

79.    It provides no meaningful relief to Plaintiffs that Paxton is only authorized to enforce his Demand through a petition to Texas's courts. *See* Tex. Bus. & Com. Code Ann. § 17.62(b). Texas courts plainly lack personal jurisdiction over Plaintiffs, who should not be forced to subject themselves to foreign tribunals to defend their constitutionally protected rights at home in Maryland.

80.    Plaintiff Media Matters is incorporated under the laws of, and has its principal place of business in, the District of Columbia. Plaintiff Eric Hananoki is domiciled in Maryland. Texas courts lack general jurisdiction over Plaintiffs. *See Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024–25 (2021).

81.    Plaintiffs have not purposefully availed themselves of the privilege of conducting activities in Texas, nor would any cause of action stemming from the Demand arise out of or relate to such purposeful contacts, if they existed. Texas courts lack specific jurisdiction to enforce the Demand against Plaintiffs. *See Johnson v. TheHuffingtonPost.com, Inc.*, 21 F.4th 314, 317–18 (5th

Cir. 2021), *reh'g en banc denied*, 32 F.4th 488 (5th Cir. 2022), *cert. denied*, 143 S. Ct. 485 (2022);

*Fidrych v. Marriott Int'l, Inc.*, 952 F.3d 124, 140 (4th Cir. 2020).

82.     Plaintiffs now have little time left to comply with Paxton's demand, at which point they must either surrender constitutionally protected materials in violation of their First and Fourth Amendment rights, or risk subjecting themselves to state-level proceedings in foreign courts that plainly lack jurisdiction over them. That is no true choice at all.

83.     This ongoing violation of Plaintiffs' First and Fourth Amendment rights will be remedied by prompt injunctive relief from this Court setting aside the Demand, as Texas law allows.

## COUNT III

**Violation of Plaintiffs' Due Process Rights Under the Fourteenth Amendment to the United States Constitution (42 U.S.C. § 1983)**

84.     Plaintiffs incorporate paragraphs one through 83 above as if set forth fully herein.

85.     The guarantee of due process in the Fourteenth Amendment "recognizes and protects an individual liberty interest" from being subjected to legal process in a jurisdiction with which a person has no contact, unless they willingly consent to such process. *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982).

86.     For a state to exercise personal jurisdiction over a party in a manner consistent with due process, the party must have "'minimum contacts' with the forum so that the exercise of jurisdiction 'does not offend traditional notions of fair play and substantial justice.'" *Fidrych v. Marriott Int'l, Inc.*, 952 F.3d 124, 131 (4th Cir. 2020) (quoting *Hawkins v. i-TV Digitalis Tavkozlesi zrt.*, 935 F.3d 211, 228 (4th Cir. 2019)).

87.     Here, Defendant Paxton has purported to subject Plaintiffs to legal process under Texas law—and has the power to force Plaintiffs into Texas court to defend against enforcement

of his Demand—despite Plaintiffs' having no minimum contacts with Texas and not being subject to either general or specific personal jurisdiction in that state. Plaintiffs do not avail themselves of Texas law and had no reason to ever foresee being subject to Texas's deceptive trade practices act. Media Matters's mere "operation of a website accessible in [Texas] is insufficient to satisfy the minimum-contacts requirement of the personal-jurisdiction inquiry" under the Due Process clause. *Fidrych*, 952 F.3d at 140.

88.     Plaintiffs are injured by the ongoing imposition of Texas law on them by Defendant Paxton despite his clear lack of jurisdiction to do so, and will be further injured if Paxton hauls Plaintiffs into Texas state court to defend their constitutional rights in a jurisdiction with which they have no relevant contacts.

## COUNT IV

**Violation of Plaintiffs' Rights Under Maryland's and Washington, D.C.'s Reporters' Shield Laws**

89.     Plaintiffs incorporate paragraphs one through 88 above as if set forth fully herein.

90.     Attorney General Paxton's Demand violates Plaintiffs' rights under Maryland's and Washington, D.C.'s shield laws by seeking to compel disclosure of statutorily protected, confidential sources. Md. Cts. & Jud. Proc. Code Ann. § 9-112(b) (2014); D.C. Code § 16-4702 (2011).

91.     Maryland and Washington, D.C.'s shield laws provide an absolute privilege against the compelled disclosure of sources, regardless of whether those sources are confidential. Md. Cts. & Jud. Proc. Ann. § 9-112(d)(2) (2014); D.C. Code § 16-4703 (2011). To overcome this qualified privilege, both statutes provide that parties seeking news or information must establish by clear and convincing evidence that (1) the news or information is relevant to a significant legal issue before a party that has a power to issue a subpoena; (2) the news or information could not, with

35

due diligence, be obtained by any alternative means; and (3) there is an overriding public interest in the disclosure. Still, courts have quashed subpoenas that seek information from news media, even when all three prongs of the qualified privilege apply. *See, e.g.*, *Bice v. Bernstein*, No. 93-CA-22258, 1994 WL 555379, at *1–*2 (Md. Cir. Ct. Apr. 20, 1994); *Grunseth v. Marriott Corp.*, 868 F. Supp. 333, 336 (D.D.C. 1994).

92.     Attorney General Paxton's Demand is consequently infirm because its overbreadth will require that Plaintiffs turn over constitutionally protected sources. The Demand asks for any and all materials related to external *and internal* communications regarding Plaintiffs' November 16 article, as well as external communications between Plaintiffs and employees and representatives of X from November 1, 2023, to November 21, 2023. What is more, the Demand seeks numerous documents regarding Plaintiffs' organizational structure, as well as the specific X accounts used to obtain the screenshots contained in the November 16 article. In essence, the Demand functions as a boundless inquiry into Plaintiff's' organization and news gathering capacity—precisely the kind of pernicious subpoena that these shield laws were designed to combat.

93.     Attorney General Paxton's Demand not only seeks privileged material in violation of Plaintiff's First Amendment rights, but also chills Plaintiff's news gathering capacity. An setting aside the Demand is the only legal mechanism to ensure that plaintiff's rights—protected by the Constitution and promulgated by state statute—are secure.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully ask for the following relief:

94.     Declare Paxton's Demand constitute a First Amendment retaliatory action in violation of Plaintiffs' rights under the First and Fourteenth Amendments of the U.S. Constitution.

36

95.     Declare that Paxton's Demand violates Plaintiffs' rights under the First, Fourth, and Fourteenth Amendments of the U.S. Constitution.

96.     Declare that courts in the State of Texas cannot exercise personal jurisdiction over Plaintiffs in any imminent action to enforce the Demand.[29]

97.     Temporarily enjoin Paxton, his officers, agents, servants, and employees from initiating any action to enforce the Demand in violation of their constitutional rights.

98.     Permanently and preliminarily enjoin Paxton, his officers, agents, servants, and employees from initiating any action to enforce the Demand or further investigating Plaintiffs in violation of their constitutional rights, as well as to the extent enforcement would require the disclosure of information protected by the Maryland and D.C. shield laws.

99.      Award Plaintiffs their costs, expenses, and reasonable attorneys' fees, pursuant to 42 U.S.C. § 1988, and any other applicable law.

100.    Grant Plaintiffs any and all other relief as the Court deems just and proper.

Dated: December 11, 2023

Respectfully submitted,
*/s/ Tina Meng Morrison*

**ELIAS LAW GROUP LLP**
Abha Khanna*
1700 Seventh Ave. Suite 2100
Seattle, WA 98101
T: (206) 656-0177
akhanna@elias.law

---

[29] It is neither unusual nor unprecedented for courts to determine whether other courts in other circuits have jurisdiction. *See, e.g.*, *Clark v. Busey*, 959 F.2d 808, 812 (9th Cir. 1992) ("Transfer is improper where the transferee court lacks jurisdiction and thus could not have originally heard the suit."); *Grondal v. United States*, 513 F. Supp. 3d 1262, 1275 (E.D. Wash. 2021); *In re Asbestos Prod. Liab. Litig. (No. VI)*, 965 F. Supp. 2d 612, 620 (E.D. Pa. 2013) ("Ohio's long-arm statute does not confer jurisdiction"). *See also* 28 U.S.C. § 1404(a) ("a district court may transfer any civil action to any other district or division where it might have been brought"); *id.* § 1631 ("the court shall, if it is in the interest of justice, transfer such action or appeal to any other such court . . . in which the action or appeal could have been brought at the time it was filed or noticed").

Tina Meng Morrison (D. Md. Bar No. 21832)
Aria C. Branch*
Christopher D. Dodge*
Jacob D. Shelly**
Elena A. Rodriguez Armenta*
Daniela Lorenzo*
Omeed Alerasool*
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
T: (202) 968-4652
tmengmorrison@elias.law
abranch@elias.law
cdodge@elias.law
jshelly@elias.law
erodriguezarmenta@elias.law
dlorenzo@elias.law
oalerasool@elias.law

**GIBSON, DUNN & CRUTCHER LLP**
Theodore J. Boutrous, Jr.*
Jay P. Srinivasan*
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: (213) 229-7000
Email: tboutrous@gibsondunn.com
Email: jsrinivasan@gibsondunn.com

Amer S. Ahmed*
Anne Champion*
200 Park Avenue
New York, New York 10166
Telephone: (212) 351-4000
Email: aahmed@gibsondunn.com
Email: achampion@gibsondunn.com

*Pro hac vice application forthcoming
**Application for admission pending

Counsel for Plaintiffs Media Matters for America and Eric Hananoki

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Media Matters for America, et al.

**(b)** County of Residence of First Listed Plaintiff
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Elias Law Group, LLP
250 Massachusetts Ave. NW, Suite 400, Washington, DC 20001
(202) 968-4652

## DEFENDANTS

Warren Kenneth Paxton, Jr., in his official capacity as Attorney General of the State of Texas

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | | |
|---|---|---|
| ☐ 1 | U.S. Government Plaintiff | ☒ 3 Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 | U.S. Government Defendant | ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | **INTELLECTUAL PROPERTY RIGHTS** | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | ☐ 820 Copyrights | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 460 Deportation |
| | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | **SOCIAL SECURITY** | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 861 HIA (1395ff) | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | | | ☐ 790 Other Labor Litigation | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 791 Employee Retirement Income Security Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☒ 440 Other Civil Rights | **Habeas Corpus:** | | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | |
|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 U.S.C. §§ 1983, 1988

Brief description of cause:
Suit to enjoin investigative demand viola Plaintiffs' civil rights under the First, Fourth, and Fourteenth Amendments to the U.S. Constitution.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____   DOCKET NUMBER _____

DATE   12/11/2023

SIGNATURE OF ATTORNEY OF RECORD   /s/ Tina Meng Morrison

FOR OFFICE USE ONLY

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of Maryland

| | |
|---|---|
| Media Matters for America, et al. | ) |
| _____ | ) |
| *Plaintiff(s)* | ) |
| v. | ) |
| | ) Civil Action No.  8:23-cv-03363 |
| | ) |
| Warren Kenneth Paxton, Jr., in his official capacity as | ) |
| Attorney General of the State of Texas | ) |
| _____ | ) |
| *Defendant(s)* | ) |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  Warren Kenneth Paxton, Jr., in his official capacity
as Attorney General of the State of Texas
PO Box 12548,
Austin, TX 78711

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   Tina Meng Morrison
ELIAS LAW GROUP LLP
250 Massachusetts Ave. NW, Suite 400,
Washington, DC 20001

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date:   _____12/11/2023_____                          _____
                                                                                   *Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❐ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

❐ I left the summons at the individual's residence or usual place of abode with *(name)* _____
_____ , a person of suitable age and discretion who resides there,
on *(date)* _____ , and mailed a copy to the individual's last known address; or

❐ I served the summons on *(name of individual)* _____ , who is
designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

❐ I returned the summons unexecuted because _____ ; or

❐ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .


I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

Media Matters for America, et al.              *

    **Plaintiff,**

                                     *

    **v.**                                      **Case No.**  8:23-cv-03363

Warren Kenneth Paxton, Jr., in his            *
official capacity as Attorney General
of the State of Texas

    **Defendant.**                              *

## DISCLOSURE OF CORPORATE INTEREST

**Check all that apply:**

☑ I certify, as party/counsel in this case that  Media Matters for America
                                                              (name of party)

is not an affiliate or parent of any corporation, and no corporation, unincorporated association, partnership or other business entity, not a party to the case, has a financial interest in the outcome of this litigation as defined in Local Rule 103.3 (D. Md.).

☐ The following corporate affiliations exist with _____:
                                                                        (name of party)

_____.
                                      (names of affiliates)

☐ The following corporations, unincorporated associations, partnerships or other business entities which are not parties may have a financial interest in the outcome of this litigation:

_____.
                   (names of entities with possible financial interests)

DisclosureCorpInterest (03/2015)

Disclosure of Corporate Interest

☐ In a case based on diversity jurisdiction, the following is a list of all members of

_____ and their states of citizenship:
(name of LLC party)

_____                    _____
(name of member)                                                  (state of citizenship)

_____                    _____
(name of member)                                                  (state of citizenship)

_____                    _____
(name of member)                                                  (state of citizenship)

_____                    _____
(name of member)                                                  (state of citizenship)

Note: If there are additional LLC members, please provide their names and states of citizenship on a separate sheet of paper.

12/11/2023                                                    /s/ Tina Meng Morrison
Date                                                              Signature

                                                                Tina Meng Morrison, D. Md. Bar No. 21832
                                                                Printed name and bar number
                                                                250 Massachusetts Ave. NW, Suite 400,
                                                                Washington, DC 20001
                                                                Address

                                                                tmengmorrison@elias.law
                                                                Email address

                                                                (202) 968-4652
                                                                Telephone number

                                                                n/a
                                                                Fax number

# Exhibit A

**November 20, 2023 | Press Release**

# Attorney General Ken Paxton Opens Investigation into Media Matters for Potential Fraudulent Activity

The Office of the Attorney General ("OAG") is opening an investigation into Media Matters for potential fraudulent activity. Under the Texas Business Organizations Code and the Deceptive Trade Practices Act, the OAG will vigorously enforce against nonprofits who commit fraudulent acts in or affecting the state of Texas.

Attorney General Paxton was extremely troubled by the allegations that Media Matters, a radical anti-free speech organization, fraudulently manipulated data on X.com (formerly known as Twitter).

"We are examining the issue closely to ensure that the public has not been deceived by the schemes of radical left-wing organizations who would like nothing more than to limit freedom by reducing participation in the public square," said Attorney General Paxton.

Back to Top

# **Exhibit B**



OFFICE OF THE ATTORNEY GENERAL
CONSUMER PROTECTION DIVISION

# CIVIL INVESTIGATIVE DEMAND

**To:**    **Media Matters for America**        *via FedEx 7741 8756 3037*
                                          **Return Date: December 12, 2023**

**c/o**    **Angelo Carusone**
       **800 Maine Ave SW, Suite 500**
       **Washington, DC 20024**

Pursuant to this office's specific authority under § 17.61 of the Texas Deceptive Trade Practices – Consumer Protection Act, §§ 17.41-.63, Texas Business and Commerce Code ("DTPA"), Media Matters for America ("Media Matters") is hereby directed to produce the items listed in **"Exhibit A"** attached hereto.

You are to make available the documentary material described in **"Exhibit A"** to the undersigned Assistant Attorney General, or other authorized agent(s) identified by the Consumer Protection Division ("Division"), by the "Return Date" indicated above for inspection and copying. In lieu of producing the originals for inspection and copying at your principal place of business, you may deliver true copies of the requested documents to the Assistant Attorney General or Authorized Agent below at the Office of the Attorney General, 300 W 15th St, Austin, TX, 78701. **Contact one of the persons listed below upon receipt to discuss the logistics of producing the requested documents to the Division.**

The Division believes that Media Matters for America is in possession, custody, or control of documentary material relevant to the subject matter of an investigation of possible violations of §§ 17.46(a) and (b) of the DTPA, related to false, misleading, and/or deceptive practices in the State of Texas.

> **TAKE NOTICE THAT pursuant to section 17.62, Texas Business and Commerce Code, any person who attempts to avoid, evade, or prevent compliance, in whole or in part, with this directive by removing, concealing, withholding, destroying, mutilating, altering, or by any other means falsifying any documentary material may be guilty of a misdemeanor and on conviction is punishable by a fine of not more than $5,000.00 or by confinement in the county jail for not more than one year, or both.**

ISSUED THIS 21st day of November, 2023.

/s Levi Fuller                             **Authorized Agent**
Levi Fuller                                 Ryan Hanlan
Assistant Attorney General               Investigator
(512) 936-1308                          (512) 936-3354

# Instructions

1. **Read These Instructions/Definitions.** Read these instructions and definitions carefully.

2. **Duty to Preserve Documents**. All documents and/or other data which relate to the subject matter or requests of this Civil Investigative Demand must be preserved. *Any ongoing, scheduled or other process of document or data destruction involving such documents or data must cease even if it is your normal or routine course of business for you to delete or destroy such documents or data and even if you believe such documents or data are protected from discovery by privilege or otherwise.* Failure to preserve such documents or data may result in legal action and may be regarded as spoliation of evidence under applicable law.

3. **Relevant Dates**. Unless otherwise noted, the requests in this Civil Investigative Demand require production of documents for each year from January 1, 2022 to the final date of your production of responsive documents, herein called "the relevant time period."

4. **Custody and Control.** In responding to this Civil Investigative Demand, you are required to produce not only all requested documents in your physical possession, but also all requested documents within your custody and control, including those within the possession of persons reasonably available to you or under your direction or control.

5. **Identification of Documents not in Custody or Control.** If any responsive document was, but no longer is, in your possession, custody or control, produce a description of each such document. The description shall include the following:

   a. The name of each author, sender, creator, and initiator of such document;

   b. the name of each recipient, addressee, or party for whom such document was intended;

   c. the date the document was created;

   d. the date(s) the document was in use;

   e. a detailed description of the content of the document;

   f. the reason it is no longer in your possession, custody or control; and

   g. the document's present whereabouts.

   If the document is no longer in existence, in addition to providing the information indicated above, state on whose instructions the document was destroyed or otherwise disposed of, and the date and manner of the destruction or disposal.

6. **Privileged Documents**. If any responsive document is withheld, in whole or in part, under any claim of privilege, provide a detailed privilege log that contains at least the following information for each document or partial document that you have withheld:

   a. the document's control numbers;

   b. all authors of the document;

   c. all addressees of the document;

   d. all recipients of the document or of any copies of the document, to the extent not included among the document's addressees;

e. the date of the document;

f. a description of the subject matter of the document sufficient to determine the applicability of the privilege;

g. the nature or type of the privilege that is being asserted for the document (e.g., "attorney-client privilege");

h. the specification(s) of the Demand to which the document is responsive;

i. the document control number(s) of any attachments to the document, regardless of whether any privilege is being asserted for such attachment(s); and

j. whether the document has been produced in redacted form, and if so, the range of the control numbers for the document.

7. **Trade Secrets.** It is your responsibility to clearly designate which, if any, of the requested documents contain trade secrets, in accordance with Section 17.61(f) of the Texas Business and Commerce Code.

8. **Consult Before Producing Documents.** Before processing or making copies of hard copy documents or electronically stored information in response to this Civil Investigative Demand, consult with the designated representative(s) of the Office of the Attorney General, ("OAG") identified above and reach agreement on the format and method of production.

   Likewise, before producing any *original* documents, consult with one of the designated representatives of the OAG identified above to obtain approval. If you produce original documents, the OAG cannot guarantee their return.

9. **You May Produce Copies.** Subject to the consultation requirement noted above, you may submit photocopies (with color photocopies where necessary to interpret the document) in lieu of original hard-copy documents, provided that such copies are accompanied by an affidavit of an officer of Media Matters for America stating that the copies are true, correct, and complete copies of the original documents, and (if appropriate) were generated and maintained in the ordinary course of your business, and provided that where the original contains colored text or images, a color copy must be provided.

10. **Non-identical Copies to be Produced.** Identical copies of responsive documents need not be produced. However, any copy of a document that differs in any manner, including but not limited to the presence of handwritten notations, different senders or recipients, etc. must be produced.

11. **No Redaction.** All materials or documents produced in response to this Civil Investigative Demand shall be produced, except as deemed privileged, in complete unabridged, unedited and unredacted form, even if portions may contain information not explicitly requested, or might include interim or final editions of a document.

12. **Documents to be Bates Numbered.** Mark each page or electronic medium (e.g., disk, tape, or CD) with individual or corporate identification and eight-digit consecutive document control numbers (e.g., DOE-12345678; CORP-12345678). Hardcopy bound pamphlets or books may be marked with a single identification and control number. Documents as to which privilege is asserted are to also receive identification and control numbers.

   If your production will be more than one box or piece of electronic media, number each box or electronic media, as well as the total number of boxes/media (e.g., box 1 of 13) and mark each with the name(s) of the person(s) whose files are contained therein, the requests(s) to which they are responsive, and the document control numbers contained therein.

13. **Document Organization**. *Each document and other tangible thing produced shall be clearly designated as to which request, and each sub-part of a request, that it satisfies. The documents produced shall be identified and segregated to correspond with the number and subsection of the request.*

14. **Production of Electronic Documents.** Unless otherwise agreed to in writing by the designated OAG representative, electronically stored information shall be produced in electronic form. Before you prepare documents or information for production in electronic form in order to comply with this Civil Investigative Demand (for example, before you attempt to process electronically stored information or image hard copy documents), you must consult with the designated representative(s) of the OAG identified above and reach agreement regarding the format and method of production.

15. **Questions.** Questions concerning this Civil Investigative Demand should be directed to Assistant Attorney General Levi Fuller at (512) 936-1308.

# Definitions

1. **"You," "your," "the business," "Media Matters for America,"** or **"Media Matters"** means Media Matters for America, their past and present officers, employees, agents and representatives, parents and predecessors, divisions, subsidiaries, affiliates, partnerships and joint ventures, and includes all persons and entities acting or purporting to act under the guidance or on behalf of any of the above. The terms "subsidiary," "affiliate," and "joint venture" refer to any firm in which there is total or partial ownership (25 percent or more) or control between the company and any other person or entity.

2. **"X," "X Corp.," "Twitter,"** or **"Twitter, Inc."** means X, their past and present officers, employees, agents and representatives, parents and predecessors, divisions, subsidiaries, affiliates, partnerships and joint ventures, and includes all persons and entities acting or purporting to act under the guidance or on behalf of any of the above.

3. **"Document"** means the original and all non-identical copies (whether different from the original because of notes, underlining, attachments, or otherwise) of all computer files, and all written, printed, graphic or recorded material of every kind, regardless of authorship. It includes communications in words, symbols, pictures, photographs, sounds, films, and tapes, as well as electronically stored information, computer files, together with all codes and/or programming instructions and other materials necessary to understand and use such systems. The term "computer files" includes information stored in or accessible through computers or other information retrieval systems and includes but is not limited to drafts of documents, metadata, embedded, hidden and other bibliographic or historical data describing or relating to documents created, revised, or distributed on computer systems, as well as spreadsheets and their underlying cell formulae and other codes. Thus, you should produce documents that exist in machine-readable form, including documents stored in personal computers, portable computers, workstations, minicomputers, phones, pagers, personal data/digital assistants, archival voice storage systems, group and collaborative tools, electronic messaging devices, mainframes, servers, backup disks and tapes, archive disks and tapes, and other forms of offline storage, whether on or off your premises. This definition covers electronic mail messages ("e-mail"), text messages, voice mail, and all other documents in the possession of you and/or your directors, officers, managers, or employees, whether located at their home or office, whether on work or personal devices. Notice: Unless otherwise specified, the term "document" excludes bills of lading, invoices in non-electronic form, customs declarations, purchase orders, and other similar documents of a purely transactional nature.

4. **"Communication"** means any exchange or transmission of words or ideas to another person or an entity, including without limitation conversations, discussions, letters, memoranda, meetings, notes, speeches, or other transfer of information, whether written, oral, or by any other means, whether direct or indirect, formal or informal, and includes any document which abstracts, digests, transcribes or records any such communication. This definition extends to and encompasses electronic communications on internal chat platforms such as Slack, Microsoft Teams, Google Chat, and other similar messaging platforms.

5. **"Entity"** means legal or business entity of any kind and includes, without limitation, corporations, partnerships, joint ventures, associations, governmental bodies, and trusts.

6. **"Evidencing"** means having any tendency to make the existence of any fact related to the request more probable than it would be without the evidence.

7. **"Identify"** means

a. Regarding an individual, to identify that individual's:

    i. name;

    ii. current or last known telephone numbers at business and home; and

    iii. current or last known business and home addresses.

b. Regarding a person other than an individual, to identify:

    i. its full name;

    ii. the nature of its organization;

    iii. the address and telephone number of its principal offices and, if applicable, the state in which it is incorporated; and

    iv. its principal line of business or activity.

c. Regarding any other tangible thing, to identify:

    i. what it is, giving a reasonably detailed description thereof;

    ii. when, where, and how it was made, if applicable;

    iii. who made it, if applicable; and

    iv. its current custodian or the person that had last known possession, custody, or control thereof.

8. **"Including"** means including, but not limited to.

9. **"Person"** includes you and means any entity or natural person.

10. **"Relate," "related,"** and **"relating"** mean being in any way legally, logically, or factually connected with the subject matter of the request at issue.

11. The words **"and"** and **"or"** shall be construed either conjunctively or disjunctively as required by the context to bring within the scope of the request, any document(s) that might be deemed outside its scope by another construction.

12. Unless the context otherwise clearly indicates, words used in the singular include the plural, the plural includes the singular, and the neuter gender includes the masculine and the feminine.

# EXHIBIT A: DOCUMENTS TO BE PRODUCED

1. Produce documents sufficient to identify Media Matters for America's employee organizational chart.

2. Produce documents sufficient to identify all of Media Matters for America's sources of income originating in the State of Texas.

3. Produce documents sufficient to identify all of Media Matters for America's operational expenditures in the State of Texas.

4. Produce all documents related to internal and external communications by Media Matters for America regarding Elon Musk's purchase of X during the relevant time period.

5. Produce all documents related to internal and external communications by Media Matters for America regarding Linda Yaccarino during the relevant time period.

6. Produce documents sufficient to identify all current and past X accounts under the ownership, control, or operating at the behest of Media Matters for America.

7. Produce all documents related to internal and external communications relating to the article titled "As Musk endorses antisemitic conspiracy theory, X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content" by Eric Hananoki.

8. Produce documents sufficient to identify all of Media Matters for America's owned, controlled, or authorized X accounts that were used to obtain, produce, or otherwise acquire the screenshot images contained in the article titled "As Musk endorses antisemitic conspiracy theory, X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content" by Eric Hananoki.

9. Produce documents sufficient to identify all X accounts, profiles, and members followed by the X accounts identified in response to Demand Number 8, above.

10. Produce all of Media Matters for America's external communications with employees and representatives of X from November 1, 2023 to November 21, 2023.

11. Produce all of Media Matters for America's external communications with Apple Inc., International Business Machine Corporation (IBM), Bravo television network, NBCUniversal, Oracle Corporation, and Comcast Corporation, Lions Gate Entertainment Corporation, Warner Bros Discovery Inc., Paramount Pictures Corporation, and Sony Group Corporation from November 1, 2023 to November 21, 2023.

12. Produce documents sufficient to identify all direct and indirect sources of funding for all Media Matters for America operations involving X research or publications.

# Exhibit C



# Transcript of Recorded Conversation

**Case:** MMFA Litigation

**Planet Depos**
**Phone:** 888-433-3767
**Fax:** 888-503-3767
**Email:** transcripts@planetdepos.com
www.planetdepos.com

1

2

3

4

5

6

7                    In re: MMFA Litigation

8

9                 RECORDED CONVERSATION

10

11

12

13

14

15

16

17

18

19

20    Job No.:  518338

21    Pages:  1 - 3

22    Transcribed by: Lauren Bishop

Transcript of Recorded Conversation

1          BENNY JOHNSON: So, this is obviously

2   horrifying. Devastating and comes in concert with

3   Elon Musk dropping and I quote, thermonuclear

4   lawsuit. On Media Matters, though it seems like

5   you're standing with the Missouri Attorney General,

6   do you encourage other republican attorney generals

7   to do this? We're -- we're so thankful that somebody

8   is just standing up and doing something. Where are

9   the rest of the republican AGs? There's got to be 20,

10  30 republican AGs in the country. Why are they so

11  quiet on issues like this?

12          KEN PAXTON: You know, that's a good

13  question. I -- I would -- I would encourage them to

14  look at this. They may have just become aware of it.

15  I mean it's a relatively new issue so hopefully over

16  the next couple weeks, you'll see other attorney

17  generals look at this and -- and I -- I would

18  encourage even democratic attorney generals. I know

19  they probably wont but they should because they

20  should care about free speech as much as we do.

21          (The recording was concluded.)

22

Transcript of Recorded Conversation

3

```
1              CERTIFICATE OF TRANSCRIBER
2              I, Lauren Bishop, do hereby certify that
3    the transcript was prepared from the digital audio
4    recording of the foregoing proceeding; that said
5    proceedings were reduced to typewriting under my
6    supervision; that said transcript is a true and
7    accurate record of the proceedings to the best of my
8    knowledge, skills, and ability; and that I am neither
9    counsel for, related to, nor employed by any of the
10   parties to the case and have no interest, financial
11   or otherwise, in its outcome.
12
13
14   _____
15   LAUREN BISHOP
16   Planet Depos,
17   December 8, 2023
18
19
20
21
22
```

Transcript of Recorded Conversation

4

| A | |
|---|---|
| **ability** | |
| 3:8 | |
| **about** | |
| 2:20 | |
| **accurate** | |
| 3:7 | |
| **ags** | |
| 2:9, 2: 0 | |
| **any** | |
| 3:9 | |
| **attorney** | |
| 2:5, 2:6, 2: 6, | |
| 2: 8 | |
| **audio** | |
| 3:3 | |
| **aware** | |
| 2: 4 | |

| B |
|---|
| **because** |
| 2: 9 |
| **become** |
| 2: 4 |
| **benny** |
| 2: |
| **best** |
| 3:7 |
| **bishop** |
|  :22, 3:2, 3: 5 |

| C |
|---|
| **care** |
| 2:20 |
| **case** |
| 3: 0 |
| **certificate** |
| 3: |
| **certify** |
| 3:2 |
| **comes** |
| 2:2 |
| **concert** |
| 2:2 |
| **concluded** |
| 2:2 |
| **conversation** |
|  :9 |

**counsel**
3:9
**country**
2: 0
**couple**
2: 6

| D |
|---|
| **december** |
| 3: 7 |
| **democratic** |
| 2: 8 |
| **depos** |
| 3: 6 |
| **devastating** |
| 2:2 |
| **digital** |
| 3:3 |
| **doing** |
| 2:8 |
| **dropping** |
| 2:3 |

| E |
|---|
| **elon** |
| 2:3 |
| **employed** |
| 3:9 |
| **encourage** |
| 2:6, 2: 3, 2: 8 |
| **even** |
| 2: 8 |

| F |
|---|
| **financial** |
| 3: 0 |
| **foregoing** |
| 3:4 |
| **free** |
| 2:20 |

| G |
|---|
| **general** |
| 2:5 |
| **generals** |
| 2:6, 2: 7, 2: 8 |
| **good** |
| 2: 2 |

| H |
|---|
| **hereby** |
| 3:2 |
| **hopefully** |
| 2: 5 |
| **horrifying** |
| 2:2 |

| I |
|---|
| **interest** |
| 3: 0 |
| **issue** |
| 2: 5 |
| **issues** |
| 2: |
| **it's** |
| 2: 5 |

| J |
|---|
| **job** |
|  :20 |
| **johnson** |
| 2: |

| K |
|---|
| **ken** |
| 2: 2 |
| **know** |
| 2: 2, 2: 8 |
| **knowledge** |
| 3:8 |

| L |
|---|
| **lauren** |
|  :22, 3:2, 3: 5 |
| **lawsuit** |
| 2:4 |
| **litigation** |
|  :7 |
| **look** |
| 2: 4, 2: 7 |

| M |
|---|
| **matters** |
| 2:4 |
| **mean** |
| 2: 5 |

**media**
2:4
**missouri**
2:5
**mmfa**
 :7
**much**
2:20
**musk**
2:3

| N |
|---|
| **neither** |
| 3:8 |
| **new** |
| 2: 5 |
| **next** |
| 2: 6 |

| O |
|---|
| **obviously** |
| 2: |
| **other** |
| 2:6, 2: 6 |
| **otherwise** |
| 3: |
| **outcome** |
| 3: |
| **over** |
| 2: 5 |

| P |
|---|
| **pages** |
|  :2 |
| **parties** |
| 3: 0 |
| **paxton** |
| 2: 2 |
| **planet** |
| 3: 6 |
| **prepared** |
| 3:3 |
| **probably** |
| 2: 9 |
| **proceeding** |
| 3:4 |
| **proceedings** |
| 3:5, 3:7 |

Transcript of Recorded Conversation

| **Q** | **supervision** | **5** | |
|---|---|---|---|
| **question** | 3:6 | **518338** | |
| 2: 3 | **T** | :20 | |
| **quiet** | **thankful** | | |
| 2: | 2:7 | | |
| **quote** | **that's** | | |
| 2:3 | 2: 2 | | |
| **R** | **there's** | | |
| **record** | 2:9 | | |
| 3:7 | **thermonuclear** | | |
| **recorded** | 2:3 | | |
| :9 | **transcribed** | | |
| **recording** | :22 | | |
| 2:2 , 3:4 | **transcriber** | | |
| **reduced** | 3: | | |
| 3:5 | **transcript** | | |
| **related** | 3:3, 3:6 | | |
| 3:9 | **true** | | |
| **relatively** | 3:6 | | |
| 2: 5 | **typewriting** | | |
| **republican** | 3:5 | | |
| 2:6, 2:9, 2: 0 | **U** | | |
| **rest** | **under** | | |
| 2:9 | 3:5 | | |
| **S** | **W** | | |
| **said** | **weeks** | | |
| 3:4, 3:6 | 2: 6 | | |
| **see** | **we're** | | |
| 2: 6 | 2:7 | | |
| **seems** | **wont** | | |
| 2:4 | 2: 9 | | |
| **should** | **Y** | | |
| 2: 9, 2:20 | **you'll** | | |
| **signature-p1kal** | 2: 6 | | |
| 3: 3 | **you're** | | |
| **skills** | 2:5 | | |
| 3:8 | **2** | | |
| **somebody** | **20** | | |
| 2:7 | 2:9 | | |
| **something** | **2023** | | |
| 2:8 | 3: 7 | | |
| **speech** | **3** | | |
| 2:20 | **30** | | |
| **standing** | 2: 0 | | |
| 2:5, 2:8 | | | |

# Exhibit D

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| EXXON MOBIL CORPORATION, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | No. 4:16-cv-00469-K |
| | ) | |
| MAURA TRACY HEALEY, | ) | |
| Attorney General of Massachusetts, | ) | |
| in her official capacity, | ) | |
| | ) | |
| *Defendant.* | ) | |

**BRIEF OF TEXAS, LOUISIANA, SOUTH CAROLINA, ALABAMA, MICHIGAN, ARIZONA, WISCONSIN, NEBRASKA, OKLAHOMA, UTAH, AND NEVADA AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTEREST OF *AMICI CURIAE* AND BACKGROUND .......................................................1

ARGUMENT ........................................................................................................................2

    I.   Attorneys General should act impartially. ...................................................2

        A.   Attorneys General should not employ legal power to tip the
            scales in a policy debate. ...........................................................3

            1.   Targeting critics. .............................................................4

            2.   Abusing subpoena power.................................................5

        B.   Climate change is the subject of legitimate international
            debate.......................................................................................6

    II.  Politicized investigations undermine public confidence.............................9

CONCLUSION ......................................................................................................................9

## INTEREST OF *AMICI CURIAE* AND BACKGROUND

Exxon Mobil Corporation (Exxon) is challenging the validity of a Civil Investigative Demand (CID), a state civil administrative subpoena, issued by the Attorney General of Massachusetts (Massachusetts). Massachusetts dispatched the CID to investigate supposed violations of consumer protection laws through Exxon's marketing and sale of fossil fuel-derived products and securities. Exxon is asking the Court to issue an injunction prohibiting Massachusetts from enforcing the CID.

*Amici* possess sovereign authority to investigate violations of law. As chief legal officers, they have long used their power—including the issuance of CIDs—to determine whether unlawful conduct occurred. However, this power does not include the right to engage in unrestrained, investigative excursions to promulgate a social ideology, or chill the expression of points of view, in international policy debates.

The concerns of *Amici* and others regarding Massachusetts's tactics are expressed in a recent open letter.[1] In it, the actions of Massachusetts and others are condemned, as "this effort by our colleagues to police the global warming debate through the power of the subpoena is a grave mistake." The signatories, representing a wide range of viewpoints on climate change, "agree on at least one thing—this is not a question for the courts. Using law enforcement authority to resolve a public policy debate undermines the trust invested in our offices and threatens free speech."[2] As most recognize, "vigorous debate exists in this country regarding the risks of climate change and the appropriate response to those risks. Both sides are well-funded and sophisticated public policy participants. Whatever our country's response,

---

[1] Open Letter from Attorneys General (Luther Strange, Alabama; Bill Schuette, Michigan; Ken Paxton, Texas; Craig Richards, Alaska; Doug Peterson, Nebraska; Sean Reyes, Utah; Mark Brnovich, Arizona; Adam Laxalt, Nevada; Brad Schimel, Wisconsin; Leslie Rutledge, Arkansas; Scott Pruitt, Oklahoma; Jeff Landry, Louisiana; Alan Wilson, South Carolina) dated June 15, 2016, *available online at* http://www.ago.state.al.us/news/852.pdf.

[2] *Id.* at p.1.

it will affect people, communities, and businesses that all have a right to participate in this debate." Thus, attorneys general should "stop policing viewpoints."[3]

*Amici* are concerned about the unconstitutional use of investigative powers. They have an interest in preserving their roles as evenhanded enforcers of the law and, thus, have direct and vital interests in the issues before the Court.

ARGUMENT

Attorneys General have a constitutional duty to act dispassionately in the execution of their office. The Supreme Court has explained that attorneys representing the public do not represent an ordinary party in litigation, but "a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest , . . . is not that it should win a case but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935). This distinctive role of the prosecutor is also expressed the Model Code of Professional Responsibility. MODEL CODE OF PROF'L RESPONSIBILITY EC 7-13 (1982) ("The responsibility of a public prosecutor differs from that of the usual advocate; his duty is to seek justice, not merely to convict."). Massachusetts crossed both legal and ethical lines with its CID.

# I. Attorneys General should act impartially.

Massachusetts's investigation is the product of a cultural movement "committed to aggressively protecting and building upon the recent progress the United States has made in combatting climate change."[4] And the common interest agreement of the powers aligned on this axis of ideology underscores the partiality of their endeavor, as they seek to "limit climate change and ensur[e] the dissemination

---

[3] *Id.*

[4] Press Release, New York State Attorney General, *A.G. Schneiderman, Former Vice President Al Gore And A Coalition Of Attorneys General From Across The Country Announce Historic State-Based Effort To Combat Climate Change* (March 29, 2016) (*available online at* http://www.ag.ny.gov/press-release/ag-schneiderman-former-vice-president-al-gore-and-coalition-attorneys-general-across).

2

of accurate information about climate change." ECF No. 57 at 3.[5] And Defendant acknowledges that the issuance of the CID is part of an "aggressive approach."[6]

While *amici* have authority to conduct investigations regarding consumer protection, fraud, and deceptive trade practices, these investigations must be supported by a "reasonable belief" that there has been, or is about to be, unlawful false, misleading, or deceptive acts or practices in the conduct of any trade or commerce. *See*, *e.g.*, TEX. BUS. & COM. CODE §§ 17.46, 17.47, 17.60, 17.61. And while the government's power "to protect people against fraud" has "always been recognized in this country and is firmly established," *Donaldson v. Read Magazine, Inc.*, 333 U.S. 178, 190 (1948), "[s]imply labeling an action one for 'fraud,' of course, will not carry the day," *Illinois ex rel. Madigan v. Telemarketing Assocs.*, 538 U.S. 600, 617 (2003).

### A. Attorneys General should not employ legal power to tip the scales in a policy debate.

The authority attorneys general have to investigate fraud does not allow them to encroach on the constitutional freedom of others to engage in an ongoing public policy debate of international importance. Thus, government action that restricts or chills speech because of the message embodied within that speech contravenes the First Amendment. Indeed, "there is practically universal agreement that a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs." *Mills v. Alabama*, 384 U.S. 214, 218 (1966). The First Amendment generally prevents government from proscribing speech, *see*, *e.g.*, *Cantwell v. Connecticut*, 310 U.S. 296, 309–311 (1940), or even expressive conduct, *see*, *e.g.*, *Texas v. Johnson*, 491

---

[5] This ideology was on full display at the March 29, 2016 press conference of the so-called "AG's United for Clean Power," characterized as "the beginning of the end of our addiction to fossil fuel and the degradation of our planet." Attorney General Schneiderman, Press Conference, AGs United for Clean Power (March 29, 2016) (confirming subpoena to ExxonMobil) (*video available online at* http://www.ag.ny.gov/press-release/ag-schneiderman-former-vice-president-al-gore-and-coalition-at-torneys-general-across). Former Vice President Al Gore alleged that commercial interests (such as the Plaintiff) are "committing fraud in their communications . . . ." *Id.*

[6] *Id.*

3

U.S. 397, 406 (1989), for the mere disapproval of the ideas expressed. Here, the chilling effect of Massachusetts's CID should be of concern since the "loss of First Amendment freedoms for even minimal periods of time constitutes irreparable injury . . . ." *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. Unit B Nov. 1981) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

The heart of viewpoint discrimination is the government preferring one message to another. But "[t]he First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others." *Members of the City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984); *see also Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995); *Cornelius v. NAACP*, 473 U.S. 788, 806 (1985). Viewpoint discrimination occurs when "the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *McGuire v. Reilly*, 386 F.3d 45, 62 (1st Cir. 2004).

While Massachusetts claims an interest in consumer protection as the basis for its CID, the Supreme Court has been clear that proffering what may be on its face "reasonable grounds" for the action does "not save a regulation that is in reality a facade for viewpoint-based discrimination." *Cornelius*, 473 U.S. at 811.

### 1. Targeting critics.

The First Amendment is concerned with "the inherent risk that the Government seeks not to advance a legitimate regulatory goal, but to suppress unpopular ideas." *Hill v. Colorado*, 530 U.S. 703, 719 (2000). Thus, it stands as a bulwark against Government action designed to suppress ideas or information, or to manipulate the public debate through coercion rather than persuasion. *See Palmer ex rel. Palmer v. Waxahachie Indep. Sch. Dist.*, 579 F.3d 502, 510 (5th Cir. 2009).

Using CIDs to suppress policy debates is like imposing prior restraints on speech. Governmentally imposed prior restraints on speech are tantamount to censorship. *See Near v. Minnesota*, 283 U.S. 697, 713, (1931); *cf. Fernandes v.*

*Limmer*, 663 F.2d 619, 632 (5th Cir. Unit A Dec. 1981). Massachusetts labeling its so-called investigation (into an unsettled area of science and public policy) as related to "fraud" certainly "raise[s] the specter that the Government may effectively drive certain ideas or viewpoints from the marketplace." *Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116 (1991).

But if our society refuses to tolerate *both* the proponents and critics of ideas vying for acceptance, then the marketplace of ideas becomes a mere oligarchy of consumption. As Justice Holmes put it:

> But when men have realized that time has upset many fighting faiths, they may come to believe even more than they believe the very foundations of their own conduct that the ultimate good desired is better reached by free trade in ideas—that the best test of truth is the power of the thought to get itself accepted in the competition of the market, and that truth is the only ground upon which their wishes safely can be carried out.

*Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting).

## 2.    Abusing subpoena power.

The Fourth Amendment limits the scope of administrative subpoenas. *See Okla. Press Publ'g Co. v. Walling*, 327 U.S. 186, 208–11 (1946). Where subpoenaed materials may be protected by the First Amendment, the requirements of the Fourth Amendment are applied with "scrupulous exactitude." *Stanford v. Texas,* 379 U.S. 476, 485 (1965). As such, so-called "fishing expeditions," like this one, are proscribed and "[i]t is contrary to the first principles of justice to allow a search through all the respondents' records, relevant or irrelevant, in the hope that something will turn up." *Fed. Trade Comm'n v. Am. Tobacco Co.*, 264 U.S. 298, 306 (1924).

Massachusetts's abuse of its subpoena power runs afoul of the First Amendment. *See, e.g., AFL-CIO v. FEC*, 333 F.3d 168, 175 (D.C. Cir. 2003) (citing *Buckley v. Valeo*, 424 U.S. 1, 64–68 (1976) (disclosure of campaign contributions); *NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449, 462–63 (1958) (disclosure of

membership lists)). A First Amendment privilege against disclosures exists where such "will result in (1) harassment, membership withdrawal, or discouragement of new members, or (2) other consequences which objectively suggest an impact on, or 'chilling' of, the members' associational rights." *Perry v. Schwarzenegger*, 591 F.3d 1147, 1160 (9th Cir. 2009) (quotation omitted).

For example, subpoenas seeking investigative notes as well as the names of contacts have been held to be an invalid chilling of the free exercise of political speech and association under the First Amendment. *See Lacey v. Maricopa Cnty.*, 693 F.3d 896, 917 (9th Cir. 2012) (finding "invalid" under First Amendment "subpoenas demanding that [a] paper . . . disclose its reporters' notes and reveal information about anyone who visited the New Times's [sic] website" because subpoenas would "chill speech"); *see also Pebble Ltd. P'ship v. EPA*, 310 F.R.D. 575, 582 (D. Alaska 2015) (subpoenas are invalid when they have "the tendency to chill the free exercise of political speech and association which is protected by the First Amendment").

These protections afforded by the Constitution protect us and our freedom to engage in open and candid discussions about significant issues. But the mere existence of those very discussions is threatened by the chill of subpoenas, like Massachusetts's CID, hanging in the air. Thus, not only is Massachusetts attempting to silence Exxon through the issuance and threat of compelling a response to the CID, this very action harms everyone, stifling consumers and those seeking information in order to evaluate various viewpoints in this public policy debate.

### B.   Climate change is the subject of legitimate international debate.

Massachusetts presumes that the scientific debate regarding climate change is somehow settled, along with the related and equally important public policy debate on how to respond to what science has found. Yet, neither is true. The clearest and most undeniable fact about climate change is that, like so many other areas of science and public policy, the debate is unsettled, the research far from complete, and the

path forward unclear. *Amici* agree that "[s]cientists continue to disagree about the degree and extent of global warming and its connection to the actions of mankind,"[7] as do many others. Moreover, science does not teach the obvious public policy response to its data and findings, it merely provides a starting point.

Modern science helps us better understand our world. It constantly subjects to scrutiny various hypotheses against objective data. *See, e.g., Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593 (1993). However, because it is almost never possible for all relevant data to be marshaled, scientific proclamations are always subject to change because of new data, enhanced measurements, or other unforeseen factors. *Cf.* Karl Popper, The Logic of Scientific Discovery 44, 47 (1959). Thus, "[s]cientific controversies must be settled by the methods of science rather than by the methods of litigation." *Underwager v. Salter*, 22 F.3d 730, 736 (7th Cir. 1994)

Accordingly, the intersection of science, law, and public policy should be approached with caution and objectivity. Unfortunate results take root when government invests itself in only one side of a scientific debate since "bad ideas can persist in science for decades, and surrounded by myrmidons of furious defenders they can turn into intolerant dogmas."[8] Unfortunately,

---

[7] Scott Pruitt and Luther Strange, *The Climate-Change Gang*, National Review (May 17, 2016), *available online at* http://www.national review.com/article/435470/climate-change-attorneys-general-overstepping-their-authority.

[8] Matt Ridley, *The Climate Wars and the Damage to Science,* GWPF Essay 3 at p.3 (Global Warming Policy Foundation 2015), *available online at* http://www.thegwpf.com/content/uploads/2015/11/climate-wars.pdf. In addition to being former Science Editor of the Economist, "Matt Ridley is one of the world's foremost science writers. His books have sold over a million copies and been translated into 30 languages. His new book The Evolution of Everything was published in 2015. He is a member of the [Global Warming Policy Foundation]'s Academic Advisory Council. As a landowner, he receives a wayleave income from a coal-mining company." In the words of Ridley,

    I am not a full sceptic of climate change, let alone a 'denier'. I think carbon-dioxide induced warming during this century is likely, though I think it is unlikely to prove rapid and dangerous. So I don't agree with those who say the warming is all natural, or all driven by the sun, or only an artefact of bad measurement, but nor do I think anything excuses bad scientific practice in support of the carbon dioxide theory, and every time one of these scandals erupts and the scientific establishment asks us to ignore it, I wonder if the extreme sceptics are not

> [t]his is precisely what has happened with the climate debate and it is at risk of damaging the whole reputation of science. The 'bad idea' in this case is not that climate changes, nor that human beings influence climate change; but that the impending change is sufficiently dangerous to require urgent policy responses. In the 1970s, when global temperatures were cooling, some scientists could not resist the lure of press attention by arguing that a new ice age was imminent. Others called this nonsense and the World Meteorological Organization rightly refused to endorse the alarm. That's science working as it should. In the 1980s, as temperatures began to rise again, some of the same scientists dusted off the greenhouse effect and began to argue that runaway warming was now likely. At first, the science establishment reacted skeptically and a diversity of views was aired. It's hard to recall now just how much you were allowed to question the claims in those days.[9]

Even the premise that "97% of all climate scientists agree on climate change" is argued by Ridley to be pseudo-science. The self-serving conclusion that "97% of all climate scientists agree on climate change" is derived from a poll involving only seventy-nine scientists[10]—hardly a statistically-relevant sample. Moreover, of those seventy-nine scientists, 97% believe that climate change is man-made—not that it was dangerous.[11] "A more recent poll of 1854 members of the American Meteorological Society found the true number is 52 per cent."[12] Indeed,

> there has been a systematic and thorough campaign to rule out the middle ground as heretical: not just wrong, but mistaken, immoral and beyond the pale. That's what the word 'denier', with its deliberate connotations of Holocaust denial, is intended to do. For reasons I do not fully understand, journalists have been shamefully happy to go along with this fundamentally religious project. Politicians love this polarizing because it means they can attack a straw man.[13]

---

on to something. I feel genuinely betrayed by the profession that I have spent so much of my career championing.
*Id.* at p.10.

[9] *Id.* at p.4.
[10] *Id.* at p.7.
[11] *Id.*
[12] *Id.*
[13] *Id.* at p.6.

## II.    Politicized investigations undermine public confidence.

The transcript of the press conference of the "AG's United for Clean Power" demonstrates that Massachusetts commenced its investigation precisely for the reasons the First Amendment forbids.[14] "It is one thing to use the legal system to pursue public policy outcomes; but it is quite another to use prosecutorial weapons to intimidate critics, silence free speech, or chill the robust exchange of ideas."[15]

Allowing government law enforcement officials to violate constitutional rights is to "violate the sacred trust of the people . . . ." *United States v. Costa*, 356 F. Supp. 606, 609 (D.D.C. 1973). It undermines "the right of the people to be secure in their persons, houses, papers and effects, and would obliterate one of the most fundamental distinctions between our form of government, where officers are *under* the law, and the police-state where they *are* the law." *Johnson v. United States*, 333 U.S. 10, 17 (1948) (emphasis added).

Regrettably, history is embroiled with examples where the legitimate exercise of law enforcement is soiled with political ends rather than legal ones. Massachusetts seeks to repeats that unfortunate history. That the statements and workings of the "AG's United for Clean Power" are entirely one-sided, and target only certain participants in the climate change debate, speaks loudly enough.[16]

### CONCLUSION

*Amici* aver that the Court should grant Exxon's motion for preliminary relief.

---

[14] *See* n.5, *supra.*

[15] Press Release, Louisiana Department of Justice, Attorney General Jeff Landry Slams Al Gore's Coalition (Mar. 30, 2016) (*available online at* https://www.ag.state.la.us/Article/2207/5).

[16] "[T]his fraud investigation targets only 'fossil fuel companies' and only statements minimizing climate change risks. If it is possible to minimize the risks of climate change, then the same goes for exaggeration. If minimization is fraud, exaggeration is fraud." *See* n.1, *supra,* at p.2. It is also worth noting that "[e]leven of the 17 attorneys general who participated [in the "AG's United for Clean Power" press conference] are the same folks who took part in the 2010 sue-and-settle lawsuit that used federal courts to try to force the adoption of the federal energy regulations that became the EPA's 'Power Plan.'" Michael Batasch, *Kansas AG takes on Al Gore's Alarmism – Won't Join Anti-Exxon "Publicity Stunt,"* The Daily Caller (Apr. 4, 2016), *available online at* http://dailycaller.com/2016/04/04/kansas-ag-takes-on-al-gores-alarmism-wont-join-ant-exxon-publicity-stunt.

Respectfully submitted this the 8th day of September, 2016,

JEFF LANDRY
Attorney General of Louisiana

ALAN WILSON
Attorney General of South Carolina

LUTHER STRANGE
Attorney General of Alabama

BILL SCHUETTE
Attorney General of Michigan

MARK BRNOVICH
Attorney General of Arizona

BRAD SCHIMEL
Attorney General of Wisconsin

DOUG PETERSON
Attorney General of Nebraska

SCOTT PRUITT
Attorney General of Oklahoma

SEAN REYES
Attorney General of Utah

ADAM LAXALT
Attorney General of Nevada

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

BRANTLEY STARR
Deputy First Assistant Attorney General

PRERAK SHAH
Senior Counsel to the Attorney General

*/s/ Andrew D. Leonie*
ANDREW D. LEONIE
Associate Deputy Attorney General for the
Office of Special Litigation
Andrew.Leonie@texasattorneygeneral.gov

AUSTIN R. NIMOCKS
Associate Deputy Attorney General for the
Office of Special Litigation
Austin.Nimocks@texasattorneygeneral.gov

MICHAEL TOTH
Senior Counsel for the Office of Special
Litigation

Office of Special Litigation
Texas Attorney General's Office
P.O. Box 12548, Mail Code 009
Austin, Texas 78711-2548
Tel: 512-936-1414
Fax: 512-936-0545

*ATTORNEYS FOR AMICI CURIAE*

10

**CERTIFICATE OF SERVICE**

I hereby certify that on the 8th day of September 2016, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which I understand to have caused service on all counsel of record.

*/s/ Andrew D. Leonie III*
Andrew D. Leonie III
SBOT No. 12216500

11

# Exhibit B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| MEDIA MATTERS FOR AMERICA, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>WARREN KENNETH PAXTON JR., in his official capacity as Attorney General of the State of Texas,<br><br>Defendant. | CIV. NO. 23-3363<br><br>**(EXPEDITED HEARING REQUESTED)** |

## PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Plaintiffs Media Matters for America ("Media Matters") and Eric Hananoki respectfully move pursuant to Fed. R. Civ. P. 65 and Local Rule 105 for a temporary restraining order enjoining Defendant Warren Kenneth Paxton, Jr., in his official capacity as Attorney General of the State of Texas, or his officers, agents, servants, and employees, from seeking to further enforce a civil investigative demand served on Plaintiffs on December 1, 2023, which was issued to retaliate against Plaintiffs for engaging in core protected First Amendment conduct—specifically, media reporting about the social media platform X Corp. (formerly known as Twitter) and its owner Elon Musk, notwithstanding the fact that the articles at issue lack any connection whatsoever to the state of Texas. Plaintiffs further request that the Court grant a preliminary injunction enjoining Defendant from engaging in similar retaliatory conduct related to Plaintiffs' reporting pending full resolution of Plaintiffs' claims. This Motion is based upon the Complaint in this action, as well as the Memorandum in Support of Motion for Temporary Restraining Order and supporting Declarations of Cynthia Padera, Eric Hananoki, and Ben Dimiero filed herewith.

Media Matters is a non-profit media watchdog organization and Mr. Hananoki is a Senior Investigative Reporter at Media Matters. Plaintiffs investigate, research, and report on political extremism in the United States, including on social media platforms like X. On November 20, 2023, in response to media coverage of X and its owner—Elon Musk—that he did not like, Attorney General Paxton announced that he was investigating Media Matters for an unspecified violation of Texas's deceptive trade practices law. Defendant Paxton formally served a civil investigative demand ("Demand") on Media Matters on December 1, commanding it to "produce [] documentary material and permit inspection and copying," and seeking a broad array of materials from Media Matters and Mr. Hananoki, including documents and communications about their research and reporting, communications with possible sources at X and its advertisers, as well as sensitive materials related to Media Matters's funding, expenditures, and employees The Demand cites Texas's deceptive trade practices law (Tex. Bus. & Com. Code Ann. § 17.61(a)) as its authority but Plaintiffs had no reason to ever foresee being investigated by the Texas Attorney General under that law—Plaintiffs do not live or work in Texas; do not "transact business" in Texas, *see* Texas. Tex. Bus. Org. Code § 9.0002(a); have no registered agent in Texas; do not engage in any "business practices" in Texas, Bus. & Com. § 17.44(a), or conduct "trade" or "commerce" in Texas, Bus. & Com. §§ 17.45(6), .46(a). Mr. Hananoki performs nearly all his work, including all work targeted by the Demand, in Maryland. By the Attorney General's own admissions, the Demand and investigation were both prompted by Plaintiffs' reporting on X activity that lacks any connection whatsoever to the state of Texas.

Mr. Paxton's investigation and his Demand are a flagrant attack on Plaintiffs' First Amendment rights, and for the reasons set forth in the accompanying brief in support of this motion, Plaintiffs readily meet the factors for a temporary restraining order and preliminary

injunction. *See Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346 (4th Cir. 2009). *First*, Plaintiffs are likely to succeed on the merits of their claims. Mr. Paxton's investigation and Demand are transparent efforts to retaliate against Plaintiffs for their constitutionally-protected speech and press activities. His retaliation has already chilled Plaintiffs from further engaging in these constitutionally-protected activities and will continue to do so absent immediate relief. *See Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005). The Demand further violates Plaintiffs' First and Fourth Amendment rights by unreasonably demanding that Plaintiffs turn over privileged materials, including Plaintiffs' documents and communications regarding their newsgathering and reporting, as well as sensitive organizational information about Media Matters and its donors. *See, e.g.*, *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2382 (2021); *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 917 (9th Cir. 2012). Mr. Paxton's investigation also violates the Due Process Clause of the Fourteenth Amendment—Plaintiffs have no relevant contacts with Texas, and any imposition of legal process against them in that state is unconstitutional.

*Second*, Paxton's retaliatory investigation against Media Matters is causing Plaintiffs irreparable harm by chilling their constitutionally-protected speech and press activities. *See Newsom ex rel. Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *see generally* Declaration of Eric Hananoki; Declaration of Ben Dimiero.

*Finally*, the balance of the equities and the public interesting weigh strongly in favor of enjoining Mr. Paxton's unlawful and retaliatory investigation and upholding Plaintiffs' constitutional rights. *See, e.g.*, *Legend Night Club v. Miller*, 637 F.3d 291, 303 (4th Cir. 2011). The public's interest in a free press weighs particularly strongly in favor of granting preliminary

relief here. *See, e.g.*, *Minneapolis Star and Tribune Co. v. Minnesota Comm'r of Revenue,* 460 U.S. 575, 585 (1983). In contrast, Defendant Paxton will suffer no harm in having his unlawful and retaliatory enjoined pending full adjudication of Plaintiffs' claims.

Dated: December 11, 2023

Respectfully submitted,
*/s/ Tina Meng Morrison*

**ELIAS LAW GROUP LLP**
Abha Khanna*
1700 Seventh Ave. Suite 2100
Seattle, WA 98101
T: (206) 656-0177
akhanna@elias.law

Tina Meng Morrison (D. Md. Bar No. 21832)
Aria C. Branch*
Christopher D. Dodge*
Jacob D. Shelly**
Elena A. Rodriguez Armenta*
Daniela Lorenzo*
Omeed Alerasool*
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
T: (202) 968-4652
tmengmorrison@elias.law
abranch@elias.law
cdodge@elias.law
jshelly@elias.law
erodriguezarmenta@elias.law
dlorenzo@elias.law
oalerasool@elias.law

**GIBSON, DUNN & CRUTCHER LLP**
Theodore J. Boutrous, Jr.*
Jay P. Srinivasan*
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: (213) 229-7000
Email: tboutrous@gibsondunn.com
Email: jsrinivasan@gibsondunn.com

Amer S. Ahmed*
Anne Champion*
200 Park Avenue
New York, New York 10166
Telephone: (212) 351-4000
Email: aahmed@gibsondunn.com
Email: achampion@gibsondunn.com

*Pro hac vice application forthcoming
**Application for admission pending

Counsel for Plaintiffs Media Matters for America and Eric Hananoki

**CERTIFICATE OF SERVICE**

I hereby certify that this document will be served on the Defendant in accordance with

Federal Rule of Civil Procedure 5(a).

/s/ Tina Meng Morrison
Tina Meng Morrison

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MEDIA MATTERS FOR AMERICA, *et al.*,

               Plaintiffs,

    v.

WARREN KENNETH PAXTON JR., in his
official capacity as Attorney General of the
State of Texas,

             Defendant.

CIV. NO. 23-cv-3363

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF
## MOTION FOR TEMPORARY RESTRAINING ORDER

# TABLE OF CONTENTS

TABLE OF CONTENTS ......................................................................................................II

INTRODUCTION ............................................................................................................ 1

BACKGROUND ............................................................................................................. 3

    A.    Over the past year, in the wake of Musk's ownership, X consistently places advertisements on racist, antisemitic, and violent accounts. ................................. 3

    B.    Media Matters and Hananoki report on X's pattern of placing advertisements on extremist accounts..................................................................................... 6

    C.    Texas Attorney General Kenneth Paxton retaliates against Media Matters and Hananoki for their reporting. ................................................................. 8

    D.    Media Matters and Hananoki are chilled from further newsgathering and reporting on X and Musk........................................................................................ 10

STANDARD OF REVIEW ............................................................................................. 13

ARGUMENT ................................................................................................................ 13

    I.    Media Matters and Hananoki are likely to prevail on the merits of their claims........ 13

    A.    Plaintiffs are likely to establish Paxton retaliated against their constitutionally protected activities in violation of the First Amendment....................................... 13

    B.    Plaintiffs are likely to establish that Paxton's Demand violates both the First and Fourth Amendments and the Maryland and D.C. shield laws. ............................ 22

    C.    Plaintiffs are likely to establish that the legal process against them in Texas violates Due Process due to a lack of contact with that state............................... 26

    II.    Plaintiffs will suffer irreparable harm absent an order restraining Paxton's investigation and enforcement of his Demand............................................ 27

    III.    The remaining equitable factors strongly favor granting preliminary relief.............. 29

CONCLUSION................................................................................................................ 30

CERTIFICATE OF SERVICE ....................................................................................... 32

## INTRODUCTION

Media Matters for America ("Media Matters") and Eric Hananoki research and report on political extremism in the media. Their work is impactful, often at the center of a vigorous ongoing national conversation about political extremism in American public life. And it regularly shines a light on public figures and politicians who engage in hateful political rhetoric. These powerful people often bristle at this accountability, which is why Plaintiffs must now come to this Court: In response to Plaintiffs' journalism, Texas Attorney General Ken Paxton has misused the powers of his office to launch a retaliatory and unlawful investigation against Plaintiffs for their constitutionally protected research and reporting. This lawless investigation—which includes a demand that Paxton be permitted to rifle through Plaintiffs' most sensitive journalistic and organizational documents—is a frontal assault on our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open," particularly where it concerns criticism of "government and public officials." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). Plaintiffs seek immediate relief to protect their constitutionally protected speech and press rights, and their rights under the Maryland and District of Columbia reporters' shield laws, pending adjudication of their claims for declaratory relief. Plaintiffs have been—and will continue to be—irreparably harmed without immediate relief.

Hananoki, a Senior Investigative Reporter at Media Matters, has investigated the dramatic rise in hateful rhetoric on X since it was acquired about 15 months ago by Elon Musk. Musk has held X out as a "digital town square" for public debate, all while gutting its ability to regulate content that promotes violence, white nationalism, antisemitism, and a host of baseless conspiracy theories. Such content has proliferated under Musk's ownership, driving away advertisers who have seen their brands appear alongside vile hate speech. Plaintiffs and other media organizations have documented this trend in America's so-called digital town square for over a year.

1

On November 16, 2023, Hananoki published an article—"*As Musk endorses antisemitic conspiracy theory, X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content*"—reporting on Musk's support for a conspiracy theory that Jewish people have a "hatred against whites" and support "flooding the[] country" with "hordes of minorities." His article noted that at the same time Musk endorsed this antisemitic conspiracy theory, X was placing advertisements next to pro-Nazi content. Musk took offense at this coverage, and immediately threatened a "thermonuclear" lawsuit. Certain politicians and media figures rallied to Musk's cause, including Paxton, who on November 20—the same day Musk sued Plaintiffs—announced he was launching an investigation into Media Matters. Paxton offered no explanation as to how Media Matters—a D.C.-based non-profit—or Hananoki—a Maryland-based reporter—violated Texas law, or even what possible jurisdiction he had over them, as none of their work covering Musk occurred in or had anything to do with Texas. Instead, Paxton announced he was "troubled" by Musk's "allegations" and attacked Media Matters as a "radical anti-free speech organization" that "would like nothing more than to limit freedom by reducing participation in the public square."

Two days later, Paxton issued a civil investigative demand ("Demand") commanding Media Matters to turn over confidential materials, including documents and communications about their research and reporting, communications with possible sources at X and its advertisers, and sensitive materials related to Media Matters's operations. *See* Declaration of Christopher D. Dodge ("Dodge Decl."), Ex. A. The Demand was served on December 1 with a return date of December 12, 2023—tomorrow—at which point Paxton is entitled to enforce the demand in Texas state court. The Demand is an extraordinary intrusion into Plaintiffs' newsgathering and reporting, plainly intended to chill those activities, acting in effect as an ongoing demand for virtually any materials Plaintiffs have—or may create—related to their research and reporting on X or Musk.

Paxton's retaliatory investigation and Demand are transparent attempts to punish and deter Plaintiffs speech and press activities. This retaliatory campaign has, for now, had its intended effect: Plaintiffs have been chilled from publishing additional criticism or coverage of X or Musk since Paxton announced his investigation—despite a flood of tips identifying extremist content on the platform—for fear of further retaliation and harassment. To remedy this ongoing irreparable harm, Plaintiffs move for a temporary restraining order enjoining Paxton from further investigating them or enforcing his Demand, as well as a preliminary injunction to ensure such relief is maintained until their constitutional and state law claims are resolved on the merits. This Court has jurisdiction to enjoin Attorney General Paxton because this lawsuit arises from unlawful retaliatory action that he intentionally directed towards Maryland. Compl. ¶ 12. Plaintiffs request a speedy hearing under Rule 57 on their claim for declaratory relief that the Demand and the investigation violate their rights under the U.S. constitution and Maryland law.

## BACKGROUND

**A.      Over the past year, in the wake of Musk's ownership, X consistently places advertisements on racist, antisemitic, and violent accounts.**

Elon Musk completed his purchase of the social media platform now known as X on October 27, 2022. He purchased the platform, purportedly, because of his belief that "it is important to the future of civilization to have a common digital square."[1] After taking control, Musk promptly laid off approximately 80 percent of the platform's staff and hollowed out critical areas responsible for overseeing platform policy, trust and safety, communications, and ethical AI. Compl. ¶ 25. He likewise laid off many of the content moderators responsible for keeping the

---

[1] Douglas Yeung, *The 'Digital Town Square' Problem*, TheRANDBlog (Jan. 13, 2023), https://www.rand.org/pubs/commentary/2023/01/the-digital-town-square-problem.html.

platform free of harassment. *Id*. Musk's sweeping changes raised public alarm and sparked concern amongst lawmakers over the platform's ability to combat misinformation and hate speech.[2]

Under the auspices of promoting "free speech," Musk also suspended products and policies that protected users from misinformation and violent content. Compl. ¶ 26. He reinstated suspended accounts of known white supremacists and conspiracy theorists while suspending the accounts of journalists reporting on his air travel. *Id*. In the wake of Musk's deep changes to the social media platform, extremist, racist, antisemitic, and violent content surged on X. *Id*. ¶ 27. Within the 12 hours of Musk's takeover, there had been "a nearly 500% increase in the use of the N-word." *Id*. Within the first week, use of the word "Jew" increased fivefold with antisemitic content receiving the most engagement. *Id*. Within just two months, the New York Times reported the following about the rise in hate speech on the platform:

- "Before Elon Musk bought Twitter, slurs against Black Americans showed up on the social media service an average of 1,282 times a day. After the billionaire became Twitter's owner, they jumped to 3,876 times a day."
- "Slurs against gay men appeared on Twitter 2,506 times a day on average before Mr. Musk took over. Afterward, their use rose to 3,964 times a day."
- "[A]ntisemitic posts referring to Jews or Judaism soared more than 61 percent in the two weeks after Mr. Musk acquired the site."

Compl. ¶ 28. The platform likewise saw a renewed explosion of baseless conspiracy theories concerning, among other things, COVID-19 vaccines and QAnon. This spike in violent and extremist content on X, as well as Musk's drastic management changes, were widely reported on by a broad array of media outlets at the time. *Id*. (collecting sources).

---

[2] Brian Fung & Clare Duffy, *How a single year of Elon Musk turned Twitter into a husk of its former self*, CNN (Oct. 27, 2023), https://www.cnn.com/2023/10/27/tech/elon-musk-twitter-x-one-year-changes/index.html [hereinafter *A single year of Elon Musk turned Twitter into a husk*].

These developments, unsurprisingly, quickly pushed advertisers away. Since "the early days of Musk's takeover, many of Twitter's largest advertisers—including the likes of General Mills and the Volkswagen Group—paused their spending over concerns about X's layoffs, content moderation capabilities and general uncertainty about the platform's future."[3] This led to a precipitous drop in X's revenue. In July 2023, Musk reported "a 50% decline in ad revenue and heavy debt load" and in September reported that advertising revenue was "still down 60%."[4] Still more advertisers began to flee X when the increasing hateful and violent rhetoric started appearing alongside their advertising, creating a false association between their brands and vile hate speech.

X's inability to control the placement of extremist content alongside advertisements was widely reported in the media, beginning soon after Musk's takeover. Some examples include:

1. **Reuters**, "Advertisers react to Twitter's new ownership" (Nov. 18, 2022) ("Advertisers are grappling with Twitter's new ownership under Tesla boss Elon Musk, who once tweeted 'I hate advertising.'").

2. **The Washington Post**, "Amazon, Uber, Snap ads appear on Twitter pages of white nationalists restored by Musk," Faiz Siddiqui (Dec. 6, 2022) ("Ads from dozens of major brands were appearing on white nationalist and extremist accounts.").

3. **ARS Technica**, "Twitter running major brands' ads with extremist tweets—until they get flagged," Ashley Belanger (Dec. 7, 2022) ("[T]the US Department of Health and Human Services realized its promoted tweet about updated COVID vaccines was appearing on Twitter pages of white nationalist accounts.").

4. **The Verge**, "Twitter advertisers aren't happy with ads appearing on pages of white nationalists," Jon Porter (Dec. 7, 2022)

5. **Center for Countering Digital Hate**, "Toxic Twitter: How Twitter Generates Millions in Ad Revenue by Bringing Back Banned Accounts," (Feb. 2023) ("[J] just ten reinstated accounts renowned for publishing hateful content and dangerous conspiracies will generate up to $19 million a year in advertising revenue for Twitter.").

---

[3] *A single year of Elon Musk turned Twitter into a husk*, *supra* note 2; Alberto Chiumento, et al., *Advertisers react to Twitter's new ownership,* Reuters (Nov. 18, 2022), https://www.reuters.com /technology/advertisers-react-twitters-new-ownership-2022-11-03/; Alan Ohnsman, *GM, Ford Say They Aren't Running Twitter Ads As They Assess Changes Under Elon Musk*, Forbes (Oct. 28, 2022), https://www.forbes.com/sites/alanohnsman/2022/10/28/gm-ford-say-they-arent-running-twitter-ads-as-they-assess-changes-under-elon-musk.

[4] *A single year of Elon Musk turned Twitter into a husk*, *supra* note 2.

6. **The Washington Post**, "Twitter stands to gain from restoring formerly banned accounts," Taylor Lorenz (Feb. 9, 2023).

7. **The Kansas City Star**, "Mizzou ad appears on racist X page as social media site faces concerned advertisers," Jonathan Shorman (Mar. 15, 2023) ("CNN reported on Thursday that in the past 24 hours it had spotted ads on X, formerly called Twitter, for the University of Missouri and major brands, such as Amazon, Samsung, Cox Communications and others, on the profile page of VDARE, a racist outlet.").

8. **Business Insider**, "Disney, Microsoft, the NBA Had Twitter Ads Next to Neo-Nazi Propaganda," Katherine Tangalakis-Lippert (June 18, 2023) ("Ads for Disney, ESPN, the NBA, Adobe, and Microsoft appeared . . . next to vitriolic white supremacist content.").

9. **The N.Y. Post**, "Disney, Microsoft ads on Twitter show up next to neo-Nazi propaganda as advertisers return: report," Shannon Thaler (June 19, 2023) ("Neo-Nazi propaganda continues to find a home on Twitter and is adjacent to ads from major companies").

Compl. ¶ 34. This coverage occurred independently of Plaintiffs' own reporting efforts, reflecting the widespread interest and discussion around hate speech in America's "digital town square."

### B. Media Matters and Hananoki report on X's pattern of placing advertisements on extremist accounts.

Since 2004, Media Matters has reported on misinformation and bias in the media. As part of its mission to educate the public on violent extremism and political rhetoric, Media Matters began researching and reporting on the rise in extremist and fringe content on X after Musk's changes to the platform. Hananoki, a Senior Investigative Reporter at Media Matters whose beat covers political extremism, has for over a decade researched and written countless reports and articles about extremist and violent rhetoric on social media platforms, often criticizing public figures and politicians in the process. Hananoki Decl. ¶¶ 2, 4, 6–9. His reporting has been widely cited and discussed in America's largest news outlets and relied upon by government officials, including a Department of Justice indictment, the Mueller Report on Russian interference in the 2016 election, and a bipartisan U.S. Senate Select Committee on Intelligence report. *Id.* ¶¶ 5–6. Even Attorney General Paxton has previously relied on Hananoki's reporting. In 2020, Hananoki

uncovered "tweets filled with racist rhetoric, violent threats" and conspiracy theories from an

Assistant Attorney General in Texas, prompting Paxton's office to fire the employee. *Id.* ¶ 8.

 Hananoki has reported on X—and before that, Twitter—for years. His coverage of X has

increased over the past year given the marked increase in extremism on the platform since Musk's

takeover. *Id.* ¶ 10. Hananoki's research and reporting often focused on what advertisements X's

users of different political leanings might see on the platform. Since February 10, 2023, Media

Matters has published at least 14 articles about X's placement of advertisements alongside hateful

content, most of which were researched and written by Hananoki. Dimiero Decl. ¶ 8. They include:

1. "Under Elon Musk, Twitter is running corporate ads alongside tweets from Holocaust deniers," (Feb. 10, 2023).

2. "Linda Yaccarino just started as Twitter's new CEO, but Elon Musk already destroyed the platform for advertisers," (June 8, 2023).

3. "Dish, Samsung, Wall Street Journal, and others are advertising on the Twitter account of a leading white nationalist group," (June 22, 2023).

4. "Update: Twitter placed ads for USA Today, National Women's Soccer League, and other major brands on a terrorism-linked neo-Nazi account," (July 27, 2023).

5. "Advertisers beware: Elon Musk and Linda Yaccarino are trying to lure you back by rebranding Twitter, but it's still a toxic cesspool," (Aug. 8, 2023).

6. "X Corp. CEO Yaccarino's interview on CNBC should alarm major advertising brands," (Aug. 11, 2023).

7. "Update: Under Linda Yaccarino, X is placing ads for major brands on a verified pro-Hitler account (Aug. 16, 2023).

8. "X is placing ads for brands like the NFL and MLB next to unhinged conspiracy theories about Jewish people and 9/11," (Sept. 11, 2023).

9. "X is placing major ads on a heavily followed antisemitic account that endorses killing politicians and LGBTQ advocates," (Sept. 12, 2023).

10. "X is placing ads for the NFL on prominent white nationalist accounts," (Sept. 27, 2023).

11. "X is placing ads for MLB, the NFL, and the Pittsburgh Steelers on antisemitic and Holocaust denial accounts," (Oct. 12, 2023).

12. "Pro-Hitler and Holocaust denier account: X has paid me $3,000 in ad revenue sharing," (Nov. 13, 2023).

13. "As Musk endorses antisemitic conspiracy theory, X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content," (Nov. 16, 2023).

14. "X is placing ads for Amazon, NBA Mexico, NBCUniversal, and others next to content with white nationalist hashtags," (Nov. 17, 2023).

Hananoki's reporting was consistent with the findings of other news sources—in the wake of Musk's purchase, the X platform continued to juxtapose advertisements alongside extremist content, be it unintentional or not. Hananoki employed ordinary and unremarkable investigative journalistic practices to investigate this issue, using an existing X research account controlled by Media Matters to follow white supremacist accounts and gauge how X's automated advertising algorithm would respond. Compl. ¶¶ 39–40.

His November 16 article reported the results of his most recent investigatory work, providing the public examples of X's advertisement placement and reporting on Musk's endorsement of a widespread antisemitic conspiracy theory that Jewish people are seeking to promote "hatred against whites" and are seeking to "flood[] the[] country" with "hordes of minorities." Hananoki Decl. ¶ 14. In researching, fact checking, and drafting the November 16 article, Hananoki complied with Media Matters's policies and used ordinary journalistic practices. Dimiero Decl. ¶¶ 6–8. Hananoki researched and wrote the article from his home in Maryland, where he does most of his research and reporting. Hananoki Decl. ¶¶ 2, 21. He has never travelled outside of the Washington metropolitan area for his work, including to Texas. *Id.*

### C. Texas Attorney General Kenneth Paxton retaliates against Media Matters and Hananoki for their reporting.

Despite a year's worth of reporting by Media Matters and other news outlets on X's inability to protect advertisers from extremist content, Musk seemed to take personal offense at Hananoki's November 16 article reporting on Musk's endorsements of an antisemitic conspiracy theory, for which he received widespread condemnation. Hananoki Decl. ¶ 14. Two days after the article was published, and directly referencing Hananoki's article, Musk posted on X that he would

file "a thermonuclear lawsuit against Media Matters." Hananoki Decl. ¶ 16. The post received hundreds of thousands of likes and comments, and tens of thousands of reposts.

Certain media and political figures—nearly all prior subjects of Media Matters's reporting on political extremism—quickly urged retaliation against Media Matters. As an example, on November 19, former adviser to President Trump, Stephen Miller declared "There are 2 dozen+ conservative state Attorneys General," implying states should investigate Plaintiffs for their journalism. Compl. ¶ 47. Missouri Attorney General Andrew Bailey took up Miller's call for retaliation and announced that his "team [was] looking into" Plaintiffs' article. *Id.* ¶ 48. Paxton acted the next day, announcing in November 20 a press release that he was launching an investigation into Media Matters. Dodge Decl., Ex. B. His press release used charged and partisan language to disparage Media Matters as "a radical anti-free speech . . . [and] left-wing organization[] who would like nothing more than to limit freedom by reducing participation in the public square[.]" Ex. B. It noticeably failed, however, to explain how Plaintiffs violated Texas law or were subject to its jurisdiction for Maryland-based reporting about a California-based company.

Paxton then provided an interview to activist Benny Johnson, who framed Paxton's investigation as "devastating" to Media Matters and "com[ing] in concert with Elon Musk dropping . . . [a] 'thermonuclear' lawsuit on Media Matters." Dodge Decl. Ex. C, Nov. 28, 2023 "The Benny Show" Certified Tr. 2:2–4. He pointedly asked Paxton if he "encourage[d] other Republican attorney generals to do this" and asked "Where are the rest of the Republican AGs? . . . Why are they so quiet on issues like this?" *Id.* at 2:7–11. Paxton responded by encouraging other state attorneys general to investigate Media Matters. *Id.* at 2:13–20. Paxton confirmed on CNBC that he launched his investigation because of "the information that []they provide" the public regarding X. Dodge Decl. Ex. D, Tr. at 3:5–6.

9

On November 21, 2023, the day after announcing his investigation, Paxton issued the Demand. Ex. A. Like the press release, it provided no explanation as to how Media Matters or Hananoki violated Texas law, nor any basis for exercising the State's coercive power over them. The Demand was served on December 1, 2023, with a return date of December 12.

On its face, the Demand is unreasonable, overbroad, and seeks materials that are protected from disclosure under the First Amendment and the Maryland and District of Columbia shield laws. Ex. A at 7. The Demand requests that Media Matters produce on an ongoing basis all documents related to its internal and external communications, from as far back as January 1, 2022, regarding X CEO Linda Yaccarino and Musk's purchase of X, as well as all internal and external communications regarding the November 16 article. *Id*. In other words, it operates as an ongoing demand for virtually any materials related to Plaintiffs' coverage of X and Musk. It also demands all external communications with employees and representatives of X and ten other corporate entities from November 1, 2023 to November 21, 2023, *id*.; categories of documents related to Media Matters' internal operations, including documents related to its organizational structure, sources of income originating in Texas, operational expenditures in Texas, current and past X accounts including those used to obtain the screenshots contained in the November 16 article, and sources of funding for operations involving X research and publications, *id*.

### D. Media Matters and Hananoki are chilled from further newsgathering and reporting on X and Musk.

Paxton's investigation, public attacks, and far-reaching Demand have chilled Media Matters and Hananoki's speech and press activities. Hananoki's research and writing have been severely impaired: draft articles he intended to publish about violent extremism on X have been held back by his editors for fear of further retaliation from Paxton. Hananoki Decl. ¶ 30. Since Paxton launched his investigation, Hananoki has not published any articles about Musk and how

his ownership of X has enabled political extremism after consistently doing so for months. *Id.* ¶ 31; Dimiero Decl. ¶¶ 13–16. To compound this chill, Hananoki and Media Matters have been subjected to a wave of threats since Paxton's public retaliation campaign. Hananoki Decl. ¶ 28; Padera Decl. ¶ 21; Dimiero Decl. ¶ 19. This has caused Hananoki to fear for his safety and compelled him to increase security at his home. Hananoki Decl. ¶ 29. Media Matters itself has had to hire an outside security firm to ensure the safety of its employees in response. Padera Decl. ¶ 22.

Other researchers and writers at Media Matters have also been constrained in their journalistic work because they are fearful of becoming embroiled in Paxton's investigation or publishing articles that could incite additional retaliation. Dimiero Decl. ¶¶ 13–14, 18. As a direct result of Paxton's harassment, they have pared back reporting and publishing, particularly on any topics relating to the Paxton investigation. *Id.* Media Matters's editorial team's fear of retaliation has repeatedly caused them to not publish stories about X and Musk. *Id.* ¶¶ 15–16. This is not for want of material—Media Matters has received scores of unsolicited tips from readers and X users who continue to witness extremist and violent content placed next to advertisements on X. *Id.* ¶ 15. Media Matters has not pursued these tips due to Paxton's retaliation, in part because any work created by acting on these tips may have to be disclosed to Paxton. *Id.* ¶¶ 15–16, 18.

In a radical change of operation, Media Matters's executive and editorial team have also been forced to become closely involved in the organization's publishing decisions since Paxton launched his investigation. *Id.* ¶ 17. Now, Media Matters must carefully assess whether a new article impacts existing legal proceedings or could generate new ones. *Id.* This has significantly slowed down the publication process. *Id.* Meanwhile, Media Matters's associations with external groups have also been impacted by the investigation. Padera Decl. ¶ 20. Several groups that previously collaborated closely with Media Matters are reevaluating doing so following the

11

commencement of Paxton's investigation, worried that any related communications may be turned over to Paxton or lead to investigations into their own work. *Id.*

Paxton's overbroad and unreasonable Demand further chills Plaintiffs' speech by threatening compelled disclosure of thousands of sensitive documents and communications, including materials Hananoki used to prepare his November 16 article relevant to the organization's editorial processes. Ex. A at 7; Dimiero Decl. ¶ 12. It would further require Media Matters to turn over operational information about its employees, donors, funding, and expenditures—closely guarded, non-public information essential to its strategic mission. Padera Decl. ¶ 17.

The Demand is no empty letter—it is backed by the now imminent possibility that Paxton will seek to haul Plaintiffs into a Texas court to compel disclosure of their documents. *See* Tex. Bus. & Com. Code Ann. § 17.62(b). Media Matters and Hananoki have no relevant contacts with Texas, and thus no reasonable expectation that they would ever be summoned to Texas to answer for their journalism and defend their speech and press rights or be subjected to intrusive demands from the State Attorney General. Media Matters is not registered as a foreign corporation in Texas, it has no registered agent in Texas, nor does it "transact business," perform any "business practices," or conduct any "trade" or "commerce" in Texas. Tex. Bus. Org. Code § 9.0002(a); Bus. & Com. §§ 17.45(6), .46(a). Hananoki's work occurred exclusively in Maryland and involved no contact—direct or indirect—with Texas. Hananoki Decl. ¶¶ 21–24. The prospect that Plaintiffs

may be dragged into court in Texas in retaliation for their work in Maryland and D.C. has further

chilled them and discouraged further coverage of X and Musk. *Id.* ¶ 34; Dimiero Decl. ¶ 18.[5]

**STANDARD OF REVIEW**

To obtain a temporary restraining order or preliminary injunction, Plaintiffs must show:

(1) likelihood of success on the merits; (2) likelihood of "suffer[ing] irreparable harm in the

absence of preliminary relief;" (3) "the balance of equities tips in [their] favor;" and (4) "the

injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

"When a temporary restraining order is sought against the government . . . these last two factors

merge." *Ass'n of Cmty. Cancer Ctrs. v. Azar*, 509 F. Supp. 3d 482, 501 (D. Md. 2020) (citing

*Pursuing Am. Greatness v. Fed. Elec. Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016)). The

requirements for a preliminary injunction are the same as for a temporary restraining order. *See*

*Maages Auditorium v. Prince George's Cnty*, 4 F. Supp. 3d 752, 760 n.1 (D. Md. 2014).

**ARGUMENT**

**I.  Media Matters and Hananoki are likely to prevail on the merits of their claims.**

**A.  Plaintiffs are likely to establish Paxton retaliated against their constitutionally protected activities in violation of the First Amendment.**

"[T]he law is settled that . . . the First Amendment prohibits government officials from

subjecting an individual to retaliatory actions . . . for speaking out." *Hartman v. Moore*, 547 U.S.

250, 256 (2006). "The First Amendment right to free speech includes not only the affirmative right

to speak, but also the right to be free from retaliation by a public official for the exercise of that

right." *Suarez Corp. Indus. v. McGraw,* 202 F.3d 676, 685 (4th Cir. 2000). "Official reprisal for

---

[5] The Deceptive Trade Practices Act also arms Paxton with a host of other powers with which to retaliate against Plaintiffs, including restraining orders, civil penalties, and sanctions. *See, e.g.*, Tex. Bus. & Com. Code Ann. §§ 17.47(a)–(b) (authorizing OAG to "bring an action in the name of the state" for injunctive relief), (c)–(d) (authorizing OAG to seek damages and restitution), (e)– (f) (authorizing OAG to seek monetary civil penalties for violations of injunctions).

protected speech 'offends the Constitution [because] it threatens to inhibit exercise of the protected right.'" *Hartman*, 547 U.S. at 256 (quoting *Crawford–El v. Britton,* 523 U.S. 574, 588, n.10 (1998)). It is "obvious" that efforts "to punish political speech by members of the press . . . run afoul of the First Amendment." *El Dia, Inc. v. Rossello*, 165 F.3d 106, 109 (1st Cir. 1999).

The Fourth Circuit has long recognized First Amendment retaliation claims as "actionable" because "retaliatory actions may tend to chill individuals' exercise of constitutional rights." *ACLU of Md., Inc. v. Wicomico Cnty.*, 999 F.2d 780, 785 (4th Cir. 1993) (citing *Perry v. Sindermann*, 408 U.S. 593, 597 (1972)). To prevail, Plaintiffs must show: "(1) [they] engaged in protected First Amendment activity, (2) [Paxton] took some action that adversely affected [their] First Amendment rights, and (3) there was a causal relationship between [their] protected activity and [Paxton's] conduct." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005). "[F]or purposes of a First Amendment retaliation claim under § 1983, a plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter 'a person of ordinary firmness' from the exercise of First Amendment rights." *Id.* at 500. Plaintiffs are likely to prove each of these elements and prevail on the merits of their first claim. A declaratory judgment and injunctive relief are appropriate means of seeking vindication of such rights. *See* 28 U.S.C. §§ 2201 and 2202; *Kenny v. Wilson*, 885 F.3d 280, 287–88 (4th Cir. 2018).

### 1. Media Matters's and Hananoki's newsgathering and reporting are protected First Amendment activities.

Media Matters is a non-profit media watchdog group that provides journalistic research and investigative reporting on political extremism. *See supra* 6. Hananoki is a senior investigative reporter for Media Matters who covers political extremism, including extensive coverage of X's ongoing placement of advertisements on racist, antisemitic, and violent accounts on the X

14

platform. *See supra* 6–7. Plaintiffs routinely investigate, publish, report, and comment on political extremism in American media, including on platforms like X.

Plaintiffs' journalistic pursuits—on topics of clear public concern and discussion—are at the core of our First Amendment freedoms. "The protection given speech and press" by the First Amendment "assure[s] [an] unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Roth v. United States*, 354 U.S. 476, 484 (1957). This protection serves not only the news media itself, but society at large: "A broadly defined freedom of the press assures the maintenance of our political system and an open society," *Time, Inc. v. Hill*, 385 U.S. 374, 389 (1967). A free press is foundational to our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co.*, 376 U.S. at 269–70. (explaining such "freedom of expression upon public questions is secured by the First Amendment").

Paxton is targeting Plaintiffs for retaliation because of their protected journalism and speech. As explained, since Musk purchased X in October 2022, the platform has permitted advertisements to appear next to accounts that promote racist, antisemitic, and violent content. *See supra* 3–6. This has been the subject of extensive public discussion and media coverage, and not only from Plaintiffs. *See supra* 5–6. X and Musk have invited this scrutiny by repeatedly framing X as "digital town square" for public debate. *See supra* 6.

Plaintiffs' reporting on this issue of important national concern is unequivocally protected by the First Amendment. They have a "legally protected interest" under the First Amendment to "gather news." *Overbey v. Mayor of Baltimore*, 930 F.3d 215, 227 (4th Cir. 2019). This protection "unequivocally" extends to their "editorial judgment and . . . free expression of views on" matters of public concern, such as political extremism on X, "however controversial." *Miami Herald Pub.*

15

*Co. v. Tornillo*, 418 U.S. 241, 255 (1974) (quoting *Pittsburgh Press Co. v. Human Relations Comm'n*, 413 U.S. 376, 391 (1973)). Indeed, "the constitutional protection of the press reaches its apogee" where, as here, Plaintiffs are members of the press who write about "a public figure" or "on a matter of public concern." *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092 (4th Cir. 1993) (citing *New York Times Co.*, 376 U.S. at 254); *cf. Tannous v. Cabrini Univ.*, No. CV 23-1115, 2023 WL 8026634, at \*3 (E.D. Pa. Nov. 20, 2023) (First Amendment protected allegedly "cherry-picked" reproduction of tweets and commentary suggesting Plaintiff held antisemitic views). Simply put, "the First Amendment applies in full force to *all* 'news, comment, and advertising'" and "protect[s] a news outlet's editorial perspective [and] the way its beat reporters cover a given" public issue. *Washington Post v. McManus*, 944 F.3d 506, 518 (4th Cir. 2019) (quoting *Tornillo*, 418 U.S. at 258). Plaintiffs are therefore likely to show they "engaged in protected First Amendment activity" by investigating and reporting on political extremism on X. *Constantine*, 411 F.3d at 499.

> ## 2. Paxton's retaliatory conduct has already chilled Plaintiffs' First Amendment rights and would chill any person of ordinary firmness.

Paxton, through his investigation and Demand, has already taken "action that adversely affected [Plaintiffs'] First Amendment rights." *Constantine*, 411 F.3d at 499. To determine whether retaliatory conduct violates the First Amendment, the Fourth Circuit employs an "objective standard" that looks to whether "the defendant's allegedly retaliatory conduct would likely deter 'a person of ordinary firmness' from the exercise of First Amendment rights." *Id.* at 500 (collecting cases). The "plaintiff[s'] actual response to the retaliatory conduct provides some evidence of the tendency of that conduct to chill First Amendment activity" but "it is not dispositive." *Id.* The "cause of action targets conduct that tends to *chill* [First Amendment] activity, not just conduct that *freezes* it completely." *Id.* (emphases in original). Accordingly, Plaintiffs are

*not* required to "prove that the allegedly retaliatory conduct caused [them] to cease First Amendment activity altogether." *Id.* It is sufficient to show—as Plaintiffs do—that Paxton's retaliatory acts would objectively chill the First Amendment activity of similarly situated plaintiffs of ordinary firmness. Indeed, it has already chilled Plaintiffs' protected speech and press activities.

The Court must "conduct this inquiry on a case-by-case basis, considering the actors involved and their relationship." *Snoeyenbos v. Curtis*, 60 F.4th 723, 731 (4th Cir. 2023). Here, as the result of their reporting about a California-based company, a non-profit news organization headquartered in Washington, D.C., and an investigative reporter living and working in Maryland have been made subject to an investigation in Texas seeking highly sensitive material regarding their funding, expenditures, organizational structure, communications with sources, and internal discussion of news stories. Ex. A at 7. The investigation was initiated by a State Attorney General without any showing that Plaintiffs violated that state's law or are even subject to its jurisdiction. *Id.* Indeed, Plaintiffs had *no* reasonable expectation of ever being subject to investigation by the Texas Attorney General, never mind under the state's Deceptive Trade Practices Act—Media Matters is a non-profit media organization, does not engage in trade or commerce with consumers, and neither it nor Hananoki have any relevant connection to the state. Despite no jurisdictional nexus, Paxton demands Plaintiffs turn over to him their most sensitive journalistic and organizational documents. Ex. A at 7. If Plaintiffs refuse, Paxton may seek to have them held in contempt or sue them in a foreign court under unspecified charges. *See* Tex. Bus. & Com. Code Ann. §§ 17.62, 17.47. This form of retaliation is no idle threat or mere inconvenience. It carries serious implications for Media Matters's ability to operate and report on matters of public concern. To compound matters, Paxton has encouraged other attorneys general to launch their own retaliatory campaigns against Plaintiffs under their state laws, again regardless of any genuine

basis to do so or whether Plaintiffs are even plausibly subject to the jurisdiction of such officials. *See supra* 9.

Paxton's explicit retaliation against Plaintiffs for news coverage and reporting would plainly "tend[] to chill the exercise of constitutional rights" by a person or organization of "ordinary firmness." *Constantine*, 411 F.3d at 500. The mere "*threat* of invoking legal sanctions and other means of coercion, persuasion, and intimidation" is sufficient to tend to chill protected speech. *Drive In Theatres, Inc. v. Huskey*, 435 F.2d 228, 230 (4th Cir. 1970) (emphasis added) (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963)); *see also Shoen v. Shoen*, 48 F.3d 412, 416 (9th Cir. 1995) (recognizing First Amendment harm from the "threat of administrative and judicial intrusion into the newsgathering and editorial process" (quoting *Shoen v. Shoen*, 5 F.3d 1289 (9th Cir. 1993))); *Coss v. Teters*, No. 2:23-CV-00180, 2023 WL 3470899, at *4 (S.D.W. Va. May 12, 2023) ("[T]hreats alone can constitute an adverse action if the threat is capable of deterring a person of ordinary firmness from engaging in protected conduct." (quoting *Hill v. Lappin*, 630 F.3d 468, 474 (6th Cir. 2010))).

Paxton's public threats to retaliate have already moved from threat to deed—Plaintiffs have until December 12, one day from now, to respond to his Demand for a broad swathe of sensitive materials. Courts have, naturally, found that the actual commencement of a threatened investigation—even before any conclusion is reached or penalties imposed—constitutes actionable retaliation. Indeed, the Fourth Circuit found a plaintiff's speech chilled when a state board told him that "he and his website were under investigation" and that the board had "statutory authority" to modify what content he could put on his website—consistent with what Paxton has done here. *Cooksey v. Futrell*, 721 F.3d 226, 237 (4th Cir. 2013). "A person of ordinary firmness would surely feel a chilling effect" under such circumstances. *Id.*; *see also Abbott v. Pastides*, 900

F.3d 160, 179 (4th Cir. 2018) (explaining "a threatened administrative inquiry" confers standing where "the administrative process itself imposes some significant burden, independent of any ultimate sanction");[6] *White v. Lee*, 227 F.3d 1214, 1228 (9th Cir. 2000) (concluding government officials "unquestionably chilled the plaintiffs' exercise of their First Amendment rights" through a retaliatory investigation even though the officials "did not ban or seize the plaintiffs' materials, and . . . ultimately decided not to pursue either criminal or civil sanctions against them").

The predictable—and intended—chilling effect of Paxton's investigation and Demand is reinforced by the power Texas law gives him to further punish Plaintiffs for noncompliance—"here the penalties include public reprimands, sanctions, civil penalties," *South Carolina Freedom Caucus v. Jordan*, No. 3:23-CV-795-CMC, 2023 WL 4010391, at *8 (D.S.C. June 13, 2023), as well as restraining orders and the ability to haul Plaintiffs into courts in a jurisdiction with which they have no meaningful contacts, Tex. Bus. & Com. Code Ann. §§ 17.47, 17.62; *cf. Technology Patents, LLC v. Deutsche Telekom AG*, 573 F. Supp. 2d 903, 917 (D. Md. 2008) (recognizing the "chilling effect" of haling parties into jurisdiction with which they have limited contacts), *aff'd sub nom. Technology Patents LLC v. T-Mobile (UK) Ltd.*, 700 F.3d 482 (Fed. Cir. 2012). These sanctions further establish an "asserted chill [that] would likely deter a person of ordinary firmness from the exercise of First Amendment rights." *S.C. Freedom Caucus*, 2023 WL 4010391, at *8.

Paxton himself recognizes that retaliatory efforts like these are likely to chill speech. In 2016, after Massachusetts issued a similar CID to Exxon Mobil regarding its climate change

---

[6] *Abbott* involved "an unusual First Amendment claim" where school officials "approved" plaintiffs' public event even "knowing that it would include displays of a swastika and other controversial material," "did nothing to interfere with the event," and "imposed no sanction on the plaintiffs after the fact" despite briefly investigating complaints from other students. 900 F.3d at 168–69. Those facts bear no resemblance to the investigation here, where Plaintiffs remain subject to an ongoing, and not merely "threatened," "administrative inquiry" that "imposes [a] significant burden" on their First Amendment activities, "independent of any ultimate sanction." *Id.* at 179.

claims, Paxton and other state Attorneys General filed an amicus brief warning that "the authority attorneys general have to investigate fraud does not allow them to encroach on the constitutional freedom of others to engage in an" public debate. Dodge Decl. Ex. E, Brief of Amici Curiae in *Exxon Mobile Corp., v., et al*., Case No. Case 16-CV-00469-K, ECF. No. 63-2 at 6. Paxton was concerned such abuse of state law "chills speech" and "contravenes the First Amendment." *Id.*

Finally, although it is not dispositive, Plaintiffs' speech has already been chilled. *See Constantine*, 411 F.3d at 500; *see also Cooksey*, 721 F.3d at 236 (finding plaintiff had "sufficiently shown that he has experienced a non-speculative and objectively reasonable chilling effect of his speech due to the actions of the State Board"); *Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333, 381 (D.D.C. 2020) (finding speech chilled where "journalists and editors ha[d] already refrained from engaging in certain speech and [were] likely to continue doing so" in response to investigation). Hananoki, after writing articles on X for the better part of a year, has been chilled from publishing new articles about the platform due to fear of further retaliation. Hananoki Decl. ¶¶ 30–31; *see also* Dimiero Decl. ¶ 13–18. His editors have instructed him that Media Matters cannot publish work he has already prepared describing extremism on X. At the same time, Media Matters has been flooded with tips about extremist content on X appearing alongside advertisements, but has not followed up on these tips due to chill imposed by Paxton's actions—including, in particular, the concern that it would have to turn over source information to Paxton per the terms of the Demand. Dimiero Decl. ¶¶ 14–15. Hananoki—with over his sixteen-year career of reporting—has never been subject to this kind of retaliation from a government official, which has severely disrupted his writing and research. Hananoki Decl. ¶ 27, 33.

The chill has impacted Media Matters more broadly. Many other Media Matters reporters have shied away from covering topics that could be perceived as related to Paxton's investigation,

for fear of being targeted in legal. Padera Decl. ¶ 18; Dimiero Decl. ¶¶ 14, 18. Media Matters's ability to release work to the public has been harmed—its publication process has been slowed due to a need for leadership to carefully scrutinize work in view of Paxton's investigative intrusion. Dimiero Decl. ¶ 17. Media Matters's editorial team has had to make the difficult decision to keep articles from being published due to threats of investigation and legal action. *Id.* ¶¶ 13–16. Likewise, Plaintiffs' ability to work with other organizations has been chilled. Padera Decl. ¶ 20. Groups that once routinely worked with Media Matters are reevaluating doing so, for fear that their documents and communications could be turned over to a retaliatory Attorney General. *Id.*

### 3. Paxton's retaliatory actions are a direct causal response to Plaintiffs' constitutionally protected activities.

Plaintiffs' commentary and reporting on X, particularly Hananoki's November 16 article discussing Musk's endorsement of an antisemitic conspiracy theory, is unambiguously what caught Paxton's attention. In his own words, Paxton initiated the Demand on Plaintiffs because of "the information they provide" the public regarding X. Ex. D, Tr. at 3:5–6. Paxton's choice to investigate Plaintiffs—without *any* showing that they violated Texas law or are subject to its jurisdiction—immediately followed Musk's public complaints about the November 16 article. *See* Ex. A; Ex. B. Paxton announced his investigation on November 20—the same day Musk filed his meritless civil suit against Media Matters. *See* Ex. B. Not long after launching his investigation, Paxton encouraged *other* state Attorneys General to take retaliatory actions against Plaintiffs.

The Demand also confirms that Paxton's retaliatory conduct is motivated by Plaintiffs' coverage of X and Musk. It demands Plaintiffs turn over "all documents related to internal and external communications" concerning Hananoki's November 16 article, as well Plaintiffs' internal and external communications "regarding Elon Musk's purchase of X" and "regarding Linda

21

Yaccarino;" "communications with employees and representatives of X;" and "all current and past X accounts" controlled by Plaintiffs. *See* Ex. A at 7.

The materials sought by these demands reflect Paxton's desire to rifle through Plaintiffs' files concerning their news coverage and reporting . There is no serious dispute that—but-for Plaintiffs' constitutionally protected reporting on X—Paxton would not have launched his retaliatory investigation or served his Demand. Plaintiffs therefore will show "there was a causal relationship between [their] protected activity and [Paxton's] conduct." *Constantine*, 411 F.3d at 499; *see also Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019). Plaintiffs are therefore likely to prevail on their claim for unlawful retaliation.

>    **B.**   **Plaintiffs are likely to establish that Paxton's Demand violates both the First and Fourth Amendments and the Maryland and D.C. shield laws.**

>    1.   ***Constitutional Claims***. Plaintiffs are presently required to turn over a treasure trove of their most sensitive documents to Attorney General Paxton by December 12—tomorrow. *See supra* 10. Paxton's wide-ranging Demand touches upon nearly every part of Media Matters's operations, including its organizational and employee structure; its "sources of income;" its "operational expenditures;" its "internal communications" on articles and matters of public concern; its social media accounts on X; its communications with employees at X and X's advertisers (including potential sources); and "all direct and indirect sources of funding" for all "operations" relating to publications on X. Ex. A at 7. Plaintiffs are likely to show this intrusive Demand violates both the First and Fourth Amendments.

The Fourth Amendment limits the scope of administrative subpoenas. *Okla. Press Publ'g Co. v. Walling*, 327 U.S. 186, 208–11 (1946). Likewise, the First Amendment guards Plaintiffs from the compelled disclosure of materials that would chill their constitutional rights. *Perry v. Schwarzenegger*, 591 F.3d 1147, 1160 (9th Cir. 2009); *Pebble Ltd. P'ship v. EPA*, 310 F.R.D. 575,

582 (D. Alaska 2015) (subpoenas invalid when they have "the tendency to chill the free exercise of political speech and association which is protected by the First Amendment"). These twin constitutional guarantees often overlap; thus, where "the materials sought to be seized" by an administrative subpoena even simply "*may* be protected by the First Amendment," the requirements of the Fourth Amendment are applied with "scrupulous exactitude." *Zurcher v. Stanford Daily*, 436 U.S. 547, 564 (1978) (citing *Stanford v. Texas*, 379 U.S. 476, 485 (1965)) (emphasis added). "No less a standard could be faithful to First Amendment freedoms." *Stanford,* 379 U.S. at 485. That is especially true where, as here, no cause has been shown before demanding documents—such "unrestricted power of search and seizure [can] be an instrument for stifling liberty of expression." *Marcus v. Search Warrants,* 367 U.S. 717, 729 (1961).

Paxton's Demand, on its face, is vastly overbroad, unreasonable, and seeks to pry into matters protected by the First Amendment—it shows no trace of "scrupulous exactitude." *Stanford*, 379 U.S. at 485. It seeks information about Plaintiffs' donors, sources of funding, and expenditures in a manner designed to chill Plaintiffs' speech and press activities. The Supreme Court has "long understood as implicit in the right to engage in activities protected by the First Amendment a . . . right to associate with others." *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2382 (2021) (quoting *Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984)). Accordingly, the First Amendment "prohibit[s] . . . compelled disclosure" of documents about an organization's associational activities—including the compelled disclosures about members and donors—absent compliance with "exacting scrutiny." *Id.* at 2382-83, 2386 (holding California violated First Amendment by requiring disclosure of "donors' names and the total contributions" to charitable organization); *see also NAACP v. Alabama*, 357 U.S. 449, 462 (1958) (membership lists); *Buckley v. Valeo*, 424 U.S. 1, 64 (1976) (campaign contributions); *Am. Fed'n of Lab. &*

23

*Cong. of Indus. Organizations v. FEC*, 333 F.3d 168, 176 (D.C. Cir. 2003) (identities of employees and volunteers). Paxton, having provided no explanation as to how Plaintiffs may have violated Texas law, has not met the "exacting scrutiny" and "scrupulous exactitude" required to obtain these types of materials. "It is contrary to the first principles of justice to allow a search through all the respondents' r[e]cords, relevant or irrelevant, in the hope that something will turn up." *Fed. Trade Comm'n v. Am. Tobacco Co.*, 264 U.S. 298, 306 (1924) (Holmes, J.). This Court has the power to enjoin enforcement of such a constitutionally infirm subpoena. *See Local 1814, Int'l Longshoremen's Ass'n v. Waterfront Comm'n of N.Y. Harbor*, 667 F.2d 267, 274 (2d Cir. 1981).

The Demand is further infirm because it seeks journalistic materials that are afforded significant constitutional protection. Paxton may not "rummage at large in newspaper files or [] intrude into or [] deter normal editorial and publication decisions" through his search. *Zurcher*, 436 U.S. at 566. In *Zurcher*, the officers lacked "any occasion or opportunity," *id.*, for such rummaging because a judicially approved search warrant provided the necessary "exactitude" regarding the "First Amendment interests [that] would be endangered by the search," *id.* at 565. Paxton has met no similar bar here, yet nonetheless seeks categories of notes and files on draft articles and communications with potential sources—clearly protected materials. *See Lacey v. Maricopa Cnty.*, 693 F.3d 896, 917 (9th Cir. 2012) (quashing "broad, invalid subpoenas demanding that the paper reveal its sources [and] disclose its reporters' notes"). It is certainly not "carefully tailored to avoid unnecessary interference with protected activities." *Pebble Ltd. P'ship*, 310 F.R.D. at 582 (quashing subpoena). Fundamentally, Paxton's investigation is targeted at speech and press activities that are afforded broad constitutional protection. Such "investigations premised solely upon *legal* activity are the very type of 'fishing expeditions' that were the target of Justice Holmes's assault in *American Tobacco*." *Major League Baseball v. Crist*, 331 F.3d 1177,

24

1187 (11th Cir. 2003) (concluding that CID violated Fourth Amendment and "that an investigation predicated solely upon legal activity does not pass muster under *any* standard").

Plaintiffs are therefore likely to prevail on their second claim that the Demand itself is an unlawful fishing expedition in violation of the First and Fourth Amendments.

***Maryland & D.C. Shield Laws*.** The Demand also seeks information protected by Maryland's shield law. Md. Cts. & Jud. Proc. Code Ann. § 9-112(b)(3), (c)(2). The Maryland shield law provides absolute protection against compelled disclosure of sources and qualified protection against compelled disclosure of other information, including "any news or information procured . . . in the course of pursuing [] professional activit[ies]," including notes, to the extent such information is not publicly disclosed. *See id*. § 9-112(c). It protects media organizations and their employees acting within the scope of a contract in any news gathering or disseminating capacity. *See id*. § 9-112(d). The shield law is grounds to quash or limit a subpoena. *Equitable Trust Co. v. State Comm'n on Human Relations*, 411 A.2d 86, 99 (Md. 1979) ("It is well established that an enforcing court may limit through modification or partial enforcement subpoenas it finds to be unduly burdensome." (quoting *F.T.C. v. Texaco, Inc.*, 517 F.2d 137, 149–50 (D.C. Cir. 1975)); *Bice v. Bernstein*, 1994 WL 555379, at *1 (Md. Cir. Ct. Apr. 20, 1994) (quashing subpoena even where qualified disclosure test met). The Demand also seeks information protected by D.C.'s similar shield law. *See* D.C. Code § 16-4702.

Permitting attorneys general, like Paxton, to skirt another state's shield laws by misusing their own statutory authority to issue subpoenas violates basic principles of federalism and would make a mockery of state shield laws. Maryland and the District of Columbia each have a profound interest in protecting their residents from being summoned by other states—without any personal jurisdiction of such a resident—and made to divulge documents protected by Maryland and D.C.

law. Texas may not "enact [] a policy for the entire Nation" by issuing CIDs that trample over another state's shield laws. *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 571 (1996).

    **C.**    **Plaintiffs are likely to establish that the legal process against them in Texas violates Due Process due to a lack of contact with that state.**

The Due Process Clause of the Fourteenth Amendment "recognizes and protects an individual liberty interest" against being unwillingly subjected to legal process in a jurisdiction with which a person lacks meaningful contact. *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982). Simply put, due process guards against forcing parties like Plaintiffs to "submit[] to the coercive power of a State that may have little legitimate interest in the claims in question." *Bristol-Myers Squibb Co. v. Superior Ct. of California*, 582 U.S. 255, 263 (2017). Such arbitrary imposition of a "State's coercive power" is "subject to review for compatibility with the Fourteenth Amendment's Due Process Clause." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 918 (2011). Plaintiffs are likely to show that they are not within the personal jurisdiction of Texas, and thus not lawfully subject to Paxton's retaliatory investigation or any effort by him to enforce the Demand against Plaintiffs in Texas court.

Two flavors of personal jurisdiction exist: general and specific. *See Bristol-Myers Squibb*, 582 U.S. at 262. Plaintiffs are plainly not subject to general jurisdiction in Texas—neither is domiciled or "fairly regarded as at home" in Texas. *Goodyear*, 564 U.S. at 924; *see supra* 8.

Specific jurisdiction is lacking as well. It requires "an affiliation[n] between the forum and the underlying controversy, principally, [an] activity . . . that takes place in the forum State and is therefore subject to the State's regulation." *Goodyear*, 564 U.S. at 919 (first alteration in original). The controversy here arises out of Media Matters's and Hananoki's reporting and publishing on political extremism on X—work which occurred exclusively in Maryland and D.C. No element of this work occurred in Texas or required interaction with Texas. *See supra* 8. Paxton's actions alone

are what connects this case to Texas, but he "cannot be the only link between" between his chosen forum and Plaintiffs—"[r]ather, it is [Media Matters and Hananoki's] conduct that must form the necessary connection with the forum State" for any jurisdictional basis to exist there. *Walden v. Fiore*, 571 U.S. 277, 285 (2014). No such connection exists here. Accordingly, Plaintiffs are likely to show that any imposition of Texas's coercive power by Paxton violates due process.

That Media Matters publishes Hananoki's work on a website available to anyone with an internet connection changes nothing. "Making a website that's visible in Texas, of course, does not suffice" for jurisdiction. *Johnson v. TheHuffingtonPost.com, Inc.*, 21 F.4th 314, 320 (5th Cir. 2021), *cert. denied,* 143 S. Ct. 485 (2022). "[T]he website does not target [Texas] residents . . . any more than it targets any other state" and "makes itself available to any one who seeks it out, regardless of where they live." *Fidrych v. Marriott Int'l, Inc.*, 952 F.3d 124, 141 (4th Cir. 2020). Accordingly, "the general availability of the website to [Texas] residents . . . does not create the substantial connection to [Texas] necessary to support the exercise of jurisdiction." *Id.* at 143.

## II. Plaintiffs will suffer irreparable harm absent an order restraining Paxton's investigation and enforcement of his Demand.

Hananoki and Media Matters have been suffering irreparable harm since Paxton first served his retaliatory and far-ranging Demand. The issuance of this Demand by a state Attorney General has reasonably chilled Plaintiffs from publishing news coverage and criticism of Musk and X. *See supra* 11–13. It is well established that "'loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Newsom ex rel. Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003) (internal quotations omitted). This harm will continue while Plaintiffs' journalistic efforts are subject to the intrusive and retaliatory demand for documents and communications from Paxton. *Id.* "[E]very moment's continuance" of Paxton's investigation into Plaintiffs' newsgathering and Demand for materials "amounts to a

flagrant, indefensible, and continuing violation of the First Amendment." *New York Times Co. v. United States*, 403 U.S. 713, 714–15 (1971) (Black, J., concurring).

Plaintiffs' irreparable harm is exacerbated by the far-ranging scope and immense burdens of Paxton's retaliatory Demand. Among other overbroad requests, the Demand seeks "all documents" relating to "internal and external communications" regarding "Elon Musk's purchase of X" and "Linda Yaccarino" generally. Ex. A at 7. Because it requires continued production of documents until Plaintiffs' "final" production, Paxton's retaliatory Demand operates effectively as an ongoing demand for any new documents Media Matters and Hananoki create in relation to further reporting that Media Matters and Hananoki may wish to do on the impact of Musk's purchase of the X platform, for example, further chilling their ability to report and speak on such topics. The Demand even seeks "all of Media Matters for America's external communications with employees and representatives of X" between certain dates, effectively a demand for communications with sources at X. *Cf. N.J.-Philadelphia Presbytery of the Bible Presbyterian Church v. N.J. State Bd. of Higher Educ.*, 654 F.2d 868, 884 (3d Cir. 1981) (observing likelihood of irreparable harm in "first amendment contexts" where state action "prevent[s] a source from communicating with a reporter"). Paxton's prying into Plaintiffs' notes, research materials, and communications with any sources—in a jurisdiction where none of Plaintiffs' activities occur—adds to the harm Plaintiffs are suffering. Dimiero Decl. ¶¶ 12–19; Hananoki Decl. ¶¶ 27–34.

The Demand poses an additional imminent and irreparable injury to their associational rights. *See Bonta*, 141 S. Ct. at 2382 (2021) (quoting *Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984)). At nothing more than the caprice of Paxton, Texas now demands documents from Plaintiffs concerning their donors, employees, operational expenditures, and internal communications. Ex. A at 7. Defendant Paxton has offered *zero* explanation of Texas's need for

these materials, never mind an explanation sufficient to meet exacting scrutiny. *Bonta*, 141 S. Ct. at 2382–83. Indeed, to date Paxton has offered no explanation at all as to how Plaintiffs have violated Texas law or are properly subject to investigation in Texas. *See generally* Ex. A. Subjecting Plaintiffs to such an "unreasonable search[]" is "sufficient to demonstrate irreparable harm." *Am. Fed'n of Teachers.-W. Va., AFL-CIO v. Kanawha Cnty. Bd. of Educ.*, 592 F. Supp. 2d 883, 892 (S.D.W. Va. 2009) (violation of Fourth Amendment constituted irreparable harm).[7]

Plaintiffs' already strong showing of irreparable harm here is bolstered by the strength of their First Amendment claims. "[I]n the context of an alleged violation of First Amendment rights, a plaintiff's claimed irreparable harm is 'inseparably linked' to the likelihood of success on the merits of plaintiff's First Amendment claim." *WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave,* 553 F.3d 292, 298 (4th Cir. 2009). The flagrancy of Paxton's violation of core First Amendment rights reinforces the need for swift relief to remedy Plaintiffs' ongoing harms.

## III.    The remaining equitable factors strongly favor granting preliminary relief.

The remaining equitable factors favor Plaintiffs. Both "factors [are] established when there is a likely First Amendment violation." *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 191 (4th Cir. 2013). That is because "it is *always* in the public interest to protect First Amendment liberties." *Legend Night Club v. Miller*, 637 F.3d 291, 303 (4th Cir. 2011) (emphasis added) (quoting *Joelner v. Vill. of Wash. Park*, 378 F.3d 613, 620 (7th Cir. 2004)). That interest is heightened where, as here, the First Amendment protections serve both Plaintiffs and the public at large; "[a]n untrammeled press is a vital source of public information, and an informed public is

---

[7] The compelled disclosure of Plaintiffs' donors constitutes irreparable harm both to Plaintiffs and their donors, who lack the opportunity to protect their identities from disclosure. The irreparable harm to third parties further pushes this factor, as well as the balance of the equities, in Plaintiffs' favor. *See Jones v. D.C.*, 177 F. Supp. 3d 542, 546 n.3 (D.D.C. 2016).

the essence of working democracy." *Minneapolis Star and Tribune Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575, 585 (1983) (cleaned up). Granting temporary relief ensures that Plaintiffs may continue to participate in the "unfettered interchange of ideas for the bringing about of political and social changes desired by the people," *Roth*, 354 U.S. at 484, and further serves the public interest against intrusive government fishing expeditions, *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021) (en banc).

In contrast, granting preliminary relief does not harm Paxton. Because his investigation lacks any legitimate basis or connection to Texas, he suffers no harm in having his efforts temporarily enjoined. Paxton "cannot legitimately claim to be 'harmed' as a result of being restrained from illegal conduct." *Prysmian Cables & Sys. USA, LLC v. Szymanski*, 573 F. Supp. 3d 1021, 1044 (D.S.C. 2021) (collecting cases). "If anything, the system is improved by such an injunction." *Giovani Carandola, Ltd. v. Bason,* 303 F.3d 507, 521 (4th Cir. 2002).

## CONCLUSION

For the reasons set forth above, the Court should grant Plaintiffs' motion for a temporary restraining order and a preliminary injunction. A proposed order is attached.

Dated: December 11, 2023          Respectfully submitted,
*/s/ Tina Meng Morrison*

**ELIAS LAW GROUP LLP**
Abha Khanna*
1700 Seventh Ave. Suite 2100
Seattle, WA 98101
T: (206) 656-0177
akhanna@elias.law

Tina Meng Morrison (D. Md. Bar No. 21832)
Aria C. Branch*
Christopher D. Dodge*
Jacob D. Shelly**
Elena A. Rodriguez Armenta*
Daniela Lorenzo*
Omeed Alerasool*
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
T: (202) 968-4652
tmengmorrison@elias.law
abranch@elias.law
cdodge@elias.law
jshelly@elias.law
erodriguezarmenta@elias.law
dlorenzo@elias.law
oalerasool@elias.law

**GIBSON, DUNN & CRUTCHER LLP**
Theodore J. Boutrous, Jr.*
Jay P. Srinivasan*
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: (213) 229-7000
Email: tboutrous@gibsondunn.com
Email: jsrinivasan@gibsondunn.com

Amer S. Ahmed*
Anne Champion*
200 Park Avenue
New York, New York 10166
Telephone: (212) 351-4000
Email: aahmed@gibsondunn.com
Email: achampion@gibsondunn.com

*Pro hac vice application forthcoming
**Application for admission pending

Counsel for Plaintiffs Media Matters for America and Eric Hananoki

## CERTIFICATE OF SERVICE

I hereby certify that this document will be served on the Defendant in accordance with Federal Rule of Civil Procedure 5(a).

*/s/ Tina Meng Morrison*
Tina Meng Morrison

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| MEDIA MATTERS FOR AMERICA, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>WARREN KENNETH PAXTON JR., in his official capacity as Attorney General of the State of Texas,<br><br>Defendant. | CIV. NO. \_\_-\_\_\_\_ |

## DECLARATION OF CYNTHIA PADERA IN SUPPORT OF
## PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER

I, Cynthia Padera, declare as follows:

1.      I am over the age of 18, am competent to testify, and have personal knowledge of the facts and information set forth in this declaration.

2.      I am the Chief Operating Officer of Media Matters for America ("Media Matters").

3.      I first joined Media Matters in April 2013 and, after leaving for a period in June 2015, returned in February 2017. I have served as Chief Operating Officer since August 2019.

4.      Media Matters is a web-based, not-for-profit, 501(c)(3) research and information center dedicated to comprehensively monitoring, analyzing, and correcting conservative misinformation in U.S. media.

5.      In my role, I support Media Matters's day-to-day operations and manage enterprise-level initiatives, technology, and administration. I engage on an as-needed basis with all of Media Matters's activities, and I interact with Media Matters's officers and employees at all levels.

6.      Media Matters is incorporated under the laws of the District of Columbia.

7.      Media Matters has its principal place of business, and sole physical office space, in the District of Columbia.

8.      Media Matters is registered to conduct business in the District of Columbia.

9.      Media Matters does not have an office, or any other physical presence, in Texas.

10.     Media Matters is not registered to conduct business in Texas.

11.     Media Matters is not registered as a charity organization in Texas.

12.     Media Matters does not have a registered agent in Texas.

13.     The Media Matters website publishes articles written by Media Matters employees in furtherance of the organization's mission to expose misinformation in the media, and in keeping with our internal guidelines for news coverage, which reflect ordinary journalistic standards.

14.     Media Matters has approximately 106 full-time employees, including at least 64 reporters, writers, and researchers.

15.     Media Matters employees may request authorization to work remotely and, upon approval, may choose to do from any location in the United States.[1] Mr. Hananoki is considered an employee with remote work authorization who may sometimes commute into the District of Columbia when he chooses to do so, but to my knowledge he performs most of his work at home in Maryland. To my knowledge, he has never had to travel outside of the Washington, DC metropolitan area for his work for Media Matters. He is employed within the Editorial Department at Media Matters.

[1] Of Media Matters employees authorized to work remotely, only one employee has provided a residential address in Texas. That employee has not been in Texas since the start of October 2023, did not work with Mr. Hananoki on the November 16 article nor any other of his articles related to X or otherwise, and works in an entirely different department.

2

16.     On November 20, 2023, X filed suit against Media Matters and Mr. Hananoki, complaining about Mr. Hananoki's November 16 article and a subsequent article written by him and published on November 17, 2023.

17.     On November 21, 2023, Attorney General Paxton issued a civil investigative demand that commanded Media Matters to produce documents and communications about our general operations, as well as the November 16 article. For example, the demand requires Media Matters to turn over, among other things "all documents related to internal and external communications" relating to the November 16 article. Attorney General Paxton served the Demand on our outside counsel on December 1, 2023.

18.     Media Matters leadership views the Attorney General's investigation as a response to Mr. Musk's complaints about Media Matters, intended to punish Media Matters for its news coverage and to curry favor with Mr. Musk and his significant online following. His investigation has harmed morale at Media Matters. Numerous reporters, writers, researchers, and other employees have indicated to leadership staff that they are now fearful of being targeted in legal proceedings. The investigation has contributed to the creation of a culture of fear within Media Matters, chilling employees' willingness and comfort with speaking on any topic related to the subjects of the investigation.

19.     Media Matters employees have indicated to leadership staff that they feel constrained in their ability to continue their work in the same manner as prior to the investigation.

20.     Media Matters's relationships and ability to coordinate with other groups have also been harmed by Attorney General Paxton. Some organizations that previously worked closely with Media Matters are re-evaluating their ability to continue to do so, or to work on new projects in the future, out of fear that documents and communications may come into the possession of

Attorney General Paxton or attorneys general in other states.

21.     Attorney General Paxton's public threats against Media Matters have also resulted in a significant influx of threats against Media Matters staff and against Mr. Hananoki. We have received over one hundred threatening messages via phone or email since November 18, 2023. These threats have ranged from threats of legal retaliation to violent death threats.

22.     The increased harassment has become so severe that Media Matters has been forced to hire an outside security firm to protect its employees in response.

23.     Media Matters's senior leaders and I have had to devote the vast majority of our time to focusing on the legal threats, investigations, and lawsuits that began with Mr. Musk's threat on November 18, 2023, rather than our ordinary job responsibilities. This includes conferring with counsel, speaking with concerned employees, and strengthening oversight of all operations given increased risk of further retaliation by those who do not like our reporting. This distraction has further harmed our ability to produce reporting and journalism on political extremism in the United States media.

24.     Media Matters leadership, officers, and staff are seriously concerned and fearful about having to protect their constitutional rights in places where they do not live or work, as well as against a partisan state attorney general.

Under 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on: _____12/11/2023_____

_____*Cynthia Padera*_____
Cynthia Padera

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MEDIA MATTERS FOR AMERICA, *et al.*,

              Plaintiffs,

    v.

WARREN KENNETH PAXTON JR., in his
official capacity as Attorney General of the
State of Texas,

              Defendant.

CIV. NO. __-____

---

## DECLARATION OF ERIC HANANOKI IN SUPPORT OF
## PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER

I, Eric Hananoki, declare as follows:

1.      I am over the age of 18, am competent to testify, and have personal knowledge of the facts and information set forth in this declaration.

2.      I am a Senior Investigative Reporter at Media Matters for America ("Media Matters"). I have worked at Media Matters since November 2007 and have had the role of Senior Investigative Reporter since August 2022. Prior to that, I held numerous other positions at Media Matters including Researcher, Senior Researcher, Research Fellow, and Investigative Reporter. I live in Montgomery County, Maryland and perform most of my work from my home.

3.      Media Matters is a web-based, nonprofit, 501(c)(3) research and information center dedicated to comprehensively monitoring, analyzing, and correcting conservative misinformation in U.S. media. It is headquartered and has its sole office in Washington, D.C. I occasionally visit our office as part of my job responsibilities.

1

4.      For at least the past decade, my work at Media Matters has focused on documenting extremism—including white nationalism, antisemitism, and Islamophobia—in the public square, including from public figures and officials while they appear in media outlets or when they worked as media figures.

5.      My work has been broadly cited by a wide array of other media outlets, including the Associated Press, CNN, Fox News, Los Angeles Times, MSNBC, the New York Post, the New York Times, Politico, USA Today, the Wall Street Journal, and the Washington Post.

6.      My research has also been cited to or relied upon by both government agencies, and Democratic and Republican public officials and entities. For example, under former President Trump, the United States Department of Justice cited my research regarding a far-right commentator who promoted and sold a bogus COVID-19 cure.[1] My work researching Roger Stone was cited in both Robert Mueller's report and in a bipartisan U.S. Senate Select Committee on Intelligence report on Russian interference in the 2016 presidential election.[2]

7.      My investigation into political extremism has exposed prominent individuals promoting racist, hateful, or conspiratorial content. For example, the National Republican Congressional Committee withdrew support for a congressional candidate in New Jersey after my

---

[1] *United States v. My Dr. Suggests LLC*, No. 2:20-CV-00279-DBB, 2021 WL 662442 (D. Utah Feb. 19, 2021), Plaintiffs' Ex Parte Mot. and Mem. of Law for a Temporary Restraining Order and Order to Show Cause Why a Preliminary Injunction Should Not Issue, Dkt. 2, at 13; *id.*, Decl. of Virginia Keys, Dkt. 2-1, ¶¶ 7, 28–29.

[2] Both reports cited a Media Matters article that included a video that I had found and produced. *See* Report on the Investigation into Russian Interference in the 2016 Presidential Election, Volume I of II, Special Counsel Robert S. Mueller, III, March 2019, at 57 n.233, available at https://www.justice.gov/storage/report_volume1.pdf; Select Committee on Intelligence, Russian Active Measures Campaigns and Interference in the 2016 U.S. Election, Volume 5: Counterintelligence Threats and Vulnerabilities, at 246 n.1638, available at https://www.intelligence.senate.gov/sites/default/files/documents/report_volume5.pdf.

discovery that the candidate had promoted white supremacist views online.[3] Likewise, Republican leaders in California distanced themselves from a candidate for Congress after I reported on his endorsement of 9/11 conspiracy theories.[4]

8.      I have also previously reported on extremism within the Texas Attorney General's office. In 2020, I uncovered tweets filled with racist rhetoric, violent threats and conspiracy theories that had been posted by an Assistant Attorney General in the Texas Attorney General's office.[5] Attorney General Paxton's employee had, among other things, threatened violence against protestors, called Islam a "virus," referred to transgender people as "abominations," and endorsed the QAnon conspiracy theory that "President Donald Trump is secretly working to take down . . . a supposed cabal of satanic high-ranking officials who they claim are operating pedophile rings." Later on the same day that my research was published, Attorney General Paxton's office fired the attorney, explaining the person could "discredit" to the agency.[6]

---

[3] "House Republicans withdraw support of N.J. candidate after report says he shared racist screed," NJ.com (July 10, 2018), https://www.nj.com/politics/2018/07/house_republicans_withdraw_support_of_nj_candidate.html (noting that NRCC chair "Stivers reacted to a report by the liberal watchdog group Media Matters about [the candidate] linking to the article that ran on a white supremacist website.").

[4] "California GOP committees distance themselves from 'Bush staged 9/11' congressional candidate," Media Matters for America (Oct. 2, 2018), https://www.mediamatters.org/george-w-bush/california-gop-committees-distance-themselves-bush-staged-911-congressional-candidate.

[5] "A Texas assistant attorney general is a QAnon conspiracy theorist who tweets out violent threats and bigoted remarks," Media Matters for America (Sept. 3, 2020), https://www.mediamatters.org/twitter/texas-assistant-attorney-general-nick-moutos-qanon-conspiracy-theorist-who-tweets-out.

[6] Trinady Joslin, "Assistant Texas attorney general loses job after report surfaces racist tweets," The Texas Tribune (Sept. 3, 2020), https://www.texastribune.org/2020/09/03/nick-moutos-texas-attorney-general; Taylor Goldenstein, " Records: Texas assistant AG who lost job over tweets was fired, had been warned about social media," Houston Chronicle (Sept. 11, 2020), https://www.houstonchronicle.com/politics/texas/article/texas-assistant-ag-social-media-posts-fired-warned-15558487.php.

9.      As part of my beat, I both actively engage with and cover the platform now known as X, and formerly known as Twitter. In 2022, X was purchased by Elon Musk, who has repeatedly called the platform a "digital town square" or "de facto town square." I have reported on politically extreme rhetoric on Twitter (and now X) for the better part of a decade.

10.      Since Musk completed his acquisition of X, I have observed that the platform has experienced a sustained and significant surge in extremist content. This trend has been widely reported on and observed by the media for over a year. For example, over a year ago, the Washington Post reported that "ads from dozens of major brands" such as Amazon and Uber were appearing on the pages of white nationalists on X.[7] Even advertisements for the United States Department of Health and Human Services appeared on white nationalist pages at that time.

11.      As part of my long-running coverage of political extremism online, I have written numerous articles about X Corp., Musk, and the social media platform X.

12.      These articles frequently focused on the appearance of corporate advertisements alongside hateful content posted by white nationalist, antisemitic, and extremist users on X. My work on this subject matter includes the following articles:

- *Under Elon Musk, Twitter is running corporate ads alongside tweets from Holocaust deniers*, Media Matters for America (Feb. 10, 2023).[8]

- *Dish, Samsung, Wall Street Journal, and others are advertising on the Twitter account of a leading white nationalist group*, Media Matters for America (June 22, 2023).[9]

- *Update: Twitter placed ads for USA Today, National Women's Soccer League, and other major brands on a terrorism-linked neo-Nazi account*, Media Matters for

---

[7] Faiz Siddiqui, "Amazon, Uber, Snap ads appear on Twitter pages of white nationalists restored by Musk," The Washington Post (Dec. 6, 2022),
https://www.washingtonpost.com/technology/2022/12/06/twitter-ads-elon-musk/.

[8] Available at https://www.mediamatters.org/twitter/under-elon-musk-twitter-running-corporate-ads-alongside-tweets-holocaust-deniers.

[9] Available at https://www.mediamatters.org/twitter/dish-samsung-wall-street-journal-and-others-are-advertising-twitter-account-leading-white.

America (July 27, 2023).[10]

- *Update: Under Linda Yaccarino, X is placing ads for major brands on a verified pro-Hitler account*, Media Matters for America (Aug. 16, 2023).[11]

- *X is placing ads for brands like the NFL and MLB next to unhinged conspiracy theories about Jewish people and 9/11*, Media Matters for America (Sept. 11, 2023).[12]

- *X is placing major ads on a heavily followed antisemitic account that endorses killing politicians and LGBTQ advocates*, Media Matters for America (Sept. 12, 2023).[13]

- *X is placing ads for the NFL on prominent white nationalist accounts*, Media Matters for America (Sept. 27, 2023).[14]

- *X is placing ads for MLB, the NFL, and the Pittsburgh Steelers on antisemitic and Holocaust denial accounts*, Media Matters for America (Oct. 12, 2023).[15]

- *Pro-Hitler and Holocaust denier account: X has paid me $3,000 in ad revenue sharing*, Media Matters for America (Nov. 13, 2023).[16]

- *As Musk endorses antisemitic conspiracy theory, X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content*, Media Matters for America (Nov. 16, 2023).[17]

- *X is placing ads for Amazon, NBA Mexico, NBCUniversal, and others next to content with white nationalist hashtags*, Media Matters for America (Nov. 17, 2023).[18]

---

[10] Available at https://www.mediamatters.org/twitter/twitter-placed-ads-usa-today-national-womens-soccer-league-and-other-major-brands-terrorism.

[11] Available at https://www.mediamatters.org/twitter/update-under-linda-yaccarino-x-placing-ads-major-brands-verified-pro-hitler-account.

[12] Available at https://www.mediamatters.org/twitter/x-placing-ads-brands-nfl-and-mlb-next-unhinged-conspiracy-theories-about-jewish-people-and.

[13] Available at https://www.mediamatters.org/twitter/x-placing-major-ads-heavily-followed-antisemitic-account-endorses-killing-politicians-and.

[14] Available at https://www.mediamatters.org/white-nationalism/x-placing-ads-nfl-prominent-white-nationalist-accounts.

[15] Available at https://www.mediamatters.org/twitter/x-placing-ads-mlb-nfl-and-pittsburgh-steelers-antisemitic-and-holocaust-denial-accounts.

[16] Available at https://www.mediamatters.org/twitter/pro-hitler-and-holocaust-denier-account-x-has-paid-me-3000-ad-revenue-sharing.

[17] Available at https://www.mediamatters.org/twitter/musk-endorses-antisemitic-conspiracy-theory-x-has-been-placing-ads-apple-bravo-ibm-oracle.

[18] Available at https://www.mediamatters.org/twitter/x-placing-ads-amazon-nba-mexico-nbcuniversal-and-others-next-content-white-nationalist.

13.    X's persistent placement of advertisements next to extremist content has been widely reported in the media, apart from my own significant work on the topic.

14.    My November 16 article also reported on Musk's endorsement of a widespread antisemitic conspiracy theory that Jewish people are seeking to promote "hatred against whites" and are seeking to "flood[] the[] country" with "hordes of minorities."[19] Musk's endorsement of this antisemitic theory drew widespread condemnation, including by President Joe Biden, and was extensively covered in the media.[20]

15.    My November 16 article contains screenshots of X feeds, which include at least nine organic posts from X users and six advertisements from major corporate entities. For example, below are images of an advertisement for Oracle appearing alongside a quote from Nazi dictator Adolf Hitler, as well as an advertisement for the Bravo television network next to a post praising Hitler's Nazi party, that I included in my article:

---

[19] *Supra* n.15; *see also* Blake Montgomery, "Elon Musk agrees with accusing Jewish people of 'hatred against whites,'" The Guardian (Nov. 16, 2023), https://www.theguardian.com/technology/2023/nov/16/elon-musk-antisemitic-tweet-adl.

[20] Blake Montgomery, "White House condemns Elon Musk's 'abhorrent' antisemitic tweets," The Guardian (Nov. 17, 2023), https://www.theguardian.com/technology/2023/nov/17/white-house-biden-elon-musk-antisemitic-tweet-hate; Aimee Picchi, "Elon Musk faces growing backlash over his endorsement of antisemitic X post," CBS News (Nov. 17, 2023), https://www.cbsnews.com/news/elon-musk-actual-truth-antisemitic-post-backlash-advertisers/; Allison Morrow, "With antisemitic tweet, Elon Musk reveals his 'actual truth,'" CNN (Nov. 17, 2023), https://www.cnn.com/2023/11/17/business/elon-musk-reveals-his-actual-truth/index.html; Mike Wendling, "White House criticizes Elon Musk over 'hideous' antisemitic lie," BBC (Nov. 17, 2023), https://www.bbc.com/news/world-us-canada-67446800.



16. On November 18, 2023, in the wake of this coverage and condemnation, Musk threatened to "fil[e] a thermonuclear lawsuit" against Media Matters. *See* @elonmusk, X.com (Nov. 18, 2023, 2:01 AM ET), https://perma.cc/X4HN-PLJ4.



17. The threat was apparently in response to my November 16 article.

18.     On November 20, 2023, X filed suit against me and my employer, citing two articles authored by me and published on Media Matters on November 16, 2023 and November 17, 2023.

19.     On the same day, Texas Attorney General Paxton issued a press release announcing he would investigate Media Matters "for potential fraudulent activity."[21] In that press release, Attorney General Paxton characterized Media Matters as a "radical anti-free speech organization" and referenced "allegations" that Media Matters "fraudulently manipulated data on X.com." I perceived these references to allegations as direct references to my investigatory work in my articles, specifically that of the November 16 article. The press release also referred to possible deception and "schemes of radical left-wing organizations who would like nothing more than to limit freedom by reducing participation in the public square[.]" These accusations are categorically false—as a journalist, freedom of speech and freedom of the press—including the ability to report and criticize on the press itself—are at the core of my work.

20.     On November 21, 2023, Attorney General Paxton issued a civil investigative demand that requested documents about the article that I authored on November 16. The demand expressly references me in several places and demands that Media Matters turn over, among other things "all documents related to internal and external communications" relating to my November 16 article. This would include various materials I used and prepared in writing my November 16 article.

21.     I have never visited Texas for any aspect of my work at Media Matters over the

---

[21] "Attorney General Ken Paxton Opens Investigation into Media Matters for Potential Fraudulent Activity," Press Release, Texas Attorney General (Nov. 20, 2023), available at https://texasattorneygeneral.gov/news/releases/attorney-general-ken-paxton-opens-investigation-media-matters-potential-fraudulent-activity.

past sixteen years, including for any work related to the November 16 article. No element of any of my work over the past year covering the X platform or Musk has involved speaking with any Texas residents or Texas-based businesses. I have never traveled outside of the Washington, D.C. area as part of my work for Media Matters. I generally conduct my work from my home in Maryland. I conducted all activities related to preparing, researching, writing, and editing the November 16 article from my home in Maryland.

22.     In preparing, researching, writing, and publishing the November 16 article, I was not aware of any connection—and continue to believe it has no connection—to Texas, Texas residents, Texas users of X, or advertisers who may transact business in Texas.

23.     I have also reviewed all the X accounts that are either referenced, or whose posts on X are reproduced as screenshots, in the November 16 article.

24.     To the best of my awareness, none of these accounts appear to be of users based in Texas and I had, and continue to have, no reason to believe any of these users are based in Texas.[22]

25.     I believe that Attorney General Paxton's request for my documents and communications is in response to Musk's highly publicized threat against Media Matters. I further believe Attorney General Paxton has singled out Media Matters and me, and that he is using us to increase his public stature and standing among conservative and partisan audiences, including among Musk's large online fanbase.

26.     I additionally believe that Attorney General Paxton's actions against Media Matters are retribution because my colleagues and I have critically reported on him in the past. For example, Attorney General Paxton stated during a December 1, 2023 interview about his Media

---

[22] X does not display locations by default and account holders may list a location of their choice. *See* "Post location FAQs," X.com, available at https://help.twitter.com/en/safety-and-security/post-location-settings.

Matters investigation that he is "pretty sure they have put hit pieces out on me."[23]

27.     Attorney General Paxton's demand for documents, and other public threats and statements about Media Matters, have had an extremely negative effect on my journalistic work and have disrupted my ordinary reporting and writing.

28.     Since Attorney General Paxton announced his investigation, both I and my employer have experienced harassment and received hateful and threatening messages.

29.     In response to this harassment, I have taken measures to increase my home security and my personal security.

30.     The investigation and demand have also forced me to curtail my work investigating and covering X out of fear that I will face further harassment, threats, and legal retaliation. For example, I have prepared extensive research and draft articles about antisemitism on social media that have not, and now likely will not, be published.

31.     In fact, since Attorney General Paxton announced his investigation and issued his document demand, I have not published any articles about Musk and how his ownership of X has enabled political extremism. My editors have specifically instructed me that, due to Attorney General Paxton's investigation, Media Matters cannot publish work that I have already prepared regarding Musk and political extremism on X. Multiple stories that I have prepared on this topic have been held back by my editors due to concerns with Attorney General Paxton's investigation, as well as Musk's lawsuit.

32.     Instead of my ordinary investigative work, since Attorney General Paxton threatened Media Matters, I have spent most of my time attending to legal matters, including

---

[23] "Ken Paxton vs. Pfizer EXCLUSIVE," The Tudor Dixon Podcast (published Dec. 1, 2023), available at https://omny.fm/shows/the-tudor-dixon-podcast/the-tudor-dixon-podcast-ken-paxton-vs-pfizer-exclu. *See id.* at 22:23.

preparing for and responding to Attorney General Paxton's investigative demand and conferring with Media Matters officers and counsel. I would otherwise be spending my time on my reporting beat.

33.     In my sixteen-year career as a researcher and reporter on political extremism, I have never been investigated by a law enforcement official or other state official for my work.

34.     I am seriously concerned and fearful about having to protect my constitutional rights against a powerful, and public-perception-driven, state attorney general in a foreign and unfamiliar jurisdiction.


Under 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on:  ___12/11/2023_____

_____
Eric Hananoki

11

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| MEDIA MATTERS FOR AMERICA, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> WARREN KENNETH PAXTON JR., in his official capacity as Attorney General of the State of Texas, <br><br> Defendant. | CIV. NO. __-____ |

## DECLARATION OF BENJAMIN DIMIERO IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER

I, Benjamin Dimiero, declare as follows:

1.      I am over the age of 18, am competent to testify, and have personal knowledge of the facts and information set forth in this declaration.

2.      I am the Editor-in-Chief of Media Matters for America ("Media Matters").

3.      Media Matters is a web-based, not-for-profit, 501(c)(3) research and information center dedicated to comprehensively monitoring, analyzing, and correcting conservative misinformation in U.S. media.

4.      I first joined Media Matters as an intern in 2007. After becoming a full-time staff member in 2008, I worked in both communications and writing roles, and then became head of the investigative research team. In 2016, I became the editorial director, where I oversaw the full-time editing team and several members of our senior writing staff. In 2023, I became the Editor-in-Chief of Media Matters, and I oversee the entire Editorial Department.

1

5.     As Editor-in Chief, I am the last set of eyes for my team of senior writing staff, which includes setting processes for review and timing of articles, and outlining priorities for research and writing.

6.     Our editorial team, consistent with the organization's mission, is focused on researching and writing articles to expose misinformation in the media. Like the rest of the organization, we adhere to our internal guidelines for news coverage, which reflect ordinary journalistic standards.

7.     Our editorial team includes senior investigative reporter Eric Hananoki, with whom I work closely.

8.     Along with other Media Matters reporters, writers, and researchers, Mr. Hananoki has written multiple articles about X Corp., its owner Elon Musk, and the social media platform X, formerly known as Twitter. These articles have often focused on the appearance of corporate advertisements alongside hateful content posted by white nationalist, antisemitic, and extremist users on X. Such articles include:

- *Under Elon Musk, Twitter is running corporate ads alongside tweets from Holocaust deniers*, Media Matters for America (Feb. 10, 2023).[1]

- *Linda Yaccarino just started as Twitter's new CEO, but Elon Musk already destroyed the platform for advertisers*, Media Matters for America (June 8, 2023).[2]

- *Dish, Samsung, Wall Street Journal, and others are advertising on the Twitter account of a leading white nationalist group*, Media Matters for America (June 22, 2023).[3]

- *Update: Twitter placed ads for USA Today, National Women's Soccer League, and other major brands on a terrorism-linked neo-Nazi account*, Media Matters for

---

[1] Available at https://www.mediamatters.org/twitter/under-elon-musk-twitter-running-corporate-ads-alongside-tweets-holocaust-deniers.

[2] Available at https://www.mediamatters.org/twitter/linda-yaccarino-just-started-twitters-new-ceo-elon-musk-already-destroyed-platform.

[3] Available at https://www.mediamatters.org/twitter/dish-samsung-wall-street-journal-and-others-are-advertising-twitter-account-leading-white.

America (July 27, 2023).[4]

- *Advertisers beware: Elon Musk and Linda Yaccarino are trying to lure you back by rebranding Twitter, but it's still a toxic cesspool*, Media Matters for America (Aug. 8, 2023).[5]

- *X Corp. CEO Yaccarino's interview on CNBC should alarm major advertising brands*, Media Matters for America (Aug. 11, 2023).[6]

- *Update: Under Linda Yaccarino, X is placing ads for major brands on a verified pro-Hitler account*, Media Matters for America (Aug. 16, 2023).[7]

- *X is placing ads for brands like the NFL and MLB next to unhinged conspiracy theories about Jewish people and 9/11*, Media Matters for America (Sept. 11, 2023).[8]

- *X is placing major ads on a heavily followed antisemitic account that endorses killing politicians and LGBTQ advocates*, Media Matters for America (Sept. 12, 2023).[9]

- *X is placing ads for the NFL on prominent white nationalist accounts*, Media Matters for America (Sept. 27, 2023).[10]

- *X is placing ads for MLB, the NFL, and the Pittsburgh Steelers on antisemitic and Holocaust denial accounts*, Media Matters for America (Oct. 12, 2023).[11]

- *Pro-Hitler and Holocaust denier account: X has paid me $3,000 in ad revenue sharing*, Media Matters for America (Nov. 13, 2023).[12]

- *As Musk endorses antisemitic conspiracy theory, X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content*, Media Matters for America

---

[4] Available at https://www.mediamatters.org/twitter/twitter-placed-ads-usa-today-national-womens-soccer-league-and-other-major-brands-terrorism.

[5] Available at https://www.mediamatters.org/twitter/advertisers-beware-elon-musk-and-linda-yaccarino-are-trying-lure-you-back-rebranding.

[6] Available at https://www.mediamatters.org/twitter/x-corp-ceo-yaccarinos-interview-cnbc-should-alarm-major-advertising-brands.

[7] Available at https://www.mediamatters.org/twitter/update-under-linda-yaccarino-x-placing-ads-major-brands-verified-pro-hitler-account.

[8] Available at https://www.mediamatters.org/twitter/x-placing-ads-brands-nfl-and-mlb-next-unhinged-conspiracy-theories-about-jewish-people-and.

[9] Available at https://www.mediamatters.org/twitter/x-placing-major-ads-heavily-followed-antisemitic-account-endorses-killing-politicians-and.

[10] Available at https://www.mediamatters.org/white-nationalism/x-placing-ads-nfl-prominent-white-nationalist-accounts.

[11] Available at https://www.mediamatters.org/twitter/x-placing-ads-mlb-nfl-and-pittsburgh-steelers-antisemitic-and-holocaust-denial-accounts.

[12] Available at https://www.mediamatters.org/twitter/pro-hitler-and-holocaust-denier-account-x-has-paid-me-3000-ad-revenue-sharing.

(Nov. 16, 2023) (the "November 16 article" or "Nov. 16 Article").[13]

- *X is placing ads for Amazon, NBA Mexico, NBCUniversal, and others next to content with white nationalist hashtags*, Media Matters for America (Nov. 17, 2023).[14]

9.      Mr. Hananoki authored 11 of the 14 articles referenced above, including the article published on November 16, 2023. The November 16 article, in addition to reporting on the appearance of advertisements alongside extremist content, commented on Mr. Musk's recent endorsement of an antisemitic conspiracy theory.

10.     While Media Matters and Mr. Hananoki reported extensively on these topics, X's persistent placement of advertisements next to extremist content has been widely reported in the media by other sources.[15]

11.     On November 20, 2023, X filed a lawsuit against Media Matters and Mr. Hananoki over Mr. Hananoki's November 16 article and a subsequent article written by him and published on November 17, 2023.

12.     On November 21, 2023, Attorney General Paxton issued a civil investigative demand that commanded Media Matters to produce documents and communications related to our

---

[13] Available at https://www.mediamatters.org/twitter/musk-endorses-antisemitic-conspiracy-theory-x-has-been-placing-ads-apple-bravo-ibm-oracle.

[14] Available at https://www.mediamatters.org/twitter/x-placing-ads-amazon-nba-mexico-nbcuniversal-and-others-next-content-white-nationalist.

[15] Faiz Siddiqui, "Amazon, Uber, Snap ads appear on Twitter pages of white nationalists restored by Musk," The Washington Post (Dec. 6, 2022), https://www.washingtonpost.com/technology/2022/12/06/twitter-ads-elon-musk/; Jon Porter, "Twitter advertisers aren't happy with ads appearing on pages of white nationalists," The Verge (Dec. 7, 2022), https://www.theverge.com/2022/12/7/23497928/twitter-advertisers-brand-safety-unbanned-accounts-white-nationalists; Jonathan Shorman, "Mizzou ad appears on racist X page as social media site faces concerned advertisers," The Kansas City Star (Mar. 15, 2023), https://www.kansascity.com/news/politics-government/article280309284.html; Shannon Thaler, "Disney, Microsoft ads on Twitter show up next to neo-Nazi propaganda as advertisers return: report," The N.Y. Post (June 19, 2023), https://nypost.com/2023/06/19/disney-microsoft-ads-on-twitter-show-up-next-to-neo-nazi-propaganda-report/.

research and writing processes, including about the November 16 article. For example, the demand requires Media Matters to turn over, among other things "all documents related to internal and external communications" relating to the November 16 article.

13.     The investigation has dramatically changed my team's editorial processes and had a negative impact on morale. Concern about the investigation on our team has created a new culture of fear about what can be researched and ultimately reported by our researchers and reporters. Stories that would normally be published after our usual vetting process—including stories about media coverage of Attorney General Paxton's anti-abortion actions in Texas—now receive greater internal scrutiny and risk-calculation from myself, our senior editor, and Media Matters's leadership. And stories on other topics—such as Musk's decision to permit prominent conspiracy theorist Alex Jones back onto the platform—may go unreported on entirely. There is a general sense among our team and organization that we must tread very lightly, and be careful not to cross lines that would jeopardize our work or our employees' safety. This heightened need for internal scrutiny and risk calculation is not due to any concerns that the reporting is fair or accurate, but because of concern that certain reporting could make us a target for further retaliation.

14.     Since Attorney General Paxton announced his investigation, Media Matters's editorial leaders have pared back reporting and publishing, particularly on any topics that could be perceived as relating to the Paxton investigation.

15.     Critically, the lawsuit and corresponding investigation from Attorney General Paxton have compelled us to change what our approach would normally be following the publication of such important articles. Without the legal proceedings and threat of legal action from a state official, our team would be focused on keeping the momentum going following stories like Mr. Hananoki's November 16 and 17 articles. We would be following up their publication

and widespread coverage with additional articles, or continued research from Mr. Hananoki related to extremism on the X platform, but for fear of retaliation. Notably, since Media Matters has been threatened by Attorney General Paxton and X, we have received several tips from people who have seen advertisements for prominent brands placed alongside extremist content. Though traditionally our approach would be to pursue these tips, despite this influx of possible leads, we have limited the scope of our reporting on this topic for fear of additional retaliation.

16.     At least two articles that would have been published related to the topics in Mr. Hananoki's November 16 and November 17 articles have not been published due to concerns that their publication would lead to negative consequences and possible further legal action.

17.     Media Matters's leadership and editorial team have also been forced to take a larger role in the organization's collective publishing decisions since Attorney General Paxton announced his investigation and served his Demand. In particular, I have been in communication much more than usual with leadership about what we should and should not publish. This has significantly slowed down our editorial and publication process, as we must work with leadership to assess whether publishing new articles will impact legal proceedings. In my more than 16 years at Media Matters, I do not think the organization has found itself in this posture.

18.     Writers have expressed concern about their ability to conduct meaningful investigations that could form the basis for future publications, given concerns that legal proceedings will prevent us from publishing their work and that their notes and emails could be subject to search by hostile attorneys general like Paxton.

19.     Attorney General Paxton's public threats against Media Matters have also contributed to safety concerns against Media Matters staff, including members of my team. These increased safety concerns have added to the culture of fear at Media Matters, and operate as a

serious distraction from our work, further harming our ability to produce reporting and journalism on political extremism in the United States media.

      Under 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on:     <u>         12/11/2023                       </u>

<u>                                     </u>

Benjamin Dimiero

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| MEDIA MATTERS FOR AMERICA, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> WARREN KENNETH PAXTON JR., in his official capacity as Attorney General of the State of Texas, <br><br> Defendant. | CIV. NO. 23-3363 |

## DECLARATION OF CHRISTOPHER D. DODGE IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER

I, Christopher D. Dodge, declare as follows:

1.      I am over the age of 18, am competent to testify, and have personal knowledge of the facts and information set forth in this declaration.

2.      I am a Counsel at Elias Law Group LLP in Washington, DC. I am a member of the bar in the State of New York, the Commonwealth of Massachusetts, and the District of Columbia. I am counsel for Media Matters for America and Eric Hananoki ("Plaintiffs") in this matter.

3.      I submit this declaration in support of Plaintiffs' Motion for Temporary Restraining Order in the above-captioned matter.

4.      A true and correct copy of the Civil Investigative Demand issued on November 21, 2023 by Texas Attorney General Warren Kenneth Paxton Jr. is attached as **Exhibit A**.

5.      A true and correct copy of the November 20, 2023 press release from Attorney General Paxton's office describing the investigation is attached as **Exhibit B**.

1

6.      A true and correct copy of the certified transcript of Attorney General Paxton's November 28, 2023 interview with Benny Johnson is attached as **Exhibit C**.

7.      A true and correct copy of the certified transcript of Attorney General Paxton's November 21, 2023 interview with CNBC "Last Call" is attached as **Exhibit D**.

8.      A true and correct copy of Brief of Amici Curiae in *Exxon Mobile Corp., v., et al.*, Case No. Case 16-CV-00469-K, ECF. No. 63-2, is attached as **Exhibit E**.


Under 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

*/s/ Christopher Dooley Dodge*
Christopher Dooley Dodge

# Exhibit A



OFFICE OF THE ATTORNEY GENERAL
CONSUMER PROTECTION DIVISION

# CIVIL INVESTIGATIVE DEMAND

**To:**  **Media Matters for America**       *via FedEx 7741 8756 3037*
                                            **Return Date: December 12, 2023**

**c/o**  **Angelo Carusone**
       **800 Maine Ave SW, Suite 500**
       **Washington, DC 20024**

Pursuant to this office's specific authority under § 17.61 of the Texas Deceptive Trade Practices – Consumer Protection Act, §§ 17.41-.63, Texas Business and Commerce Code ("DTPA"), Media Matters for America ("Media Matters") is hereby directed to produce the items listed in **"Exhibit A"** attached hereto.

You are to make available the documentary material described in **"Exhibit A"** to the undersigned Assistant Attorney General, or other authorized agent(s) identified by the Consumer Protection Division ("Division"), by the "Return Date" indicated above for inspection and copying. In lieu of producing the originals for inspection and copying at your principal place of business, you may deliver true copies of the requested documents to the Assistant Attorney General or Authorized Agent below at the Office of the Attorney General, 300 W 15th St, Austin, TX, 78701. **Contact one of the persons listed below upon receipt to discuss the logistics of producing the requested documents to the Division.**

The Division believes that Media Matters for America is in possession, custody, or control of documentary material relevant to the subject matter of an investigation of possible violations of §§ 17.46(a) and (b) of the DTPA, related to false, misleading, and/or deceptive practices in the State of Texas.

> **TAKE NOTICE THAT pursuant to section 17.62, Texas Business and Commerce Code, any person who attempts to avoid, evade, or prevent compliance, in whole or in part, with this directive by removing, concealing, withholding, destroying, mutilating, altering, or by any other means falsifying any documentary material may be guilty of a misdemeanor and on conviction is punishable by a fine of not more than $5,000.00 or by confinement in the county jail for not more than one year, or both.**

ISSUED THIS 21st day of November, 2023.

/s Levi Fuller                             **Authorized Agent**
Levi Fuller                                   Ryan Hanlan
Assistant Attorney General            Investigator
(512) 936-1308                          (512) 936-3354

# Instructions

1. **Read These Instructions/Definitions.** Read these instructions and definitions carefully.

2. **Duty to Preserve Documents**. All documents and/or other data which relate to the subject matter or requests of this Civil Investigative Demand must be preserved. ***Any ongoing, scheduled or other process of document or data destruction involving such documents or data must cease even if it is your normal or routine course of business for you to delete or destroy such documents or data and even if you believe such documents or data are protected from discovery by privilege or otherwise.*** Failure to preserve such documents or data may result in legal action and may be regarded as spoliation of evidence under applicable law.

3. **Relevant Dates**. Unless otherwise noted, the requests in this Civil Investigative Demand require production of documents for each year from January 1, 2022 to the final date of your production of responsive documents, herein called "the relevant time period."

4. **Custody and Control.** In responding to this Civil Investigative Demand, you are required to produce not only all requested documents in your physical possession, but also all requested documents within your custody and control, including those within the possession of persons reasonably available to you or under your direction or control.

5. **Identification of Documents not in Custody or Control.** If any responsive document was, but no longer is, in your possession, custody or control, produce a description of each such document. The description shall include the following:

   a. The name of each author, sender, creator, and initiator of such document;

   b. the name of each recipient, addressee, or party for whom such document was intended;

   c. the date the document was created;

   d. the date(s) the document was in use;

   e. a detailed description of the content of the document;

   f. the reason it is no longer in your possession, custody or control; and

   g. the document's present whereabouts.

   If the document is no longer in existence, in addition to providing the information indicated above, state on whose instructions the document was destroyed or otherwise disposed of, and the date and manner of the destruction or disposal.

6. **Privileged Documents**. If any responsive document is withheld, in whole or in part, under any claim of privilege, provide a detailed privilege log that contains at least the following information for each document or partial document that you have withheld:

   a. the document's control numbers;

   b. all authors of the document;

   c. all addressees of the document;

   d. all recipients of the document or of any copies of the document, to the extent not included among the document's addressees;

e. the date of the document;

f. a description of the subject matter of the document sufficient to determine the applicability of the privilege;

g. the nature or type of the privilege that is being asserted for the document (e.g., "attorney-client privilege");

h. the specification(s) of the Demand to which the document is responsive;

i. the document control number(s) of any attachments to the document, regardless of whether any privilege is being asserted for such attachment(s); and

j. whether the document has been produced in redacted form, and if so, the range of the control numbers for the document.

7. **Trade Secrets.** It is your responsibility to clearly designate which, if any, of the requested documents contain trade secrets, in accordance with Section 17.61(f) of the Texas Business and Commerce Code.

8. **Consult Before Producing Documents.** Before processing or making copies of hard copy documents or electronically stored information in response to this Civil Investigative Demand, consult with the designated representative(s) of the Office of the Attorney General, ("OAG") identified above and reach agreement on the format and method of production.

   Likewise, before producing any *original* documents, consult with one of the designated representatives of the OAG identified above to obtain approval. If you produce original documents, the OAG cannot guarantee their return.

9. **You May Produce Copies.** Subject to the consultation requirement noted above, you may submit photocopies (with color photocopies where necessary to interpret the document) in lieu of original hard-copy documents, provided that such copies are accompanied by an affidavit of an officer of Media Matters for America stating that the copies are true, correct, and complete copies of the original documents, and (if appropriate) were generated and maintained in the ordinary course of your business, and provided that where the original contains colored text or images, a color copy must be provided.

10. **Non-identical Copies to be Produced.** Identical copies of responsive documents need not be produced. However, any copy of a document that differs in any manner, including but not limited to the presence of handwritten notations, different senders or recipients, etc. must be produced.

11. **No Redaction**. All materials or documents produced in response to this Civil Investigative Demand shall be produced, except as deemed privileged, in complete unabridged, unedited and unredacted form, even if portions may contain information not explicitly requested, or might include interim or final editions of a document.

12. **Documents to be Bates Numbered.** Mark each page or electronic medium (e.g., disk, tape, or CD) with individual or corporate identification and eight-digit consecutive document control numbers (e.g., DOE-12345678; CORP-12345678). Hardcopy bound pamphlets or books may be marked with a single identification and control number. Documents as to which privilege is asserted are to also receive identification and control numbers.

   If your production will be more than one box or piece of electronic media, number each box or electronic media, as well as the total number of boxes/media (e.g., box 1 of 13) and mark each with the name(s) of the person(s) whose files are contained therein, the requests(s) to which they are responsive, and the document control numbers contained therein.

13. **Document Organization**. *Each document and other tangible thing produced shall be clearly designated as to which request, and each sub-part of a request, that it satisfies. The documents produced shall be identified and segregated to correspond with the number and subsection of the request.*

14. **Production of Electronic Documents.** Unless otherwise agreed to in writing by the designated OAG representative, electronically stored information shall be produced in electronic form. Before you prepare documents or information for production in electronic form in order to comply with this Civil Investigative Demand (for example, before you attempt to process electronically stored information or image hard copy documents), you must consult with the designated representative(s) of the OAG identified above and reach agreement regarding the format and method of production.

15. **Questions.** Questions concerning this Civil Investigative Demand should be directed to Assistant Attorney General Levi Fuller at (512) 936-1308.

## Definitions

1. **"You," "your," "the business," "Media Matters for America,"** or **"Media Matters"** means Media Matters for America, their past and present officers, employees, agents and representatives, parents and predecessors, divisions, subsidiaries, affiliates, partnerships and joint ventures, and includes all persons and entities acting or purporting to act under the guidance or on behalf of any of the above. The terms "subsidiary," "affiliate," and "joint venture" refer to any firm in which there is total or partial ownership (25 percent or more) or control between the company and any other person or entity.

2. **"X," "X Corp.," "Twitter,"** or **"Twitter, Inc."** means X, their past and present officers, employees, agents and representatives, parents and predecessors, divisions, subsidiaries, affiliates, partnerships and joint ventures, and includes all persons and entities acting or purporting to act under the guidance or on behalf of any of the above.

3. **"Document"** means the original and all non-identical copies (whether different from the original because of notes, underlining, attachments, or otherwise) of all computer files, and all written, printed, graphic or recorded material of every kind, regardless of authorship. It includes communications in words, symbols, pictures, photographs, sounds, films, and tapes, as well as electronically stored information, computer files, together with all codes and/or programming instructions and other materials necessary to understand and use such systems. The term "computer files" includes information stored in or accessible through computers or other information retrieval systems and includes but is not limited to drafts of documents, metadata, embedded, hidden and other bibliographic or historical data describing or relating to documents created, revised, or distributed on computer systems, as well as spreadsheets and their underlying cell formulae and other codes. Thus, you should produce documents that exist in machine-readable form, including documents stored in personal computers, portable computers, workstations, minicomputers, phones, pagers, personal data/digital assistants, archival voice storage systems, group and collaborative tools, electronic messaging devices, mainframes, servers, backup disks and tapes, archive disks and tapes, and other forms of offline storage, whether on or off your premises. This definition covers electronic mail messages ("e-mail"), text messages, voice mail, and all other documents in the possession of you and/or your directors, officers, managers, or employees, whether located at their home or office, whether on work or personal devices. Notice: Unless otherwise specified, the term "document" excludes bills of lading, invoices in non-electronic form, customs declarations, purchase orders, and other similar documents of a purely transactional nature.

4. **"Communication"** means any exchange or transmission of words or ideas to another person or an entity, including without limitation conversations, discussions, letters, memoranda, meetings, notes, speeches, or other transfer of information, whether written, oral, or by any other means, whether direct or indirect, formal or informal, and includes any document which abstracts, digests, transcribes or records any such communication. This definition extends to and encompasses electronic communications on internal chat platforms such as Slack, Microsoft Teams, Google Chat, and other similar messaging platforms.

5. **"Entity"** means legal or business entity of any kind and includes, without limitation, corporations, partnerships, joint ventures, associations, governmental bodies, and trusts.

6. **"Evidencing"** means having any tendency to make the existence of any fact related to the request more probable than it would be without the evidence.

7. **"Identify"** means

    a. Regarding an individual, to identify that individual's:

        i. name;

        ii. current or last known telephone numbers at business and home; and

        iii. current or last known business and home addresses.

    b. Regarding a person other than an individual, to identify:

        i. its full name;

        ii. the nature of its organization;

        iii. the address and telephone number of its principal offices and, if applicable, the state in which it is incorporated; and

        iv. its principal line of business or activity.

    c. Regarding any other tangible thing, to identify:

        i. what it is, giving a reasonably detailed description thereof;

        ii. when, where, and how it was made, if applicable;

        iii. who made it, if applicable; and

        iv. its current custodian or the person that had last known possession, custody, or control thereof.

8. **"Including"** means including, but not limited to.

9. **"Person"** includes you and means any entity or natural person.

10. **"Relate," "related,"** and **"relating"** mean being in any way legally, logically, or factually connected with the subject matter of the request at issue.

11. The words **"and"** and **"or"** shall be construed either conjunctively or disjunctively as required by the context to bring within the scope of the request, any document(s) that might be deemed outside its scope by another construction.

12. Unless the context otherwise clearly indicates, words used in the singular include the plural, the plural includes the singular, and the neuter gender includes the masculine and the feminine.

# EXHIBIT A: DOCUMENTS TO BE PRODUCED

1. Produce documents sufficient to identify Media Matters for America's employee organizational chart.

2. Produce documents sufficient to identify all of Media Matters for America's sources of income originating in the State of Texas.

3. Produce documents sufficient to identify all of Media Matters for America's operational expenditures in the State of Texas.

4. Produce all documents related to internal and external communications by Media Matters for America regarding Elon Musk's purchase of X during the relevant time period.

5. Produce all documents related to internal and external communications by Media Matters for America regarding Linda Yaccarino during the relevant time period.

6. Produce documents sufficient to identify all current and past X accounts under the ownership, control, or operating at the behest of Media Matters for America.

7. Produce all documents related to internal and external communications relating to the article titled "As Musk endorses antisemitic conspiracy theory, X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content" by Eric Hananoki.

8. Produce documents sufficient to identify all of Media Matters for America's owned, controlled, or authorized X accounts that were used to obtain, produce, or otherwise acquire the screenshot images contained in the article titled "As Musk endorses antisemitic conspiracy theory, X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content" by Eric Hananoki.

9. Produce documents sufficient to identify all X accounts, profiles, and members followed by the X accounts identified in response to Demand Number 8, above.

10. Produce all of Media Matters for America's external communications with employees and representatives of X from November 1, 2023 to November 21, 2023.

11. Produce all of Media Matters for America's external communications with Apple Inc., International Business Machine Corporation (IBM), Bravo television network, NBCUniversal, Oracle Corporation, and Comcast Corporation, Lions Gate Entertainment Corporation, Warner Bros Discovery Inc., Paramount Pictures Corporation, and Sony Group Corporation from November 1, 2023 to November 21, 2023.

12. Produce documents sufficient to identify all direct and indirect sources of funding for all Media Matters for America operations involving X research or publications.

# Exhibit B

()

**November 20, 2023 | Press Release**

# Attorney General Ken Paxton Opens Investigation into Media Matters for Potential Fraudulent Activity

The Office of the Attorney General ("OAG") is opening an investigation into Media Matters for potential fraudulent activity. Under the Texas Business Organizations Code and the Deceptive Trade Practices Act, the OAG will vigorously enforce against nonprofits who commit fraudulent acts in or affecting the state of Texas.

Attorney General Paxton was extremely troubled by the allegations that Media Matters, a radical anti-free speech organization, fraudulently manipulated data on X.com (formerly known as Twitter).

"We are examining the issue closely to ensure that the public has not been deceived by the schemes of radical left-wing organizations who would like nothing more than to limit freedom by reducing participation in the public square," said Attorney General Paxton.

Back to Top

# Exhibit C



# Transcript of Recorded Conversation

**Case:** MMFA Litigation

**Planet Depos**
**Phone:** 888-433-3767
**Fax:** 888-503-3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

```
 1

 2

 3

 4

 5

 6

 7                    In re: MMFA Litigation

 8

 9                    RECORDED CONVERSATION

10

11

12

13

14

15

16

17

18

19

20   Job No.:  518338

21   Pages:  1 - 3

22   Transcribed by: Lauren Bishop
```

Transcript of Recorded Conversation

2

1           BENNY JOHNSON: So, this is obviously
2    horrifying. Devastating and comes in concert with
3    Elon Musk dropping and I quote, thermonuclear
4    lawsuit. On Media Matters, though it seems like
5    you're standing with the Missouri Attorney General,
6    do you encourage other republican attorney generals
7    to do this? We're -- we're so thankful that somebody
8    is just standing up and doing something. Where are
9    the rest of the republican AGs? There's got to be 20,
10   30 republican AGs in the country. Why are they so
11   quiet on issues like this?
12           KEN PAXTON: You know, that's a good
13   question. I -- I would -- I would encourage them to
14   look at this. They may have just become aware of it.
15   I mean it's a relatively new issue so hopefully over
16   the next couple weeks, you'll see other attorney
17   generals look at this and -- and I -- I would
18   encourage even democratic attorney generals. I know
19   they probably wont but they should because they
20   should care about free speech as much as we do.
21           (The recording was concluded.)
22

Transcript of Recorded Conversation

3

```
 1                CERTIFICATE OF TRANSCRIBER
 2           I, Lauren Bishop, do hereby certify that
 3    the transcript was prepared from the digital audio
 4    recording of the foregoing proceeding; that said
 5    proceedings were reduced to typewriting under my
 6    supervision; that said transcript is a true and
 7    accurate record of the proceedings to the best of my
 8    knowledge, skills, and ability; and that I am neither
 9    counsel for, related to, nor employed by any of the
10    parties to the case and have no interest, financial
11    or otherwise, in its outcome.
12
13       Lauren Bishop
14    _____
15    LAUREN BISHOP
16    Planet Depos,
17    December 8, 2023
18
19
20
21
22
```

Transcript of Recorded Conversation

4

| A | |
|---|---|
| **ability** | 3:8 |
| **about** | 2:20 |
| **accurate** | 3:7 |
| **ags** | 2:9, 2: 0 |
| **any** | 3:9 |
| **attorney** | 2:5, 2:6, 2: 6, 2: 8 |
| **audio** | 3:3 |
| **aware** | 2: 4 |

| B | |
|---|---|
| **because** | 2: 9 |
| **become** | 2: 4 |
| **benny** | 2: |
| **best** | 3:7 |
| **bishop** | :22, 3:2, 3: 5 |

| C | |
|---|---|
| **care** | 2:20 |
| **case** | 3: 0 |
| **certificate** | 3: |
| **certify** | 3:2 |
| **comes** | 2:2 |
| **concert** | 2:2 |
| **concluded** | 2:2 |
| **conversation** | :9 |

| | |
|---|---|
| **counsel** | 3:9 |
| **country** | 2: 0 |
| **couple** | 2: 6 |

| D | |
|---|---|
| **december** | 3: 7 |
| **democratic** | 2: 8 |
| **depos** | 3: 6 |
| **devastating** | 2:2 |
| **digital** | 3:3 |
| **doing** | 2:8 |
| **dropping** | 2:3 |

| E | |
|---|---|
| **elon** | 2:3 |
| **employed** | 3:9 |
| **encourage** | 2:6, 2: 3, 2: 8 |
| **even** | 2: 8 |

| F | |
|---|---|
| **financial** | 3: 0 |
| **foregoing** | 3:4 |
| **free** | 2:20 |

| G | |
|---|---|
| **general** | 2:5 |
| **generals** | 2:6, 2: 7, 2: 8 |
| **good** | 2: 2 |

| H | |
|---|---|
| **hereby** | 3:2 |
| **hopefully** | 2: 5 |
| **horrifying** | 2:2 |

| I | |
|---|---|
| **interest** | 3: 0 |
| **issue** | 2: 5 |
| **issues** | 2: |
| **it's** | 2: 5 |

| J | |
|---|---|
| **job** | :20 |
| **johnson** | 2: |

| K | |
|---|---|
| **ken** | 2: 2 |
| **know** | 2: 2, 2: 8 |
| **knowledge** | 3:8 |

| L | |
|---|---|
| **lauren** | :22, 3:2, 3: 5 |
| **lawsuit** | 2:4 |
| **litigation** | :7 |
| **look** | 2: 4, 2: 7 |

| M | |
|---|---|
| **matters** | 2:4 |
| **mean** | 2: 5 |

| | |
|---|---|
| **media** | 2:4 |
| **missouri** | 2:5 |
| **mmfa** | :7 |
| **much** | 2:20 |
| **musk** | 2:3 |

| N | |
|---|---|
| **neither** | 3:8 |
| **new** | 2: 5 |
| **next** | 2: 6 |

| O | |
|---|---|
| **obviously** | 2: |
| **other** | 2:6, 2: 6 |
| **otherwise** | 3: |
| **outcome** | 3: |
| **over** | 2: 5 |

| P | |
|---|---|
| **pages** | :2 |
| **parties** | 3: 0 |
| **paxton** | 2: 2 |
| **planet** | 3: 6 |
| **prepared** | 3:3 |
| **probably** | 2: 9 |
| **proceeding** | 3:4 |
| **proceedings** | 3:5, 3:7 |

Transcript of Recorded Conversation

| Q | | supervision | 5 | |
|---|---|---|---|---|
| question | | 3:6 | 518338 | |
| 2: 3 | | **T** | :20 | |
| quiet | | thankful | | |
| 2: | | 2:7 | | |
| quote | | that's | | |
| 2:3 | | 2: 2 | | |
| **R** | | there's | | |
| record | | 2:9 | | |
| 3:7 | | thermonuclear | | |
| recorded | | 2:3 | | |
| :9 | | transcribed | | |
| recording | | :22 | | |
| 2:2 , 3:4 | | transcriber | | |
| reduced | | 3: | | |
| 3:5 | | transcript | | |
| related | | 3:3, 3:6 | | |
| 3:9 | | true | | |
| relatively | | 3:6 | | |
| 2: 5 | | typewriting | | |
| republican | | 3:5 | | |
| 2:6, 2:9, 2: 0 | | **U** | | |
| rest | | under | | |
| 2:9 | | 3:5 | | |
| **S** | | **W** | | |
| said | | weeks | | |
| 3:4, 3:6 | | 2: 6 | | |
| see | | we're | | |
| 2: 6 | | 2:7 | | |
| seems | | wont | | |
| 2:4 | | 2: 9 | | |
| should | | **Y** | | |
| 2: 9, 2:20 | | you'll | | |
| signature-p1kal | | 2: 6 | | |
| 3: 3 | | you're | | |
| skills | | 2:5 | | |
| 3:8 | | **2** | | |
| somebody | | 20 | | |
| 2:7 | | 2:9 | | |
| something | | 2023 | | |
| 2:8 | | 3: 7 | | |
| speech | | **3** | | |
| 2:20 | | 30 | | |
| standing | | 2: 0 | | |
| 2:5, 2:8 | | | | |

# Exhibit D



**Planet Depos**
*We Make It Happen™*

# Transcript of Recorded Conversation

**Case:** MMFA Litigation

**Planet Depos**
**Phone:** 888-433-3767
**Fax:** 888-503-3767
**Email:** transcripts@planetdepos.com
www.planetdepos.com

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

1

2

3

4

5

6

7               In re: MMFA Litigation

8

9               RECORDED CONVERSATION

10

11

12

13

14

15

16

17

18

19

20   Job No.:  517865

21   Pages:  1 - 6

22   Transcribed by: Lauren Bishop

Transcript of Recorded Conversation

```
1            MALE SPEAKER 1: Let's speak with
2    Republican Attorney General of Texas, Ken Paxton.
3    Ken, Attorney General, thank you very much for
4    joining us. What specifically are you looking for in
5    this investigation?
6            KEN PAXTON: We have an obligation. I have
7    four different responsibilities into the Texas
8    Constitution. One of those is to look at any
9    fraudulent activity of a corporation and then we also
10   oversee charitable organizations. So in this case
11   with Media Matters being charitable organization,
12   nonprofit, we have the responsibility to make sure
13   that doing things that are inappropriate for
14   violating state law. We've started off with asking
15   them questions and we're going to ask them questions
16   and whether that leads to anything else will be
17   determined by their actual behavior and what
18   information they turn over.
19           MALE SPEAKER 1: There are already people
20   of course questioning the -- I won't say the
21   jurisdiction, but Texas' involvement given that X
22   formerly known as Twitter, is a California-based
```

Transcript of Recorded Conversation

3

1    corporation. What is the people and the state of

2    Texas' interest in this?

3            KEN PAXTON: Well, look, I mean X operates

4    in Texas. It operates all the world and Media

5    Matters, what they do to X, the information that they

6    -- they provide effects Texas. And so anything that

7    affects Texans, we have an obligation to look at and

8    that's -- that's what we're doing. So, yeah, it

9    doesn't matter whether they're incorporated, but

10   they're doing business and Texas becomes our

11   interest.

12           MALE SPEAKER 1: Well, what -- and it's

13   very complicated and of course, this is TV, so we

14   don't have a lot of time, but as I understand it

15   Attorney General Paxton, what X is alleging and --

16   and by the way Media Matters is denying -- want to

17   make that clear. Is that Media Matters created a lot

18   of fake accounts or a bunch of different accounts

19   followed a bunch of accounts that might be around or

20   involved in hateful content and sort of almost gained

21   the algorithm to force a specific result. They deny

22   it. Let's say they actually did that. Is that illegal

Transcript of Recorded Conversation

1  in any way?

2          KEN PAXTON: Yeah. I mean it can be.

3  Depends on exactly what they did. If it's viewed as

4  fraudulent activity under Texas law, then they can be

5  accountable to the state of Texas for that. I mean,

6  the reality is we're also -- we're in a lawsuit with

7  Twitter. We've been in a lawsuit with them for

8  several years involving kind of this similar

9  information that they might have created fake

10  accounts several years ago that were deceptively

11  providing information to advertisers and consumers

12  about how big their audience is. So we've looked at

13  actually both sides.

14          MALE SPEAKER 1: Yeah. Because there are

15  just regular users that probably have multiple

16  accounts for multiple different -- multiple different

17  reasons. Would this be more of a criminal situation

18  or a civil situation because I can -- I can go from A

19  to Z if -- if the allegations are accurate you're

20  damaging X's business by basically doing this and

21  then writing about it and then spooking advertisers

22  away.

Transcript of Recorded Conversation

```
1              KEN PAXTON: Yeah. So for us we don't have
2    any authority to investigate or do anything
3    criminally unless we're referred that by a local
4    district attorney in Texas. So district attorney in
5    Texas with to do the investigation, refer us to
6    either investigation or prosecution. Until then
7    everything that we're doing is completely civil
8    related to what -- exactly what you're talking about.
9              (The recording was concluded.)
10
11
12
13
14
15
16
17
18
19
20
21
22
```

Transcript of Recorded Conversation

6

```
1              CERTIFICATE OF TRANSCRIBER

2              I, Lauren Bishop, do hereby certify that

3    the transcript was prepared from the digital audio

4    recording of the foregoing proceeding; that said

5    proceedings were reduced to typewriting under my

6    supervision; that said transcript is a true and

7    accurate record of the proceedings to the best of my

8    knowledge, skills, and ability; and that I am neither

9    counsel for, related to, nor employed by any of the

10   parties to the case and have no interest, financial

11   or otherwise, in its outcome.

12         Lauren Bishop

13

14

15   _____

16   LAUREN BISHOP

17   Planet Depos,

18   December 6, 2023

19

20

21

22
```

Transcript of Recorded Conversation

## A

**ability**
6:8
**about**
4: 2, 4:2 , 5:8
**accountable**
4:5
**accounts**
3: 8, 3: 9,
4: 0, 4: 6
**accurate**
4: 9, 6:7
**activity**
2:9, 4:4
**actual**
2: 7
**actually**
3:22, 4: 3
**advertisers**
4:   , 4:2
**affects**
3:7
**ago**
4: 0
**algorithm**
3:2
**all**
3:4
**allegations**
4: 9
**alleging**
3: 5
**almost**
3:20
**already**
2: 9
**also**
2:9, 4:6
**any**
2:8, 4: , 5:2,
6:9
**anything**
2: 6, 3:6, 5:2
**around**
3: 9
**asking**
2: 4

## B

**attorney**
2:2, 2:3, 3: 5,
5:4
**audience**
4: 2
**audio**
6:3
**authority**
5:2
**away**
4:22

### B

**basically**
4:20
**because**
4: 4, 4: 8
**becomes**
3: 0
**been**
4:7
**behavior**
2: 7
**being**
2:
**best**
6:7
**big**
4: 2
**bishop**
 :22, 6:2, 6: 6
**both**
4: 3
**bunch**
3: 8, 3: 9
**business**
3: 0, 4:20

### C

**california-based**
2:22
**case**
2: 0, 6: 0
**certificate**
6:
**certify**
6:2
**charitable**
2: 0, 2:

## civil

**civil**
4: 8, 5:7
**clear**
3: 7
**completely**
5:7
**complicated**
3: 3
**concluded**
5:9
**constitution**
2:8
**consumers**
4:
**content**
3:20
**conversation**
 :9
**corporation**
2:9, 3:
**counsel**
6:9
**course**
2:20, 3: 3
**created**
3: 7, 4:9
**criminal**
4: 7
**criminally**
5:3

### D

**damaging**
4:20
**december**
6: 8
**deceptively**
4: 0
**deny**
3:2
**denying**
3: 6
**depends**
4:3
**depos**
6: 7
**determined**
2: 7

## different

**different**
2:7, 3: 8, 4: 6
**digital**
6:3
**district**
5:4
**doing**
2: 3, 3:8,
3: 0, 4:20, 5:7

### E

**effects**
3:6
**either**
5:6
**else**
2: 6
**employed**
6:9
**everything**
5:7
**exactly**
4:3, 5:8

### F

**fake**
3: 8, 4:9
**financial**
6: 0
**followed**
3: 9
**force**
3:2
**foregoing**
6:4
**formerly**
2:22
**four**
2:7
**fraudulent**
2:9, 4:4

### G

**gained**
3:20
**general**
2:2, 2:3, 3: 5
**given**
2:2

Transcript of Recorded Conversation

**go**
4: 8
**going**
2: 5

### H

**hateful**
3:20
**hereby**
6:2

### I

**illegal**
3:22
**inappropriate**
2: 3
**incorporated**
3:9
**information**
2: 8, 3:5, 4:9,
4:
**interest**
3:2, 3:  , 6: 0
**investigate**
5:2
**investigation**
2:5, 5:5, 5:6
**involved**
3:20
**involvement**
2:2
**involving**
4:8

### J

**job**
 :20
**joining**
2:4
**jurisdiction**
2:2

### K

**ken**
2:2, 2:3, 2:6,
3:3, 4:2, 5:
**kind**
4:8

**knowledge**
6:8
**known**
2:22

### L

**lauren**
 :22, 6:2, 6: 6
**law**
2: 4, 4:4
**lawsuit**
4:6, 4:7
**leads**
2: 6
**let's**
2: , 3:22
**litigation**
 :7
**local**
5:3
**look**
2:8, 3:3, 3:7
**looked**
4: 2
**looking**
2:4
**lot**
3: 4, 3: 7

### M

**make**
2: 2, 3: 7
**male**
2: , 2: 9,
3: 2, 4: 4
**matter**
3:9
**matters**
2:   , 3:5,
3: 6, 3: 7
**mean**
3:3, 4:2, 4:5
**media**
2:  , 3:4,
3: 6, 3: 7
**might**
3: 9, 4:9
**mmfa**
 :7

**more**
4: 7
**much**
2:3
**multiple**
4: 5, 4: 6

### N

**neither**
6:8
**nonprofit**
2: 2

### O

**obligation**
2:6, 3:7
**one**
2:8
**operates**
3:3, 3:4
**organization**
2:
**organizations**
2: 0
**otherwise**
6:
**outcome**
6:
**over**
2: 8
**oversee**
2: 0

### P

**pages**
 :2
**parties**
6: 0
**paxton**
2:2, 2:6, 3:3,
3: 5, 4:2, 5:
**people**
2: 9, 3:
**planet**
6: 7
**prepared**
6:3
**probably**
4: 5

**proceeding**
6:4
**proceedings**
6:5, 6:7
**prosecution**
5:6
**provide**
3:6
**providing**
4:

### Q

**questioning**
2:20
**questions**
2: 5

### R

**reality**
4:6
**reasons**
4: 7
**record**
6:7
**recorded**
 :9
**recording**
5:9, 6:4
**reduced**
6:5
**refer**
5:5
**referred**
5:3
**regular**
4: 5
**related**
5:8, 6:9
**republican**
2:2
**responsibilities**
2:7
**responsibility**
2: 2
**result**
3:2

### S

**said**
6:4, 6:6

Transcript of Recorded Conversation

| | | |
|---|---|---|
| **say**<br>2:20, 3:22<br>**several**<br>4:8, 4: 0<br>**sides**<br>4: 3<br>**signature-p1kal**<br>6: 2<br>**similar**<br>4:8<br>**situation**<br>4: 7, 4: 8<br>**skills**<br>6:8<br>**sort**<br>3:20<br>**speak**<br>2:<br>**speaker**<br>2: , 2: 9,<br>3: 2, 4: 4<br>**specific**<br>3:2<br>**specifically**<br>2:4<br>**spooking**<br>4:2<br>**started**<br>2: 4<br>**state**<br>2: 4, 3: , 4:5<br>**supervision**<br>6:6<br>**sure**<br>2: 2 | **things**<br>2: 3<br>**time**<br>3: 4<br>**transcribed**<br>:22<br>**transcriber**<br>6:<br>**transcript**<br>6:3, 6:6<br>**true**<br>6:6<br>**turn**<br>2: 8<br>**tv**<br>3: 3<br>**twitter**<br>2:22, 4:7<br>**typewriting**<br>6:5 | **we're**<br>4:6<br>**whether**<br>2: 6, 3:9<br>**world**<br>3:4<br>**writing**<br>4:2 |

| **X** |
|---|
| **x's**<br>4:20 |

| **Y** |
|---|
| **yeah**<br>3:8, 4:2, 4: 4,<br>5:<br>**years**<br>4:8, 4: 0 |

| **1** |
|---|
| **1**<br>2: , 2: 9,<br>3: 2, 4: 4 |

| **2** |
|---|
| **2023**<br>6: 8 |

| **5** |
|---|
| **517865**<br>:20 |

| **T** |
|---|
| **talking**<br>5:8<br>**texans**<br>3:7<br>**texas**<br>2:2, 2:7, 3:4,<br>3:6, 3: 0, 4:4,<br>4:5, 5:4, 5:5<br>**texas'**<br>2:2 , 3:2<br>**thank**<br>2:3 |

| **U** |
|---|
| **under**<br>4:4, 6:5<br>**understand**<br>3: 4<br>**unless**<br>5:3<br>**until**<br>5:6<br>**users**<br>4: 5 |

| **V** |
|---|
| **viewed**<br>4:3<br>**violating**<br>2: 4 |

| **W** |
|---|
| **want**<br>3: 6<br>**way**<br>3: 6, 4:<br>**we're**<br>2: 5, 3:8, 5:3,<br>5:7<br>**we've**<br>2: 4, 4:7, 4: 2 |

# Exhibit E

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| EXXON MOBIL CORPORATION, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | No. 4:16-cv-00469-K |
| | ) | |
| MAURA TRACY HEALEY, | ) | |
| Attorney General of Massachusetts, | ) | |
| in her official capacity, | ) | |
| | ) | |
| *Defendant.* | ) | |

**BRIEF OF TEXAS, LOUISIANA, SOUTH CAROLINA, ALABAMA, MICHIGAN, ARIZONA, WISCONSIN, NEBRASKA, OKLAHOMA, UTAH, AND NEVADA AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

# Table of Contents

Interest of *Amici Curiae* And Background ...................................................1

Argument ...................................................................................................2

    I.   Attorneys General should act impartially. ...................................2

        A.  Attorneys General should not employ legal power to tip the scales in a policy debate. .........................................................3

            1.  Targeting critics. .............................................................4

            2.  Abusing subpoena power...................................................5

        B.  Climate change is the subject of legitimate international debate...............................................................................6

    II.  Politicized investigations undermine public confidence.............................9

Conclusion .................................................................................................9

## INTEREST OF *AMICI CURIAE* AND BACKGROUND

Exxon Mobil Corporation (Exxon) is challenging the validity of a Civil Investigative Demand (CID), a state civil administrative subpoena, issued by the Attorney General of Massachusetts (Massachusetts). Massachusetts dispatched the CID to investigate supposed violations of consumer protection laws through Exxon's marketing and sale of fossil fuel-derived products and securities. Exxon is asking the Court to issue an injunction prohibiting Massachusetts from enforcing the CID.

*Amici* possess sovereign authority to investigate violations of law. As chief legal officers, they have long used their power—including the issuance of CIDs—to determine whether unlawful conduct occurred. However, this power does not include the right to engage in unrestrained, investigative excursions to promulgate a social ideology, or chill the expression of points of view, in international policy debates.

The concerns of *Amici* and others regarding Massachusetts's tactics are expressed in a recent open letter.[1] In it, the actions of Massachusetts and others are condemned, as "this effort by our colleagues to police the global warming debate through the power of the subpoena is a grave mistake." The signatories, representing a wide range of viewpoints on climate change, "agree on at least one thing—this is not a question for the courts. Using law enforcement authority to resolve a public policy debate undermines the trust invested in our offices and threatens free speech."[2] As most recognize, "vigorous debate exists in this country regarding the risks of climate change and the appropriate response to those risks. Both sides are well-funded and sophisticated public policy participants. Whatever our country's response,

---

[1] Open Letter from Attorneys General (Luther Strange, Alabama; Bill Schuette, Michigan; Ken Paxton, Texas; Craig Richards, Alaska; Doug Peterson, Nebraska; Sean Reyes, Utah; Mark Brnovich, Arizona; Adam Laxalt, Nevada; Brad Schimel, Wisconsin; Leslie Rutledge, Arkansas; Scott Pruitt, Oklahoma; Jeff Landry, Louisiana; Alan Wilson, South Carolina) dated June 15, 2016, *available online at* http://www.ago.state.al.us/news/852.pdf.

[2] *Id*. at p.1.

it will affect people, communities, and businesses that all have a right to participate in this debate." Thus, attorneys general should "stop policing viewpoints."[3]

*Amici* are concerned about the unconstitutional use of investigative powers. They have an interest in preserving their roles as evenhanded enforcers of the law and, thus, have direct and vital interests in the issues before the Court.

ARGUMENT

Attorneys General have a constitutional duty to act dispassionately in the execution of their office. The Supreme Court has explained that attorneys representing the public do not represent an ordinary party in litigation, but "a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest , . . . is not that it should win a case but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935). This distinctive role of the prosecutor is also expressed the Model Code of Professional Responsibility. MODEL CODE OF PROF'L RESPONSIBILITY EC 7-13 (1982) ("The responsibility of a public prosecutor differs from that of the usual advocate; his duty is to seek justice, not merely to convict."). Massachusetts crossed both legal and ethical lines with its CID.

# I. Attorneys General should act impartially.

Massachusetts's investigation is the product of a cultural movement "committed to aggressively protecting and building upon the recent progress the United States has made in combatting climate change."[4] And the common interest agreement of the powers aligned on this axis of ideology underscores the partiality of their endeavor, as they seek to "limit climate change and ensur[e] the dissemination

---

[3] *Id.*
[4] Press Release, New York State Attorney General, *A.G. Schneiderman, Former Vice President Al Gore And A Coalition Of Attorneys General From Across The Country Announce Historic State-Based Effort To Combat Climate Change* (March 29, 2016) (*available online at* http://www.ag.ny.gov/press-release/ag-schneiderman-former-vice-president-al-gore-and-coalition-attorneys-general-across).

2

of accurate information about climate change." ECF No. 57 at 3.[5] And Defendant acknowledges that the issuance of the CID is part of an "aggressive approach."[6]

While *amici* have authority to conduct investigations regarding consumer protection, fraud, and deceptive trade practices, these investigations must be supported by a "reasonable belief" that there has been, or is about to be, unlawful false, misleading, or deceptive acts or practices in the conduct of any trade or commerce. *See*, *e.g.*, Tex. Bus. & Com. Code §§ 17.46, 17.47, 17.60, 17.61. And while the government's power "to protect people against fraud" has "always been recognized in this country and is firmly established," *Donaldson v. Read Magazine, Inc.*, 333 U.S. 178, 190 (1948), "[s]imply labeling an action one for 'fraud,' of course, will not carry the day," *Illinois ex rel. Madigan v. Telemarketing Assocs.*, 538 U.S. 600, 617 (2003).

## A. Attorneys General should not employ legal power to tip the scales in a policy debate.

The authority attorneys general have to investigate fraud does not allow them to encroach on the constitutional freedom of others to engage in an ongoing public policy debate of international importance. Thus, government action that restricts or chills speech because of the message embodied within that speech contravenes the First Amendment. Indeed, "there is practically universal agreement that a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs." *Mills v. Alabama*, 384 U.S. 214, 218 (1966). The First Amendment generally prevents government from proscribing speech, *see*, *e.g.*, *Cantwell v. Connecticut*, 310 U.S. 296, 309–311 (1940), or even expressive conduct, *see*, *e.g.*, *Texas v. Johnson*, 491

---

[5] This ideology was on full display at the March 29, 2016 press conference of the so-called "AG's United for Clean Power," characterized as "the beginning of the end of our addiction to fossil fuel and the degradation of our planet." Attorney General Schneiderman, Press Conference, AGs United for Clean Power (March 29, 2016) (confirming subpoena to ExxonMobil) (*video available online at* http://www.ag.ny.gov/press-release/ag-schneiderman-former-vice-president-al-gore-and-coalition-at-torneys-general-across). Former Vice President Al Gore alleged that commercial interests (such as the Plaintiff) are "committing fraud in their communications . . . ." *Id.*

[6] *Id.*

3

U.S. 397, 406 (1989), for the mere disapproval of the ideas expressed. Here, the chilling effect of Massachusetts's CID should be of concern since the "loss of First Amendment freedoms for even minimal periods of time constitutes irreparable injury . . . ." *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. Unit B Nov. 1981) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

The heart of viewpoint discrimination is the government preferring one message to another. But "[t]he First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others." *Members of the City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984); *see also Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995); *Cornelius v. NAACP*, 473 U.S. 788, 806 (1985). Viewpoint discrimination occurs when "the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *McGuire v. Reilly*, 386 F.3d 45, 62 (1st Cir. 2004).

While Massachusetts claims an interest in consumer protection as the basis for its CID, the Supreme Court has been clear that proffering what may be on its face "reasonable grounds" for the action does "not save a regulation that is in reality a facade for viewpoint-based discrimination." *Cornelius*, 473 U.S. at 811.

### 1. Targeting critics.

The First Amendment is concerned with "the inherent risk that the Government seeks not to advance a legitimate regulatory goal, but to suppress unpopular ideas." *Hill v. Colorado*, 530 U.S. 703, 719 (2000). Thus, it stands as a bulwark against Government action designed to suppress ideas or information, or to manipulate the public debate through coercion rather than persuasion. *See Palmer ex rel. Palmer v. Waxahachie Indep. Sch. Dist.*, 579 F.3d 502, 510 (5th Cir. 2009).

Using CIDs to suppress policy debates is like imposing prior restraints on speech. Governmentally imposed prior restraints on speech are tantamount to censorship. *See Near v. Minnesota*, 283 U.S. 697, 713, (1931); *cf. Fernandes v.*

*Limmer*, 663 F.2d 619, 632 (5th Cir. Unit A Dec. 1981). Massachusetts labeling its so-called investigation (into an unsettled area of science and public policy) as related to "fraud" certainly "raise[s] the specter that the Government may effectively drive certain ideas or viewpoints from the marketplace." *Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116 (1991).

But if our society refuses to tolerate *both* the proponents and critics of ideas vying for acceptance, then the marketplace of ideas becomes a mere oligarchy of consumption. As Justice Holmes put it:

> But when men have realized that time has upset many fighting faiths, they may come to believe even more than they believe the very foundations of their own conduct that the ultimate good desired is better reached by free trade in ideas—that the best test of truth is the power of the thought to get itself accepted in the competition of the market, and that truth is the only ground upon which their wishes safely can be carried out.

*Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting).

## 2. Abusing subpoena power.

The Fourth Amendment limits the scope of administrative subpoenas. *See Okla. Press Publ'g Co. v. Walling*, 327 U.S. 186, 208–11 (1946). Where subpoenaed materials may be protected by the First Amendment, the requirements of the Fourth Amendment are applied with "scrupulous exactitude." *Stanford v. Texas,* 379 U.S. 476, 485 (1965). As such, so-called "fishing expeditions," like this one, are proscribed and "[i]t is contrary to the first principles of justice to allow a search through all the respondents' records, relevant or irrelevant, in the hope that something will turn up." *Fed. Trade Comm'n v. Am. Tobacco Co.*, 264 U.S. 298, 306 (1924).

Massachusetts's abuse of its subpoena power runs afoul of the First Amendment. *See, e.g., AFL-CIO v. FEC*, 333 F.3d 168, 175 (D.C. Cir. 2003) (citing *Buckley v. Valeo*, 424 U.S. 1, 64–68 (1976) (disclosure of campaign contributions); *NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449, 462–63 (1958) (disclosure of

membership lists)). A First Amendment privilege against disclosures exists where such "will result in (1) harassment, membership withdrawal, or discouragement of new members, or (2) other consequences which objectively suggest an impact on, or 'chilling' of, the members' associational rights." *Perry v. Schwarzenegger*, 591 F.3d 1147, 1160 (9th Cir. 2009) (quotation omitted).

For example, subpoenas seeking investigative notes as well as the names of contacts have been held to be an invalid chilling of the free exercise of political speech and association under the First Amendment. *See Lacey v. Maricopa Cnty.*, 693 F.3d 896, 917 (9th Cir. 2012) (finding "invalid" under First Amendment "subpoenas demanding that [a] paper . . . disclose its reporters' notes and reveal information about anyone who visited the New Times's [sic] website" because subpoenas would "chill speech"); *see also Pebble Ltd. P'ship v. EPA*, 310 F.R.D. 575, 582 (D. Alaska 2015) (subpoenas are invalid when they have "the tendency to chill the free exercise of political speech and association which is protected by the First Amendment").

These protections afforded by the Constitution protect us and our freedom to engage in open and candid discussions about significant issues. But the mere existence of those very discussions is threatened by the chill of subpoenas, like Massachusetts's CID, hanging in the air. Thus, not only is Massachusetts attempting to silence Exxon through the issuance and threat of compelling a response to the CID, this very action harms everyone, stifling consumers and those seeking information in order to evaluate various viewpoints in this public policy debate.

## B.  Climate change is the subject of legitimate international debate.

Massachusetts presumes that the scientific debate regarding climate change is somehow settled, along with the related and equally important public policy debate on how to respond to what science has found. Yet, neither is true. The clearest and most undeniable fact about climate change is that, like so many other areas of science and public policy, the debate is unsettled, the research far from complete, and the

path forward unclear. *Amici* agree that "[s]cientists continue to disagree about the degree and extent of global warming and its connection to the actions of mankind,"[7] as do many others. Moreover, science does not teach the obvious public policy response to its data and findings, it merely provides a starting point.

Modern science helps us better understand our world. It constantly subjects to scrutiny various hypotheses against objective data. *See, e.g., Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593 (1993). However, because it is almost never possible for all relevant data to be marshaled, scientific proclamations are always subject to change because of new data, enhanced measurements, or other unforeseen factors. *Cf.* Karl Popper, The Logic of Scientific Discovery 44, 47 (1959). Thus, "[s]cientific controversies must be settled by the methods of science rather than by the methods of litigation." *Underwager v. Salter*, 22 F.3d 730, 736 (7th Cir. 1994)

Accordingly, the intersection of science, law, and public policy should be approached with caution and objectivity. Unfortunate results take root when government invests itself in only one side of a scientific debate since "bad ideas can persist in science for decades, and surrounded by myrmidons of furious defenders they can turn into intolerant dogmas."[8] Unfortunately,

---

[7] Scott Pruitt and Luther Strange, *The Climate-Change Gang*, National Review (May 17, 2016), *available online at* http://www.national review.com/article/435470/climate-change-attorneys-general-overstepping-their-authority.

[8] Matt Ridley, *The Climate Wars and the Damage to Science,* GWPF Essay 3 at p.3 (Global Warming Policy Foundation 2015), *available online at* http://www.thegwpf.com/content/uploads/2015/11/climate-wars.pdf. In addition to being former Science Editor of the Economist, "Matt Ridley is one of the world's foremost science writers. His books have sold over a million copies and been translated into 30 languages. His new book The Evolution of Everything was published in 2015. He is a member of the [Global Warming Policy Foundation]'s Academic Advisory Council. As a landowner, he receives a way-leave income from a coal-mining company." In the words of Ridley,

I am not a full sceptic of climate change, let alone a 'denier'. I think carbon-dioxide induced warming during this century is likely, though I think it is unlikely to prove rapid and dangerous. So I don't agree with those who say the warming is all natural, or all driven by the sun, or only an artefact of bad measurement, but nor do I think anything excuses bad scientific practice in support of the carbon dioxide theory, and every time one of these scandals erupts and the scientific establishment asks us to ignore it, I wonder if the extreme sceptics are not

[t]his is precisely what has happened with the climate debate and it is at risk of damaging the whole reputation of science. The 'bad idea' in this case is not that climate changes, nor that human beings influence climate change; but that the impending change is sufficiently dangerous to require urgent policy responses. In the 1970s, when global temperatures were cooling, some scientists could not resist the lure of press attention by arguing that a new ice age was imminent. Others called this nonsense and the World Meteorological Organization rightly refused to endorse the alarm. That's science working as it should. In the 1980s, as temperatures began to rise again, some of the same scientists dusted off the greenhouse effect and began to argue that runaway warming was now likely. At first, the science establishment reacted skeptically and a diversity of views was aired. It's hard to recall now just how much you were allowed to question the claims in those days.[9]

Even the premise that "97% of all climate scientists agree on climate change" is argued by Ridley to be pseudo-science. The self-serving conclusion that "97% of all climate scientists agree on climate change" is derived from a poll involving only seventy-nine scientists[10]—hardly a statistically-relevant sample. Moreover, of those seventy-nine scientists, 97% believe that climate change is man-made—not that it was dangerous.[11] "A more recent poll of 1854 members of the American Meteorological Society found the true number is 52 per cent."[12] Indeed,

there has been a systematic and thorough campaign to rule out the middle ground as heretical: not just wrong, but mistaken, immoral and beyond the pale. That's what the word 'denier', with its deliberate connotations of Holocaust denial, is intended to do. For reasons I do not fully understand, journalists have been shamefully happy to go along with this fundamentally religious project. Politicians love this polarizing because it means they can attack a straw man.[13]

---

on to something. I feel genuinely betrayed by the profession that I have spent so much of my career championing.
*Id*. at p.10.
[9] *Id*. at p.4.
[10] *Id*. at p.7.
[11] *Id*.
[12] *Id*.
[13] *Id*. at p.6.

## II. Politicized investigations undermine public confidence.

The transcript of the press conference of the "AG's United for Clean Power" demonstrates that Massachusetts commenced its investigation precisely for the reasons the First Amendment forbids.[14] "It is one thing to use the legal system to pursue public policy outcomes; but it is quite another to use prosecutorial weapons to intimidate critics, silence free speech, or chill the robust exchange of ideas."[15]

Allowing government law enforcement officials to violate constitutional rights is to "violate the sacred trust of the people . . . ." *United States v. Costa*, 356 F. Supp. 606, 609 (D.D.C. 1973). It undermines "the right of the people to be secure in their persons, houses, papers and effects, and would obliterate one of the most fundamental distinctions between our form of government, where officers are *under* the law, and the police-state where they *are* the law." *Johnson v. United States*, 333 U.S. 10, 17 (1948) (emphasis added).

Regrettably, history is embroiled with examples where the legitimate exercise of law enforcement is soiled with political ends rather than legal ones. Massachusetts seeks to repeats that unfortunate history. That the statements and workings of the "AG's United for Clean Power" are entirely one-sided, and target only certain participants in the climate change debate, speaks loudly enough.[16]

### Conclusion

*Amici* aver that the Court should grant Exxon's motion for preliminary relief.

---

[14] *See* n.5, *supra*.

[15] Press Release, Louisiana Department of Justice, Attorney General Jeff Landry Slams Al Gore's Coalition (Mar. 30, 2016) (*available online at* https://www.ag.state.la.us/Article/2207/5).

[16] "[T]his fraud investigation targets only 'fossil fuel companies' and only statements minimizing climate change risks. If it is possible to minimize the risks of climate change, then the same goes for exaggeration. If minimization is fraud, exaggeration is fraud." *See* n.1, *supra*, at p.2. It is also worth noting that "[e]leven of the 17 attorneys general who participated [in the "AG's United for Clean Power" press conference] are the same folks who took part in the 2010 sue-and-settle lawsuit that used federal courts to try to force the adoption of the federal energy regulations that became the EPA's 'Power Plan.'" Michael Batasch, *Kansas AG takes on Al Gore's Alarmism – Won't Join Anti-Exxon "Publicity Stunt,"* The Daily Caller (Apr. 4, 2016), *available online at* http://dailycaller.com/2016/04/04/kansas-ag-takes-on-al-gores-alarmism-wont-join-ant-exxon-publicity-stunt.

Respectfully submitted this the 8th day of September, 2016,

JEFF LANDRY
Attorney General of Louisiana

ALAN WILSON
Attorney General of South Carolina

LUTHER STRANGE
Attorney General of Alabama

BILL SCHUETTE
Attorney General of Michigan

MARK BRNOVICH
Attorney General of Arizona

BRAD SCHIMEL
Attorney General of Wisconsin

DOUG PETERSON
Attorney General of Nebraska

SCOTT PRUITT
Attorney General of Oklahoma

SEAN REYES
Attorney General of Utah

ADAM LAXALT
Attorney General of Nevada

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

BRANTLEY STARR
Deputy First Assistant Attorney General

PRERAK SHAH
Senior Counsel to the Attorney General

*/s/ Andrew D. Leonie*
ANDREW D. LEONIE
Associate Deputy Attorney General for the
Office of Special Litigation
Andrew.Leonie@texasattorneygeneral.gov

AUSTIN R. NIMOCKS
Associate Deputy Attorney General for the
Office of Special Litigation
Austin.Nimocks@texasattorneygeneral.gov

MICHAEL TOTH
Senior Counsel for the Office of Special
Litigation

Office of Special Litigation
Texas Attorney General's Office
P.O. Box 12548, Mail Code 009
Austin, Texas 78711-2548
Tel: 512-936-1414
Fax: 512-936-0545

*ATTORNEYS FOR AMICI CURIAE*

10

## CERTIFICATE OF SERVICE

I hereby certify that on the 8th day of September 2016, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which I understand to have caused service on all counsel of record.

*/s/ Andrew D. Leonie III*
Andrew D. Leonie III
SBOT No. 12216500

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| MEDIA MATTERS FOR AMERICA, *et al.*, | |
| Plaintiffs, | CIV. NO. 23-3363 |
| v. | |
| WARREN KENNETH PAXTON JR., in his official capacity as Attorney General of the State of Texas, | |
| Defendant. | |

## [PROPOSED] TEMPORARY RESTRAINING ORDER

On December 11, 2023, Plaintiffs Media Matters for America ("Media Matters") and Eric Hananoki filed a motion for a temporary restraining order and preliminary injunction. After considering the arguments and papers submitted, the Court **GRANTS** the motion and enters the following Temporary Restraining Order:

**ORDERED** that Warren Kenneth Paxton, Jr., Attorney General of the State of Texas, together with his agents, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of the injunction (collectively "Defendant Paxton"), is enjoined from enforcing the Civil Investigative Demand served by Attorney General Paxton to Media Matters on December 1, 2023;

**ORDERED** that Defendant Paxton is enjoined from further subjecting Plaintiffs to any legal process in Texas, including but not limited to any proceeding intended to enforce the December 1, 2023 Civil Investigative Demand, arising from Plaintiffs' research and reporting on the social media platform known as X and on Elon Musk;

**ORDERED** that Defendant Paxton is enjoined from further investigating Plaintiffs in retaliation for their research and reporting on the social media platform X and Elon Musk;

This order and all supporting pleadings and opposing papers must be served on the adverse party within ___ days.

Defendant is **FURTHERED ORDERED** to show cause on _____, at _____ before this Court as to why a preliminary injunction to the same effect should not issue.

This order shall remain in effect until _____.

**IT IS SO ORDERED.**

Dated: _____

_____
United States District Judge,
District of Maryland

2

## CERTIFICATE OF SERVICE

I hereby certify that this document will be served on the Defendant in accordance with Fed.

R. Civ. P. 5(a).


Dated: December 11, 2023                    Respectfully submitted,
                                           */s/ Tina Meng Morrison*

                                           **ELIAS LAW GROUP LLP**
                                           Abha Khanna*
                                           1700 Seventh Ave. Suite 2100
                                           Seattle, WA 98101
                                           T: (206) 656-0177
                                           akhanna@elias.law

                                           Tina Meng Morrison (D. Md. Bar No. 21832)
                                           Aria C. Branch*
                                           Christopher D. Dodge*
                                           Jacob D. Shelly**
                                           Elena A. Rodriguez Armenta*
                                           Daniela Lorenzo*
                                           Omeed Alerasool*
                                           250 Massachusetts Ave. NW, Suite 400
                                           Washington, DC 20001
                                           T: (202) 968-4652
                                           tmengmorrison@elias.law
                                           abranch@elias.law
                                           cdodge@elias.law
                                           jshelly@elias.law
                                           erodriguezarmenta@elias.law
                                           dlorenzo@elias.law
                                           oalerasool@elias.law

**GIBSON, DUNN & CRUTCHER LLP**
Theodore J. Boutrous, Jr.*
Jay P. Srinivasan*
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: (213) 229-7000
Email: tboutrous@gibsondunn.com
Email: jsrinivasan@gibsondunn.com

Amer S. Ahmed*
Anne Champion*
200 Park Avenue
New York, New York 10166
Telephone: (212) 351-4000
Email: aahmed@gibsondunn.com
Email: achampion@gibsondunn.com

*Pro hac vice* application forthcoming
**Application for admission pending

*Counsel for Plaintiffs Media Matters for America and Eric Hananoki*

4

# Exhibit G

EJ 381 973 991 US

**UNITED STATES POSTAL SERVICE.**

NATIONAL CAPITOL
2 MASSACHUSETTS AVE NE
WASHINGTON, DC 20002-9997
(800)275-8777

12/13/2023                                    03:34 PM

---

| Product | Qty | Unit Price | Price |
|---------|-----|-----------|-------|
| PM Express 1-Day | 1 | | $28.95 |

Legal Env
Austin, TX 78711
Flat Rate
Signature Waiver
Scheduled Delivery Date
Thu 12/14/2023 06:00 PM
Money Back Guarantee
Tracking #:
EJ381973991US
Insurance                                     $0.00
Up to $100.00 included
Total                                        $28.95

---

Grand Total:                                 $28.95

---

Credit Card Remit                            $28.95
Card Name: AMEX
Account #: XXXXXXXXXXXX2004
Approval #: 828387
Transaction #: 192
AID: A000000025010801 Contactless
AL: AMERICAN EXPRESS
PIN: Not Required

---

In a hurry? Self-service kiosks offer
quick and easy check-out. Any Retail
Associate can show you how.

Save this receipt as evidence of
insurance. For information on filing an
insurance claim go to
https://www.usps.com/help/claims.htm
or call 1-800-222-1811

Text your tracking number to 28777 (2USPS)
to get the latest status. Standard Message
and Data rates may apply. You may also
visit www.usps.com USPS Tracking or call
1-800-222-1811.

Preview your Mail
Track your Packages
Sign up for FREE @
https://informeddelivery.usps.com

All sales final on stamps and postage.
Refunds for guaranteed services only.
Thank you for your business.

Tell us about your experience.
Go to: https://postalexperience.com/Pos
or scan this code with your mobile device,

