# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| MEDIA MATTERS FOR AMERICA, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>WARREN KENNETH PAXTON JR., in his official capacity as Attorney General of the State of Texas,<br><br>Defendant. | CIV. NO. 23-cv-3363 |

## DEFENDANT'S OPPOSITION TO PLAINTIFFS' RENEWED MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 3

    A.   Texas's DTPA and Defendant's CID Authority ............................................. 3

    B.   Factual Background ....................................................................................... 4

STANDARD OF REVIEW ................................................................................................. 10

ARGUMENT ...................................................................................................................... 11

    I.      Media Matters has not Suffered Justiciable Injury. .................................. 11

    II.     The Court Lacks Personal Jurisdiction over the Texas Attorney General................. 14

         A.   Defendant is not subject to general jurisdiction............................... 15

         B.   Defendant is not subject to specific jurisdiction. ............................. 15

    III.   Venue in Maryland is Improper. ............................................................... 17

    IV.   Media Matters has not Shown a First Amendment Violation.................... 19

    V.    Media Matters Could Have Avoided Any Harm, and its Litigation Conduct is Inequitable........................................................................................... 20

CONCLUSION.................................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**                                                                   **Page(s)**

*Abbott v. Pastides,*
900 F.3d 160 (4th Cir. 2018) ...................................................................... 13

*ALS Scan, Inc. v. Digital Serv. Consultants, Inc.,*
293 F.3d 707 (4th Cir. 2002) ...................................................................... 15

*Barth v. District of Columbia,*
No. 92-7093, 1993 WL 523999 (D.C. Cir. Dec. 14, 1993) ....................................... 24

*Bates v. C&S Adjusters, Inc.,*
980 F.2d 865 (2d Cir. 1992) ...................................................................... 18

*Belle Fourche Pipeline Co. v. United States,*
751 F.2d 332 (10th Cir. 1984) ............................................................... 11, 23

*Benisek v. Lamone,*
138 S. Ct. 1942 (2018) ...................................................................... 10, 11

*Borowski v. DePuy, Inc.,*
850 F.2d 297 (7th Cir. 1988) ...................................................................... 23

*Bulkley Assocs. v. Dep't of Industrial Relations,*
1 F.4th 346 (5th Cir. 2021) ...................................................................... 18

*Calder v. Jones,*
465 U.S. 783 (1984) ......................................................................... 15, 16

*Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs.,*
334 F.3d 390, (4th Cir. 2003) ...................................................................... 14

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013) ...................................................................... 13

*Cooksey v. Futrell,*
721 F.3d 226 (4th Cir. 2013) ...................................................................... 13

*Di Biase v. SPX Corp.,*
872 F.3d 224 (4th Cir. 2017) ...................................................................... 11

*Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.,*
141 S. Ct. 1017 (2021) ...................................................................... 16

*Golden Eagle Distrib. Corp. v. Burroughs Corp.,*
801 F.2d 1531 (9th Cir. 1986) ...................................................................... 23

*Google, Inc. v. Hood,*
822 F.3d 212 (5th Cir. 2016) ............................................................ 12, 21, 23

*Helicopteros Nacionales de Colombia v. Hall*,
    466 U.S. 408 (1984) ................................................................................................ 15

*Ins. Co. of N. Am. v. Marina Salina Cruz*,
    649 F.2d 1266 (9th Cir. 1981) ................................................................................ 17

*Jorgenson v. Volusia Cnty.*,
    846 F.2d 1350 (11th Cir. 1988) .............................................................................. 24

*Laird v. Tatum*,
    408 U.S. 1, 11 (1972) ............................................................................................. 13

*Leroy v. Great Western United Corp.*,
    443 U.S. 173 (1979) ......................................................................................... 17, 18

*Letren v. Trans Union, LLC*,
    No. 15-3361-PX, 2017 WL 4098743 (D. Md. Sept. 15, 2017) ........................ 21, 25

*Lewis v. Younger*,
    653 F.2d 1258 (9th Cir. 1980) ......................................................................... 12, 23

*Maages Auditorium v. Prince George's Cnty.*,
    4 F. Supp. 3d 752 (D. Md. 2014) ........................................................................... 11

*Matthews v. Freedman*,
    128 F.R.D. 194 (E.D. Pa. 1989) ............................................................................. 23

*Mazurek v. Armstrong*,
    520 U.S. 968 (1997) ............................................................................................... 10

*Music Makers Holdings v. Sarro*,
    No. 09cv1836-RWT, 2010 WL 2807805 (D. Md. July 15, 2010) .......................... 18

*PPG Indus., Inc. v. JMB/Hous. Ctrs. Partners Ltd. P'ship*,
    146 S.W.3d 79 (Tex. 2004) ...................................................................................... 4

*Reisman v. Caplin*,
    375 U.S. 440 (1964) ........................................................................... 11, 21, 23, 24

*Reps. Comm. for Freedom of Press v. AT&T*,
    593 F.2d 1030 (D.C. Cir. 1978) .................................................................. 1, 12, 23

*RNC v. Pelosi*,
    602 F. Supp. 3d 1 (D.D.C. 2022) .......................................................................... 21

*Safari Club Int'l v. Salazar*,
    852 F. Supp. 2d 102 (D.D.C. 2012) ...................................................................... 20

*Sahyers v. Prugh, Holliday & Karatinos, P.L.*,
    560 F.3d 1241 (11th Cir. 2009) .............................................................................. 24

*Scotts Co. v. United Indus. Corp.*,
    315 F.3d 264 (4th Cir. 2002) ................................................................................. 19

*Stover v. O'Connell Assocs., Inc.*,
   84 F.3d 132 (4th Cir. 1996) ................................................................. 2, 15

*Stroman Realty v. Wercinski*,
   513 F.3d 476 (5th Cir. 2008) ................................................................. 17

*Thompson v. Nat'l Football League*,
   No. 1:13-CV-00367, 2014 WL 1646929 (W.D. Pa. Apr. 24, 2014) ....................... 18

*Twitter, Inc. v. Paxton*,
   56 F.4th 1170 (9th Cir. 2022) ....................................... 2, 12, 13, 14, 21, 23

*United States v. Kulukundis*,
   329 F.2d 197 (2d Cir. 1964) ................................................................. 12

*Universal Leather v. Koro AR*,
   773 F.3d 553 (4th Cir. 2014) ................................................................. 14

*Vitkus v. Blinken*,
   79 F.4th 352 (4th Cir. 2023) ................................................................. 11

*Walden v. Fiore*,
   571 U.S. 277 (2014). ................................................................. 2, 16

*White v. Lee*,
   227 F.3d 1214 (9th Cir. 2000) ................................................................. 14

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ................................................................. 10

*Young v. New Haven Advoc.*,
   315 F.3d 256 (4th Cir. 2002) ................................................................. 16

*Zazzali v. Swenson*,
   852 F. Supp. 2d 438 (D. Del. 2012) ................................................................. 18

**Statutes**

28 U.S.C. § 1391 ................................................................. 17

Tex. Bus. & Com. Code § 17.44 ................................................................. 4

Tex. Bus. & Com. Code § 17.46 ................................................................. 1, 3, 4

Tex. Bus. & Com. Code § 17.60 ................................................................. 22

Tex. Bus. & Com. Code § 17.61 ................................................................. 4, 7, 12, 20, 23

Tex. Bus. & Com. Code § 17.62 ................................................................. 4

Tex. Bus. & Com. Code ch. 17, subch. E ................................................................. 3

**Rules**

Fed. R. Civ. P. 11(c) ............................................................................................... 3

Local Rule 101.1.b. ............................................................................................... 24

**Other Authorities**

Compl.,
*X Corp. v. Media Matters*,
No. 4:23-cv-01175 (N.D. Tex.), ECF No. 1 ............................................ 6, 7, 8, 9, 18

Matt Gertz,
*It's the antisemitism, stupid*, Media Matters (Nov. 17, 2023)................................... 5

Eric Hananoki,
*As Musk endorses antisemitic conspiracy theory, X has been placing ads
for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content*,
Media Matters (Nov. 16, 2023, updated Nov. 17, 2023) ....................................... 4, 5

Order,
*Texas All. for Retired Ams. v. Hughs*,
28 F. 4th 669 (5th Cir. 2022) (No. 20-40643), ECF No. 101................................... 22

X Safety,
*Stand with X to protect free speech,* X Blog (Nov. 18, 2023)................................. 5, 6

## INTRODUCTION

In seeking to have a federal court enjoin an ongoing State investigation, the motion by Plaintiff Media Matters for America (Media Matters) is as meritless as it is extraordinary. On November 18, 2023, it came to light that Media Matters had arguably made false and misleading statements about the inner workings of X Corp. (f/k/a Twitter). Texas's Deceptive Trade Practices Act (DTPA) makes it unlawful to "disparag[e] the . . . services[] or business of another by false or misleading representation of facts." Tex. Bus. & Com. Code § 17.46(b)(8). Accordingly, on November 20, Defendant Ken Paxton, in his capacity as Texas's Attorney General, initiated an investigation. To date, Defendant has not reached a conclusion about whether Media Matters violated the law. It is possible that Media Matters' conduct was not false or misleading, or that its conduct otherwise did not sufficiently affect trade or commerce in Texas to come within the scope of the DTPA. But that is precisely why the Attorney General launched an *investigation*—to find out.

Media Matters asks this Court to enter extraordinary and unprecedented relief to short-circuit that investigation under the premise that the investigation harms its First Amendment rights. That is not something federal courts do. "[A]ny person can establish the existence of a First Amendment right and of an investigative technique that could possibly be employed in bad faith so as to violate that right." *Reps. Comm. for Freedom of Press v. AT&T*, 593 F.2d 1030, 1070 (D.C. Cir. 1978) (Op. of Wilkey, J.). If this sufficed for a preliminary injunction, it would have "no logical stopping-point." *Id.* And for three threshold reasons, Media Matters' attempt to obtain this unprecedented relief fails.

*First*, ripeness. Defendant's announcement of the investigation and issuance of a Civil Investigative Demand (CID) do not cognizably injure Media Matters. That is crystal clear under a

host of precedent, including binding Supreme Court precedent. And it is ***especially*** clear because the only Circuit court to address this Defendant's specific CID authority concluded that a party does not suffer a cognizable injury, including any form of chilled speech, merely by virtue of receiving said CID. *Twitter, Inc. v. Paxton*, 56 F.4th 1170, 1179 (9th Cir. 2022). That is because, among other things, the "CID is not self-enforcing." *Id.* at 1176. Media Matters suffers no automatic penalties if it ignores the CID. Instead, for the Attorney General to enforce the CID, he would have to sue in Texas State Court, where Media Matters would have the right to assert a First Amendment defense, or any other arguments. *Id.* Media Matters conspicuously failed to even cite this authority in its Renewed Motion for Temporary Restraining Order and Preliminary Injunction (the Renewed Motion).

*Second*, personal jurisdiction. The Texas Attorney General and his investigation have **zero** cognizable contacts with Maryland. The CID was issued to Media Matters in the District of Columbia. *See, e.g.*, Declaration of Christopher D. Dodge ("Dodge Decl."), Ex. A (ECF No. 20-5). Although Plaintiff Eric Hananoki allegedly resides in Maryland, he was not the recipient of the CID. Nor is he the subject of the Attorney General's investigation. Nor can the CID be enforced against him. And regardless, for personal jurisdiction to exist, "the plaintiff cannot be the only link between the defendant and the forum." *Walden v. Fiore*, 571 U.S. 277, 285 (2014). Indeed, binding precedent confirms that even far greater contacts with this State do not suffice for personal jurisdiction. *See, e.g.*, *Stover v. O'Connell Assocs., Inc.*, 84 F.3d 132, 134 (4th Cir. 1996) (holding no personal jurisdiction over "New York private investigation firm" who retained "Maryland investigation companies to provide it with information about Maryland subjects, including the plaintiff in this case").

*Third*, venue. Contrary to Media Matters' assertion, it is untrue that "a substantial part of the events giving rise to Plaintiffs' claims occurred in the District of Maryland," *contra* Compl. ¶ 13. Even by Media Matters' telling, the overwhelming share of events giving rise to the investigation involve Media Matters' potentially false or misleading disparagement of X.com. *See, e.g.*, Renewed Motion at 3-8. And those allegations are the subject of X Corp.'s lawsuit against Media Matters in the Northern District of Texas. To the extent this case is justiciable in any federal court, it belongs in that court with that related case.

As explained in further detail below, moreover, Media Matters' merits arguments are all premature. And Media Matters also is not entitled to relief because it has acted inequitably in multiple respects. It has misled the Court about whether it was chilled by Defendant's investigation, violated its duty of candor to the Court about various other aspects of this matter, and engaged in flagrantly un-collegial litigation conduct. *See infra* at 20-25; *cf.* Fed. R. Civ. P. 11(c).

Media Matters' Renewed Motion should be denied.

## BACKGROUND

### A.    Texas's DTPA and Defendant's CID Authority

Like many States, Texas has adopted a modified version of the Uniform Unfair and Deceptive Trade Practices Act. *See* Tex. Bus. & Com. Code ch. 17, subch. E. In Texas, the Deceptive Trade Practices Act (DTPA) protects consumers by prohibiting "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce." *Id.* § 17.46(a). Deceptive trade practices are defined broadly to include, among other things, "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have," *id.* § 17.46(b)(5); inducing consumers to enter transactions by "failing to

disclose information concerning goods or services which was known at the time of the transaction," *id.* § 17.46(b)(24); and, as particularly relevant here, "disparaging the goods, services, or business of another by false or misleading representation of facts," *id.* § 17.46(b)(8). By statute, these categories "shall be liberally construed." *Id.* § 17.44(a).

The DTPA also authorizes a number of enforcement mechanisms. *See PPG Indus., Inc. v. JMB/Hous. Ctrs. Partners Ltd. P'ship*, 146 S.W.3d 79, 84-85 (Tex. 2004). As relevant here, the statute authorizes Defendant's Consumer Protection Division to issue a CID if the "division believes that any person may be in possession, custody, or control" of "material relevant to the subject matter of an investigation of a possible violation of this subchapter." Tex. Bus. & Com. Code § 17.61(a). If the recipient chooses to provide documents, those documents generally may not be shared outside the Office of the Attorney General (OAG) except by consent or court order. *Id.* § 17.61(f). If the recipient objects to the CID, that recipient may affirmatively challenge it in Texas state court, *id.* § 17.61(g); or it may wait to see if the Attorney General chooses to bring an enforcement action (where the recipient may raise any defenses), *see id.* § 17.62(b). So long as the recipient of a CID does not seek to destroy documents, he will not face any penalty for declining to provide documents based on a good-faith objection to that CID. *Id.* §§ 17.61(g), 17.62(a), (c).

### B.     Factual Background

On November 16, 2023, Media Matters published a document titled "*As Musk endorses antisemitic conspiracy theory, X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content*."[1] This document made a number of serious and economically harmful

---

[1] Eric Hananoki, *As Musk endorses antisemitic conspiracy theory, X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content*, Media Matters (Nov. 16, 2023, updated Nov. 17, 2023), https://www.mediamatters.org/twitter/musk-endorses-antisemitic-conspiracy-theory-x-has-been-placing-ads-apple-bravo-ibm-oracle.

Media Matters claims (at 2) that "Hananoki"—not Media Matters—published this document. Although Hananoki is listed as the author, there is no evidence in the public record or the record before this Court that Hananoki *published*

allegations against X Corp., an entity that employs people in Texas. Specifically, the document claimed that X "plac[es] ads for major brands like Apple, Bravo (NBCUniversal), IBM, Oracle, and Xfinity (Comcast) next to content that touts Adolf Hitler and his Nazi Party." *Id.* And the document claimed that Media Matters "found ads for Apple, Bravo, Oracle, Xfinity, and IBM next to posts that tout Hitler and his Nazi Party on X." *Id.* Media Matters' document also reproduced what Media Matters claimed were images of those ads next to the Hitler or Nazi Party content. *Id.* Unsurprisingly, at least some of these advertisers appear to have withdrawn their advertisements from X. Indeed, that objective appears to have been the whole point of the document. Media Matters kept a running "update" of advertisers who had withdrawn their ads from X. *Id.* And, on the following day, Media Matters published another document—this one by a different author—stating that "No advertiser is safe while Elon Musk controls X." Matt Gertz, *It's the antisemitism, stupid*, Media Matters (Nov. 17, 2023), https://www.mediamatters.org/elon-musk/its-antisemitism-stupid.

On November 18, X issued a blog post alleging how Media Matters' document was false or misleading in multiple respects. X Safety, *Stand with X to protect free speech,* X Blog (Nov. 18, 2023), https://blog.twitter.com/en_us/topics/company/2023/stand-with-x-to-protect-free-speech. The upshot of X's allegations is that Media Matters' document did not describe an organic experience on X's platform. Instead, X alleged that Media Matters jury-rigged an artificial experience that few, and perhaps zero, other users or advertisers would ever experience, and then publicized that artificial experience as if it were organic to create a misleading impression. *Id.* According to X's blog post, some of the advertiser combinations with Hitler or Nazi content that

---

the document. On the contrary, the document was published on Media Matters' website and, according to Media Matters' declarant, Hananoki is an employee of Media Matters. Padera Decl. ¶ 15.

Media Matters described were apparently "seen" by only "one user"—the "author" of Media Matters' document. *Id.* The blog post claimed that Media Matters apparently achieved these outlier results by "curat[ing]" their account in a way that would generate these results. *Id.*

On November 20, 2023, the Attorney General announced an investigation into Media Matters for potential fraudulent activity. Dodge Decl., Ex. B. His investigation began because he was "extremely troubled by" X's allegations about Media Matters' "manipulat[ions]." *Id.* The Attorney General, however, did not claim that Media Matters had broken the law, only that his office is "examining the issue closely." *Id.* Indeed, the Attorney General does not unreservedly accept X's allegations about what happened. Getting to the bottom of that is the whole point of the investigation.

Later that day, X Corp. filed a lawsuit against Media Matters in the Northern District of Texas over Media Matters' November 16 document. That lawsuit added significant detail to how X believed that Media Matters had created a false depiction of the X platform. Specifically, X claimed that "Media Matters knowingly and maliciously manufactured side-by-side images depicting advertisers posts on X Corp.'s social media platform beside Neo-Nazi and white supremacist fringe content and then portrayed these manufactured images as if they were what typical X users experience on the platform." Compl. ¶ 1, *X Corp. v. Media Matters*, No. 4:23-cv-01175 (N.D. Tex.), ECF No. 1 ("*X Lawsuit*"). According to X, Media Matters accessed an old X account (one that would bypass X's "ad filter for new users") and then had that account follow content **only** "in one of two categories": (1) "those known to produce extreme fringe content," and (2) "accounts owned by X's big-name advertisers." *Id.* ¶ 8. According to X, Media Matters then "endlessly scroll[ed] and refresh[ed]" its account page until it generated "controversial content next to X's largest advertisers' paid posts." *Id.* ¶ 10. The upshot, according to X, was an

inauthentic—and objectively misleading—representation of the X platform experience. For example, X claimed that the paid posts of IBM, Comcast, and Oracle "appeared alongside the fringe content cited by Media Matters for ***only one*** viewer (out of more than 500 million) on all of X: ***Media Matters***." *Id.* ¶ 13 (emphasis original).

On November 21, the Attorney General's office issued a CID to Media Matters requesting multiple sets of documents. As is customary under the Texas DTPA, the Attorney General gave Media Matters until December 12, 2023—20 days from service—to respond to the CID. Dodge Decl., Ex. A at 1; Tex. Bus. & Com. Code § 17.61(g) (contemplating "20 days"). Media Matters suggests (at 2) that the CID was not served until "December 1." That is highly misleading; Media Matters had already engaged OAG *about the CID* before December 1. *See* Declaration of Levi Fuller ("Fuller Decl."), Ex. B (OAG's December 1 email memorializing that Media Matters' counsel "call[ed] yesterday"—November 30—regarding CID); *see also infra* at 22-23.

Defendant's investigation is primarily designed to investigate three things: (1) the veracity of X's allegations; (2) The nexus of Media Matters' conduct to Texas; and (3) the effect of Media Matters' underlying conduct to trade and commerce. *See* Dodge Decl., Ex. A at 7.

**Veracity**: To evaluate the veracity of X's allegations, the CID requests among other things, that Media Matters produce:

- "[D]ocuments sufficient to identify" Media Matters' "accounts that were used to obtain, produce, or otherwise acquire the" content published in Media Matters' November 16 document. Dodge Decl., Ex. A at 7 No. 8; *accord X Lawsuit* ¶ 29 (alleging Media Matters used an account that enabled it to "evade X's content filters for new users");

- "[D]ocuments sufficient to identify all X accounts, profiles, and members followed by the X accounts identified" in the bullet above. Dodge Decl., Ex. A at 7 No. 9; *accord X Lawsuit* ¶ 30 (alleging Media Matters "set its accounts to follow only 30 users" and that "[*a*]*ll* of these users were either already known for posting controversial content or were accounts for X's advertisers" (emphasis original)); and

- Media Matters' "external communications with" X during a critical 3-week time period. Dodge Decl., Ex. A at 7 No. 10.

**Texas Nexus**: Texas's DTPA is, of course, a Texas statute. To evaluate the nexus of Media Matters' conduct with Texas, the CID requests that Media Matters produce:

- "[D]ocuments sufficient to identify all of Media Matters for America's sources of income originating in the State of Texas." Dodge Decl., Ex. A at 7 No. 2;

- "[D]ocuments sufficient to identify all of Media Matters for America's operational expenditures in the State of Texas." Dodge Decl., Ex. A at 7 No. 3; and

- Media Matters' "external communications" with the advertisers at the center of the controversy over the November 16 document. Dodge Decl., Ex. A at 7 No. 11; *accord X Lawsuit* ¶ 19 (alleging "Media Matters' campaign against X Corp. was purposefully directed at, among others, relationships with advertisers who are located in, have a significant presence in, or transact substantial business in Texas."). At least some of these advertisers are headquartered in Texas.

**Effect on trade and commerce**: Texas's DTPA is about trade and commerce, not merely misleading statements in the abstract. To evaluate the November 16 document's nexus to trade and commerce, the CID requests that Media Matters produce:

- "[D]ocuments" related to "Elon Musk's purchase of X." Dodge Decl., Ex. A at 7 No. 4;

- Media Matters' "external communications" with the advertisers at the center of the controversy over the November 16 document. Dodge Decl., Ex. A at 7 No. 11; *accord X Lawsuit* ¶ 19 (alleging "Media Matters' campaign against X Corp. was purposefully directed at, among others, relationships with advertisers who are located in, have a significant presence in, or transact substantial business in Texas."); and

- "[D]ocuments sufficient to identify all direct and indirect sources of funding for" Media Matters' operation. Dodge Decl., Ex. A at 7 No. 12.[2]

Media Matters contends (at 3) it "ha[s] been chilled from publishing additional criticism or coverage of X or Musk since" the Attorney General announced his investigation. Media Matters' COO, for example, asserts that there is a "culture of fear within Media Matters" to "speak[] on any topic related to the subject of the investigation." Declaration of Cynthia Padera ¶ 18 ("Padera Decl."), ECF No. 20-2. But it is almost impossible to square that with the public record. For example:

- On November 25 (after Defendant announced his investigation and issued the CID), Media Matters President Angelo Carusone stated on TV that "things [on X] appeared exactly the way we said, that ads were running alongside Nazi content." Fuller Decl., Ex. D.

---

[2] Although Media Matters does not have a right to understand the possible theories of the Attorney General's investigation, Defendant lays out these specifics in detail for the benefit of the Court's evaluation. Documents regarding Media Matters' funding could be highly relevant to effects on trade and commerce because, for example, Media Matters may be funded by an economic competitor of Elon Musk or X.

- On the same day, Carusone said "Musk . . . doesn't really see a problem or at least seemingly, with a lot of this content because it's also a reflection of his own worldview." *Id.*

- On the same day, Carusone said X "still provides at this point a safe haven for extremists and disinformation." *Id.*

- On November 26, Carusone similarly said on TV that "Musk . . . engag[es] with some pretty extreme, you know, antisemitic, great replacement theory." Fuller Decl., Ex. E.

- On the same day, Carusone touted Media Matters' "reports showing that [X is] sharing ad revenue with these Hitler stan accounts." *Id.*

- On December 3 Carusone went on TV to accuse X CEO Linda Yaccarino of coercing "advertising partners . . . to really align with the values of what X is trying to do." Fuller Decl., Ex. F.

- On December 18 Carusone went on TV to boast how Media Matters has "chronicle[d] the descent of X now into a sort of a supercharged engine of radicalization." Fuller Decl., Ex. G.

Defendant takes no view on whether Carusone's speech *supra* is constitutionally protected. But his conduct clearly illustrates that Media Matters' speech has not been *chilled*.

## STANDARD OF REVIEW

"A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam). That burden is heavy: "[A] preliminary injunction is an extraordinary remedy never awarded as of right." *Benisek v. Lamone*, 138 S. Ct. 1942 (2018) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)). "As a matter of

equitable discretion, a preliminary injunction does not follow as a matter of course from a plaintiff's showing of a likelihood of success on the merits. Rather, a court must also consider whether the movant has shown that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Benisek*, 138 S. Ct. at 1943-44 (internal quotations omitted); *See also Vitkus v. Blinken*, 79 F.4th 352, 361 (4th Cir. 2023). The possibility that adequate relief will be available at a later date weighs heavily against a claim of irreparable harm. *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (citing *Sampson v. Murray*, 415 U.S. 61 (1974)). The same standards apply for a temporary restraining order. *Maages Auditorium v. Prince George's Cnty.*, 4 F. Supp. 3d 752, 760 n.1 (D. Md. 2014).

## ARGUMENT

### I.    Media Matters has not Suffered Justiciable Injury.

The accepted rule since at least the Supreme Court's 1964 *Reisman v. Caplin* decision is that an agency's non-self-executing request for documents is not reviewable until the agency tries to enforce it. 375 U.S. 440 (1964). In *Reisman*, the recipient of an administrative request for documents was not obligated to produce anything until after the agency brought an "enforcement action" where the recipient would be afforded "a judicial determination" of the lawfulness of the request and the viability of any of his defenses. *Id.* at 446. That "opportunity for judicial review before any coercive sanctions may be imposed" was an adequate "remedy"; and the court would not permit the recipient of the request to short-circuit this process by preemptively seeking an injunction in federal court. *Id.* at 450. *Reisman* is now widely understood as having "announced a rule strongly disfavoring any pre-enforcement review of investigative subpoenas." *Belle Fourche Pipeline Co. v. United States*, 751 F.2d 332, 334 (10th Cir. 1984); *see also United States v.*

*Kulukundis*, 329 F.2d 197, 199 (2d Cir. 1964) (Friendly, J.) (explaining *Reisman* "seems to destroy the basis underlying decisions of this court which authorized applications to vacate [non-self-executing subpoenas] (and appeals from their denial) in advance of any judicial proceeding by the Government for their enforcement").

The presence of a First Amendment claim changes nothing. As a respected D.C. Circuit judge put it, "[t]here is no person in the United States" who cannot allege some "First Amendment right" that an "investigative technique" has supposedly trampled on, and then seek an injunction against the investigation on that basis. *Reps. Comm. For Freedom of Press v. AT&T*, 593 F.2d 1030, 1070 (D.C. Cir. 1978) (Wilkey, J.). That "approach has no logical stopping-point" and, if ever entertained, would mire the federal courts in a flood of litigation to short-circuit investigations before the investigations can even determine whether the subject has broken the law. *Id.* No wonder the courts have rejected these kinds of actions for an injunction, even when the First Amendment is at issue. *See, e.g.*, *Google, Inc. v. Hood*, 822 F.3d 212, 226 (5th Cir. 2016) (concluding, in First Amendment context, that an "administrative subpoena is not ripe for review" because it is not "self-executing"). Instead, as then-Judge Anthony Kennedy put it in a similar context, Media Matters "can properly litigate [its legal arguments] if and when the Attorney General attempts to enforce [state] law against [it] after the completion of his investigation." *Lewis v. Younger*, 653 F.2d 1258, 1260 (9th Cir. 1980). Or, Media Matters could take advantage of the procedures that the DTPA offers to challenge the CID. *See* Tex. Bus. & Com. Code § 17.61(g). But Media Matters cannot seek pre-enforcement review of the CID in federal court.

The Ninth Circuit's decision in *Twitter, Inc. v. Paxton* removes any conceivable doubt about whether Media Matters has already suffered cognizable injury. 56 F.4th 1170. In that case, Twitter sought an injunction against this same Defendant—Attorney General Paxton—after he

initiated a DTPA investigation and served a CID on Twitter. Twitter alleged materially similar First Amendment harm as Media Matters alleges here, *id.* at 1175 (Twitter declarant alleging "the CID and associated investigation chill Twitter's speech") and identified statements from Defendant that it believed showed retaliatory intent, *id.* at 1172 (Defendant stated Twitter was "the left's Chinese-style thought police" and vowed to "fight them with all I've got"). The court concluded, however, that "Twitter has not suffered an Article III injury because the CID is not self-enforcing." *Id.* at 1176. After all, Twitter—like Media Matters here—"never faced any penalties for its refusal to comply with the CID." *Id.* And all the actions Twitter claimed to have taken to self-censor in response to the CID were—much like Media Matters' alleged actions here—"self-inflicted because the actions were voluntary." *Id.*; *accord Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 418 (2013).

   None of Media Matters' First Amendment authority supports a contrary outcome. By and large, courts adjudicate First Amendment "retaliation" cases only where "the challenged exercise of governmental power was regulatory, proscriptive, or compulsory in nature." *Laird v. Tatum*, 408 U.S. 1, 11 (1972). "In none of" the Supreme Court's cases does "the chilling effect arise merely from the individual's knowledge that a governmental agency was engaged in certain activities," *id.*, or from a non-self-executing CID. Media Matters' case citations (at 18-19) are illustrative. For example, in one of Media Matters' authorities—*Abbott v. Pastides*—the Fourth Circuit explained that the government entity's process of "gather[ing] information—the 'who, what, when, whys, and hows' of [an] [e]vent"—did ***not*** establish cognizable injury. 900 F.3d 160, 166, 171 (4th Cir. 2018). That is exactly what the Attorney General is engaged in here. In *Cooksey v. Futrell*, the court found adequate First Amendment harm, by contrast, because the defendant state agency threatened "an injunction" against the plaintiff, returned a "red-pen mark-up" of

13

plaintiff's speech, and issued "unsolicited written and oral correspondence" explaining that plaintiff's "speech violated the" law. 721 F.3d 226, 236-37 (4th Cir. 2013). Here, nothing like that has happened—the Attorney General has not even determined whether Media Matters violated the law. And in *White v. Lee*, 227 F.3d 1214 (9th Cir. 2000), the court did not discuss standing, and the plaintiffs there "would have had no opportunity to challenge any aspect of the investigation until formal charges were brought, at which point they could have faced a large fine," *Twitter*, 56 F.4th at 1177. That is why the Ninth Circuit in *Twitter* concluded that its own *White v. Lee* opinion was inapposite in this exact setting.

## II.     The Court Lacks Personal Jurisdiction over the Texas Attorney General.

This Court also lacks personal jurisdiction over Attorney General Paxton. He has **zero** contacts with Maryland, and it is in any event only the truly extraordinary case where a State Attorney General will be subject to jurisdiction in another jurisdiction's courts.

For "a district court to assert personal jurisdiction over a nonresident defendant, two conditions must be satisfied: (1) the exercise of jurisdiction must be authorized under the state's long-arm statute; and (2) the exercise of jurisdiction must comport with the due process requirements of the Fourteenth Amendment." *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs.*, 334 F.3d 390, 396 (4th Cir. 2003). "Maryland courts have consistently held that the state's long-arm statute is coextensive with the limits of personal jurisdiction set by the due process clause of the Constitution," so the two inquiries "merge[]" into one here. *Id.* at 396-97. Personal jurisdiction comes in two forms: general and specific. Media Matters cannot meet its burden to show either. *See Universal Leather v. Koro AR*, 773 F.3d 553, 558 (4th Cir. 2014) (holding "plaintiff has the burden of making a prima facie showing").

### A.       Defendant is not subject to general jurisdiction.

General jurisdiction is obviously inapplicable here: Defendant does not have the requisite "continuous and systematic" contacts with Maryland for that exercise of jurisdiction. *Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 415-16 (1984).

### B.       Defendant is not subject to specific jurisdiction.

Specific jurisdiction is also lacking. Specific jurisdiction turns on a three-part test: "(1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the State; (2) whether the plaintiffs' claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable." *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 712 (4th Cir. 2002) (alterations omitted).

*No Purposeful Availment:* First, there is no credible argument that Defendant "purposefully availed" himself of the privilege of conducting activities in Maryland. *ALS Scan*, 293 F.3d at 712. On the contrary, Defendant announced his investigation in Texas, Dodge Decl., Ex. B, and issued the CID to Plaintiff Media Matters in the District of Columbia, Dodge Decl., Ex. A.

Even far greater contacts with Maryland would not support personal jurisdiction. After all, the Fourth Circuit has held that even an out-of-state "investigation" that actually retains *Maryland* "companies to provide . . . information about Maryland subjects" is not sufficient for personal jurisdiction over the out-of-state investigator. *Stover v. O'Connell Assocs., Inc.*, 84 F.3d 132, 134 (4th Cir. 1996) (holding no personal jurisdiction over "New York private investigation firm").

Media Matters is wrong (Renewed Motion at 3; Compl. ¶ 12) in claiming that the Attorney General has taken any actions "intentionally directed towards Maryland." Media Matters' argument relies (*see* Compl. ¶ 12) on the "effects" test for personal jurisdiction announced in *Calder v. Jones*, where the Court concluded that two Floridians who had defamed a Californian

were subject to personal jurisdiction in California for the tort. 465 U.S. 783 (1984). The Floridians published a story that "impugned the professionalism of" the Californian, whose "career was centered in California," the story "was drawn from California sources," and "the brunt of the harm" was suffered in California. *Id.* at 788-89. Moreover, the story was published in a periodical whose "largest circulation" was in California. *Id.* at 790. That is plainly nothing like this case, but Media Matters attempts to place Plaintiff Hananoki in a position analogous to the *Calder* Californian. Namely, Media Matters contends that the November 16 document was "written by Hananoki," that Hananoki's preparation and authorship of the document occurred "in the District of Maryland," and that Defendant's CID is seeking material "in this District." Compl. ¶ 12.

Media Matters' argument is fatally flawed at multiple steps.

*First*, it is well-established that "the plaintiff cannot be the only link between the defendant and the forum." *Walden*, 571 U.S. at 285. "[T]he place of a plaintiff's injury and residence *cannot* create a defendant's contact with the forum state." *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1031 (2021). Instead, this Court must look at "whether the defendant has expressly aimed or directed [his] conduct toward the forum state." *Young v. New Haven Advoc.*, 315 F.3d 256, 262 (4th Cir. 2002). And here, Defendant's conduct was not in any sense "aimed" at Maryland—indeed, his CID was issued to, and served in, the District of Columbia, where Media Matters resides. At the very most, Defendant's conduct indirectly affected a Maryland resident (it did not, *see infra* next paragraph). But that is a far cry from the Attorney General "expressly aim[ing] or direct[ing] his conduct" toward Maryland. *Id.*

*Second*, while this binding authority alone is fatal for Media Matters, the reality is a great deal worse for it because, even under Media Matters' legally flawed theory, the possibility of personal jurisdiction hinges on *Hananoki*. Compl. ¶ 12. But Hananoki is a straw plaintiff.

Defendant is not investigating Hananoki. *See* Dodge Decl., Ex. B. Defendant did not serve Hananoki with a CID. *See* Dodge Decl., Ex. A at 1. And Defendant therefore cannot enforce the CID against Hananoki. Tex. Bus. & Com. Code § 17.62(b) (enforcement against entity that was "*served*" with CID (emphasis added)).[3]

   ***Exercising Jurisdiction would be Unreasonable***:  It would also be highly unreasonable for this Court to exercise jurisdiction over the Attorney General of Texas because of the resulting extreme "conflict with the sovereignty of the defendant's [S]tate." *Ins. Co. of N. Am. v. Marina Salina Cruz*, 649 F.2d 1266, 1270 (9th Cir. 1981). The "sovereign status of a defendant militates against the reasonableness of jurisdiction." *Id.* at 1272. And the default rule is that state agencies should not "have to defend [their] attempt to enforce [state] laws "—much less mere investigations under those laws—"in courts throughout the nation." *Stroman Realty v. Wercinski*, 513 F.3d 476, 487 (5th Cir. 2008).

## III. Venue in Maryland is Improper.

   Venue is also improper here for similar reasons.

   Media Matters claims "a substantial part of the events giving rise to Plaintiffs' claims occurred in the District of Maryland, where nearly all of Hananoki's work occurred." Compl. ¶ 13 (citing 28 U.S.C. § 1391(b)(2)). Of course, like Media Matters' personal jurisdiction argument, this theory depends on Hananoki's presence as a straw plaintiff.

   And, in any event, the Supreme Court has rejected this approach to venue. In *Leroy v. Great Western United Corp.*, a Texas corporation filed suit against Idaho officials in Texas federal court to challenge an Idaho statute that restricted activities in Texas. 443 U.S. 173 (1979). The

---

[3] It is particularly bizarre that Media Matters would use Hananoki as a straw plaintiff in an attempt to invoke this Court's jurisdiction when 10 of its 11 listed counsel are not even admitted here, Renewed Motion at 31-32, and when Media Matters itself is "incorporated," and has "its principal place of business in" the "District of Columbia." Compl. ¶ 15.

corporation's claim was based on "action that was taken in Idaho by Idaho residents," namely "the enactment of the statute by the legislature, the review of [the Texas corporation's] filing, the forwarding of the comment letter by [an Idaho official], and the entry of the order postponing the effective date of the tender by [an Idaho official]—as well as the future action that may be taken in the State by its officials to punish or to remedy any violation of its law." *Id.* at 185-86. Based on these facts, the Court held that the suit had "only one obvious locus—the District of Idaho." *Id.* at 185. This case also has one obvious locus—Texas.[4]

That venue is proper in Texas alone is especially obvious here because *X already filed a lawsuit in Texas against Media Matters for the same conduct Defendant is investigating*. *X Corp. v. Media Matters*, No. 4:23-cv-01175 (N.D. Tex.). That case clearly involves a "related" set of facts, and courts commonly look to relatedness when determining where venue is proper. *See Zazzali v. Swenson*, 852 F. Supp. 2d 438, 448 (D. Del. 2012) ("A motion to transfer may also be granted if there is a related case which has been first filed or otherwise is the more appropriate vehicle to litigate the issues between the parties."); *Thompson v. Nat'l Football League*, No. 1:13-CV-00367, 2014 WL 1646929, at *3 (W.D. Pa. Apr. 24, 2014) (same).[5] Moreover, it is quite likely

---

[4] Congress's amendment of the venue statute in 1990 (after *Leroy*) is irrelevant to this point because, while that amendment clarified that venue can be proper in multiple districts, the Court's decision in *Leroy* did not turn on "whether [the pre-amendment statute] adopt[ed] the occasionally fictive assumption that a claim may arise in only one district." *Leroy*, 443 U.S. at 384-85; *accord Bates v. C&S Adjusters, Inc.*, 980 F.2d 865, 867 (2d Cir. 1992) (observing, post-amendment, that "*Leroy* . . . remain[s] [an] important source[] of guidance").

[5] Transfer is unwarranted because, as explained *supra* at 11-14, this case is not justiciable in *any* federal court. But if the Court thinks this case is justiciable, then the Northern District of Texas is manifestly the proper place for it to be litigated.

The District of Columbia would not be a proper venue under *Leroy*, and Defendant is also not subject to personal jurisdiction there. While Media Matters' case for personal jurisdiction over Defendant would not be as obviously foreclosed in D.C. as it is here, Defendant's contact with D.C.—namely, the service of a CID there—does not suffice for personal jurisdiction. *See, e.g.*, *Music Makers Holdings v. Sarro*, No. 09cv1836-RWT, 2010 WL 2807805, at *5 (D. Md. July 15, 2010) ("[R]ecent out-of-circuit court of appeals decisions have analyzed the issue in a variety of contexts and have uniformly held that cease-and-desist letters alone do not establish personal jurisdiction."); *cf. Bulkley Assocs. v. Dep't of Industrial Relations*, 1 F.4th 346, 353-54 (5th Cir. 2021) (explaining how the Fifth Circuit recognizes this rule but that the court deviated once when the New Jersey Attorney General threatened to "halt

that that court will eventually address all of the arguments Media Matters has made here if X Corp. seeks the same material in discovery.

## IV.    Media Matters has not Shown a First Amendment Violation.

Media Matters also cannot show that the Attorney General violated its First Amendment rights.

Media Matters admits (at 14) that, to succeed on its retaliation claim, it must show that it "engaged in protected First Amendment activity" and that Defendant took responsive action in retaliation for that activity. But Media Matters cannot possibly show *on this record* that the activity at issue in the Attorney General's investigation was protected First Amendment activity. Instead, it is well-established that, under laws like Texas's DTPA, a party can constitutionally be liable for both "literally false" statements and statements that, "although literally true, [are] likely to mislead and to confuse" viewers. *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 273 (4th Cir. 2002). And X Corp.'s lawsuit lays out a fact pattern that is suggestive of speech not merely "likely" to deceive viewers, but deliberately designed to do so. If that is the case, then it is hard to see how that same speech is constitutionally protected.

The Attorney General does not unreservedly take X Corp.'s allegations against Media Matters at face value, and he does not ask this Court to do so. But that is the point of Defendant's *investigation*. Among other things, Defendant's investigation will shed significant light on whether Media Matters' speech was actually First Amendment-protected—*i.e.*, whether it was likely, or deliberately designed, to mislead. Media Matters' suit functionally asks the Court to assume the

---

[plaintiff's] activity nationwide, including activity [in Texas] that had no connection to New Jersey property or residents").

conclusion of that investigation in a way that will be favorable to Media Matters. But the appropriate course is to see what the investigation actually yields.[6]

## V.     Media Matters Could Have Avoided Any Harm, and its Litigation Conduct is Inequitable.

Media Matters' arguments about irreparable harm also are not equitable. And its meritless harm argument, coupled with various other misrepresentations and lack of candor, raises serious questions about its good faith.

As to the alleged harm: "It is well-settled that a preliminary injunction movant does not satisfy the irreparable harm criterion when the alleged harm is self-inflicted." *Safari Club Int'l v. Salazar*, 852 F. Supp. 2d 102, 123 (D.D.C. 2012) (quotations omitted). "In analogous circumstances, plaintiffs who decline the opportunity to avail themselves of a regulatory scheme to avoid the very harm for which they seek injunctive relief have been denied the [injunctive] relief." *Id.* Here, of course, Media Matters "decline[d] the opportunity" to use the DTPA's "regulatory scheme," *id.*, to set aside Defendant's CID. If there were merit to Media Matters' substantive arguments, those procedures would have provided Media Matters full relief against the harm it now characterizes as "irreparable."

---

[6] Media Matters' other merits arguments (at 22-27) also do not support its request that the Court enjoin Defendant. Media Matters can litigate whether Defendant's demand is "overbroad, unreasonable" or "seeks to pry into matters protected by the First Amendment" under the procedures the DTPA provides. Tex. Bus. & Com. Code § 17.61(g). Or, like any other party, it can meet and confer with Defendant about the overbreadth, etc., in an attempt to narrow the requests. And at least some requests are *plainly* not overbroad, unreasonable, or seeking First Amendment protected material. *See, e.g.*, Dodge Decl., Ex. A at 7 No. 9 (narrowly tailored request for a mere three weeks of "external communications" between Media Matters and X Corp); *id.* No. 10 (similar request for communications between Media Matters and advertisers). So the sweeping relief that Media Matters seeks cannot be granted on these arguments.

Media Matters' argument about whether it is subject to personal jurisdiction in Texas fares no better. Defendant's investigation is intended in part to evaluate that exact question. *See supra* at 8-9 (explaining how some requests are intended to evaluate the breadth of Media Matters' contacts with Texas). In that respect, the CID accomplishes much the same purpose as jurisdictional discovery. Just like when jurisdictional discovery is ordered, it would make no sense here to conclude Media Matters is not subject to jurisdiction in Texas without first flushing out the facts necessary to determine whether that is true.

But Media Matters' irreparable harm argument is actually a great deal more inequitable than that. Namely, Media Matters refused Defendant's offer to extend **greater** relief than **any** authority requires. Defendant's office offered to stipulate that it would not enforce the CID, or even take any related judicial or enforcement action, for months. ECF No. 28-1 at 5. That is the customary way that government enforcers relieve parties of any potential irreparable harm and allow courts time to more carefully consider a case. *See, e.g.*, *RNC v. Pelosi*, 602 F. Supp. 3d 1, 15 (D.D.C. 2022). But Media Matters refused this stipulation and insisted on pressing forward with its preliminary injunction motion on the grounds that "mere delay" of CID enforcement did not remedy its alleged injury. ECF No. 28-1 at 4. "Mere delay," however, is the **same thing** a preliminary injunction offers. Defendant recognizes that, in the absence of agreement, this Court had a judicial responsibility to require "full briefing" to "assess the strength" of Media Matters' harm argument, and to proceed with its scheduled preliminary injunction hearing. ECF No. 31. But, as the full briefing, and an overwhelming line of case law, shows (*see, e.g.*, *Reisman*, *Google v. Hood*, *Twitter v. Paxton*), Media Matters is not entitled to **any** relief in federal court. Media Matters' rejection of Defendant's offer to give the company far more than any authority requires was inequitable conduct. *See, e.g.*, ECF No. 28-1 at 5 (email putting Media Matters on notice of *Google* and *Twitter* holdings).

This conduct is independently unbecoming of officers of the Court, like Media Matters' counsel. *Accord Letren v. Trans Union, LLC*, No. 15-3361-PX, 2017 WL 4098743, at *5 (D. Md. Sept. 15, 2017) (Xinis, J.) (a "primary purpose" of sanctions is to "deter parties and their counsel from pursuing unnecessary . . . litigation"). And unfortunately, this conduct has been undertaken in combination with multiple misrepresentations and lack of candor.

*First*, misrepresentations. Media Matters contends it "ha[s] been chilled from publishing additional criticism or coverage of X or Musk since [Defendant] announced his investigation," Renewed Motion at 3, and that there is a "culture of fear within Media Matters" to "speak[] on any topic related to the subject of the investigation," Padera Decl. ¶ 18. Someone evidently forgot to tell this to Media Matters' President, because he has been on TV at least four times since the Attorney General announced his investigation, where he has made materially the same—and even more aggressive—claims against X and Musk as those made in the November 16 document. *See supra* at 9-10. Media Matters' President, for example, doubled down on the November 16 document ("things [on X] appeared exactly the way we said, that ads were running alongside Nazi content"), and even asserted that the Nazi content was a "reflection of [Musk's] own worldview," *see supra* at 9-10. It is not apparent how Media Matters can possibly square that with its assertion here that it has been chilled from criticizing X or Musk, or that it does not want to speak on matters related to the Attorney General's investigation.

Media Matters also makes (at 10) the highly misleading assertion that Defendant's November 21 CID was served on "December 1." FedEx records show that it was delivered and accepted at Media Matters' office on November 22. Fuller Decl., Ex. A; *see* Tex. Bus. & Com. Code § 17.60(d)(3) (service). And there is **no question** Media Matters **actually** received it before December 1 because, by November 30, it had hired counsel who had already reached out to Defendant's office about the CID. *See* Fuller Decl., Ex. B (memorializing this phone call). But at that point, OAG realized that Media Matters had chosen a law firm whose name partner was recently sanctioned for lack of candor to a court. Order, *Texas All. for Retired Ams. v. Hughs*, 28 F. 4th 669 (5th Cir. 2022) (No. 20-40643), ECF No. 101 (Mar. 11, 2021 Order). OAG concluded, in an extreme abundance of caution and to preempt any possibility of gamesmanship, that it would

re-serve Media Matters through a professional process server—this time through Media Matters' chosen law firm, which was accomplished on December 1. *See* Fuller Decl., Ex. C. Plainly, however, that was not the only time Defendant served Media Matters. And this misrepresentation is material because it created the misimpression that Defendant had given Media Matters only a 12-day window to respond to the CID, Renewed Motion at 10, whereas the DTPA contemplates a default 20-day window for CID recipients to seek review in Texas State court, Tex. Bus. & Com. Code § 17.61(g).

*Second*, lack of candor. Media Matters failed to bring to the Court's attention the veritable mountain of authority holding that non-self-executing document demands are not reviewable in federal court. *See, e.g.*, *Reisman*, 375 U.S. 440; *Belle Fourche Pipeline*, 751 F.2d 332; *Reps. Comm. for Freedom of Press*, 593 F.2d 1030; *Google*, 822 F.3d 212; *Lewis*, 653 F.2d 1258; *Twitter* 56 F.4th 1170. "Although this line of cases contains no controlling decisions by the Court of Appeals for *this* circuit, the sheer volume of uniformly contrary decisions from other courts, as well as dictum from leading Supreme Court opinions, constituted more than adequate authority to put plaintiff's counsel on notice that his [arguments] were not well grounded in law and that sanctions would be in order unless counsel bolstered his assertions with at least a modicum of argument for extension, modification, or reversal of existing law." *Matthews v. Freedman*, 128 F.R.D. 194, 202 (E.D. Pa. 1989) (emphasis added). After all, "[a] lawyer should not be able to proceed with impunity in real or feigned ignorance of authorities which render his argument meritless." *Golden Eagle Distrib. Corp. v. Burroughs Corp.,* 801 F.2d 1531, 1542 (9th Cir. 1986). *Borowski v. DePuy, Inc.,* 850 F.2d 297, 304-05 (7th Cir. 1988) (reprimanding counsel's "ostrich-like tactic of pretending that potentially dispositive authority against [his] contention does not exist[]" (internal citation omitted)).

Granted, Media Matters was entitled to contend that the Supreme Court's *Reisman* decision does not control because it did not address the First Amendment. But the Ninth Circuit addressed *exactly* that argument in *Twitter* and nevertheless concluded in this exact context that the suit was not justiciable. 56 F.4th at 1178-79. And of course, Media Matters also was entitled to pursue a Circuit split with the Ninth Circuit. But Media Matters' counsel was not ethically permitted to fail to even ***apprise*** this Court of all this authority, much less the sole Circuit court case (*Twitter*) addressing this precise scenario. *Accord, e.g.*, *Jorgenson v. Volusia Cnty.*, 846 F.2d 1350 (11th Cir. 1988) (sanctions); *Barth v. District of Columbia*, No. 92-7093, 1993 WL 523999, at *4 (D.C. Cir. Dec. 14, 1993) (Henderson, J., concurring) (counsel's "ability to distinguish the omitted cases when pressed to do so should not excuse its lack of candor in its pleadings").

***Third***, Media Matters' gamesmanship and lack of collegiality have imposed unnecessary burdens on Defendant and the Court. It is well established that "civility and collegiality" in litigation are in the public interest and "greatly advance[] judicial efficiency" by promoting "inexpensive determination of every action and proceeding." *Sahyers v. Prugh, Holliday & Karatinos, P.L.*, 560 F.3d 1241, 1245 (11th Cir. 2009). But multiple of Media Matters' litigation tactics have undermined judicial efficiency and unnecessarily raised the costs of litigation. Media Matters, for example, enlisted Hananoki as a straw plaintiff as part of an apparent effort to establish personal jurisdiction over Defendant in Maryland. *See supra* at 16-17. That needlessly forced Defendant to expend resources on outside counsel. *See, e.g.*, Local Rule 101.1.b. Media Matters has offered no reason why it enlisted Hananoki in this gambit when it could have instead sued in its home—the District of Columbia, where undersigned counsel, and other attorneys in OAG, are barred.

In addition, there are significant indicia here that Media Matters "knowingly or recklessly raise[d] a frivolous argument, or argue[d] a meritorious claim for the purpose of harassing an opponent." *Letren*, 2017 WL 4098743, at *6. Namely, Media Matters offered no comprehensible explanation why it forced Defendant's counsel, and this Court, to expend resources over the Holiday break. As noted earlier, the Attorney General offered to stipulate not to enforce the CID, or take any related action, for a period to allow a more reasonable briefing schedule and more reasonable time for this Court to evaluate the claims. *See* ECF No. 28-1. When the Attorney General implored Media Matters to explain how this did not moot any possible urgency on the Renewed Motion, Media Matters responded that its "complaint and motion speak for themselves." *Id.* But that is nonsensical—the complaint and motion were filed *before* Defendant offered his stipulation, and do not address the stipulation. Media Matters also contended that "mere delay" of enforcement would not remedy its injury. *Id.* But "mere delay" is the same thing a preliminary injunction accomplishes. And, in any event, the Attorney General did not propose the stipulation as a full-blown substitute for the preliminary injunction—rather, it was offered merely to elongate the briefing and hearing schedule on that motion so that the parties and this Court would not be burdened over the Holidays.

## CONCLUSION

The Court should deny Plaintiffs' Renewed Motion.

Dated: December 30, 2023

Respectfully submitted,

*/s/ Gene C. Schaerr*
GENE C. SCHAERR (D. Md. # 22340)
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC  20006
gschaerr@schaerr-jaffe.com

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney General

JAMES LLOYD
Deputy Attorney General for Civil Litigation

*/s/ Ryan S. Baasch*
RYAN S. BAASCH*
(signed by Gene C. Schaerr with
permission of Ryan S. Baasch)
Division Chief
Consumer Protection Division
OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Telephone: (512) 463-9917
ryan.baasch@oag.texas.gov

CHRIS LAVORATO*
Assistant Attorney General
General Litigation Division
OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Telephone: (512) 475-4476
chris.lavorato@oag.texas.gov

*Admitted *pro hac vice*

*Attorneys for Defendant*
*Ken Paxton, Attorney General*
*of the State of Texas*

26

**CERTIFICATE OF SERVICE**

I, Gene C. Schaerr, hereby certify that on December 30, 2023, I electronically filed Defendant's Opposition to Plaintiffs' Renewed Motion for Temporary Restraining Order and Preliminary Injunction with the Clerk for the United States District Court of Maryland using the CM/ECF system, which shall send electronic notification to counsel of record.

*/s/ Gene C. Schaerr*
Gene C. Schaerr