IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| MEDIA MATTERS FOR AMERICA, *et al.*, | |
| Plaintiffs, | CIV. NO. 23-cv-3363 |
| v. | |
| WARREN KENNETH PAXTON JR., in his official capacity as Attorney General of the State of Texas, | |
| Defendant. | |

## PLAINTIFFS' REPLY IN SUPPORT OF RENEWED MOTION FOR TEMPORARY RESTRAINING ORDER

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

ADDITIONAL BACKGROUND ......................................................................................... 2

ARGUMENT ....................................................................................................................... 3

    I.       Plaintiffs' claims are ripe for adjudication.................................................... 3

    II.     This Court has personal jurisdiction over Paxton and venue is proper in
             this district............................................................................................... 10

    III.    The equities strongly favor issuing the requested preliminary injunction. ................. 14

CONCLUSION................................................................................................................... 15

CERTIFICATE OF SERVICE .......................................................................................... 18

## INTRODUCTION

For the First Amendment to have teeth, journalists must be free of the fear that state officials halfway across the country will misuse state laws to harass them for disfavored speech. *See New York Times Co. v. Sullivan*, 376 U.S. 254 (1964). Texas Attorney General Ken Paxton's conduct goes far beyond what is permissible under the auspices of a state's investigation of "consumer fraud" within its jurisdictional reach and, unless relief is granted, will continue to chill Plaintiffs' speech. Nothing in his response justifies denial of Plaintiffs' request for urgent relief.

The relevant facts are virtually undisputed. On November 16, 2023, Eric Hananoki, a Maryland-based journalist employed by Media Matters, published an article on the proliferation of hate speech on X and the platform's failure to make good on its promise that its new content controls would protect advertisers. Two days after the article was published, Elon Musk declared he was launching a "thermonuclear" response, and two days after that X filed suit against Plaintiffs in federal district court in Texas. Attorney General Paxton quickly took up Musk's cause, mirroring and amplifying X's rhetoric with a press release announcing that he was launching an investigation into Media Matters—which he described as "a radical anti-free speech" and "left-wing organization[] [that] would like nothing more than to limit freedom by reducing participation in the public square," Compl. Ex. A, at 1—based solely on Musk's allegations. Paxton followed up with a sweeping Demand for a virtually unlimited swathe of materials related to Hananoki's reporting, Media Matters's internal operations, and "all direct and indirect sources of funding" for any "operations involving X research or publication." Compl. Ex. B, at 7.

Like his press release, Paxton's response to Plaintiffs' motion is long on *ad hominem* attacks and short on substance. It offers procedural arguments meant to stave off consideration of Plaintiffs' clear injury, not one of which has merit. It fails to explain how his office has jurisdiction to "investigate" Plaintiffs at all, admitting that Paxton has *no idea* whether Plaintiffs even come

within reach of Texas and must still "evaluate that exact question." Opp'n 20 n.6. And, although Paxton claims an interest in getting to the bottom of whether Plaintiffs' speech "was likely, or deliberately designed, to mislead," Opp'n 19, he fails even to acknowledge—let alone address—Plaintiffs' evidence on the *year-long coverage* by *other* outlets showing *repeated* examples of hate speech appearing next to advertisements on X. Paxton's failure to engage with the underlying facts only underscores that his "investigation" has little to do with testing the "veracity of X's allegations," Opp'n 7, and is instead a pretext to punish Plaintiffs for exercising their First Amendment rights.

The Court should issue an injunction excusing Plaintiffs' compliance with the Demand while this case is heard because their speech continues to be stifled irreparably and they are likely to succeed in proving that Paxton unconstitutionally retaliated against them for exercising core First Amendment rights.

## ADDITIONAL BACKGROUND

On December 12, as requested in the Demand, Media Matters responded to the Attorney General's Office, setting forth why it believed Paxton's conduct to be unlawful and raising objections to the Demand. Second Dodge Decl., Ex. A. Paxton's office responded six days ago on December 29. *Id*., Ex. B. Its letter confirms Paxton intends to enforce the Demand without any showing of jurisdiction or cause. Texas law, he claims, grants him "broad discretion in the overall breadth and relevance of the materials that may be sought in the course of a pre-suit investigation" and requires him to provide his targets with only "the general subject matter of the investigation." *Id*. at 1-2. Plaintiffs' rights in responding are constricted because "a CID issued by [Paxton] is not limited by the Texas Rules of Civil Procedure." *Id*. at 1. Paxton reserves his "right to pursue appropriate legal action to enforce" the Demand and asserts that Plaintiffs' only option to "resist

the Attorney General's investigation" is "to establish that there were zero permissible justifications" for it. *Id*. The letter requests an answer by January 4. *See id.* at 4.

All the while, the chilling of Plaintiffs' speech—and ensuing irreparable harm—has only intensified since they sought relief last month. *See* Supplemental Declaration of Eric Hananoki.

## ARGUMENT

### I.     Plaintiffs' claims are ripe for adjudication.

Plaintiffs' claims are ripe because Paxton's retaliatory conduct has already had its predictable and intended effect—chilling Plaintiffs from engaging in their constitutionally protected newsgathering and reporting activities. To argue otherwise, Paxton relies on a body of case law that largely has nothing to do with the First Amendment. In so doing, he ignores a critical distinction, as "ripeness requirements are [] relaxed in First Amendment cases" due to the "special need to protect against any inhibiting chill." *Cooksey v. Futrell*, 721 F.3d 226, 240 (4th Cir. 2013). "Indeed, First Amendment rights are particularly apt to be found ripe for immediate protection, because of the fear of irretrievable loss." *Id*. (citation omitted); *see also* 13B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3532.3 (3d ed. 2023) (collecting cases). A First Amendment claim is ripe once a plaintiff has "plausibly alleged" the defendant's conduct "require[s] them to self-censor." *Edgar v. Haines*, 2 F. 4th 298, 311 (4th Cir. 2021), *cert. denied* 142 S. Ct. 2737 (2022). Thus, the "fundamental question is whether plaintiffs have shown that" the retaliation "to which they are currently subject . . . . require[s] them to self-censor." *S.C. State Conf. of NAACP v. Wilson*, No. 2:23-CV-01121-DCN, 2023 WL 5207978, at *5 (D.S.C. Aug. 14, 2023) (quoting *Edgar*, 2 F. 4th at 311). That is precisely what Plaintiffs have shown here.

Paxton's ripeness argument relies almost exclusively on his failure to (yet) enforce the Demand in court. As an initial matter, Paxton's December 29 letter—which avows enforcement regardless of jurisdictional concerns—puts to rest any pretense that he will let the Demand lie

3

unenforced. Regardless, under binding Circuit precedent, Plaintiffs' claim became ripe once Paxton took sufficient action for Plaintiffs to experience a "non-speculative and objectively reasonable chilling effect" of their speech. *Am. Fed'n of Gov't Emps. v. Off. of Special Couns.*, 1 F.4th 180, 188 (4th Cir. 2021) (quoting *Cooksey*, 721 F.3d at 236, 240-41). At that point, "no further government action [is] required" for Plaintiffs' claim to be ripe. *Id.* (cleaned up). It is irrelevant that "more discourse could occur" between Paxton and Plaintiffs, "or that [Paxton] has not yet made [his] final decision on this issue." *Cooksey*, 721 F.3d at 241. Courts in this Circuit have recognized that "a First Amendment claim may be ripe for review even before the government has taken enforcement action" if the plaintiff alleges an objectively reasonable chill. *Kramer v. Grossman*, No. CIV.A. ELH-13-1745, 2014 WL 937146, at *8-9 (D. Md. Mar. 10, 2014) (finding claims ripe "before disciplinary proceedings [had] take[n] place"); *see also S.C. Citizens for Life, Inc. v. Krawcheck*, 301 F. App'x 218, 221 (4th Cir. 2008) (explaining "free speech can be chilled prior to enforcement"). Here, where Paxton's invasive Demand has caused Plaintiffs to curtail their speech, including by causing them "not to write about certain topics because" of retaliation, their chill is "objectively reasonable." *Edgar*, 2 F.4th at 310; *see* Dimiero Decl. ¶¶ 15-18; Hananoki Decl. ¶¶ 27-32; Supp. Hananoki Decl. ¶¶ 3-6. "Such self-censorship is enough." *Edgar*, 2 F. 4th at 310 (citing *Cooksey*, 721 F.3d at 236).

Paxton's argument that "[t]he presence of the First Amendment claim changes nothing," Opp'n 12, misapprehends controlling law and misstates out-of-Circuit precedent. That misreading of case law is especially evident with *Twitter, Inc. v. Paxton*, 56 F.4th 1170 (9th Cir. 2022), a decision on which Paxton erroneously places great reliance. Opp'n 2, 12-14, 21, 23.

*Twitter, Inc. v. Paxton* arose after Twitter removed former President Trump from the platform in the wake of January 6. *See* 56 F.4th at 1172. After Paxton issued a document demand

to Twitter under the same Texas law at issue here, Twitter sued Paxton in California, alleging "its content moderation decisions are protected speech." *Id*. at 1172-73. Notably, the Ninth Circuit ***rejected*** Paxton's argument that Twitter's First Amendment challenge was not ripe "because the CID is not self-enforcing" and had not yet been enforced. *Id*. at 1174. It recognized that Twitter was "not really making a pre-enforcement challenge" but rather claiming Paxton's retaliatorily conduct "targeted [Twitter] specifically with the CID and related investigation." *Id*. at 1175; *see also id*. ("[T]he subject of [Twitter's] challenge is not only some anticipated future enforcement action by OAG; Twitter claims OAG has already acted against it."). Accordingly, the Court "conclude[d] that the retaliatory framework"—the same framework on which Plaintiffs rely here— "is the appropriate one under which to evaluate Twitter's standing." *Id*. at 1175.

Where Twitter ran into trouble—and why the Ninth Circuit ultimately found that its "allegations [were] not enough to establish constitutional standing and ripeness"—was "because Twitter *fail[ed] to allege any chilling effect* on its speech or any other legally cognizable injury." *Id*. (emphasis added). The Court reasoned that Twitter's affiant did "not declare that the OAG's CID has actually chilled employees' speech or Twitter's content moderation decisions." *Id*. Here, however, Plaintiffs have shown that the Demand has chilled their speech, including specifically by impacting their decisions about what to publish. Dimiero Decl. ¶¶ 15-19 (Plaintiffs have declined leads, withheld articles, and suffered from a slower, more burdensome publication process due to a "culture of fear" from retaliation); Hananoki Decl. ¶¶ 27-32 (explaining his work has been "curtail[ed]" and that he is no longer publishing stories on X or Musk); Supp. Hananoki Decl. ¶¶ 4-6 (describing additional story ideas he has not pursued for fear of retaliation).

Paxton mischaracterizes the *Twitter* decision as having reached a blanket conclusion "that a party does not suffer a cognizable injury, including any form of chilled speech, merely by virtue

of receiving" a CID. Opp'n 2. To the contrary, the Ninth Circuit expressly recognized that "a chilling effect on speech can itself be the harm" when a plaintiff brings a First Amendment claim in response to such a demand. 56 F.4th at 1178. Once a plaintiff shows reasonable chill, "its constitutional injury has already occurred; there is no way for [a plaintiff] to avoid that alleged injury by challenging the document request later" when the CID is eventually enforced. *Id*. at 1178-79. The Ninth Circuit's decision thus did ***not*** turn on the fact that the CID had not yet been enforced, but rather on Twitter's failure to make the necessary threshold factual showing. If the Court had meant to endorse a *per se* rule that pre-enforcement challenges to civil subpoenas are unripe, it would have had no occasion to discuss First Amendment retaliation principles and Twitter's insufficiently pled chill. *Id*. at 1174-79. Instead, that court expressly endorsed the same rule this Circuit applies: that, "[i]n the First Amendment context, 'the injury-in-fact element is commonly satisfied by a sufficient showing of self-censorship, which occurs when a claimant is chilled from exercising his right to free expression.'" *Id*. at 1174 (quoting *Edgar*, 2 F.4th at 310).[1]

Paxton also fails to mention that, in *Twitter*, the Ninth Circuit expressly ***rejected*** Paxton's resort to many of the same cases he relies upon here. For example, the panel found that Paxton's reliance on *Google, Inc. v. Hood*, 822 F.3d 212 (5th Cir. 2016)—a case that concerned a pre-enforcement challenge to a CID under Mississippi law, and which Paxton again cites here, Opp'n 12, 21, 23—was misplaced because the case "did not recognize that Google could have suffered injury in the form of objectively reasonable chilling of its speech or another legally cognizable harm from the CID even prior to the CID's enforcement." 56 F.4th at 1178 n.3. That is the very

---

[1] Contrary to Paxton's misreading, *Twitter* did not hold that any chill from a CID is self-inflicted. After concluding Twitter had failed to allege chill, *id*. at 1174-75, the court next concluded Twitter had "not allege[d] that it ha[d] suffered *any other legally cognizable harm*," *id*. at 1175-76 (emphasis added). Specifically, Twitter complained the CID "forced it to incur financial costs and divert employee time," but the Court found *these* injuries were incurred "voluntarily in responding to the CID" since "the enforceability of the CID remain[ed] an open question." *Id*. at 1176.

injury Plaintiffs' show here. The Court similarly rejected Paxton's reliance on *Reisman v. Caplin*, 375 U.S. 440, 442 (1968), finding it did not "apply for two simple reasons: It's not about the First Amendment nor ripeness." 56 F.4th at 1178. *Reisman* involved a civil demand issued by the IRS to a couple's accountant that the couple alleged violated their rights against unreasonable seizure and self-incrimination. The Supreme Court dismissed for "want of equity"—not ripeness—finding the couple could challenge the request "on any appropriate ground" upon enforcement. 375 U.S. at 443, 449. Here, Plaintiffs' claim arises under the First Amendment and they have shown their speech is chilled *now*—not in the future when they may be compelled to turn over documents.[2]

*Reporters Committee for Freedom of Press v. AT&T*, 593 F.2d 1030 (D.C. Cir. 1978), also does not help Paxton. There, a coalition of journalists challenged AT&T's practice of turning over long-distance billing records to law enforcement, arguing it was required to first provide notice. *Id*. at 1036. Plaintiffs sought "extraordinary prospective relief by which they" would "be notified of any subpoena directed at their toll-call records." *Id*. at 1064. *No* document demand or subpoena, however, was actually pending against the plaintiffs. As a result, the Court found their claim sought relief tantamount to "an ongoing judicial audit of future government investigations in order to screen out [b]ad faith subpoenas." *Id*. at 1064. Here, Plaintiffs' claim does not concern the "mere possibility of future abridgment of rights," *id*. at 1070, but the *present* abridgment of such rights from a specific, ongoing investigation and intrusive Demand targeting their work.[3]

*Laird v. Tatum*, 408 U.S. 1 (1972), is irrelevant for similar reasons. The plaintiffs there challenged the Army's domestic data-gathering system but complained of "no specific action of

---

[2] Furthermore, as Paxton emphasized in his December 29 letter, unlike the couple in *Reisman*, Plaintiffs have limited bases upon which to challenge his Demand. According to Paxton, he enjoys "broad discretion" to issue a demand to unbound "by the Texas Rules of Civil Procedure"—with no showing of cause or jurisdiction—and a recipient must establish "zero permissible justifications for the investigation" to avoid responding. Second Dodge Decl., Ex. A at 1.

[3] Notably, Judge Wilkey "accept[ed] the notion that otherwise legitimate investigative techniques" such as subpoenas "may be abused" and "can abridge journalists' First Amendment rights." *Id.* at 1067. That, of course, is this case.

the Army against them" and offered only "speculative apprehensiveness that the Army may at some future date misuse the information in some way that would cause" them harm. *Id.* at 13. Here, Plaintiffs are "presently [] subject" to the state-sponsored retaliation they are "challenging," *id.* at 11—there is nothing speculative about that retaliation's ongoing impact on Plaintiffs.

Paxton is well-aware that the law does not prohibit pre-enforcement challenges on First Amendment grounds. He previously acknowledged First Amendment activity is "chilled" by a CID "hanging in the air" and "stifling . . . those seeking information [] to evaluate various viewpoints in [a] public policy debate." Dodge Decl. Ex. E, at 6; *see generally* Second Dodge Decl., Ex. C (reraising arguments in an amicus brief to the Second Circuit). Paxton's prior briefing to *two* federal courts—authored by *his office* on behalf of Texas and other states—supported a pre-enforcement challenge on the basis that issuance of a CID alone can unlawfully chill speech, which is the exact opposite position he urges here. In contrast to his present effort to downplay his actions, Paxton claimed then that such conduct imperiled "a fundamental guarantee of our Republic—the ability to have a viewpoint on a topic of public debate and not fear government retaliation for expressing it." Second Dodge Decl., Ex. C at 2.

Paxton's opposition also fails to provide any meaningful response to Plaintiffs' declarants—he ignores Hananoki's and Dimiero's declarations entirely and cites Padera's only in passing. Paxton instead relies on a handful of instances where the President of Media Matters discussed X on television, alleging this activity shows Plaintiffs are not chilled. Opp'n 9-10, 22. That argument misconstrues First Amendment law: the Fourth Circuit has "never held that a plaintiff must prove that the allegedly retaliatory conduct caused her to cease First Amendment activity altogether." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005). The First Amendment forbids retaliatory "conduct that tends to *chill* such activity,

not just conduct that *freezes* it completely." *Id*. Indeed, "a plaintiff need not actually be deprived of her First Amendment rights in order to establish First Amendment retaliation." *Id*. The Media Matters President's occasional television appearances do not disprove that its editorial and reporting staff—including Hananoki—are presently self-censoring and making different journalistic decisions than they otherwise would have, including by deciding not to publish specific articles. Those are paradigmatic examples of chill. *See Edgar*, 2 F.4th at 310.

Finally, Paxton observes that certain categories of untrue statements do not fall within the First Amendment and claims Plaintiffs cannot show "*on this record*" that their work "was protected First Amendment activity." Opp'n 19. But Paxton offers nothing beyond his bare say-so to prove that Hananoki's reporting would fall within that narrow exception. Indeed, Paxton admits he has *no idea* whether X's claims of falsity are true, nor reason to believe well-established constitutional protections for speech would not apply. *See id*. at 7, 10, 19.

Plaintiffs, on the other hand, present undisputed evidence that their reporting was consistent with *a year's worth of other media coverage* about the rise of extremism on X, including the repeated placement of advertisements next to such content. Compl. ¶¶ 27-39. This includes many reports and posts by people unrelated to Media Matters who found examples of hate speech appearing adjacent to advertising on X. *Id*. Paxton's response conspicuously ignores this publicly available evidence.

Ultimately, Paxton's claims as to the purposes of his investigation do not hold water. Paxton asserts that his investigation is "primarily designed to investigate three things: (1) the veracity of X's allegations, (2) [t]he nexus of Media Matters's conduct to Texas; and (3) the effect of Media Matters' underlying conduct to trade and commerce." Opp'n 7. As noted above, Plaintiffs have presented—and Paxton has failed to address—overwhelming and publicly-available

evidence undercutting "the veracity of X's allegations." On the "Texas Nexus" prong of the "investigation," Paxton surely has access to records showing Media Matters is neither registered to do business in Texas nor has a registered agent there. And Paxton now has sworn declarations that detail Plaintiffs' lack of contacts with Texas. Padera Decl. ¶¶ 6-12, 15; Hananoki Decl. ¶¶ 21-24. Yet his brief mentions none of this. There is simply no credible basis for his claim that he must obtain extensive internal records from Media Matters to determine if there is any "Texas Nexus."

Worse yet, Paxton fails to explain how his Demand relates to a legitimate investigation into possible "effects on trade or commerce in Texas" from Plaintiffs' reporting. Instead, he simply lists what the Demand requests, making no effort to justify how "documents" related to "Musk's purchase of X" or communications with X's advertisers could shed light on this purported aim. Opp'n 9. These overbroad and irrelevant requests highlight how expansive he views his authority to pry into the privileged records and communications of journalists like Plaintiffs—without Plaintiffs having any "right to understand the possible theories of [his] investigation." Opp'n 9 n.2.

These far-reaching and baseless requests have had real impacts on Plaintiffs' ability to exercise protected First Amendment speech—an irreparable harm that becomes more entrenched in the absence of judicial relief. *See* Supp. Hananoki Decl. ¶¶ 3-6. Paxton's willful retaliation against Plaintiffs for participating in an important national conversation about political extremism on a major social media platform injures them now. Their claims are ripe for resolution.

## II.   This Court has personal jurisdiction over Paxton and venue is proper in this district.

Paxton's claim that this Court lacks jurisdiction is also meritless. Opp'n 14-17. Federal courts may exercise "personal jurisdiction over a nonresident defendant acting outside of the forum when the defendant has intentionally directed his tortious conduct toward the forum state, knowing that that conduct would cause harm to a forum resident." *Carefirst of Md., Inc. v. Carefirst Pregnancy Centers, Inc.*, 334 F.3d 390, 398 (4th Cir. 2003) (citing *Calder v. Jones*, 465 U.S. 783,

789-90 (1984)). The factors relevant to establishing specific personal jurisdiction—purposeful availment, where the plaintiffs' claims arise, and reasonableness—are easily met here. *Id.* at 397.

Paxton intentionally directed his conduct towards Maryland. He exercised his self-described "broad discretion" to launch an investigation targeting a Maryland-based journalist regarding an article exclusively prepared in Maryland and issued a Demand calling for production of documents and communications created and stored in Maryland. Paxton's suggestion that Hananoki is a "straw plaintiff" is belied by the text of the Demand which *twice* targets Hananoki by name, requests Hananoki's sources and contacts at X around the time of his November 16 article, and demands the production of documents related to Hananoki's work (which plainly reaches documents created and maintained *by Hananoki*). Compl. Ex. B at 7. It is immaterial that Paxton "announced his investigation in Texas," Opp'n 15, because he "knew that the brunt of [the] injury would be felt by" the reporter whose work he is targeting "in the State in which [the reporter] lives and works." *Calder*, 465 U.S. at 789-90. By launching an investigation focused on Maryland-based activities and seeking documents from and pertaining to a Maryland resident, Paxton has "formed a contact with the forum State." *Walden v. Fiore*, 571 U.S. 277, 290 (2014).[4]

Several courts have found state attorneys general—including Paxton—subject to personal jurisdiction in other states under similar facts. Paxton himself lost this argument in *Twitter*, where the district court found that "Paxton [was] subject to personal jurisdiction in California" based on "allegations . . . that Paxton, in his official capacity as Attorney General of Texas, engaged in retaliatory conduct expressly aimed at chilling the speech of a California resident," which

---

[4] *Stover v. O'Connell Associates, Inc.*, 84 F.3d 132 (4th Cir. 1996), is inapposite. There, a New York-based investigation firm hired a Maryland company to perform a "criminal check" on a Maryland resident. *Id.* at 136. The Maryland company obtained public documents, which it sent to the New York firm. *Id.* The Fourth Circuit held that merely "[o]rdering a product or service by telephone from a company in a different state does not subject the customer to that state's jurisdiction." *Id.* at 137. That bears no resemblance to Paxton's targeted investigation and Demand here.

"suffice[d] to support the exercise of personal jurisdiction." *Twitter, Inc. v. Paxton*, No. 21-CV-01644-MMC, 2021 WL 1893140, at *2 (N.D. Cal. May 11, 2021) (citing *Calder*, 465 U.S. at 789-90), *aff'd*, 56 F.4th 1170 (9th Cir. 2022) (not reaching issue); *see also Exxon Mobil Corp. v. Schneiderman*, 316 F. Supp. 3d 679, 686 (S.D.N.Y. 2018) (concluding New York had jurisdiction over Massachusetts Attorney General in case Paxton participated in).

Similarly, in *Defense Distributed v. Grewal*, 971 F.3d 485 (5th Cir. 2020), the Fifth Circuit held Texas had jurisdiction over the New Jersey Attorney General, who had issued a cease-and-desist letter to a Texas-based company. The Court found the Attorney General purposefully availed himself of Texas as a forum by issuing the letter, thereby "project[ing] himself across state lines and assert[ing] a pseudo-national executive authority." *Id.* at 493. The plaintiffs plausibly alleged the "letter had a chilling effect on the exercise of their First Amendment rights," which, "in turn, caused them to cease publication." *Id.* at 495. As the Fifth Circuit explained, "***this alone constitutes purposeful availment***" because "[t]he defendant is purposefully availing himself of 'the privilege of causing a consequence' in Texas." *Id.* at 493-94 (quoting *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 213 (5th Cir. 1999)) (emphasis added). That is precisely the case here.[5]

The two other specific jurisdiction factors weigh in favor of Plaintiffs as well. Paxton does not dispute that "plaintiffs' claims arise out of those activities [he] directed at the State," *Carefirst*, 334 F.3d at 398, and for good reason—they arise directly from Paxton's targeting of journalism in Maryland. Having chosen to "project[] himself across state lines" to punish speech and press

---

[5] Paxton claims that the "default rule" is that state officials should not have to defend their actions "in courts throughout the nation." Opp'n 17 (quoting *Stroman Realty, Inc. v. Wercinski*, 513 F.3d 476, 487 (5th Cir. 2008)). But the case he relies upon was distinguished by the Fifth Circuit in *Defense Distributed. See* 971 F.3d at 492. As the concurrence explained, *Stroman* concerned an Arizona official's attempt "to uniformly apply [Arizona's] laws" against a Texas-based real estate company that "chose to market Arizona properties and transact business with Arizona residents." *Id.* at 497 (Higginson, J., concurring) (quoting *Stroman*, 513 F.3d at 486). But this case is more like *Defense Distributed* where the New Jersey Attorney General "attempted to reach conduct that did not involve New Jersey residents or assets at all." *Id. Stroman* also did not involve any claim of unlawful retaliation or chilled First Amendment rights.

activities in Maryland, Paxton cannot be heard to complain about having to defend his actions in the very forum he has targeted. *Defense Distributed*, 971 F.3d at 493; *see also Snyder v. Phelps*, No. CIV. A. RDB-06-1389, 2007 WL 3071412, at *7 (D. Md. June 5, 2007).[6]

Exercising jurisdiction over Paxton is particularly reasonable because Maryland has a profound interest in holding its courts open to its own residents suffering irreparable harm from unconstitutional retaliation—even (or perhaps especially) when that retaliation comes from an official in another state seeking to punish lawful activity within Maryland. *Cook v. McQuate*, No. 7:15-CV-456, 2016 WL 5794232, at *6 (W.D. Va. Aug. 18, 2016). Maryland's interest is heightened here, where Paxton's Demand runs roughshod over Maryland's reporter privilege—a statutory right Maryland has chosen to bestow on reporters like Hananoki. Compl. ¶¶ 89-93.

Venue is also appropriate. Paxton does not dispute his investigation was triggered by Plaintiffs' publication of Hananoki's November 16 article—which was researched and written exclusively in Maryland. Hananoki Decl. ¶ 21. And the fact that Hananoki's speech has been chilled *in Maryland* is also important: indeed, where a case is "brought on First Amendment grounds, [this] impact becomes the most important part" of the venue analysis because "[t]he suppression itself is a more 'substantial' event than the decision to suppress the speech." *Kalman v. Cortes*, 646 F. Supp. 2d 738, 742 (E.D. Pa. 2009). Plaintiffs "suffer[] harm . . . where the[ir] speech would have taken place," making such locations more appropriate venues than "the district in which the statute was written and the decision to restrict th[e] plaintiff's speech was made." *Id.*[7]

---

[6] Paxton suggests his "sovereign" status "militates" against jurisdiction. Opp'n 17. But the case he cites concerned a *foreign* sovereign—Mexico—and made that suggestion with respect to "cases arising before the passage of the Foreign sovereign Immunity Act of 1976." *Ins. Co. of N. Am. v. Marina Salina Cruz*, 649 F.2d 1266, 1272 (9th Cir. 1981).

[7] Paxton also briefly suggests that *Leroy v. Great Western United Corp.*, 443 U.S. 173 (1979), makes Texas the sole appropriate venue. Opp'n 17-18. But "*Leroy* is of limited, if any, significance now," Wright & Miller, 14D Fed. Prac. & Proc. Juris. § 3802 (4th ed.), because the 1990 "civil venue statute permits venue in multiple judicial districts as

**III.    The equities strongly favor issuing the requested preliminary injunction.**

Paxton's "equities" arguments focus almost exclusively on tangential attacks on Plaintiffs and their counsel, none of which justifies denying the relief requested. In the process, Paxton fails to respond to any of Plaintiffs' arguments as to why the balance of equities strongly favors granting preliminary relief, thus waiving any counterarguments.

*First*, Paxton claims Plaintiffs' harm is self-inflicted because they did not avail themselves of the procedures under Texas law for setting aside the Demand. But doing so would have run the risk of forfeiting Plaintiffs' jurisdictional defenses in Texas court. *See Dawson-Austin v. Austin*, 968 S.W.2d 319, 322 (Tex. 1998) (seeking affirmative action from court waives special appearance). Moreover, Paxton's December 29 letter not only confirms but underscores that it is his position that baseline procedural safeguards are not available to Plaintiffs under Texas procedure—including the protections of the Texas Rules of Civil Procedure. *Supra* at 2-3; *see also* Opp'n 9 n.2 (noting Plaintiffs "do[] not have a right to understand" Paxton's "possible theories"). That is not a meaningful alternative pathway for Plaintiffs to vindicate their federal constitutional rights. Moreover, the Texas statute under which Paxton is proceeding contemplates challenges in the county where the target of the Demand "reside[s]," which—if the statute is read to apply to nonresidents—should permit challenges outside the state. Tex Bus. & Commerce Code 17.61(g).

*Second*, Paxton says his offer to delay enforcement for some time undercuts Plaintiffs' irreparable harm. That is wrong. So long as the Demand is "hanging in the air" Plaintiffs will be "chilled," as Paxton himself once acknowledged. *Supra* at 8; *see also* 12/09/2023 Tr. at 6:11-17 (Court explaining to defense counsel that because "part of the harm" Plaintiffs "have claimed is

---

long as 'a substantial part' of the underlying events took place in those districts." *Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 356 (2d Cir. 2005). That is the case here. Compl. ¶¶ 13, 16, 42, 64. And Paxton's offhand suggestion that this case should be transferred to the Northern District of Texas because of a lawsuit filed there by X against both Media Matters and Hananoki, Opp'n 18, is meritless. The Northern District of Texas has no jurisdiction over Plaintiffs.

14

by virtue of the investigation itself," "delaying this matter" likely does not "address[] that chilling effect"). Nor is a promise of suspended enforcement the same as an injunction that guarantees Plaintiffs will be free from further retaliation until final judgment and not just during Paxton's unilateral grace period. *Cf. Worthley v. Sch. Comm. of Gloucester*, 652 F. Supp. 3d 204, 211 (D. Mass. 2023) (granting injunction against order violating First Amendment even where city volunteered not to enforce order). Further, an injunction confirming that Plaintiffs are likely to prevail on the merits would also serve to deter retaliation by other state officials inclined to clamp down on Plaintiffs' speech rights. Compl. ¶¶ 47-48 (describing threats from Missouri AG).

*Third*, Paxton inaccurately describes the facts concerning service of the Demand on Plaintiffs. No matter how Paxton tries to spin it, he ignores that Plaintiffs readily acknowledged in their Complaint, motion, and witness declarations that the Demand was issued November 21, 2023. *E.g.*, Compl. ¶ 53; Mem. at 12; Padera Decl. ¶ 17. Paxton does not and cannot dispute that Plaintiffs accurately set forth the timeline of both issuance and service of the Demand.

Paxton's remaining arguments fall flat. He claims that Plaintiffs failed to cite out-of-circuit authority. Opp'n 23-25. But Paxton misreads that authority and fails to note that it squarely rejects several arguments he advances here. *Supra* at 4-8, 11-12. In contrast, Plaintiffs accurately relied on controlling Fourth Circuit precedent for First Amendment retaliation claims—which the Ninth Circuit in *Twitter* agreed is the "appropriate" "framework . . . under which to evaluate" the claims Plaintiffs assert here. 56 F.4th at 1175. Under that framework, Plaintiffs have amply met their burden of demonstrating an ongoing, irreparable chilling of speech.  They are entitled to injunctive relief protecting their First Amendment rights against overreach and retaliation.

## CONCLUSION

For the reasons above, the Court should grant Plaintiffs' motion for preliminary relief.

Dated: January 4, 2024

Respectfully submitted,
*/s/ Tina Meng Morrison*

**ELIAS LAW GROUP LLP**
Abha Khanna*
1700 Seventh Ave. Suite 2100
Seattle, WA 98101
T: (206) 656-0177
akhanna@elias.law

Tina Meng Morrison (D. Md. Bar No. 21832)
Aria C. Branch*
Christopher D. Dodge*
Jacob D. Shelly**
Elena A. Rodriguez Armenta**
Daniela Lorenzo**
Omeed Alerasool*
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
T: (202) 968-4652
tmengmorrison@elias.law
abranch@elias.law
cdodge@elias.law
jshelly@elias.law
erodriguezarmenta@elias.law
dlorenzo@elias.law
oalerasool@elias.law

**GIBSON, DUNN & CRUTCHER LLP**
Theodore J. Boutrous, Jr.***
Jay P. Srinivasan***
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: (213) 229-7000
Email: tboutrous@gibsondunn.com
Email: jsrinivasan@gibsondunn.com

Amer S. Ahmed***
Anne Champion***
200 Park Avenue
New York, New York 10166
Telephone: (212) 351-4000
Email: aahmed@gibsondunn.com
Email: achampion@gibsondunn.com

\* Admitted *pro hac vice*
\*\* Application for admission pending
\*\*\* *Pro hac vice* application forthcoming

*Counsel for Plaintiffs Media Matters for America and Eric Hananoki*

**CERTIFICATE OF SERVICE**

I hereby certify that this document will be served on the Defendant in accordance with

Federal Rule of Civil Procedure 5(a).

*/s/ Tina Meng Morrison*
Tina Meng Morrison